# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE CROP PROTECTION PRODUCTS LOYALTY PROGRAM ANTITRUST LITIGATION<br><br>This document relates to: ALL ACTIONS | Case No: 1:23-md-3062-TDS-JEP<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................... 1

BACKGROUND ........................................................................................... 2

    A.    The Parties ....................................................................................... 2

    B.    The Crop-Protection Industry ........................................................ 3

    C.    Defendants' Loyalty Programs ....................................................... 4

    D.    Defendants Monitor Their Co-Conspirators to Ensure Compliance ............ 5

    E.    Direct Injury to Farmers ................................................................ 6

LEGAL STANDARD .................................................................................... 7

ARGUMENT ................................................................................................ 7

I.     FARMERS ARE DIRECT PURCHASERS UNDER FEDERAL LAW ............... 7

    A.    Farmers Purchased From Co-Conspirator Dealers Who Participated In Defendants' Loyalty Programs ..................................... 7

    B.    Farmers Directly Purchased from the Antitrust Violators ............ 8

    C.    Defendants' Alternative Theory Would Leave No Party With Standing to Recover the Harm Caused by Defendants ............... 11

    D.    Defendants' Antitrust Violations Proximately Caused Farmers' Injuries ................................................................... 14

II.    THE COMPLAINT ADEQUATELY PLEADS STATE-LAW CLAIMS ........... 18

    A.    Having Invited "Indirect Purchasers" In By Repealing *Illinois Brick*, No Relevant State Would Kick Farmers Out ............... 18

        1.    Antitrust claims ................................................................ 18

        2.    Plaintiffs possess standing for their consumer protection claims ................................................................ 26

    B.    Defendants' Attack On Plaintiffs' Class Standing Fails ............. 29

    C.    Defendants' Miscellaneous Arguments Also Fail ....................... 30

        1.    Farmers adequately plead intrastate misconduct/effects (New York, Massachusetts, New Hampshire) ............. 30

        2.    Even indirect purchasers can sue under Montana's consumer protection law and Puerto Rico's antitrust law ............... 33

        3.    Rule 23 preempts state class action bars ......................... 34

i

4.  Farmers can bring claims under CPAs that protect only non-commercial consumers ...................................................................... 35

5.  Plaintiffs have valid CPA claims despite Defendants' argument that only deceptive conduct "counts" .............................. 37

6.  Defendants' remaining CPA arguments also lack merit ................. 41

D.  Farmers' Claims Are Timely as to Paraquat ................................................. 45

CONCLUSION ............................................................................................... 46

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & M Supply Co. v. Microsoft Corp.*,
   252 Mich. App. 580 (2002) ......................................................................... 20

*In re Aftermarket Automotive Lighting Products Antitrust Litig.*,
   2009 WL 9502003 (C.D. Cal. July 6, 2009) .............................................. 23

*In re Aftermarket Filters Antitrust Litig.*,
   2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ......................................... 39, 41

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) ........................................................... 42

*In re Aluminum Warehousing Litig.*,
   833 F.3d 151 (2d Cir. 2016) ........................................................................ 17

*Andover Healthcare, Inc. v. Johnson & Johnson Consumer Inc.*,
   2017 WL 4953909 (D. Mass. July 25, 2017) .............................................. 32

*Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) .......................................................................*passim*

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ......................................................................... 30

*Associated Gen. Contractors of California, Inc. v. California State Council*
   *of Carpenters*,
   459 U.S. 519 (1983) ...........................................................................*passim*

*In re Auto. Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ........................................................ 20

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   123 F.3d 599 (7th Cir. 1997) .................................................................. 9, 13

*In re Broiler Chicken Antitrust Litig.*,
   2023 WL 5227130 (N.D. Ill. Aug. 15, 2023) .............................................. 28

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ...................................... 19, 22, 28, 35

iii

*Brown v. Hartford Healthcare Corp.*,
  2023 WL 7150051 (Conn. Super. Ct. Oct. 26, 2023) ........................................... 22, 25

*Buetow v. A.L.S. Enterprises*,
  888 F. Supp. 2d 956 (D. Minn. 2012) ........................................................... 43

*In re Capacitors Antitrust Litig.*,
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) ......................................................... 19

*In re Cattle & Beef Antitrust Litigation*,
  2023 WL 5310905 (D. Minn. Aug. 17, 2023) ................................................ 27

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009) ........................................................... 22

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Pa. 2010) ........................................................... 42

*Churlik v. Gate City Bank*,
  2024 WL 453606 (D. Minn. Feb. 6, 2024) ................................................... 44

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
  436 Mass. 53 (2002) ....................................................................................... 28

*Cnty. of Cook v. Philip Morris*,
  817 N.E.2d 1039 (Ill. App. Ct. 2004) ........................................................... 23

*Conergy AG v. MEMC Elec. Materials, Inc.*,
  651 F. Supp. 2d 51 (S.D.N.Y. 2009) ............................................................ 31

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) .......................................................................................... 8

*Couch v. Clarke*,
  782 F. App'x 290 (4th Cir. 2019) ................................................................. 45

*Crane v. Int'l Paper Co.*,
  2005 WL 3627139 (D.S.C. Apr. 19, 2005) ................................................... 10

*Crouch v. Crompton Corp.*,
  2004 WL 2414027, 2004 NCBC LEXIS 6 (Super. Ct. N.C. Oct. 26,
  2004) .............................................................................................................. 24

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
  470 F. Supp. 2d 485 (E.D. Pa. 2006) ........................................................... 19

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
  2015 WL 3988488 (N.D. Ill. June 29, 2015) ............................................................... 23

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
  903 F. Supp. 2d 198 (S.D.N.Y. 2012).......................................................................... 40

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019) ............................................................. 22, 35, 40

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
  2023 WL 8190256 (N.D. Ill. Nov. 27, 2023) ............................................. 9, 10, 11, 16

*Dickson v. Microsoft*,
  309 F.3d 193 (4th Cir. 2002) ................................................................................ 12, 13

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
  2013 WL 5503308 (D.N.J. Oct. 2, 2013)...................................................................... 19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................... 21, 27, 38

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) .............................................................................. 28

*Elkins v. Microsoft Corp.*,
  174 Vt. 328 (2002) ....................................................................................................... 20

*Elliot v. Lachance*,
  109 N.H. 481 (N.H. 1969) ............................................................................................ 33

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust
  Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018)........................................................................... 22

*Fed. Trade Comm'n v. Mylan Lab'ys, Inc.*,
  99 F. Supp. 2d 1 (D.D.C. 1999) ................................................................................... 40

*Fed. Trade Comm'n v. Syngenta Crop Prot. AG*,
  2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ......................................................*passim*

*Federal Trade Commission v Syngenta Crop Protection AG*
  (W.D.N.C. Jan 12, 2024) ............................................................................................... 4

*Fishman's Transducers v. Paul*,
  684 F.3d 187 (1st Cir. 2012) ....................................................................................... 32

v

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................ 21, 33, 42

*Fond du Lac Bumper Exch. v. Jui Li Enter. Co.*,
  2012 WL 3841397 (E.D. Wis. Sept. 5, 2012) ............................................................ 39

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ...................................................................................... 22

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d at 519–20 ................................................................................................... 24

*In re G-Fees Antitrust Litig.*,
  584 F. Supp. 2d 26 (D.D.C. 2008) .............................................................................. 22

*GEICO Corp. v. Autoliv, Inc.*,
  345 F. Supp. 3d 799 (E.D. Mich. 2018) ................................................................ 24, 27

*In re Generic Pharms. Pricing Antitrust Litig.*,
  368 F. Supp. 3d 814 (E.D. Pa 2019) ............................................................... 28, 40, 41

*Government of Puerto Rico v. Carpenter Co.*,
  442 F. Supp. 3d 464 (D.P.R. 2020) ............................................................................. 34

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007) ...................................................................... 19

*In re HIV Antitrust Litig.*,
  2023 WL 3006572 (N.D. Cal. Apr. 18, 2023) ............................................................ 40

*Hyde v. Abbott Lab'ys, Inc.*,
  123 N.C. App. 572 (1996) ............................................................................................ 20

*Illinois Brick Co. v. Illinois*,
  43 U.S. 720 (1977) ................................................................................................ *passim*

*Illinois Brick Co. v Illinois*,
  431 U.S. 720 (1977) ........................................................................................... 7, 11, 12

*Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip
  Morris Inc.*,
  196 F.3d 818 (7th Cir. 1999) ....................................................................................... 19

*Kansas v. UtiliCorp United Inc.*,
  497 U.S. 199 (1990) ...................................................................................................... 14

Case 1:23-md-03062-TDS-JEP    Document 110    Filed 04/30/24    Page 7 of 63

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) .................................................................. 19, 22

*Kinetic Co. v. Medtronic, Inc.*,
  672 F. Supp. 2d 933 (D. Minn. 2009) ........................................................................ 43

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ................................................................................. 8, 17

*Knowles v. Visa U.S.A.*,
  2004 WL 2475284 (Super. Ct. Me. Oct. 20, 2004) .................................................... 22

*LaChance v. U.S. Smokeless Tobacco Co.*,
  156 N.H. 88 (2007) ..................................................................................................... 28

*Langan v. Johnson & Johnson Consumer Cos.*,
  897 F.3d 88 (2d Cir. 2018) .......................................................................................... 30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..................................................................................................... 14

*In re LIBOR-Based Fin. Instruments Antitrust Litigation*,
  2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ............................................................ 31

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
  2017 WL 3131977 (D.N.J. July 20, 2017) ................................................................... 40

*In re Loestrin 24 FE Antitrust Litig.*,
  410 F. Supp. 3d 352 (D.R.I. 2019) ................................................................. 20, 28, 40

*Lorix v. Crompton Corp.*,
  736 N.W.2d 619 (Minn. 2007) ....................................................................... 19, 23, 24

*Los Gatos Mercantile v. E.I. DuPont De Nemours & Co.*,
  2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ............................................................ 26

*Lowell v. Am. Cyanamid Co.*,
  177 F.3d 1228 (11th Cir. 1999) ................................................................................... 13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................... 29

*Luscher v. Bayer AG*,
  2005 WL 6959406 (Super. Ct. Ariz. Sept. 16, 2005) ................................................. 23

Case 1:23-md-03062-TDS-JEP    Document 110    Filed 04/30/24    Page 8 of 63

*Lyons v. Philip Morris, Inc.*,
    225 F.3d 909 (8th Cir. 2000) ..................................................................... 17

*Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
    2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) ....................................... 35, 36

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
    995 F.3d 134 (4th Cir. 2021) .............................................................. 29, 30

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) ..................................................................... 30

*Miami Prod. & Chem. Co. v. Olin Corp.*,
    546 F. Supp. 3d 223 (W.D.N.Y. 2021) ...................................................... 28

*Morrison v. YTB Int'l*,
    649 F.3d 533 (7th Cir. 2011) ....................................................................... 30

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    2021 WL 2403727 (S.D.N.Y. June 11, 2021) ........................................... 40

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................ 11, 12, 13, 16

*Nev. Recycling & Salvage v. Reno Disposal Co.*,
    423 P.3d 605 (Nev. 2018) ........................................................................... 23

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ..................................... 21, 28, 33, 35

*New York v. Feldman*,
    210 F. Supp. 2d 294 (S.D.N.Y. 2002) ............................................. *passim*

*Norman v. Tradewinds Airlines, Inc.*,
    286 F. Supp. 2d 575 (M.D.N.C. 2003) ...................................................... 45

*In re Opana ER Antritrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ......................................................... 18

*In re Optical Disk Drive Antitrust Litig.*,
    2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ...................................... 35, 40

*Or. Laborers-Empls. Health & Welfare Tr. Fund v. Philip Morris*,
    185 F.3d 957 (9th Cir. 1999) ....................................................................... 24

Case 1:23-md-03062-TDS-JEP   Document 110   Filed 04/30/24   Page 9 of 63

*In re Packaged Seafood Products Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................................. 35, 39

*Pooler v. R.J. Reynolds Tobacco Co.*,
    2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001) ........................................................ 20

*Precourt v. Fairbank Reconstruction Corp.*,
    856 F. Supp. 2d 327 (D.N.H. 2012) ............................................................................ 33

*In re Processed Egg Prod. Antitrust Litig.*,
    392 F. Supp. 3d 498 (E.D. Pa. 2019) ......................................................................... 29

*In re Processed Egg Prod. Antitrust Litig.*,
    851 F. Supp. 2d 867 (E.D. Pa. 2012) ......................................................................... 20

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    355 F. Supp. 3d 145 (E.D.N.Y. 2018) ........................................................................ 42

*Rivera-Muniz v. Horizon Lines Inc.*,
    737 F. Supp. 2d 57 (D.P.R. 2010) ......................................................................... 20, 34

*Rubin v. Islamic Republic of Iran*,
    583 U.S. 202 (2018) ..................................................................................................... 36

*In re S. Dakota Microsoft Antitrust Litig.*,
    2003 S.D. 19, 657 N.W.2d 668 ................................................................................... 20

*Seafarers Welfare Plan v. Philip Morris*,
    27 F. Supp. 2d 623 (D. Md. 1998) ......................................................................... 24, 25

*Searle v. Exley Exp., Inc.*,
    278 Or. 535, 540 P.2d 1054 (1977) ............................................................................ 36

*Sergeants Benevolent Association Health & Welfare Fund v. Actavis, Plc*,
    2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) .................................................... *passim*

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................................ 34, 42

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
    GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010) ..................................................................... 39, 43

*Strang v. Visa U.S.A.*,
    2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ........................................................ 25

ix

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ....................................................... 28, 40

*Supreme Auto Transport v. Arcelor Mittal USA*,
    902 F.3d 735 (7th Cir. 2018) ................................................................... 20, 21

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*,
    2023 WL 5960237 (D. Minn. Sept. 13, 2023) ............................................ 44

*Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn.*,
    229 S.W.3d 304 (Tenn. Ct. App. 2007) ..................................................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................... 19, 22, 24

*Tharpe v. Hyundai Motor America*,
    2022 WL 3137453 (C.D. Cal. July 12, 2022) ............................................. 44

*Thomasson v. Greensboro News & Rec., Inc.*,
    2020 WL 5821045 (M.D. N.C. Sept. 30, 2020) .................................... 16, 45

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
    534 F. Supp. 3d 1067 (N.D. Cal. 2021) ..................................................... 35

*Tremont Public Advisor, LLC v. Connecticut Resources Recovery Authority*,
    217 A.3d 953 (Conn. 2019) ....................................................................... 25

*In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*,
    2023 WL 2182046 (D.N.J. Feb. 23, 2023) ........................................... 35, 40

*Vinci v. Waste Mgmt.*,
    36 Cal. App. 4th 1811(1995) ..................................................................... 23

*Waggoner v. Denbury Onshore, LLC*,
    2014 WL 11290898 (S.D. Miss. Mar. 31, 2014) ....................................... 24

*White v. Rockingham Radiologists, Ltd.*,
    820 F.2d 98 (4th Cir. 1987) ....................................................................... 17

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*,
    536 F.3d 663 (7th Cir. 2008) ..................................................................... 40

*WorldHomeCenter.com v. PLC Lighting, Inc.*,
    851 F. Supp. 2d 494 (S.D.N.Y. 2011) ....................................................... 31

*Wrobel v. Avery Dennison Corp.*,
2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006).........................................................22

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
555 F. Supp. 3d 829 (N.D. Cal. 2021) ..........................................................................20

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971).......................................................................................................12

*Zutz v. Case Corp.*,
2003 WL 22848943 (D. Minn. Nov. 21, 2003) ..............................................................44

**Statutes**

Ark. Code Ann. §4-88-107 ...........................................................................................37, 38

Colo. Rev. Stat. §6-1-105(rrr) ......................................................................................37, 40

Haw. Rev. Stat. § 480-13.3............................................................................................42

Ill. Comp. Stat. 10/7(2)...................................................................................................35

Ill. Comp. Stat. Ann. 505/2.............................................................................................37

Kan. Stat. Ann. §50-623(b) ............................................................................................37

Mass. Gen. Laws Ann. ch. 93A § 11 ........................................................................32, 35

MD. Cod. Comm. Law § 11-209(b)(2)(ii) ......................................................................25

Minn. Stat. §325F.68 ......................................................................................................37

N.D. Cent. Code §51-15-09............................................................................................37

N.H. Rev. Stat. Ann. § 358-A:2 (XIV)............................................................................33

N.Y. Gen. Bus. Law § 340 .............................................................................................31

Or. Rev. Stat. Ann. § 646.780 ........................................................................................25

Or. Rev. Stat. §646.607(1) & §646.608(u)......................................................................37

Pa. Stat. §201–2(4)(xxi)..................................................................................................37

Utah Code Ann. §§ 13-11-4 & 13-11-5...........................................................................37

W. Va. Code §46A-6-104................................................................................................37

Wisconsin Antitrust Act ...................................................................................................... 45

Case 1:23-md-03062-TDS-JEP     Document 110     Filed 04/30/24     Page 13 of 63

## INTRODUCTION

This Court already denied Defendants' motion to dismiss the Government's action. *See Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ("*FTC*"). In doing so, this Court, *inter alia*, held the allegations "plausibly alleged anticompetitive conduct and injury." *Id.* at *22. Defendants use dozens of pages and a multitude of arguments to push a fundamentally untenable position: that the farmers who paid supracompetitive prices for Defendants' anticompetitive conduct should be left with no recourse. Such a result is illogical and antithetical to the purposes of the federal and state antitrust laws.

*First*, Defendants argue that the federal antitrust claims must be dismissed pursuant to the "rule" of *Illinois Brick Co. v. Illinois*, 43 U.S. 720 (1977). But that doctrine merely bars one victim from claiming that damages were "passed on" from an earlier victim. Here, Plaintiffs did not purchase from an earlier victim, but rather from Defendants' co-conspirators. By giving Dealers a piece of the monopolistic profits, the "loyalty programs" rendered the Dealers part of the problem. The Dealers were not damaged, they benefitted handsomely from the loyalty programs. In these situations, the first *innocent* purchasers—here, the Plaintiff Farmers—are the *only* ones in the distribution chain actually *harmed*. They thus have antitrust standing. Any other reading of the law would mean antitrust violators could shield themselves from private liability by paying off someone else in the distribution chain.

*Second*, Defendants' attempt at immunizing themselves under federal law is made all the more absurd by their parallel argument that they are immune under every state

1

antitrust law, too. But Plaintiffs invoked only the laws of states that expressly rejected the logic of *Illinois Brick*. Having explicitly invited "indirect" victims into court, no state would then use generic doctrines like proximate causation to kick these Plaintiffs out. Indeed, Defendants fail to cite a single case, from any state that has rejected *Illinois Brick*, that dismissed claims by a victim who purchased the defendant's goods from the defendant's own distribution chain.

*Finally*, Defendants use a hodge-podge of arguments to push for dismissal using alleged quirks in specific state antitrust and consumer protection laws. These arguments all wither under scrutiny.

## BACKGROUND

### A.    The Parties

Defendants Syngenta and Corteva are two of the largest pesticide manufacturers operating in the United States. Plaintiffs are farmers who paid artificially inflated prices for crop protection products manufactured by Defendants Syngenta or Corteva. ¶¶18-28 (collectively, "Farmers").[1] Named Plaintiffs bring this action on behalf of themselves and a class of similarly situated farmers.[2]

---

[1] Consistent with Defendants' motion (Dkt. 96, "MTD"), "¶_" citations are to the complaint (Dkt. 78).

[2] It is anticipated that additional Farmers may be added as putative class representatives when a motion for class certification is filed later in this case. In addition, some of the Named Plaintiffs purchased the crop protection products through the farms they own. Plaintiffs can amend the complaint to add that detail if necessary.

2

## B. The Crop-Protection Industry

Crop protection products—commonly known as pesticides—are used to control diseases, weeds, insects, and other organisms that harm crops. There are three types of crop protection products: (i) herbicides, which target unwanted plants or weeds; (ii) insecticides, which target insects; and (iii) fungicides, which target fungal diseases. Every crop-protection product contains at least one active ingredient ("AI"), which is a chemical substance that kills or controls the targeted pest. ¶¶42-44. Manufacturers include "basic" producers like Syngenta and Corteva, which research and patent new active ingredients, and "generics," which "only manufacture and sell crop protection products containing active ingredients that other companies have developed." ¶60.

Pesticide producers that develop new active ingredients can patent their inventions for a period of time, preventing anyone else from selling them for 20 years. ¶¶51-54. An inventor can also apply for and receive exclusive rights to certain scientific data for a period of 10 years. Once the exclusivity window closes, generic versions of the pesticides may enter the market to compete with the original brand-name version.

Ordinarily, the arrival of these generics would push down prices, because generic pesticides are substantially cheaper than branded products from Syngenta or Corteva. Here, however, Syngenta and Corteva put in place "generic defense" strategies to box out generic competition.

Pesticide manufacturers generally sell to distributors who in turn sell to retail outlets dispersed across the country. The distribution channel is dominated by only seven distributors and their company-owned retailers, which control over 80% of sales of crop

3

protection products.  ¶66; (collectively, "Dealers").[3]  Without access to the distribution channel controlled by the Dealers (both distributors and their wholly owned retailers), generic manufacturers cannot sell their products to farmers through economically feasible means.  ¶¶67-68.  The Complaint specifically alleges the Dealers directly participated in the wrongful conduct here and facilitated Syngenta and Corteva's excluding the generics from the market.  In exchange, the Dealers received payments and kickbacks from Syngenta and Corteva from the profits of the illegal scheme.  ¶¶63-64, 66-67.[4]

### C.  **Defendants' Loyalty Programs**

The Farmers in this action challenge the same "loyalty" programs at issue in *Federal Trade Commission v Syngenta Crop Protection AG* (W.D.N.C. Jan 12, 2024).  Because the FTC's antitrust claims were already deemed "plausible" by this Court, and because Defendants purport not to re-litigate those issues here, MTD at 1 n.1, no lengthy description of the rebate programs is necessary.

Suffice it to say that Defendants both operate what they call "loyalty" programs in which they make payments to Dealers in the form of end-of-year kickbacks—as long as the Dealer keeps its purchases of competing generic pesticides under a very low threshold, typically 5% to 10%.[5]  Each Defendant designed and administers its "loyalty"

---

[3] "Dealer" is a term used in the crop protection products industry to refer to both distributors and retailers.  ¶1 n.1.

[4] Despite Defendants' incorrect claims to the contrary, MTD at 21, direct sales by generic manufacturers to farmers account for only a negligible fraction of commerce.

[5] For example, under Syngenta's "Key AI" program, in order to collect the "incentive payments," Dealers have to meet the following threshold requirements for

program with the intent that the program would impede generic competition and thereby maintain market prices and branded market share at levels higher than would prevail if generics were able to compete.

Syngenta and Corteva make more money under their "loyalty" programs than they would if they had to compete fairly with generics. The scheme artificially inflates prices for farmers who get stuck paying more for products that are critical to their business. By locking up the traditional distribution channel with "loyalty agreements," Syngenta and Corteva substantially foreclosed competition from generic products and left farmers no choice but to purchase crop protection products at supracompetitive prices.

With the substantial kickbacks from Defendants' loyalty programs, Dealers can sell Defendants' branded products at premium prices and maintain a higher profit margin compared to the margin of selling generic products. ¶78. While Dealers share in Defendants' monopoly profits, they do not pass on any portion of the loyalty payments to farmers in the form of savings or rebates. ¶¶6, 226.

### D. Defendants Monitor Their Co-Conspirators to Ensure Compliance

Defendants monitor their co-conspirators to enforce compliance with their loyalty schemes. ¶¶79, 81-82. Among other things, they employ electronic reporting systems to track every sale made through Dealers, providing real-time reporting of qualifying sales. ¶79. Defendants also punish Dealers who fail to meet their loyalty thresholds by

---

each AI: 99% for mesotrione sales, 94% for azoxystrobin, 90% for s-metolachlor, and 98% as-of 2004 for older AIs paraquat and lambda-cyhalothrin. ¶¶96-97. Corteva's programs required its distributors to meet similar thresholds. ¶155.

canceling supply contracts, denying them access to certain "must have" products, and even cancelling their status as authorized dealers. ¶¶81-82.

E.    **Direct Injury to Farmers**

The Complaint alleges several ways in which Defendants' "loyalty" programs harmed Farmers. First, by stifling generic competitors, Syngenta and Corteva maintained artificially high prices for their crop protection products, even after patents and other legal exclusivity protections had expired. Consequently, Farmers have been forced to pay inflated prices for products critical to their business. For example, as benchmarked against a comparable pesticide market in Germany, Farmers paid prices "57% higher than they would be if the market was as competitive[.]" ¶251.

Second, Defendants suppressed competition and innovation in the pesticide market generally. Specifically, the Farmers allege generic manufacturers have been substantially foreclosed from the most efficient channel of distribution; that Dealers omitted generic products from their price lists, refused customer requests for generics, and systematically steered retailers and farmers toward branded products. The loyalty payments also deter Dealers from even dealing with generic manufacturers, causing some generics to exit or never enter the market at all—including some with innovative new mixtures of existing pesticides that could compete with Syngenta or Corteva. ¶¶274, 276, 284.

Defendants' conduct is ongoing. Farmers continue to "pay artificially inflated prices for crop protection products that contain the Relevant AIs" as a result of these loyalty schemes. ¶239.

6

## LEGAL STANDARD

"A Rule 12(b) (6) motion to dismiss is meant to 'test[] the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *FTC,* 2024 WL 149552 at *6 (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "In considering a Rule 12(b) (6) motion, a court must accept as true all of the factual allegations contained in the complaint, and all reasonable inferences must be drawn in the non-moving party's favor." *Id.* (cleaned up).

## ARGUMENT

### I. FARMERS ARE DIRECT PURCHASERS UNDER FEDERAL LAW

#### A. Farmers Purchased From Co-Conspirator Dealers Who Participated In Defendants' Loyalty Programs

Defendants argue the Farmers' federal antitrust claim is barred by the "direct purchaser" rule of *Illinois Brick Co. v Illinois*, 431 U.S. 720 (1977). Initially, Defendants speculate that Farmers *might* have purchased their pesticides from independent retailers that did not participate in Defendants' anticompetitive "loyalty" programs. *See* MTD at 21, 15 n.10. But this contradicts the well-pleaded allegations of the Complaint. The Complaint makes clear that Named Plaintiffs seek to represent only a class of persons or entities who, like them, purchased a crop protection product containing a Relevant AI "*directly* from a distributor or retailer that entered into a loyalty program agreement with one or more of the Defendants." ¶259 (emphasis added).

For instance, Plaintiffs Jenkins, Kirven, and Ott all purchased from Nutrien, a loyalty program participant; Plaintiff Yeargins purchased from Helena, a loyalty program

participant; Plaintiff Jones purchased from the retailer Pinnacle, wholly owned by loyalty program participant JB Simplot; and Plaintiff Bonin purchased from Ross Soil Service, a retailer wholly owned by loyalty program participant Nutrien.[6]

As the class definition makes clear, Named Plaintiffs purchased directly from Dealers who entered into loyalty programs with Defendants. Which Dealers they purchased from is not included in the current Complaint, but, if the Court deems it necessary, Plaintiffs can add these facts to an amended complaint.

### B.      Farmers Directly Purchased from the Antitrust Violators

The Supreme Court recently reiterated that immediate buyers from the alleged antitrust violators may maintain suit against the antitrust violators." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (quoting *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990)). The antitrust violators here are *both* Defendants *and* their co-conspirators— the Dealers who participated in and benefitted from the loyalty programs. Defendants reached agreements with these Dealers that prohibited them from selling competing generic products, securing their cooperation with handsome kickbacks and punitive threats. ¶¶1, 7, 9-11, 81-83, 85. Defendants enlisted the Dealers to participate in a group boycott of generic manufacturers. *See FTC*, 2024 WL 149552 at *21 (price-cutting by generic manufacturers would have been futile because "distributors would not be willing

---

[6] Entities with common ownership and control, such as internal divisions and wholly-owned subsidiaries within a parent corporation, are not two separate legal persons for the purposes of antitrust law. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). Accordingly, that distributors may have distributed Defendants' products to their wholly-owned or controlled retailer subsidiaries does not implicate *Illinois Brick*. *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 321 (4th Cir. 2006).

8

to accept the risk of losing all supply from Defendants and because Defendants' foreclosure of the most efficient distribution channel imposes costs on generic manufacturers that has 'harmed the[ir] effectiveness[]'"); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997) ("There is nothing new about the idea that a cartel might 'hire' a customer to help police the cartel.").

Where, as here, it is plausibly alleged that a wholesaler/distributor is a direct participant in the wrongdoing, direct purchasers from that wholesaler/distributor—like the Farmers here—have standing to bring antitrust claims for damages. *See, e.g.*, *id.*; *Pepper*, 139 S. Ct. at 1523 ("[i]f a retailer has engaged in unlawful monopolistic conduct that has caused consumers to pay higher-than-competitive prices, it does not matter how the retailer structured its relationship with an upstream manufacturer or supplier"); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *5 (N.D. Ill. Nov. 27, 2023) (direct purchasers from co-conspirator distributors had standing to assert antitrust claims).

The Complaint here alleges Defendants' scheme hinged on participation from Dealers who sold crop protection products to the Farmers. Because seven Dealers dominate the sale of crop-protection products in the United States, accounting for 80% of all sales, ¶66, Syngenta and Corteva foreclosed generic manufacturers from distributing their products. The scheme thus accomplished its goal of excluding generic manufacturers from the market and maintaining their own supracompetitive prices. ¶¶1, 8, 11, 13, 208, 239. Had Dealers been willing to flout Syngenta and Corteva by selling large quantities of generic products, the scheme would have failed.

Because the Complaint plausibly alleges that the Dealers were complicit with the upstream antitrust violator, farmers *are* direct purchasers from antitrust violators.[7] This is not a typical "pass-on" damages situation in which manufacturers conspire among themselves to charge higher prices to Dealers who in turn pass on the overcharge to consumers. Because the Dealers are in on the game, damages are localized at the end-user level only. *See FTC*, 2024 WL 149552 at *22 (finding it plausible that Defendants' loyalty programs caused "harm to farmers, growers, and generic manufacturers"). There were no intermediaries between the Farmers and the antitrust violators that could have absorbed any of the damages caused by Defendants' loyalty programs. Consequently, *Illinois Brick* does not foreclose the Farmers' federal antitrust claims. *See Pepper*, 139 S. Ct. at 1521 ("There is no intermediary in the distribution chain between Apple and the consumer. The iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust violator. The iPhone owners pay the alleged overcharge directly to Apple. The absence of an intermediary is dispositive."). *See also Crane v. Int'l Paper*

---

[7] It is not relevant that Plaintiffs chose not to name the co-conspirator Dealers as Defendants, as there are no pass on damages alleged and no risk of duplicative recovery. The only question is whether the Complaint plausibly alleges their role in the illegal scheme. *See In re Deere & Co. Repair Serv. Antitrust Litig.,* 2023 WL 8190256, at *15 (holding co-conspirators need not be joined, and distinguishing contrary decisions on the ground that no pass on damages were alleged); *Crane v. Int'l Paper Co.*, 2005 WL 3627139, at *7 (D.S.C. Apr. 19, 2005) (rejecting argument that co-conspirators must be joined, explaining "[t]o the extent the case law suggests such a requirement, it is to eliminate the risk of duplicative recoveries where the "middleman" is both an alleged co-conspirator and a potential victim").

That being said, if it would make a material difference in this Court's analysis, Farmers can amend the Complaint to name the Dealers as defendants.

10

*Co.*, 2005 WL 3627139, at *6-8 (D.S.C. Apr. 19, 2005) (plaintiffs who purchased from distributor co-conspirators had standing to sue); *Deere*, 2023 WL 8190256 at *5 (purchasers from distributor co-conspirators had standing to sue); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) (plaintiffs who purchased from a co-conspirator in output restriction conspiracy had standing to sue).

### C.   Defendants' Alternative Theory Would Leave No Party With Standing to Recover the Harm Caused by Defendants

 Defendants' *Illinois Brick* argument, if adopted, would lead to absurd results. Antitrust violators could insulate themselves from liability under the federal antitrust laws by paying off others in the distribution chain who participate in the conspiracy, leaving injured parties uncompensated and antitrust violators undeterred.  Defendants' *Illinois Brick* argument would entail the perverse conclusion that there is *no proper private plaintiff* under the federal antitrust laws to recover for the anticompetitive overcharges imposed by Defendants' exclusionary programs.  *See* MTD at 12.  This is because the intermediaries here—resellers enrolled in Defendants' loyalty programs—are direct participants in the program and do not suffer *any* of the anticompetitive harms caused by Defendants' scheme.  *FTC*, 2024 WL 149552, at *22; *see also Illinois Brick*, 431 U.S. at 729 ("[W]e decline to abandon the construction given in *Hanover Shoe* that

11

the *overcharged* direct purchaser, and not others in the chain of manufacture or distribution [may recover.]") (emphasis added).[8]

The Dealers here are not akin to first layer re-sellers in the typical *Illinois Brick* scenario. They are not overcharged and suffered no damages or other anticompetitive injuries. They are *paid* by the monopolist to participate in the scheme. They therefore have no damages to "pass on" to others down the distribution chain and do not implicate the policies underlying *Illinois Brick*. *See Illinois Brick*, 431 U.S. at 728 (characterizing the question presented as "whether the offensive use of pass-on authorized by the decision below is consistent with *Hanover Shoe*'s restrictions on the defensive use of pass-on"); *Nat'l Football League*, 933 F.3d at 1157 ("[The] co-conspirator exception is not really an exception at all, but rather describes a situation in which *Illinois Brick* is simply not applicable.").

Contrary to Defendants' assertions, the reasoning of *Dickson v. Microsoft*, 309 F.3d 193 (4th Cir. 2002) confirms, rather than undermines, Plaintiffs' status as direct purchasers. There, the alleged injury was a reduction in consumer choice and increase in costs from three computer manufacturers purchasing and then pre-loading Microsoft

---

[8] While in this case the government has also stepped in to curtail Defendants' anticompetitive behavior, that cannot provide an adequate response. Not only is private antitrust litigation a critical enforcement mechanism in the many cases where the government does *not* act, but Congress has made clear that it intends private litigants to follow in the wake of government enforcement actions as well. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 336 (1971) ("Congress, believing that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws,' enacted § 16(b) in order to assist private litigants in utilizing any benefits they might cull from government antitrust actions." (internal quotation marks omitted)).

software on computers they sold to the plaintiffs. *See id.* at 206-07. Microsoft allegedly possessed a monopoly on the software products pre-loaded on those devices. As a result, it was able to overcharge the computer manufacturers, which in turn *passed on* these overcharges to the Plaintiffs. *See id.* at 215 ("to calculate the 'but-for' price, the court would be required to determine the over-charge, if any, for Microsoft's software that was passed on to consumers—the exact analysis that *Illinois Brick* forbids").[9]

The problem in *Dickson* was thus the plaintiffs' pass-on theory, not that the conspiracy involved different layers of the distribution chain.[10] But the *Dickson* court recognized the possibility of a different result where a different damages theory was deployed. *Id.* at 215; *accord Brand Name Prescription Drugs*, 123 F.3d at 606 (explaining *Illinois Brick* represents "a rule concerning [passed-on] overcharges"). While the *Dickson* court used vertical price-fixing conspiracies as an example, nothing in the decision suggests that this scenario is the *only* context in which standing could be found despite the presence of a multi-step distribution chain. *See Dickson*, 309 F.3d at 215; *see also Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1231 (11th Cir. 1999) ("The

_____

[9] It is also worth noting that *Dickson* was decided seventeen years before the Supreme Court decided *Pepper*, 139 S. Ct. at 1523.

[10] Defendants' theory that the direct purchaser rule applies differently depending on the type of conspiracy alleged (*e.g.*, monopolization vs. price-fixing) is incorrect. *See, e.g.*, *Nat'l Football League,* 933 F.3d at 1158 ("If the direct purchaser conspires to limit the output that will ultimately be available to the plaintiffs, then the plaintiffs are directly impacted by the output limitation and have standing to sue.") (citing *Pepper*, 139 S. Ct. at 1521).

13

inapplicability of *Illinois Brick* to vertical conspiracies with no allegations of pass-on (what some have called the 'vertical conspiracy exception') has long been recognized").

Defendants' reliance on *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) is likewise misplaced. The *UtiliCorp* consumers were "not the immediate buyers from the alleged antitrust violators[,]" so their standing hinged on an exception to the direct purchaser rule. *Id.* at 207. Here, by contrast, Plaintiffs dealt directly with antitrust violators and thus need not resort to an exception to *Illinois Brick*. *See Pepper*, 139 S. Ct. at 1520 (relying on *UtiliCorp* to conclude that "the immediate buyers from the alleged antitrust violators' may maintain a suit against the antitrust violators").

### D. Defendants' Antitrust Violations Proximately Caused Farmers' Injuries

Apart from their "direct purchaser" argument, Defendants assert their conduct did not proximately cause the farmers' injuries, meaning Farmers are barred from recovery under the principles of antitrust standing in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But this is just a rehash of the same *Illinois Brick* argument. That "multiple distributors and many more retailers stand between manufacturers and farmers[,]" MTD at 20, is irrelevant here, where "[b]oth Syngenta and Corteva have loyalty agreements with virtually all of the major distributors and their authorized retailers," ¶72, and the farmers purchased directly from those Dealers complicit in the underlying wrongdoing (*see* Section I.A-B above).

Defendants' argument that end-users of technical grade/manufacturing use AIs are removed from the effects of their conspiracy is similarly off-base. Whether or not the AI

had to be processed by a formulator before sale to the Farmers, a Farmer who purchases such a product at an inflated price from one of Defendants' co-conspirators suffers harm directly from an antitrust violator.

The Supreme Court has "long recognized that antitrust law should look at 'the economic reality of the relevant transactions' rather than 'formal conceptions of contract law.'" *Pepper*, 139 S. Ct. At 1529 (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 208 (1968)).  For example, in *Pepper*, the parties agreed that the allegedly monopolistic overcharge was a 30% commission that Apple collected from app *developers,* which was passed on to consumers in the form of higher prices in Apple's app store.  *See Pepper*, 139 S. Ct. at 1523.  Even in that scenario, where the developers, not Apple, set the sales price for consumers, and plaintiffs' damage theory **did** include a pass-on aspect, the Supreme Court still found the consumer plaintiffs' injury sufficiently direct.  *Id.* at 1520 ("[W]hen iPhone owners want to purchase an app, they have only two options: (1) buy the app from Apple's App Store at a higher-than-competitive price or (2) do not buy the app at all.").

Similarly here, where Defendants and their co-conspirators work hand in glove to shut generic manufacturers out of the market, and where Defendants' co-conspirators control the vast majority of the retail market for crop protection products, farmers must

15

pay supracompetitive prices to Defendants' co-conspirators for their needed AIs. The only alternative is not to buy them at all.[11]

In *Deere*, 2023 WL 8190256 at *5, plaintiffs, tractor purchasers, alleged Deere and independently owned dealerships conspired to limit repair services. The court concluded that "[a]s the entity first injured by the inflated cost of Repair Services, [plaintiffs] are in the best position to enforce the antitrust law." *Id.* at 9 (citing *Illinois Brick*, 431 U.S. at 732-33). *See also Nat'l Football League*, 933 F.3d at 1157 (explaining that a plaintiff who is the immediate purchaser from any co-conspirator is *directly* injured by the antitrust violation). Here, Farmers are likewise the first injured entities in the distribution chain, having purchased their overpriced products from conspiring Dealers that *benefited* (via loyalty payments from Defendants) from their participation in the conspiracy.

Defendants next contend the Farmers' injuries are indirect because Farmers do not participate in the wholesale market for generic AIs. But by restraining the market for generic AIs, Defendants were able to achieve their goal of charging inflated prices on their *own* products sold directly to Farmers. That other parties (potential competitors) may also have been harmed by Defendants' conduct (for example, manufacturers of

---

[11] Defendants' speculation that generic manufacturers could theoretically sell directly to Farmers (*see* MTD at 21) is contradicted by the Complaint's allegations, which explain in detail that that is not how the crop protection distribution chain works. *See* ¶¶63-68. Defendants' factual argument is improper at the motion to dismiss stage. *See Thomasson v. Greensboro News & Rec., Inc.*, 2020 WL 5821045, at *2.

generic AIs) does not render the farmers' injuries indirect. *See Pepper*, 139 S. Ct. at 1524 ("It is true that Apple's alleged anticompetitive conduct may leave Apple subject to multiple suits by different plaintiffs. But *Illinois Brick* did not purport to bar multiple liability that is unrelated to passing an overcharge down a chain of distribution."); *see also, e.g., In re Aluminum Warehousing Litig.*, 833 F.3d 151, 160 (2d Cir. 2016) (recognizing right to recover for "participants in the market that was the immediate target of the alleged scheme, . . . where they directly suffered harm at the hands of the defendants.").

Defendants cite a string of inapposite cases that only serve to prove the point. For example, Defendants rely heavily on *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), a case in which consumers purchased computers with Microsoft pre-installed, rather than buying that software directly from Microsoft. But there, the entities from which plaintiffs purchased were genuine independent third parties, not co-conspirators who benefitted from Defendants' anticompetitive scheme. *Id.* at 319, 322.

Similarly, in *Lyons v. Philip Morris, Inc.*, 225 F.3d 909, 911, 914 (8th Cir. 2000), the court held that health plans' allegations "that the defendants' tobacco products cause illnesses in plan beneficiaries, and [that] the plans must pay the costs of treating those illnesses" were too remote to support antitrust or RICO standing. But here, Plaintiffs do not seek to recover for injuries derivative to a third party's injuries.

Finally, Defendants cite *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir. 1987), for the proposition that farmers are "neither a provider nor consumer" in the relevant market. But this statement has nothing to do with proximate

causation or with this case, in which the relevant market is "EPA-registered crop protection products for sale in the United States that contain [the Relevant AIs]." ¶194. Farmers are undeniably consumers in that market, and bought the products at issue directly from entities that conspired to overprice them. Nothing more is required.

## II.     THE COMPLAINT ADEQUATELY PLEADS STATE-LAW CLAIMS

### A.     Having Invited "Indirect Purchasers" In By Repealing *Illinois Brick*, No Relevant State Would Kick Farmers Out

#### 1.     *Antitrust claims*

Even if (contrary to reality) Farmers did not have standing to bring federal antitrust claims because they were indirect purchasers under *Illinois Brick*, they unquestionably have standing to bring the enumerated state law claims in the Complaint. This is because those claims are from *Illinois Brick* repealer states which passed legislation or interpreted existing statutes, to ensure indirect purchasers *could* still bring state antitrust claims for damages despite *Illinois Brick*'s logic.[12]  *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016).

Defendants concede that Farmers here are the end-users in Defendants' chain of distribution: Defendants→distributors→retailers→Farmers. MTD at 2. Given this concession, the state antitrust claims must survive in the relevant states, all of which expressly invited end users into their courts by rejecting *Illinois Brick*.[13]  Defendants

---

[12] Defendants' dispute this only as to Puerto Rico, but that argument is addressed in Section II.C below.

[13] Defendants do not challenge Plaintiffs' claims under Missouri antitrust law on *AGC* or proximate-causation grounds.

assert that a grab bag of random doctrines (causation, "remoteness," "harmonization") require dismissal under state law. MTD at 24-26. [14] But courts rejected these scattershot attacks on antitrust standing for *Illinois Brick* repealer states because they contradict the stated purpose of these state laws—to permit overcharged purchasers to recover damages for harm caused by violation of state antitrust laws even if they are not at the first step of the distribution chain. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007) ("We do not believe that the legislature repudiated *Illinois Brick* and invited indirect purchaser suits only for courts to dismiss those suits on the pleadings based on the very concerns that motivated Illinois Brick."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) ("The Court finds that any state with an Illinois Brick repealer would reject application of *AGC* to this case [.]"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) ("[I]t is inappropriate to

---

[14] In interpreting state law, the question is what a given state supreme court would do. Defendants often find a single trial-level case making a prediction as to a given state, but do not bother with any actual analysis, even where other courts have reached different conclusions as to the law of those same states. *See D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 497-98 (E.D. Pa. 2006) (Arizona); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (California); *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 828 (7th Cir. 1999) (Illinois); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) (Iowa at 257; District of Columbia at 258; North Dakota at 261; Vermont at 262; West Virginia at 264); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (New Mexico; West Virginia); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *16 (D.N.J. Oct. 2, 2013) (North Dakota).

broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts.").[15]

The cases cited by Defendants are in general accord: Generic causation and related doctrines must be applied in these repealer states to *preserve* the rights of purchasers at various levels of the distribution chain to file suit. The rest of the Defendants' citations are wholly irrelevant, dealing with factually different situations such as who can sue tobacco companies for rising healthcare costs.

*First*, Defendants cite *Supreme Auto Transport v. Arcelor Mittal USA*, 902 F.3d 735 (7th Cir. 2018), for the proposition that a state's rejection of *Illinois Brick* does not mean all other doctrines are thrown "out the window." MTD at 23. Yet Plaintiffs' position is *not* that repealer statutes trump all other standing doctrines. Rather, Plaintiffs' position is narrow, but dispositive: no repealer state would deploy generic doctrines to block the claims of *these Plaintiffs*, who are squarely within Defendants' chain of distribution. As to whether *these Plaintiffs* can bring suit despite the supposed ongoing

---

[15] There are many cases allowing claims by indirect purchasers in these states, even if the courts do not find it necessary to hand-wring about standing each time. *See A & M Supply Co. v. Microsoft Corp.*, 252 Mich. App. 580, 594-95 (2002) (finding standing for indirect plaintiffs in Michigan, without even addressing *AGC*); *In re S. Dakota Microsoft Antitrust Litig.*, 2003 S.D. 19, ¶ 18, 657 N.W.2d 668, 677 (South Dakota); *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (Puerto Rico); *In re Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 892 (E.D. Pa. 2012) (Utah); *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002) (Vermont); *Pooler v. R.J. Reynolds Tobacco Co.*, 2001 WL 403167, at *1 (Nev. Dist. Ct. Apr. 4, 2001) (Nevada); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 885 (N.D. Cal. 2021) (New Hampshire); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1006 (E.D. Mich. 2014) (New York); *Hyde v. Abbott Lab'ys, Inc.*, 123 N.C. App. 572, 584 (1996) (North Carolina); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 374 (D.R.I. 2019) (Rhode Island).

viability of doctrines like proximate causation, *Supreme Auto* agrees with Plaintiffs. *See id.* at 737, 741, 744 (indirect purchasers of steel sheets, rods, and tubing are viable plaintiffs against steel manufacturers).

The Seventh Circuit's reference to causation doctrines surviving repealer statutes was explicitly in connection with a "different story" altogether—component purchasers. *Id.* at 744. In *Supreme Auto*, plaintiffs tried to bring claims relating to all "consumer goods that include any steel component." *Id.* at 741. But the court rejected this effort, finding that the retail buyer of a washing machine could not sue a maker of raw steel just because the washing machine may have been assembled using steel screws. Here, however, Defendants do not argue that Plaintiffs are "component" buyers. Defendants admit Farmers are the intended and actual end-users of their crop protection products, in Defendants' own distribution chain and within the heartland of the repealer statutes.[16]

*Second*, Defendants string-cite cases where courts have seized upon *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), to argue that "harmonization" statutes suggest other states might look to *AGC* as well. MTD at 24 n.16, 26.[17] But the ultimate question is not whether a

---

[16] Defendants' citation to *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d. 1072 (N.D. Cal. 2007), fails for the same reason, as that was also a "component" case.

[17] Defendants' presumption that "harmonization" means *AGC* would be adopted in all instances is wrong. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 173-75 (D. Me. 2004) (state's allowance for indirect-purchaser standing was entitled to deference despite harmonization statute); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133,1153 (N.D. Cal. 2009) (rejecting notion of a "rule" that harmonization provisions are an "appropriate means of predicting" whether a state would

state might look to *AGC* in some situations.  The question is whether these repealer states would use *AGC* as a vehicle to dismiss *Plaintiffs' claims here*.  That they would not is confirmed by the very cases Defendants cite.  *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 547 (N.D. Ill. 2019) (allowing claims even though the defendants' vendor software package was merely a "necessary ingredient" to the services provided by someone else); *Knowles v. Visa U.S.A.*, 2004 WL 2475284, at *5 (Super. Ct. Me. Oct. 20, 2004) (in light of *Illinois Brick* repeal, "directness or remoteness" factor had to be "disregarded entirely"); *Wrobel v. Avery Dennison Corp.*, 2006 WL 7130617, at *3-4 (Kan. Dist. Ct. Feb. 1, 2006) (standing factors would have to be "modifi[ed] and limit[ed]" as to avoid disqualifying indirect purchasers).  Other courts recognized that, even where *AGC* is followed as a general matter, it must be followed in a way that preserves claims like those alleged in this case.[18]

---

apply *AGC*); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1121 (declining to apply *AGC* absent clear directive from state); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1312 (D. Kan. 2018) (despite harmonization statute, analyzing standing without reference to *AGC*); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 812 (same); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 n.55 (M.D. Pa. 2009) (same).

Defendants also mislead by suggesting some states have "harmonizing statutes" when they do not.  *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 519 (Tenn. 2005) (Tennessee); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1123 (Mississippi, Kansas, and Tennessee).

[18] *See Brown v. Hartford Healthcare Corp.*, 2023 WL 7150051, at *8 (Conn. Super. Ct. Oct. 26, 2023) (Connecticut); *Wrobel*, 2006 WL 7130617, at *3-4 (Kansas); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 257 (S.D.N.Y. 2019) (Maine at 259-260; Nebraska at 257); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 41-42 (D.D.C. 2008) (Wisconsin).

22

In fact, Defendants do not cite *any* case where *AGC* was applied in a repealer state, after the state rejected *Illinois Brick*, to block claims brought by an end-user who was at most two steps downstream in defendant's own distribution chain. Given that these states have invited indirect purchasers into court by rejecting *Illinois Brick*, this hole in Defendants' brief cannot be filled with far-afield cases about shareholders suing for harms felt by a corporation;[19] companies suing tobacco makers for increased healthcare costs;[20] competitors suing competitors;[21] buyers of milk suing futures traders;[22] consumer-good buyers suing "component" raw-material makers;[23] or plaintiffs who made no "effort" to demonstrate standing.[24] Indeed, the majority of cases cited by Defendants relate to whether buyers of consumer goods can sue credit-card companies for their monopolistic behavior vis-à-vis merchants. Defendants do not even argue that such cases are analogous to the fact pattern here.

*Third*, Defendants invoke "proximate causation" and "remoteness." MTD at 24-25. Yet they bizarrely cite *Lorix v. Crompton Corp.*, even though that court held that to deploy generic doctrines to block indirect purchaser claims would "thwart the intent of the legislature" and the "end user of a consumer good whose price was inflated by

---

[19] *Vinci v. Waste Mgmt.*, 36 Cal. App. 4th 1811(1995).

[20] *Cnty. of Cook v. Philip Morris*, 817 N.E.2d 1039 (Ill. App. Ct. 2004).

[21] *Nev. Recycling & Salvage v. Reno Disposal Co.*, 423 P.3d 605 (Nev. 2018).

[22] *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 2015 WL 3988488 (N.D. Ill. June 29, 2015).

[23] *Luscher v. Bayer AG*, 2005 WL 6959406 (Super. Ct. Ariz. Sept. 16, 2005).

[24] *In re Aftermarket Automotive Lighting Products Antitrust Litig.*, 2009 WL 9502003 (C.D. Cal. July 6, 2009).

23

anticompetitive conduct earlier in the chain of manufacture" is within the "limits" imposed by the state's "remoteness" doctrine. *Id.* at 629-31. Similarly, in *Crouch v. Crompton Corp.*, 2004 WL 2414027, 2004 NCBC LEXIS 6 (Super. Ct. N.C. Oct. 26, 2004), also cited by Defendants, the court held "indirect purchasers have standing" in North Carolina. *Id.* at *11, 18. Accordingly, those who are "in the direct chain of distribution" have standing. *Id.*[25] Defendants do not explain how such cases can be read as anything other than being fully in the Farmers' favor. Indeed, courts have found indirect purchaser standing in each of these states.[26]

Where the "proximate cause" cases Defendants cite are not affirmatively in Plaintiffs' favor, they are irrelevant. Defendants cite two more cases about health costs and tobacco;[27] another case brought by someone who did not purchase the good at all;[28] a case about whether a professional association or its members have standing;[29] and yet

---

[25] This confirms Plaintiffs here have standing, even if the *Crouch* court went on to dismiss other, inapposite claims. 2004 WL 2414027, at *21 ("component" claims— buyer of tires could not sue maker of chemical used to make rubber); *id.* at *26 (credit- card claims).

[26] *See Lorix.*, 736 N.W.2d at 632–33 (finding standing of indirect purchaser in Minnesota); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1123 (Mississippi); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d at 519–20 (Tennessee); *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d at 850 (Maryland).

[27] *Seafarers Welfare Plan v. Philip Morris*, 27 F. Supp. 2d 623 (D. Md. 1998); *Or. Laborers-Empls. Health & Welfare Tr. Fund v. Philip Morris*, 185 F.3d 957 (9th Cir. 1999).

[28] *Waggoner v. Denbury Onshore, LLC*, 2014 WL 11290898 (S.D. Miss. Mar. 31, 2014).

[29] *Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn.*, 229 S.W.3d 304 (Tenn. Ct. App. 2007).

24

another credit-card case.[30]  The relevance of these generic cases to the indirect purchaser question has been rejected even in their home state.  For instance, *Tremont Public Advisor, LLC v. Connecticut Resources Recovery Authority*, 217 A.3d 953 (Conn. 2019), involved claims by a losing bidder and *Brown v. Hartford Healthcare Corp.*, 2023 WL 7150051, at *8 (Conn. Super. Ct. Oct. 26, 2023), recognized that *Tremont* "provides no guidance" on the indirect-purchaser question in Connecticut.  The *Brown* court went on to find that Connecticut's standing principles must be "modified" in the indirect-purchaser context in light of the state's repealer statute.  *Id.*

      *Finally*, Defendants, in their zeal to find any supporting case law, cite cases arising before the relevant states repealed *Illinois Brick*.[31]

      In the end, Defendants cannot identify a single case where a repealer state rejected the claims of plaintiffs who were end-users in defendants' own direct distribution chain.  To the contrary, the only authority Defendants can muster are cases that *expressly recognize* that dismissing such claims using alternative labels—causation, remoteness, *AGC*, or otherwise—would thwart the policy decisions of these repealer states.  Thus, Defendants' arguments to dismiss Plaintiffs' state antitrust law claims should be rejected.

---

[30] *Strang v. Visa U.S.A.*, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005).

[31] *Seafarers* was decided in 1998, but Maryland enacted its repealer statute in 2017.  *See* MD. Cod. Comm. Law § 11-209(b)(2)(ii).  *Oregon Laborers* was decided in 1999, but Oregon enacted its repealer statute in 2001. Or. Rev. Stat. Ann. § 646.780.

### 2. _Plaintiffs possess standing for their consumer protection claims_

Defendants do not challenge claims under the consumer protection laws of North Carolina, Rhode Island, and Virginia on _AGC_ or proximate-causation grounds.  As for the other jurisdictions, Defendants fail for many of the same reasons they miss the mark on the antitrust claims.

Defendants assert that (i) certain states look to _AGC_ when applying their state antitrust laws, (ii) these states would presumably do so for their consumer protection laws too, and thus (iii) Plaintiffs' consumer protection claims must be dismissed because Plaintiffs are supposedly "indirect" purchasers.  MTD at 27.  Defendants' strained arguments fail at all three steps.

_First_, Plaintiffs dispute whether these specific states (California, Illinois, Kansas, Nebraska, Nevada, New Mexico, New York, North Dakota, and South Dakota) look to _AGC_ even in the antitrust context.  _See supra_, pp. 21-22 fn.17  (gathering cases).

_Second_, there is no basis to presume every state would import _AGC_ into its consumer protection laws.  For instance, in _Los Gatos Mercantile v. E.I. DuPont De Nemours & Co._, 2015 WL 4755335, at *22 (N.D. Cal. Aug. 11, 2015), the court rejected the requested presumption, faulting the defendants for not engaging in a meaningful state-by-state analysis.  _Id._  And the court in _Sergeants Benevolent Association Health & Welfare Fund v. Actavis, Plc_, 2018 WL 7197233, at *36 (S.D.N.Y. Dec. 26, 2018), even denied a defense request for a "one fell swoop holding," dismissing consumer protection claims in states that held fast to _Illinois Brick_ in the antitrust setting.  It would be all the more inappropriate to do so here, given these states have _rejected Illinois Brick_.

26

The two cases Defendants cite for the contrary notion—that courts presume every state that looks to *AGC* in the antitrust context would do so in the consumer protection context—are unpersuasive.  Defendants cite *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799 (E.D. Mich. 2018), but that court recognized that the laws of Arkansas, New York, and Vermont used a "remoteness" test.  *Id.* at 845-46.  The court merely referred back to its earlier federal antitrust analysis to conclude GEICO had stated a *valid* indirect claim.[32]  That does not mean Defendants here can justify *dismissal* by presuming the two tests are identical.[33]

*Third*, as with the antitrust claims, Defendants' arguments on *AGC*'s importation into the consumer context ultimately does not matter.  Defendants cannot eat their cake (asking the court to import *AGC*) and have it too (ignoring that these states have rejected *Illinois Brick*).  Thus, even if everything else Defendants argue is accepted, the conclusions reached in Section II.A above apply here as well.  That

---

[32] That is, GEICO was *allowed* to assert claims tied to its role as a consumer of a physical good, i.e., as an owner of a car that contained price-fixed auto parts.  The only dismissed claims have no relevance here, in that they were tied to GEICO's role outside the physical distribution chain, i.e., as an insurance company that reimbursed insured's for their repair costs.  *Id.* at 846.

[33] That leaves *In re Cattle & Beef Antitrust Litigation*, 2023 WL 5310905 (D. Minn. Aug. 17, 2023), but that was not an indirect purchaser case at all—that court expressly found that the plaintiffs' role as an upstream *supplier* to the defendant presented unique issues.  *Id.* at *3-4.  Even that aside, Defendants' reading of that case as suggesting a one-size-fits-all presumption is unsupported by the cases cited by the *Cattle* court.  The court in *Cattle* cited *GEICO* and *In re DRAM*.  But *GEICO* cuts against a one-size-fits-all presumption.  And *In re DRAM* did not use a sweeping presumption; the court explicitly went state by state, and even rejected the relevance of *AGC* to North Carolina, for example, which Defendants include here.  536 F. Supp. 2d at 1142.

is, having invited these Plaintiffs into court by rejecting *Illinois Brick*, none of them would turn to other doctrines to bar Plaintiffs' claims.[34]

*Finally*, Defendants relatedly argue that certain states[35] follow principles of "proximate causation." MTD at 28-30. But the same conclusion follows here. The ultimate question is not whether a state might require proximate causation to plead claims. It is whether these states would invoke any such doctrine to dismiss *these Plaintiffs*—who are the end users in Defendants' distribution chain. Defendants fail to cite a single case in *any* state recognizing a rule that would block Plaintiffs' claims here via the generic "causation" doctrine, let alone that *every* state would do so. For the reasons discussed in the preceding sections, none would.[36]

---

[34] *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 702 (E.D. Pa. 2014) (finding standing of indirect purchasers in Nevada); *Sergeants Benevolent Ass'n Health & Welfare Fund*, 2018 WL 7197233, at *46 (Nebraska); *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5227130 (N.D. Ill. Aug. 15, 2023)(Oregon at *2; Utah at *3); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 841, 847–48 (Montana); *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 94–95 (2007) (New Hampshire).

[35] These are Arkansas, Colorado, the District of Columbia, Florida, Hawaii, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, Oregon, Pennsylvania, South Carolina, Utah, and West Virginia.

[36] *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at 178–79 (Arkansas); *Miami Prod. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223 (W.D.N.Y. 2021) (Colorado at 241–42; North Dakota at 242); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d at 379 (District of Columbia); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d at 700 (Florida), 701 (Minnesota), 702-03 (Pennsylvania); *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 66–67 (2002) (Massachusetts); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 820 (Hawaii), 821 (South Carolina); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at 196 (New Mexico); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 398 (D.N.J. 2018) (New York); *In re Generic*

## B. Defendants' Attack On Plaintiffs' Class Standing Fails

Defendants contend Named Plaintiffs lack Article III and statutory standing to assert state law claims on the ground that no Named Plaintiff allegedly purchased Defendants' crop protection products or suffered injury in those states.[37] MTD at 30-31. This argument flies in the face of recent Fourth Circuit precedent, which definitively commands that the issue whether Named Plaintiffs may represent absent class members with claims under different state laws should be addressed at class certification, *not* on a motion to dismiss. *Mayor of Baltimore v. Actelion Pharms Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021).[38] The Fourth Circuit held in *Actelion,* a class action, that state law claims not connected to a Plaintiff purchase "need not be stricken or disregarded"; they "define class

_____

*Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 842 (West Virginia), 847 n. 156 (California).

[37] Defendants improperly frame their argument as a challenge to both Article III and statutory standing. But Plaintiffs do not need to allege purchases in a particular state to establish Article III standing; all they need to allege is they were injured by Defendants' anticompetitive conduct and that injury can likely be redressed by a favorable judicial decision, as they have done here. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 (1992). The argument Defendants now raise sounds more in "statutory standing." *See Mayor of Baltimore v. Actelion Pharms. Ltd.,* 995 F.3d at 134. Regardless, it is not a matter to be decided at the motion to dismiss stage. *Id.*

[38] Defendants also argue that Plaintiffs' Corteva-related state claims should be dismissed in all states where Plaintiffs' purchased Syngenta, but not Corteva products. MTD at 31 n.30. As with all the state law claims, whether Plaintiffs can raise these claims on behalf of absent class members who purchased Corteva products in other states is properly reserved for the Rule 23 analysis. Furthermore, whether a class member purchased a Corteva or Syngenta product is not a legally relevant distinction. *See In re Processed Egg Prod. Antitrust Litig.*, 392 F. Supp. 3d 498 (E.D. Pa. 2019) ("The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser.").

29

members' claims" and thus "may be considered in determining whether the plaintiffs' claims" meet Rule 23's typicality and predominance requirements.  *Id.* at 134.[39]  "If the Rule 23 requirements are met, the plaintiffs could then represent the class members who sustained damages under those laws." *Id.* (citing  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011)).

### C.  **Defendants' Miscellaneous Arguments Also Fail**

1.  *Farmers adequately plead intrastate misconduct/effects (New York, Massachusetts, New Hampshire)*

Farmers adequately plead substantial intrastate effects or misconduct to support claims under New York, Massachusetts, and New Hampshire law.  Defendants fail to recognize that, along with the statute-specific allegations in each state's Claim for Relief, Plaintiffs also "incorporate[s] and reallege[s] … each and every allegation of the preceding paragraphs of the complaint."  ¶¶420 (New York), 595 (Massachusetts), and 641 (New Hampshire).  Consumers were thus injured in each state where they purchased crop protection products containing the Relevant AIs.  These allegations satisfy the intrastate requirements of each statute.  ¶¶425, 601, 650.

---

[39] All other Circuits to have addressed this issue reached the same conclusion.  *See Morrison v. YTB Int'l*, 649 F.3d 533, 536 (7th Cir. 2011) (holding class action claims based on other states' laws "has nothing to do with standing, though it may affect whether a class should be certified"); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93, 95 (2d Cir. 2018) ("[W]hether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3)[.]"); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49-51 (1st Cir. 2018); *Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015).

30

**New York.**  New York's Donnelly Act prohibits any monopoly or restraint of trade "in the conduct of any business, trade or commerce … in this state."  N.Y. Gen. Bus. Law § 340.  On top of general allegations about how the "loyalty" programs led to higher prices, the Complaint alleges specifically that "Plaintiffs and/or other members of the Class purchased crop protection products containing Relevant AIs within the State of New York."  ¶422.  Plaintiffs further allege that "[e]ach Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of crop protection products containing the Relevant AIs."  ¶424.  These allegations relate to New York commerce and suffice to plead a cause of action under the Donnelly Act.[40]  Moreover, this is not a motion to dismiss issue.  *See WorldHomeCenter.com v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 501 (S.D.N.Y. 2011).

---

[40] Defendants' cited case law does not merit a different result.  First, the court in *WorldHomeCenter.com v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 501 (S.D.N.Y. 2011), simply held that even where the Plaintiff's "allegations relating to intrastate commerce" are "sparse," they may nonetheless suffice to state a Donnelly Act claim on a motion to dismiss.  Second, both *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 2019 WL 1331830, at *34-35 (S.D.N.Y. Mar. 25, 2019) and *Conergy AG v. MEMC Elec. Materials, Inc.*, 651 F. Supp. 2d 51, 61-62 (S.D.N.Y. 2009) are wholly distinguishable from the present situation.  In these two cases, the plaintiff(s), who were not seeking to represent a class, failed to plead that any part of the alleged conspiracy occurred in New York, that any Plaintiffs suffered injury in New York, nor that the parties had any other ties to New York.  In fact, in *Conergy AG*, the only connection to the state was a New York choice of law and choice of forum provision in a related contract. 651 F. Supp. 2d at 61.  By contrast, Plaintiffs here explicitly allege that the conspiracy occurred and resulting injury was felt partly in New York.

**_Massachusetts._**[41]  Whether alleged conduct occurred "primarily and substantially" in Massachusetts is a "fact laden" analysis inappropriate for resolution on a motion to dismiss.  *Andover Healthcare, Inc. v. Johnson & Johnson Consumer Inc.*, 2017 WL 4953909, at \*1, at \*2-3 (D. Mass. July 25, 2017) (distinguishing *Fishman's Transducers v. Paul*, 684 F.3d 187 (1st Cir. 2012), and denying motion to dismiss). Here, as in *Andover Healthcare*, Plaintiffs allege that Massachusetts consumers purchased the relevant crop protection products in the Commonwealth (¶597) and that a substantial part of the Defendants' monopoly or attempt to establish a monopoly occurred in Massachusetts (¶598).

Defendants cite no case in which the purchase of goods or services within Massachusetts was deemed insufficient to meet the "primarily and substantially" test. Unlike the *Fishman* case, where almost *none* of the allegations occurred within Massachusetts, the alleged violations of Massachusetts law here occurred *within* the Commonwealth.  It is irrelevant that Defendants also engaged in misconduct in other jurisdictions.  Under Defendants' interpretation, Massachusetts consumers who suffered at the hands of defendants that conduct nationwide business would have no recovery for violations of the Commonwealth's consumer protection statute.  That is not the law.

**_New Hampshire._**  New Hampshire's statute states that the "[pricing] of goods or services in a manner that tends to create or maintain a monopoly or otherwise harm

---

[41] As alleged *infra* 35 n.48, Plaintiffs believe that Mass. Gen. Laws Ann. ch. 93A § 11, rather than § 9, is the proper avenue for them to bring a claim under Massachusetts law.  Nevertheless, Plaintiffs have responded to the substance of Defendants' argument despite it being aimed at the wrong provision.

32

competition, including the pricing of generic prescription drugs," is prohibited in the state. N.H. Rev. Stat. Ann. § 358-A:2 (XIV). The only geographic requirement is that the trade or commerce occur "within this state." *Id.* Plaintiffs allege that Defendants monopolized or attempted to monopolize the market for crop protection products (¶644-646), that this "substantially affected New Hampshire's trade and commerce" (¶649), and that Plaintiffs in New Hampshire were injured by this conduct (¶650). Again, cases Defendants cite fail to support their argument.[42]

### 2. *Even indirect purchasers can sue under Montana's consumer protection law and Puerto Rico's antitrust law*

Defendants claim Plaintiffs lack standing to sue under the laws of Montana and Puerto Rico because neither jurisdiction repealed *Illinois Brick*. MTD at 35. This argument fails because both states permit indirect purchaser suits on other grounds.

For Montana, Plaintiffs pled violations of the state's *consumer protection statute* which permits indirect purchaser claims. ¶152; *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d at 193 (denying dismissal) ("Montana's consumer protection statute is not limited to those who engage directly in consumer transactions.").

---

[42] *In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d at 1159 and *Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327, 343-44 (D.N.H. 2012), did not involve any alleged behavior in New Hampshire. The Court in *Precourt* distinguished the situation from *Elliot v. Lachance*, 109 N.H. 481 (N.H. 1969), where the New Hampshire Supreme Court held that purchasers of tobacco products from retail stores in the state could maintain an action against tobacco manufacturers located outside New Hampshire that were alleged to have engaged in anticompetitive acts. 856 F. Supp 2d. at 344. This case is far closer to the *Lachance* case than it is to either of those cited by Defendants.

33

For Puerto Rico, Defendants concede that multiple courts have ruled that indirect purchasers have standing to sue under Puerto Rico's antitrust law. MTD at 35 n.32. *See Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (citing *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 519 (P.R. 1994)) ("Because Puerto Rico liberally construes its standing requirements in private antitrust cases … it is immaterial whether Plaintiffs are direct or indirect purchasers."); *Government of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 477-78 (D.P.R. 2020). Defendants can only point to non-controlling authorities, which disregard the Supreme Court of Puerto Rico's interpretation of Puerto Rico's antitrust statute.

3.       *Rule 23 preempts state class action bars*

Defendants wrongly assert Plaintiffs cannot bring their claims as class actions in federal court under the CPAs of Arkansas, Illinois, Montana, South Carolina, and Utah. MTD at 36. This argument flies in the face of the Supreme Court's *Shady Grove* decision, which held Rule 23 permits class actions in federal court and ***preempts*** state-law bans to the contrary. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010); *id.* at 435-36 (Stevens, J., concurring).

Defendants rely on Justice Stevens' *Shady Grove* concurrence, in which he observed that state laws that "define the scope of the state-created right" cannot be preempted. MTD at 37. But Defendants neglect to mention that Justice Stevens voted to hold that Rule 23 preempts such class action bans. *Id.* at 435-36. Indeed, applying *Shady Grove*, numerous federal courts have specifically held that Rule 23 preempts state class

34

action bars with respect to Illinois,[43] Montana,[44] and South Carolina,[45] and have permitted

class claims under the CPAs of Arkansas[46] and Utah.[47]

> ### 4.      *Farmers can bring claims under CPAs that protect only non-commercial consumers*

Defendants assert Plaintiffs' claims under the CPAs of the District of Columbia,

Massachusetts,[48] Missouri, Montana, Oregon, Pennsylvania, Rhode Island, Utah, and

Virginia should be dismissed because these laws cover only purchases made primarily for

"personal, family or household purposes."  MTD at 38-39.

---

[43] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 817-18, 820-821 (N.D. Ill. 2017) (Illinois, South Carolina, and Montana class action bars are procedural and Rule 23 applies); *In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, 2023 WL 2182046, at *5, *8 (D.N.J. Feb. 23, 2023) (Illinois, Montana, Utah).  As an independent reason to deny this motion to dismiss, the plain language of Section 7(2), which Defendants cite to support their contention that Illinois bans class actions, makes clear that the statute's class action limitation applies only "in any court of this State," meaning Illinois court—not federal court.  See 740 Ill. Comp. Stat. 10/7(2); *Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980, at *13-14, 16 (Illinois and Montana).

[44] *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1115 (N.D. Cal. 2021) (Montana).

[45] *In re Packaged Seafood*, 242 F. Supp. 3d at 1072, 1085-87 (South Carolina, Arkansas and Utah); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (South Carolina); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at, 553 (South Carolina and Arkansas).

[46] *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at 178, 193 (Montana and Arkansas).

[47] *See Sergeants Benevolent Ass'n Health & Welfare Fund*, 2018 WL 7197233, at *50-51 (Utah).

[48] Because Plaintiffs here are suing in their role as consumers who purchased Defendants' products for personal use, they maintain that §9 remains the proper avenue for asserting consumer protection claims under Massachusetts law.  However, if the Court determines that the suit should be brought under Mass. Gen. Laws Ann. ch. 93A §11, Plaintiffs can amend the Complaint accordingly.

35

But every crop protection purchase was made for "personal" use in the relevant sense that the products were purchased not for resale, but for Plaintiffs' own personal consumption. *See* ¶¶1, 13, 18-28.[49] *See also*, *Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) (citing *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989) (stating that a transaction is covered by the statute so long as "the purchaser is not engaged in the regular business of purchasing ... and reselling it"); *Searle v. Exley Exp., Inc.*, 278 Or. 535, 540 P.2d 1054 (1977) (holding to assess "personal" use, the court should look to the customary use of the goods and if they "were, in fact, bought by the plaintiff for his or someone else's use and not for resale.").[50]

The text of the relevant CPAs confirms this satisfies the "use" requirement of the statutes. Indeed, all nine CPAs include entities in their definition of consumer. This indicates the CPAs are intended to provide an avenue for redress to businesses (particularly small, family-owned ones) that suffered harm. Defendants' interpretation would mean businesses could never sue under these state Consumer Protection statutes. Such an interpretation would render the inclusion of "entities" in the definition of consumer surplusage. *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (a

---

[49] Plaintiffs maintain it is implicit within the allegations that they use their purchased crop protection products on their respective crops, identified in the Complaint, but offer to amend to explicitly state that they do not resell Defendants' products if needed.

[50] While the *Searle* court concluded a freight truck is not customarily bought for "personal" use, Plaintiffs contend that Farmers applying pesticides to their own crops "is commonly understood to have in it a personal ingredient." *Id.* at 539-40.

"statute should be construed so that effect is given to all its provisions" and "no part will be inoperative or superfluous").

<blockquote>

5. <u>*Plaintiffs have valid CPA claims despite Defendants' argument that only deceptive conduct "counts"*</u>
</blockquote>

Defendants maintain the Court should dismiss Plaintiffs' claims pursuant to the CPAs of thirteen states because Plaintiffs have failed to allege deception and reliance. MTD at 40.[51] But Defendants conspicuously omit that many of the CPAs at issue encompass claims relating to "unfair"[52] or "unconscionable"[53] conduct (or both),[54]

---

[51] Defendants attempt to disclaim the possibility they engaged in any deception because the loyalty programs are known as "an industry norm." MTD at 43 (citing ¶225). However, they ignore that this statement was made by a distributor with respect to the knowledge held by distributors and retailers in the crop protection industry. Nowhere does the Complaint allege that consumers like Plaintiffs had knowledge of these loyalty programs, let alone their details. Rather, Plaintiffs rightfully relied on the assumption that they were charged legal prices for Defendants' products. If this is unclear, Plaintiffs can amend the Complaint.

[52] *See* **Illinois:** 815 Ill. Comp. Stat. Ann. 505/2 (prohibiting "unfair methods of competition"); **Pennsylvania:**73 Pa. Stat. §201–2(4)(xxi) (prohibits "unfair methods of competition," including by "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."); **West Virginia:** W. Va. Code §46A-6-104 ("[u]nfair methods of competition and unfair or deceptive actors or practices").

[53] *See* **Arkansas:** Ark. Code Ann. §4-88-107 (prohibiting "[d]eceptive and unconscionable trade practices); **North Dakota:** N.D. Cent. Code §51-15-09 (unconscionable conduct); **Utah:** Utah Code Ann. §§ 13-11-4 & 13-11-5 (deceptive and unconscionable conduct); **Kansas:** Kan. Stat. Ann. §50-623(b) (prohibiting "deceptive and unconscionable practices").

[54] *See* **Colorado:** Colo. Rev. Stat. §6-1-105(rrr) (prohibiting "unfair," "unconscionable," or "deceptive" practice); **Minnesota:** Minn. Stat. §325F.68 (prohibiting the use of deception or "unfair or unconscionable practice[s]"; **Oregon:** Or. Rev. Stat. §646.607(1) & §646.608(u) ("unconscionable") and "unfair or deceptive conduct in trade or commerce."

not just deceptive acts.[55]

Defendants further elide that courts routinely recognize that claims sounding in antitrust violate the state consumer protection laws. That the same conduct frequently violates both the antitrust and consumer protect laws is unsurprising. "Virtually every" state consumer protection statute is modeled after the Federal Trade Commission Act (the "FTC Act"), which is used to enforce the antitrust laws and permits recovery for both "unfair" and "deceptive" acts or practices. *See Sergeants Benevolent Ass'n Health & Welfare Fund*, 2018 WL 7197233, at *35.

In any case, CPAs need "not contain language specifically prohibiting 'unfair competition'" to cover antitrust violations. *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d at 1109. As shown *infra*, state consumer protection laws should be interpreted broadly and liberally construed, typically sweeping in antitrust claims. Defendants' effort to circumscribe the scope of these thirteen laws should therefore be rejected.

Ample precedent establishes that the allegations here meet the CPAs' pleading requirements. The Arkansas Deceptive Trade Practices Act (the "ADTPA"), Ark. Code Ann. § 4-88-107, which Defendants single out, is a prime example. Defendants assert that Plaintiffs' ADTPA claim fails because they have not alleged a materially deceptive

---

[55] The three remaining states whose CPAs Defendants challenge are New York, South Dakota, and Virginia.

or misleading act by Defendants.[56]  MTD at 41. But Defendants ignore that the ADPTA

applies to "deceptive" *and* "unconscionable" practices.  Ark. Code Ann. § 4-88-107.

Multiple courts have specifically held that the ADPTA covers antitrust violations under

the law's "unconscionability" prong.[57]  And numerous courts analyzing the other CPAs at

issue have concluded repeatedly that anticompetitive conduct falls within their purview—

---

[56] Defendants cite authority suggesting that to qualify under the ADPTA, the alleged act must have been a "deceptive *consumer-oriented* act or practice."  MTD at 41, 41 n.50.  This is irrelevant to the present matter since antitrust violations suffice to state a claim under the ADPTA's "unconscionability" prong.  In any event, Defendants argue for an overly restrictive view of "consumer-oriented" conduct.  To be "consumer-oriented," it is sufficient that Defendants' anticompetitive conduct has injured the Farmers who purchased Defendants' supracompetitively priced products.  *See, e.g.*, *New York v. Feldman*, 210 F. Supp. 2d 294 (S.D.N.Y. 2002) (finding requirement that "defendants engaged in a consumer-oriented act" has "been construed liberally" and qualifies if the defendant's actions "cause any 'consumer injury or harm to the public interest'").

[57] *See Fond du Lac Bumper Exch. v. Jui Li Enter. Co.*, 2012 WL 3841397, at *6 (E.D. Wis. Sept. 5, 2012) ("the Arkansas Supreme Court has noted that the ADTPA should be given a 'liberal construction' in order 'to protect the interests of both the consumer public and the legitimate business community'") (collecting cases); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380. 404-05, 413-14, 421-22 (E.D. Pa. 2010) (also permitting antitrust claims under Minnesota and Pennsylvania CPAs); *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1072, 1082-84, 1087 (S.D. Cal. 2017) (collecting cases) (also Oregon, Utah and West Virginia CPAs); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *9  (also Utah).

finding alleged anticompetitive conduct to be "unconscionable," "unfair," "deceptive" or a combination of these elements. [58] [59]

---

[58] *See In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, 2023 WL 2182046, at *7-9 (Minnesota, Utah, West Virginia, New York, Oregon, South Dakota); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *50 (S.D.N.Y. Dec. 26, 2018) (Utah, collecting cases); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *33 (S.D.N.Y. June 11, 2021) (Utah); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 669 (7th Cir. 2008) ("Illinois courts look to the federal interpretations of unfair conduct under section 5(a) of the Federal Trade Commission Act," which includes any conduct that would violate the Sherman Act); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 552 (West Virginia); *Fed. Trade Comm'n v. Mylan Lab'ys, Inc.*, 99 F. Supp. 2d 1, 10 (D.D.C. 1999) (West Virginia); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 229 (S.D.N.Y. 2012) (South Dakota); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d at 703 (E.D. Pa. 2014) (Virginia); *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002) (since it "is well-established that the government may use the FTC Act to enforce antitrust laws," "[antitrust violations] constitute the kind of deceptive acts and practices contemplated by [the NY CPA]"); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d at 378 (holding plaintiffs allegations "that they paid overcharges based on Defendants' alleged misconduct" satisfied NY CPA (collecting cases)); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (NY).

[59] Plaintiffs agree that the correct citation is to Colo. Rev. Stat. § 6-1-105(1)(rrr) not (rr), and offer to amend if the court finds it necessary to correct this typographical error. Regardless, multiple federal courts have permitted antitrust violations to proceed past the motion-to-dismiss under the CCPA. *See In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *26 (D.N.J. July 20, 2017); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 846 (denying motion to dismiss CCPA claim in case involving only antitrust allegations). Furthermore, *In re HIV Antitrust Litig.*, 2023 WL 3006572, at *2 (N.D. Cal. Apr. 18, 2023), to which Defendants cite, misreads the statute. First, even if the court interprets the CCPA to only cover "deceptive" acts, as illustrated above, antitrust violations qualify under the "deceptive" prong, and second, C.R.S.A. § 6–1–105(3) merely indicates that conduct can be actionable under both the CCPA and other statutes like the Colorado Antitrust Act.

Defendants also incorrectly claim that Farmers did not assert Defendants' conduct was "knowing" or "reckless" as required by the statute. MTD at 42. They do. Defendants indeed "knew" they were using the loyalty programs to exclude generic competitors from the market and maintain their inflated prices. *See, e.g.,* ¶ 8 ("As a

40

Finally, Defendants claim that Plaintiffs' CPA allegations fail to meet the "minimal" federal pleading standard. MTD at 42 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But Plaintiffs detail the ample facts underlying these claims in over 80 pages in their Complaint. Because these consumer claims are based on the same conduct at issue in the federal antitrust claims, Plaintiffs need not repeat them in other sections of the Complaint. *See In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 840 (E.D. Pa. 2019) ("[Plaintiffs] need not reiterate these facts [supporting federal antitrust claims] in their consumer protection law counts.").

### 6.    *Defendants' remaining CPA arguments also lack merit*

***Hawaii.*** Defendants wrongly assert that Plaintiffs' claim under Hawaii's CPA should be dismissed for lack of pre-suit notice. Courts analyzing this law routinely hold that pre-suit notice is not a pleading requirement and nothing in Hawaii's CPA requires dismissal for failure to provide pre-suit notice. *See In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 835; *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009) (nothing in the language of Hawaii's CPA indicates that "dismissal is an appropriate remedy for failing to comply with its provisions"). Dismissal on these grounds would be "inconsistent with the remedial purposes of the statute." *Id.* at *6.

Second, Hawaii's pre-suit notice provision, which merely governs the service and filing of cases filed in state court, constitutes state procedural law and does not apply in

---

Corteva product manager bragged, '[O]ur team truly has done an A+ job blocking generics.'").

federal court. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. at 408. *See* Haw. Rev. Stat. § 480-13.3. Accordingly, Hawaii's pre-suit notice provision yields to the Federal Rules of Civil Procedure, which do not require pre-suit notice. *See In re Aggrenox Antitrust Litig.,* 94 F. Supp. 3d 224, 253-54 (D. Conn. 2015); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 156 (E.D.N.Y. 2018) (denying dismissal for Plaintiffs' Hawaii CPA claim and holding that Rule 23 governs over Hawaii's pre-suit notice provision).[60]

**Minnesota.** Defendants first argue Plaintiffs fail to allege Defendants' intent under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"). Not so. The Complaint is replete with allegations that Defendants intended for others to rely on the alleged loyalty programs in furtherance of their goal "to limit the purchase of products manufactured by generic manufacturers to extremely low levels." *See* ¶¶215-16 (Syngenta's intent with its Key AI program regarding retailers is to "[r]eward Retailers for their support of Syngenta products where a generic alternative exists," and to defend[] Syngenta's market share position."); *see also* ¶¶70, 72, 100, 175.

More basically, the MPCFA is "generally broadly construed to enhance consumer protection" and to "encourage aggressive prosecution of statutory violations." Minnesota courts have accordingly ruled that the MPCFA "support[s] a cause of action by *any*

---

[60] Defendants' cited cases are inapposite as they either ignore or else predate *Shady Grove. See In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d at 1158 (pre-dates *Shady Grove*); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 232-33 (M.D. Pa. 2010) (did not analyze Hawaii's pre-suit notice provision under *Shady Grove).*

*person injured* as a result of prohibited acts, as long as that cause of action benefits the public, and even if that person did not purchase the defendant's goods." *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 414 (E.D. Pa. 2010). The court in *Sheet Metal Workers* upheld plaintiffs' MPCFA claim despite the fact that the defendant there did not "make a fraudulent argument *to a consumer*" but instead filed sham patent litigation to maintain its monopoly and exclude the entrance of generic drugs. *Id.* Here, Farmers similarly allege that Defendants used their loyalty programs to exclude the entrance of generics, conduct that violates the MPFCA regardless of whether Defendants intended to deceive consumers.

Defendants also argue farmers' MCFA claim fails because it benefits only a discrete group of consumers, rather than the general public. MTD at 5. But Defendants misstate Plaintiffs' allegations. Farmers allege "[a]t least tens or hundreds of thousands of persons or entities have purchased a crop protection product containing a Relevant AI" and "thousands of members of the public" purchased the relevant crop protection products, forcing Farmers to pay "millions of dollars more in supra competitive prices while at the same time restricting their ability to benefit from new and innovative products." ¶¶13, 262, 404, 513, 727.

Regardless, the MCFA's public benefit requirement is "not onerous," and Plaintiffs meet the standard. *See Kinetic Co. v. Medtronic, Inc*., 672 F. Supp. 2d 933, 946 (D. Minn. 2009). "[C]ourts addressing the public-benefit issue do not focus solely (or even substantially) on the size of the audience receiving an alleged misrepresentation, but rather hone in on the relief sought by the plaintiff." *Buetow v. A.L.S. Enterprises,* 888 F.

Supp. 2d 956, 961 (D. Minn. 2012) (cleaned up).[61] "[A] public benefit typically will be found when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction)." *Id.* Here, Farmers allege Defendants' exclusionary and anticompetitive loyalty programs are ongoing and seek to enjoin Defendants from engaging in future anticompetitive conduct and to take affirmative steps to dissipate the continuing effects of their unlawful conduct. ¶¶72, 212, XII. 5. a-b; *see also Zutz v. Case Corp.*, 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003) (noting that the fact that a case involves a product that is still on the market weighs in favor of finding a public benefit).

Finally, the MCFA's public benefit requirement constitutes a "fact question for the jury[.]" *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*,2023 WL 5960237, at *18 (D. Minn. Sept. 13, 2023). The Court should thus deny Defendants' motion to dismiss Farmers' MCFA claim.

**Virginia.** Plaintiffs agree to dismiss their claim for injunctive relief under the Virginia CPA.

---

[61] Consequently, Defendants' reliance on *Churlik v. Gate City Bank*, 2024 WL 453606, at *1 (D. Minn. Feb. 6, 2024), fails to support its argument because the number of consumers affected is not the main factor Courts analyze in determining whether there is a public benefit. Additionally, *Tharpe v. Hyundai Motor America*, 2022 WL 3137453, at *6 (C.D. Cal. July 12, 2022) is easily distinguishable because Plaintiffs' complaint here is far more detailed than the short conclusory allegations at issue there—extensively detailing Defendants' wrongful conduct and the public benefit of Farmers' case.

44

**D.    Farmers' Claims Are Timely as to Paraquat**

Defendants assert that most of Plaintiffs' claims related to paraquat are time-barred and should be dismissed.  MTD at 46-47.  Defendants contend—based on improper factual assertions raised in their motion—that in connection with the Syngenta AG and ChemChina merger, the FTC required Syngenta to exclude paraquat from its loyalty rebate program by October 1, 2017, which predates the class period and various states' statutes of limitations.  MTD at 46-47.[62]

Defendants' argument is impermissible at the motion to dismiss stage.  At this phase, the court is "generally limited to a review of the allegations of the [c]omplaint itself[.]" *Thomasson v. Greensboro News & Rec., Inc.*, 2020 WL 5821045 at *2 (M.D.N.C. Sept. 30, 2020).  "The underlying concern in cases applying this rule is to protect a *plaintiff* who might not have notice of (and an opportunity to fully respond to) facts newly introduced by the *defendant* in conjunction with motion of dismissal." *Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 580 (M.D.N.C. 2003).  That is precisely the issue here.

The extent of Syngenta's compliance with the federal program is also not subject to judicial notice.  *See Couch v. Clarke*, 782 F. App'x 290, 291 (4th Cir. 2019) (only "allowing judges to recognize facts not proven in the record that are 'not subject to

---

[62] Defendants concede that, in any event, Plaintiffs' claims under the Wisconsin Antitrust Act relating to paraquat are not time-barred.  MTD at 47 (citing Wis. Stat. Ann. § 133.18(2), which has a 6-year limitations period).

45

reasonable dispute'") (citing Fed. R. Evid. 201). Defendants' argument for why the paraquat claims are time-barred must be rejected at this point in the litigation.

**CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss should be denied. In the alternative, Plaintiffs request the opportunity to amend.

Date: April 30, 2024                     Respectfully submitted,

*/s/ Daniel L. Brockett*
Daniel L. Brockett (pro hac vice)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7345
Facsimile (212) 849-7100
danbrockett@quinnemanuel.com
*Interim Class Counsel*


Steig D. Olson (pro hac vice)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Phone (212) 849-7231
Fax (212) 849-7100
steigolson@quinnemanuel.com
*Interim Class Counsel*


Sami H. Rashid (pro hac vice)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*/s/ Jay J. Chaudhuri*
Jay J. Chaudhuri
N.C. State Bar No. 27747
COHEN MILSTEIN SELLERS & TOLL
PLLC
50 Fayetteville St., Suite 980
Raleigh, NC 27601
Telephone (919) 890-0560
Facsimile (919) 890-0567
jchaudhuri@cohenmilstein.com
*Interim Class Counsel*


Michael B. Eisenkraft (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Telephone (212) 838-7797
Facsimile (212) 838-7745
meisenkraft@cohenmilstein.com
*Interim Class Counsel*


Nina Jaffe-Geffner (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue, Suite 500, NW
Washington D.C. 20005

46

Tel. (212) 849-7237
Facsimile (212) 849-7100
samirashid@quinnemanuel.com
*Interim Class Counsel*

Jeremy Andersen (pro hac vice)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Tel. (213) 443-3685
Facsimile (213) 443-3100
jeremyandersen@quinnemanuel.com
*Interim Class Counsel*

/s/ Vincent Briganti
LOWEY DANNENBERG, PC
Vincent Briganti (pro hac vice)
Christian Levis (pro hac vice)
Margaret MacLean (pro hac vice)
Roland R. St. Louis, III (pro hac vice)
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com
rstlouis@lowey.com
*Interim Class Counsel*

/s/ Richard L. Pinto
Richard L. Pinto N.C. State Bar No. 9412
Kenneth Kyre, Jr. N.C. State Bar No. 7848
Lyn K. Broom N.C. State Bar No. 17674
PINTO COATES KYRE & BOWERS,
PLLC
3202 Brassfield Road
Greensboro, NC 27410
Tel: (336) 282-8848
Facsimile: (336) 282-8409
rpinto@pckb-law.com
kkyre@pckb-law.com

Tel: (202) 408-4600
Njaffegeffner@cohenmilstein.com
*Interim Class Counsel*

/s/ Christopher M. Burke
Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Tel: (619) 625-5621
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com
*Interim Class Counsel*

47

lbroom@pckb-law.com
*Liaison Counsel*

## CERTIFICATE OF WORD COUNT

I hereby certify that foregoing document contains 13,238 words as reported by the word count feature of the word processing software, excluding those portions exempted by Local Rule 7.3(d), in compliance with the Text Order of the Court dated February 6, 2024, limiting the word count for this brief to 14,000 words.

Dated: April 30, 2024

*/s/ Lyn K. Broom*
Richard L. Pinto
N.C. State Bar No. 9412
Lyn K. Broom
N.C. State Bar No. 17674
PINTO COATES KYRE & BOWERS, PLLC
3202 Brassfield Road Greensboro, NC 27410
Tel: (336) 282-8849
Facsimile: (336) 282-8409
rpinto@pckb-law.com
*Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2024, I electronically filed the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss using the ECF system, and notification of such filing (which constitutes service of this document) will be sent electronically by the ECF system to counsel of record in this case who have registered with that system.

Dated: April 30, 2024

/s/ Lyn K. Broom
Richard L. Pinto
N.C. State Bar No. 9412
Lyn K. Broom
N.C. State Bar No. 17674
PINTO COATES KYRE & BOWERS, PLLC
3202 Brassfield Road Greensboro, NC 27410
Tel: (336) 282-8849
Facsimile: (336) 282-8409
rpinto@pckb-law.com
Liaison Counsel