IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN RE: CROP PROTECTION PRODUCTS )
LOYALTY   PROGRAM   ANTITRUST )        1:23-md-3062
LITIGATION                    )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

In this multi-district litigation putative class action, a dozen farmers allege that two major manufacturers of crop protection products used by farmers have employed anticompetitive loyalty rebate programs. Relief is sought under federal antitrust law as well as the law of 38 states and territories and the District of Columbia. Before the court is the motion to dismiss by Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc. (Doc. 94.) Plaintiffs Clint Meadows, Michael Shows, Matt Taylor, John W. Jenkins, Clifton Kirven, Janie Yeargin, Ronald Yeargin, Donald F. Deline, Peter F. Bonin, Robert Ott, Bernard "B" Jones IV, and Martin Wait, all farmers who are alleged purchasers of Defendants' products, have responded in opposition (Doc. 110), and Defendants have replied (Doc. 124). The court heard argument on the motion on August 29, 2024. (See Doc. 156.) For the reasons set forth below, the motion will be granted in part and denied in part.

I.   **BACKGROUND**

In a related public enforcement action, the Federal Trade

Commission and a dozen states ("FTC Plaintiffs") have alleged substantially similar violations of antitrust and consumer protection laws by these same Defendants. See generally Fed. Trade Comm'n v. Syngenta Crop Prot. AG, 711 F. Supp. 3d 545, No. 1:22CV828, 2024 WL 149552 (M.D.N.C. Jan. 12, 2024). In brief, the FTC Plaintiffs allege that the Defendants have excluded generic manufacturers of certain active ingredient crop protection products ("CPPs") by paying loyalty discounts to distributors contingent on their purchasing 85% or more of their products from the respective Defendant, in addition to other alleged means of exclusion. Id. at 556-61. In the motion to dismiss in that action, the Defendants principally contended that the FTC Plaintiffs failed to plead a plausible product market and that the loyalty discount programs are *per se* reasonable under the "price-cost test" because, in the Defendants' view, price is the clearly predominant means of exclusion for their loyalty discount programs. Id. at 565-79. The court denied the motion to dismiss, holding that the FTC Plaintiffs had stated plausible claims for relief. Id. at 565-86.

Here, the United States Judicial Panel on Multidistrict Litigation consolidated for pretrial proceedings eight separate actions filed in the Southern District of Indiana with two separate actions filed in this district, as well as several tag along actions. In re Crop Protection Prods. Loyalty Program Antitrust

2

Litig., 655 F. Supp. 3d 1380 (J.P.M.L. 2023); (Docs. 1, 2, 12, 77.)  Pursuant to this court's case management order (Doc. 31), Plaintiffs filed a consolidated complaint on September 5, 2023 (Doc. 78).

Citing judicial efficiency, Defendants do not pursue the same arguments as those raised in the public enforcement action.  (Doc. 95 at 15 n.1.)  Instead, they challenge whether Plaintiffs may pursue antitrust claims against them as purported "indirect purchasers" of CPPs under Illinois Brick Company v. Illinois, 431 U.S. 720 (1977), and whether Plaintiffs have sufficiently alleged proximate cause under Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014).  (Doc. 95 at 22.) Defendants also raise myriad challenges to the state law claims.

Plaintiffs' consolidated complaint ("the complaint") (Doc. 78) spans 765 paragraphs.  The facts alleged that are necessary to the disposition of this motion, and which the court accepts as true for the purpose of this motion, show the following:

Plaintiffs are crop farmers from Missouri, Illinois, Florida, Texas, Tennessee, Wisconsin, California, Mississippi, and Arkansas.  (Doc. 78 ¶¶ 18-28.)  Each Plaintiff has purchased CPPs from at least one Defendant.  (Id.)

Defendant Syngenta Crop Protection AG is a corporation organized under the laws of Switzerland, with its headquarters in Basel, Switzerland.  (Id. ¶ 29.)  Defendant Syngenta Corporation

3

is a corporation organized under the laws of Delaware, with its headquarters in Wilmington, Delaware, and is a corporate affiliate of Syngenta Crop Protection AG. (Id. ¶ 30.) Defendant Syngenta Crop Protection, LLC is a limited liability company organized under the laws of Delaware, with its headquarters in Greensboro, North Carolina, and is a corporate affiliate of Syngenta Crop Protection AG. (Id. ¶ 31.) For ease of reference only, the three Syngenta Defendants are collectively referred to as "Syngenta" herein.

Defendant Corteva, Inc. ("Corteva") is a publicly-held corporation organized under the laws of Delaware, with its headquarters in Indianapolis, Indiana. (Id. ¶ 36.) Corteva was formed in 2015 after the 2011 merger of Dow Chemical Co. and DuPont. (Id. ¶ 37.) In 2019, DowDuPont spun off Corteva into a separate company. (Id.)

Defendants produce CPPs, which are pesticides. (Id. ¶ 41.) Defendants are two of the top agrochemical companies in the world. (Id. ¶ 61.) In the "traditional distribution channel," Defendants sell CPPs to distributors, the seven largest of which are Helena Agri-Enterprises, Nutrien Ag Solutions, Growmark, WinField Solutions, J.R. Simplot Company, Wilbur-Ellis, and CHS Inc. (Id. ¶ 63.) These distributors own and operate retail businesses that then sell the CPPs to farmers. (Id. ¶ 64.) Ninety percent of CPP sales run through the traditional distribution channel, and ninety percent of traditional distribution channel sales run through the

4

above-mentioned seven distributors.  (Id. ¶ 66.)  This means that eighty percent of total CPP sales run through these seven distributors.  (Id.)  Plaintiffs allege that economies of scale make the traditional distribution channel efficient and that there are "no viable, cost-effective alternatives" to it.  (Id. ¶ 68.)

Each CPP contains at least one active ingredient, or "AI," to kill or control pests.  (Id. ¶ 42.)  Inert ingredients, on the other hand, do not kill pests but may have other functions, such as facilitating application to the crop or improving the CPP's shelf life.  (Id. ¶ 43.)  AIs are not generally interchangeable; rather, they are said to differ in several ways, including:

> (1) what crop or crops they are suited for and registered to be used on, which may correlate with geography; (2) when in the growing cycle they may be used; (3) whether they are used in herbicides, insecticides, or fungicide; (4) what specific pest(s) they are designed to target; (5) their efficacy in protecting crops from pests, which is often measured in terms of crop yield improvements; and (6) their suitability for use in different locations, weather, or climates.

(Id. ¶ 46.)

Developers of new AIs obtain exclusive use through two mechanisms.  First, under patent law, a developer can obtain 20-year patent protection.  (Id. ¶ 51.)  Second, under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., a developer of an AI must submit environmental impact data to the U.S. Environmental Protection Agency prior to sale or distribution in the United States.  Upon approval, the

5

developer obtains the exclusive right to use the data that supported its EPA submission for ten years; this "serves as a separate exclusivity period in which other companies cannot use the active ingredient." (Id. ¶¶ 52-53.) After FIFRA protection expires for a registered AI, a third-party may register a product on a fast track if it is "identical or substantially similar" to the AI whose registration has expired. (Id. ¶ 57.) These "generic registrants" rely on the data submitted on the primary registration and make data compensation payments to the primary registrant. (Id.)

Every AI relevant to this action has at least one corresponding generic registration. (Id. ¶ 58.) Plaintiffs allege that a generic version of a brand name CPP that shares the same AI(s) is a "substitute" because it is "chemically identical." (Id. ¶ 48.) However, CPPs that contain different AIs are not "reasonable substitutes." (Id.) Plaintiffs allege that generic CPPs are "generally sold at significantly lower prices than equivalent branded products." (Id. ¶ 59.) For that reason, generic entry would "spark price competition" and "cause the price and sales volume of branded products — and thus Defendants' profits — to decline." (Id.)

The core of Plaintiffs' claims in this action pertains to Defendants' alleged employment of a "generic defense" strategy to prevent the entry of generics into the market for certain AIs.

6

(Id.)[1]  Though the details of Syngenta's and Corteva's respective programs are alleged in detail in the complaint (id. ¶¶ 89-193), Defendants' principal positions on this motion are not particularized as to any Defendant or AI.

By way of an overview of the programs, which Plaintiffs allege "work in essentially the same way," Defendants have entered into "loyalty agreements" with major distributors, distributor-owned retailers, and other authorized retailers that sell their CPPs. (Id. ¶ 71.)  Under a loyalty agreement, Defendants offer a substantial payment, conditioned on the distributor's limiting its purchase in a given year of generic CPPs containing a specified post-patent AI.  (Id.)  The "loyalty threshold" to qualify for the loyalty discount is expressed as a percentage of the distributor's total purchase of the AI.  (Id.)  The loyalty thresholds have generally ranged from eighty-five percent to ninety-nine percent, and the incentive payments range from two percent to ten percent of total sales.  (Id. ¶¶ 96-97, 121, 155.)  Plaintiffs allege that Defendants also offer additional loyalty payments for bundles of several AIs, or AIs and other crop-related products, such as seeds and fertilizers.  (Id. ¶¶ 76, 77.)

In addition to offering loyalty discounts, Defendants

---

[1] As to Syngenta, these AIs are azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda-cyhalothrin; as to Corteva, these AIs are rimsulfuron, oxamyl, and acetochlor.  (Doc. 78 ¶ 69.)

"closely monitor" distributors' sales to ensure compliance through an electronic data interchange.  (Id. ¶ 79.)  Further, Defendants have allegedly "threatened to punish distributors and retailers who fail to meet their loyalty thresholds by canceling contracts, temporarily denying access to certain products, and/or declining to supply the distributor or retailers with needed products." (Id. ¶ 81.)  Defendants have allegedly followed through on these threats.  (Id. ¶ 82.)

Plaintiffs allege that incontestable demand for Defendants' CPPs make the cost of being penalized by not meeting the loyalty thresholds financially unacceptable.  (Id. ¶ 78.)  Defendants' distributors and retailers have therefore "strictly manage[d]" their purchase of generic CPPs, steered customers toward loyalty-compliant CPPs, curtailed marketing efforts associated with generic CPPS, and even removed generic products from their price lists altogether.  (Id. ¶ 85.)  As a result of these loyalty programs, Defendants allegedly maintain prices above those that would prevail in a competitive market.  (Id. ¶ 88.)  Moreover, the programs have "substantially impeded" generic entry for each AI subject to this action.  (Id. ¶ 87.)  Plaintiffs allege that the above-mentioned seven major distributors, their retailers, and others are co-conspirators in Defendants' anticompetitive conduct. (Id. ¶ 38.)

Plaintiffs plead fifty-eight claims for relief on behalf of

8

themselves and those similarly situated. The three federal claims arise under sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2, and section 3 of the Clayton Act, 15 U.S.C. § 14. (Id. ¶¶ 272-292.) For each federal claim, Plaintiffs seek damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26. (Id. ¶¶ 280-81, 286, 292.) The remaining claims arise under antitrust, consumer protection, and unfair and deceptive trade practices statutes of various states and territories.[2] (Id. ¶¶ 293-765.) Plaintiffs seek class certification, declaratory relief, injunctive relief, damages, and attorneys' fees and costs. (Id. at 185-86.) Defendants now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 94.) The motion has been fully briefed and is ready for resolution.

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). A Rule 12(b)(6) motion to dismiss is meant to "test[]

---

[2] These are Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citation omitted). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] . . . the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

10

**B.   Motion to Dismiss**

Defendants contend that the federal claims should be dismissed because Plaintiffs, in their view, are "indirect purchasers" of their CPPs or, in the alternative, because they have failed to plead proximate cause.   (Doc. 95 at 16.) Additionally, Defendants argue that the state law claims should be dismissed for failure to plead proximate cause, and for an array of state-specific grounds.   (Id. at 17.)   The court turns first to the federal claims, and specifically whether the indirect purchaser rule bars Plaintiffs' federal claims for damages.

**1.   Federal Antitrust Claims**

**a.   Indirect Purchaser Rule**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."   15 U.S.C. § 1.   Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."   Id. § 2.   Section 3 of the Clayton Act makes it unlawful for

> any person engaged in commerce . . . to lease or make a
> sale or contract for sale of goods . . . for use,
> consumption, or resale within the United States . . . or
> fix a price charged therefor, or discount from, or rebate
> upon, such price, on the condition, agreement, or

11

understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Id. § 14.  Section 4 of the Clayton Act creates a private right of action for "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws."  Id. § 15(a).

In interpreting section 4 of the Clayton Act, the Supreme Court has held that "the immediate buyers from the alleged antitrust violators" may maintain a suit against the antitrust violator for damages.  Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 207 (1990).  However, "indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue." Apple Inc. v. Pepper, 587 U.S. 273, 279 (2019) (emphasis in original).  Put another way,

if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A if A is an antitrust violator.  And C may sue B if B is an antitrust violator.

Id. at 280.

This rule is derived from Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  There, the defendants manufactured and sold concrete blocks to masonry contractors, who used those blocks in masonry structures.  Id. at 726.  The masonry contractors sold

12

those structures to general contractors who incorporated the structures into larger building projects; the general contractors then sold those constructions to customers, including the plaintiffs. Id. at 726. The plaintiffs contended the manufactures at the start of the chain had used their monopoly power to inflate the concrete blocks' cost, and the intermediate actors in the distribution chain had passed on the price overcharge. Id. at 726-27. They argued that this arrangement amounted to combination and conspiracy to fix the prices of the concrete blocks in violation of section 1 of the Sherman Act, authorizing treble damages under section 4 of the Clayton Act. The Court held that the plaintiffs could not pursue damages against the defendant manufacturers (1) because the defendant would face a "serious risk of multiple liability" from others in the distribution chain seeking the same passed-through overcharge; and (2) because of the burdens attendant to the "evidentiary complexities and uncertainties" in determining the amount of overcharge passed on to an indirect purchaser. Id. at 730-33. The Court, however, recognized two potential exceptions to this rule: (1) where a pre-existing cost-plus contract exists, and (2) where the direct purchaser is controlled or owned by its customer. Id. at 735-36 & n.16.

The parties disagree on whether Illinois Brick bars Plaintiffs' damages claims against Defendants. The parties

13

disagree on the scope of the _Illinois_ Brick rule, particularly regarding what it means to be an indirect purchaser, and on the viability of any potential exceptions to that rule. (_See_ Doc. 95 at 23-32; Doc. 110 at 20-27; Doc. 156 at 7-8, 24.) Because the parties disagree so severely on the governing law, the court now sets out the most relevant precedents.

In 1990, the Supreme Court considered the case of natural gas suppliers that allegedly violated antitrust laws and overcharged public utilities, which in turn passed on the overcharge to their customers. _Kansas v. UtiliCorp United, Inc._, 497 U.S. 199, 204 (1990). Both the utilities and the states of Kansas and Missouri, acting as _parens patriae_, sued the suppliers. _Id._ The Supreme Court held that only the public utility had a cause of action against the suppliers under the _Illinois Brick_ rule. _Id._ The consumers represented by the states were indirect purchasers under that rule, because they had purchased gas from public utilities — intermediaries — rather than directly from the suppliers that had allegedly conspired to fix the price. _Id._ at 207.

The states offered three reasons why _Illinois Brick_ should not bar their claims, two of which are relevant here. _See id._ First, they asserted that none of the policy rationales underlying _Illinois Brick_ applied to cases involving regulated public utilities. _Id._ Second, they argued that the cost-plus exception

14

contemplated by Illinois Brick should apply to permit their claim. Id. at 207-08. The Supreme Court rejected both arguments. Id. at 208.

The Court explained the first argument was unpersuasive because it was doubtful the Illinois Brick rationales — easing apportionment of overcharges, eliminating double recoveries, and promoting enforcement of the antitrust laws — would be better served by applying an exception for regulated public utilities. Id. at 208-16. But it then instructed that although "[t]he rationales underlying . . . Illinois Brick will not apply with equal force in all cases," courts should view exceptions with disfavor because "[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." Id. at 216. The Court concluded: "In sum, even assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." Id. at 217.

The states' second argument, that an exception for sales under a cost-plus contract should apply, failed because the states had not alleged such a conspiracy. Id. at 217-18. The Supreme Court explained the implications of selling pursuant to a cost-plus contract, focusing on the intermediary's ability to sell at a fixed quantity:

> In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

Id. at 217 (alterations in original) (quoting Illinois Brick, 431 U.S. at 736). The regulations and tariffs applied to the utilities did not amount to a cost-plus contract, nor did they approximate one. Id. at 217-18. Without endorsing an exception to the Illinois Brick rule for "situations that merely resemble those governed by such a [cost-plus] contract," the Court noted any such exception would not apply to the case before it.[3] Id. at 218. The result was that Illinois Brick applied to bar the states' claims against the suppliers. Id. at 219.

The Fourth Circuit applied Illinois Brick in 2002 while considering antitrust claims against Microsoft. Dickson v. Microsoft Corp., 309 F.3d 193 (4th Cir. 2002). There, the plaintiffs had purchased computers that came equipped with Microsoft's operating system from original equipment manufacturers ("OEMs"). Id. at 198-99. The plaintiffs alleged a vertical conspiracy to restrain trade — specifically, that Microsoft offered the OEMs discounts and development cooperation in exchange

---

[3] Notably, the Court stopped short of fully endorsing the cost-plus exception, referring instead to "the possibility of an exception for cost-plus contracts." Id. at 218 (emphasis added).

16

for (1) long-term exclusionary licensing agreements, (2) the OEMs' agreement to limit the removal of Microsoft's icons from computers, and (3) the OEMs' integration of Internet Explorer software into the operating system. Id. at 199. While the Fourth Circuit held that the plaintiffs had adequately alleged two vertical conspiracies, the court concluded that the conspiracies did not impose unreasonable restraints of trade, and thus affirmed the district court's dismissal of the federal antitrust claims. Id. at 205-213 (discussing failure to allege market power of co-conspirators).

The court also held in the alternative that the plaintiffs were indirect purchasers barred from recovering damages under Illinois Brick. Id. at 213-16 (analyzing Illinois Brick under the hypothetical that it found the plaintiff's claims otherwise sufficiently alleged). In the course of concluding that Illinois Brick applied, the court determined that exceptions to the rule did not apply. Id. at 214-16. It started by noting the two exceptions contemplated by Illinois Brick itself: the situation of selling under a cost-plus contract, and "where the direct purchaser is owned or controlled by its customer." Id. at 214 (citing and quoting Illinois Brick, 431 U.S. at 736 & n.16). It also noted the Supreme Court's admonition in UtiliCorp against creating new exceptions to Illinois Brick. Id. (citing 497 U.S. at 216).

The Fourth Circuit observed that other circuit courts,

17

"[d]espite" the Supreme Court's guidance, had recognized a "co-conspirator exception." Id. at 214-15 (citing In re Brand Name Prescription Drugs, 123 F.3d 599, 604-05 (7th Cir. 1997); Paper Sys. Inc. v. Nippon Paper Indus., 281 F.3d 629, 631-32 (7th Cir. 2002); Campos v. Ticketmaster Corp., 140 F.3d 1166, 1171 (8th Cir. 1998); Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211 (9th Cir. 1984); and Lowell v. American Cyanamid Co., 177 F.3d 1228, 1231 (11th Cir. 1999)). Rather than accept that these cases stood for the proposition that Illinois Brick could be avoided by any allegation of a conspiracy, however, the Fourth Circuit "interpret[ed] [those] cases as standing for the narrower proposition that *Illinois Brick* is inapplicable to a particular type of conspiracy — price-fixing conspiracies." Id. at 215. In doing so, the court expressly declined to decide whether it would similarly recognize a price-fixing exception because the plaintiffs failed to allege such a conspiracy. Id. The Fourth Circuit did opine, in dicta, on what a proper co-conspirator exception would look like: one "grounded on the damages theory underlying the alleged conspiracy" such that "no overcharge has been passed on to the consumer." Id. at 215.[4]

---

[4] This explanation is dicta, not because it was part of an alternative holding, United States v. Fulks, 454 F.3d 410, 434-35 (4th Cir. 2006) (citing MacDonald, Sommmer & Frates v. Yolo Cnty., 477 U.S. 340, 346 n.4 (1986), for the proposition that "alternative holdings are not dicta"); Michael Abramowicz & Maxwell Stearns, Defining Dicta, 57 Stan. L. Rev. 953, 959 n.15 (2005) ("[I]t cannot be the case that an opinion that

In 2006, the Fourth Circuit considered another antitrust action against Microsoft.  Kloth v. Microsoft Corp., 444 F.3d 312 (4th Cir. 2006).  There, the plaintiffs had purchased from OEMs computers that came with pre-installed Microsoft software.  Id. at 317-18.  The OEMs purchased from Microsoft licenses to install and use the software and then in turn offered end-users, including the plaintiffs, an end-user license agreement to use the pre-installed software.  Id.  Microsoft allegedly dictated the terms of the end-user license agreements, which gave Microsoft remedies against end-users who breached them.  Id. at 318.  The plaintiffs alleged this structure resulted in various anticompetitive harms under the Clayton Act and Sherman Act.  Id.

The Fourth Circuit concluded the plaintiffs' claims against Microsoft were barred under Illinois Brick.  Id. at 323.  The court explained that "[t]o be governed by the Illinois Brick rule, plaintiffs have to be (1) indirect purchasers (2) seeking recovery for illegal overcharges."  Id. at 320.  Both prongs applied to the plaintiffs.  First, the fact that the end user license agreements granted rights and obligations between Microsoft and the

_____

strikes down a law on two grounds rather than one expresses no holding"), but because the explanation of what a proper Illinois Brick exception would look like was unnecessary to the outcome of Dickson as no price-fixing conspiracy was alleged.  See Payne v. Taslimi, 998 F.3d 648, 654-55 (4th Cir. 2021) (defining dictum as a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding") (citation omitted).

plaintiffs did not make the plaintiffs direct purchasers; instead, the fact that the plaintiffs bought those licenses from the intermediary OEMs controlled the analysis and rendered the plaintiffs indirect purchasers against Microsoft. Id. at 320-21. As to the second prong, the plaintiffs sought recovery for an illegal overcharge because they "st[ood] at the end of a distribution chain in which the intermediaries have independently set prices and passed on alleged overcharges"; the intermediary OEMs, the court observed, could assert the same theories of harm. Id. at 322-23. The Fourth Circuit concluded by observing that the case "fits easily within the Illinois Brick paradigm. The plaintiffs are end-users who purchased Microsoft licenses from OEMs and retailers at prices fixed by the OEMs and retailers. Id. at 323. In these circumstances, the indirect purchaser doctrine of Illinois Brick applies to bar their claims." Id. at 323.

The Supreme Court most recently considered Illinois Brick in Apple Inc. v. Pepper, 587 U.S. 273 (2019). Apple had created the App Store as the only place for iPhone owners to lawfully buy applications ("apps") for their phones. Id. at 276. Independent developers created most of the apps, and those developers then "contract[ed] with Apple to make the apps available to iPhone owners in the App Store." Id. at 277. Apple, through the App Store, in turn sold apps directly to iPhone users. Id. Apple required the sales prices to end in $0.99, but otherwise permitted

20

the developers to set the price.  Id.  Apple kept 30% of the sale price.  Id.  iPhone owners sued Apple, alleging it had "monopolized the iPhone apps aftermarket."  Id. (internal quotation marks and citation omitted).  In their view, they paid more for applications under the App Store's structure than they would in a competitive market.  Id.  Apple argued the iPhone owners were indirect purchasers under Illinois Brick and thus their claims under the Clayton and Sherman Acts were barred from suit.  Id. at 277; see id. at 279.

The Supreme Court concluded that the iPhone owners were direct purchasers and thus not subject to Illinois Brick.  Id. at 288. There was no intermediary between the iPhone owners and the alleged violator, Apple; instead, the iPhone owners purchased their apps directly from Apple as retailer.  Id. at 281.  The Court referred to Illinois Brick as "a bright-line rule where direct purchasers such as the consumers here may sue antitrust violators from whom they purchased a good or service."  Id.  That rule was represented by the formula this court previously mentioned:

> if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A if A is an antitrust violator.  And C may sue B if B is an antitrust violator.

Id. at 280.  While 30 states and the District of Columbia called on the Court to overrule Illinois Brick and allow C to sue A in that hypothetical, the Court declined to do so because the iPhone

21

owners were direct purchasers under established precedent.  <u>Id.</u> at 280 n.2.  The Court also rejected Apple's argument that <u>Illinois Brick</u> permitted suits by consumers against the party that set the retail price rather than the party that sold the product to the consumer.  <u>Id.</u> at 281-85.  Four Justices dissented on the grounds that the Court had "recast[]" <u>Illinois Brick</u> as a "formalistic rule of contractual privity."  <u>Id.</u> at 289 (Gorsuch, J., dissenting).  The Fourth Circuit, in dicta, recently cited <u>Pepper</u> for the proposition that "'immediate buyers from the alleged antitrust violators' can be construed as direct purchasers under the Clayton Act."  <u>In re Zetia (Ezetimibe) Antitrust Litigation</u>, 7 F.4th 227, 238 n.8 (4th Cir. 2021) (quoting <u>Pepper</u>, 587 U.S. at 280).

With these precedents in mind, the court returns to the case at hand.

### b.  Plaintiffs' Claims

In their response in opposition to Defendants' motion to dismiss, Plaintiffs argue that <u>Illinois Brick</u> does not bar their damages claims because they are direct purchasers from antitrust violators.  (Doc. 110 at 21.)  Plaintiffs seize on the statement from <u>Pepper</u>, quoted by <u>In re Zetia</u>, that "immediate buyers from the alleged antitrust violators may maintain [a] suit against the antitrust violators."  (<u>Id.</u>)  They contend that this language means a consumer may maintain an antitrust suit against the manufacturer

22

so long as the intermediate distributor is also part of the same antitrust violation.  (See id. at 21-24.)  In other words, those injured by antitrust violations may sue everyone involved in the antitrust violation, regardless of the defendants' position in the distribution scheme.  Here, Plaintiffs allege that the intermediary distributors are part of and benefit from the antitrust conspiracy, Plaintiffs have been injured by the resulting supracompetitive prices, and Plaintiffs now may sue the antitrust-violating manufacturers at the top of the chain.  (Doc. 78 ¶ 273-74; Doc. 110 at 21-24.)  Plaintiffs also argue that Dickson does not control the outcome of this case because that decision left open the possibility of a conspiracy workaround to Illinois Brick, contingent on an appropriate damages theory.  (Doc. 110 at 26.)  As they put it, "nothing in the decision suggests that [a vertical price-fixing conspiracy] is the only context in which standing could be found despite the presence of a multi-step distribution chain."  Id. (emphasis in original).

Defendants argue, correctly, that Plaintiffs are not direct purchasers under controlling law.  As an initial matter, Plaintiffs overread Pepper's statement that "immediate buyers from the alleged antitrust violators may maintain a suit against the antitrust violators."  587 U.S. at 280 (quotation marks and citation omitted).  That statement must be read in context.  At issue in Pepper was whether consumers could maintain suit for

23

supracompetitive prices against an alleged monopolistic retailer (Apple) even though the retailer did not set prices. See id. at 281 (describing Apple's "who-sets-the-price" argument). The Supreme Court answered in the affirmative because the consumers had made their purchases directly from Apple. See id. at 280-81, 288. It did not consider whether the consumers would have standing against the further-removed app developers had they also engaged in anticompetitive conduct, which would be more analogous to the situation here. See generally Pepper, 587 U.S. 273. And Plaintiffs' understanding of Pepper is contradicted by Pepper's own description of Illinois Brick: "a bright-line rule where direct purchasers such as the consumers here may sue antitrust violators from whom they purchased a good or service." Pepper, 587 U.S. at 281 (emphasis added).

This case instead satisfies the Illinois Brick test laid out in Kloth and is most factually similar to Dickson.

First, the Kloth test is satisfied. "To be governed by the Illinois Brick rule, plaintiffs have to be (1) indirect purchasers (2) seeking recovery for illegal overcharges." Kloth, 444 F.3d at 320. Here, Plaintiffs are indirect purchasers: they acknowledge having purchased CPPs from intermediaries (distributors or retailers) rather than from these manufacturing Defendants at the top of the distribution chain. (Doc. 110 at 20) (stating that Plaintiffs purchased CPPs "from a distributor or

24

retailer that entered into a loyalty program agreement" with Defendants); (Doc. 78 at ¶ 6) (referring to the distributors and retailers as "middlemen between Defendants and farmers"); <u>Cf. Kloth</u>, 444 F.3d at 320 ("In this case, it is apparent that the plaintiffs were indirect purchasers because they did not buy products directly from Microsoft"); <u>Pepper</u>, 587 U.S. at 281 (explaining that the plaintiffs were direct purchasers because "[t]here is no intermediary in the distribution chain between Apple and the consumer"). Plaintiffs also seek to recover for illegal overcharges, or supracompetitive prices charged by the alleged monopolist. <u>See Kloth</u>, 444 F.3d at 323. The complaint is replete with references to "overcharges," and Plaintiffs allege that Defendants charge the co-conspirator intermediaries supracompetitive prices before their CPPs reach Plaintiffs. (Doc. 78 ¶¶ 15, 251-52, 264, 268; <u>see id.</u> at ¶¶ 71-72, 201 (describing the distribution scheme and resulting supracompetitive prices).)[5]

Second, this case is factually most like <u>Dickson.</u> There, the plaintiffs alleged a vertical conspiracy where the intermediary computer manufacturers both aided and benefited from Microsoft's

---

[5] That Plaintiffs also allege the antitrust violations have excluded generics and caused a lack of product innovation does not alter the court's analysis. (<u>See</u> Doc. 78 ¶¶ 213-34, 235-38) (alleging Defendants' conduct caused "market foreclosure" to generics and a "lack of innovation".) The Fourth Circuit has explained that both harms — suppressing alternative manufacturers and stifling superior products — "are essentially claims for illegal overcharges passed on to consumers." <u>Kloth</u>, 444 F.3d at 322-23.

25

alleged anticompetitive conduct.  <u>Dickson</u>, 309 F.3d 198-200.  That
the intermediary coconspirators benefited from Microsoft's alleged
anticompetitive conduct did not suffice to avoid <u>Illinois Brick</u>.
<u>See id.</u> at 215-16.  Here, Plaintiffs similarly allege a conspiracy
between the manufacturers at the top of the chain, against whom
they hope to maintain suit, and with intermediary distributors.
<u>Dickson</u> indicates, however, that this vertical conspiracy
allegation is insufficient to escape <u>Illinois Brick</u>.[6]

Plaintiffs suggest <u>Dickson</u> does not control this case because
<u>Dickson</u> opened the possibility to a conspiracy claim predicated
upon the appropriate damages theory.  (Doc. 110 at 26.)  This
argument fails both factually and legally.  First, as a factual
matter, Plaintiffs do not appear to have alleged an appropriate
theory of damages akin to what the <u>Dickson</u> court contemplated.
There, the Fourth Circuit noted in dicta that in a price-fixing
conspiracy, "the consumer is the only party who has paid any
overcharge."  <u>Dickson</u>, 309 F.3d at 215 (citation omitted).  Here,
the complaint does not permit the determination that only

---

[6] Plaintiffs intimate, in a footnote, that <u>Pepper</u> has abrogated <u>Dickson</u>.
(Doc. 110 at 26 n.9.)  Supreme Court precedent does not abrogate prior
Fourth Circuit precedent unless it is clearly contrary to the earlier
Fourth Circuit precedent.  <u>See</u> <u>Short v. Hartman</u>, 87 F.4th 593, 605 (4th
Cir. 2023).  In trying to get there, Plaintiffs overread <u>Pepper</u>'s
statement that "immediate buyers from the alleged antitrust violators
may maintain a suit against the antitrust violators."  587 U.S. at 280;
<u>see</u> <u>supra</u>.  Plaintiffs are unable to show <u>Pepper</u> is in tension with
<u>Dickson</u>, let alone clearly contrary such that the two decisions are
"impossible to reconcile."  <u>Short</u>, 87 F.4th at 605 (citation omitted).

26

Plaintiffs as end-users of the CPPs have paid any overcharge. (See Doc. 78 ¶¶ 1-13, 69-252.)   It is not alleged, for example, that the rebates paid to the intermediaries fully offset the supracompetitive prices they pay to Defendants for the CPPs.   Nor is it clear that the intermediaries do not use any portion of the rebates to lower their own prices for end users or farmers. Instead, the difficulties of apportionment contemplated by Illinois Brick are present here.   In an unrelated case, another court came to the same conclusion:

> In any event, determining whether the overcharges were entirely absorbed by consumers would require a complicated economic analysis of which parties incurred the overcharges and whether the payments [to the intermediaries] accounted for these overcharges. The court in Dickson observed that this is "the exact analysis that Illinois Brick forbids" for purposes of the antitrust standing analysis.

In re Zetia (Ezetimibe) Antitrust Litigation, No. 2:18-md-2836, 2019 WL 6977405, at *6 (E.D. Va. Dec. 20, 2019) (citation omitted).

Second, the argument fails as a legal matter because Dickson did not actually open the door to the possibility of new, permissible conspiracy claims.   Dickson speculated on, without deciding, what an appropriate damages theory might look like — one where no overcharge is passed on to the consumer.   309 F.3d at 215.

Whatever the policy wisdom of a general conspiracy exception to Illinois Brick, it is not for this court to create one.   "While

27

district courts are often said to be the 'front line experimenters in the laboratories of difficult legal questions,' they are bound to follow circuit precedent" and controlling law. Carcaño v. McCrory, 203 F. Supp. 3d 615, 637 (M.D.N.C. 2016) (citation omitted). That controlling law includes, first, the Supreme Court's most recent enunciation of Illinois Brick as "a bright-line rule where direct purchasers such as the consumers here may sue antitrust violators from whom they purchased a good or service." Pepper, 587 U.S. at 281. Second, Illinois Brick recognized only two potential exceptions to the indirect purchaser rule: where sales are made under a cost-plus agreement and where the direct purchaser is controlled or owned by its customer. 431 U.S. at 736 & n.16. Third, the Fourth Circuit has yet to affirmatively embrace any additional exception to Illinois Brick or to enlarge any existing exception. See Dickson, 309 F.3d at 214-15; Kloth, 444 F.3d at 321-22; In re Zetia, 7 F.4th at 238 & n.8; accord In re Zetia, 2019 WL 6977405, at *6 (explaining that "the Fourth Circuit has never approved a price-fixing exception to the direct purchaser rule, much less an exception that extends to all instances of passed-on overcharges"). Fourth, the Supreme Court has admonished lower courts against creating new exceptions to Illinois Brick for fear of undermining the general rule. See UtiliCorp, 497 U.S. at 216-17. Therefore, Plaintiffs, who purchased CPPs from distributors and retailers rather than these

28

Defendants, are indirect purchasers under Illinois Brick without an applicable exception.

At the August 29 hearing, Plaintiffs offered a new argument for avoiding Illinois Brick: that they had, in fact, alleged a price-fixing conspiracy. (Doc. 115 at 24.) Plaintiffs contended that Illinois Brick and Dickson do not bar a price-fixing conspiracy, regardless of whether conspiracy allegations more broadly suffice to defeat the Illinois Brick rule. (Id. at 30.) Defendants responded that Plaintiffs failed to sufficiently allege a price-fixing conspiracy in the complaint. (Id. at 45-46.)

Plaintiffs' attempt to raise this new argument for the first time at oral argument, after extensive briefing by the parties in a case of this nature and after the Plaintiffs went to the trouble of preparing a consolidated complaint, "undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage." N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010). The court considers such an argument as waived. United States v. Bowles, 602 F.3d 581, 583 n.* (4th Cir. 2010) ("In his supplemental brief and at oral argument, Bowles argued for the first time that his guilty plea was not voluntary or competent. We find this argument is waived.").

However, it also fails on the merits. To survive a motion to dismiss under Rule 12(b)(6), there must be sufficient factual

allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Any suggestion of a price-fixing conspiracy in the complaint falls well short of the Twombly/Iqbal standard.

The Supreme Court has explained that the essence of price fixing is the agreement to sell at certain price levels or within certain price ranges:

> [P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon.

United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-23 (1940). At oral argument, when pressed by the court, Plaintiffs' counsel cited paragraphs 273, 274, and 275 of the complaint in support of the contention that the complaint contains a price-fixing allegation, equating "price stabilization" with "price fixing." (Doc. 156 at 24.) The complaint contains only four paragraphs that have any reference to fixing price in violation of federal law. (Doc. 78 ¶¶ 273-76.) Paragraph 274 is representative of the complaint's sparse treatment of price-fixing allegations:

30

> In formulating and carrying out the alleged agreement,
> understanding, and conspiracy Defendants, distributors,
> and authorized retailers did those things that they
> combined and conspired to do, including but not limited
> to the acts, practices, and course of conduct set forth
> above, and the following, among others: engaged in a
> combination or conspiracy in restraint of trade to
> artificially raise, <u>fix,</u> maintain, and/or stabilize
> prices for crop protection products containing the
> Relevant AIs principally but not exclusively, <u>by
> designing and enforcing loyalty programs that prevented
> and continue to prevent competing generic manufacturers
> from entering the market and/or efficiently distributing
> their products.</u>

(<u>Id.</u> ¶ 274) (emphases added.) Paragraph 273 alleges "Defendants

entered into a continuing agreement . . . with distributors and

authorized retailers . . . to artificially raise, fix, maintain,

and/or stabilize prices." (<u>Id.</u> ¶ 273.) Paragraph 275 uses the

same language but alleges that Defendants entered into a

"continuing agreement" with "each other." (<u>Id.</u> ¶ 275.) Paragraph

276 (not cited by Plaintiffs) contains a similar reference to a

"conspiracy . . . to artificially raise, fix, maintain, and/or

stabilize prices," this time through the mechanism of "entering

into a market allocation agreement." (<u>Id.</u> ¶ 276.) These are no

more than boilerplate references to the statutory requirements of

the Sherman Act. The complaint does not provide any <u>factual</u>

allegation to plausibly explain how Defendants conspired to fix

prices. (<u>See</u> <u>id.</u> ¶¶ 69-252.) Rather, the complaint's description

of harms accurately captures Plaintiffs' theory of the case:

"Through the use of their exclusionary loyalty programs and the

anticompetitive agreement between themselves, Syngenta and Corteva substantially foreclosed generic manufacturers from the Relevant Markets, stifled innovation, and imposed supracompetitive prices on farmers." (Id. ¶ 208.) At the hearing, Plaintiffs' counsel acknowledged as much, explaining that "there's not a fixed, specific price you must sell at, you know, cost plus 20 percent, or something like this. . . . there is an incentive to raise the price." (Doc. 156 at 25.)

The sale of products at supracompetitive prices, alleged throughout the complaint and described at the hearing, is not necessarily price fixing. Dickson makes this clear. There, the Fourth Circuit acknowledged the plaintiffs' allegation that the conspiracy between Microsoft and the OEMs resulted in supracompetitive prices for end-users, id. at 200, but ultimately concluded the plaintiffs had failed to sufficiently allege a price-fixing conspiracy, id. at 215. Here, the complaint alleges that Defendants' loyalty programs foreclosed generics from the market and caused Plaintiffs to pay higher prices for CPPs than they would in a competitive market. (See Doc. 78 ¶¶ 239-52.) But there are no allegations that distributors or retailers had to maintain any price. As in Dickson, the complaint's references to "supracompetitive prices" do not amount to an agreement to set

prices.[7]  See Socony-Vacuum, 310 U.S. at 222-23 (describing the agreement to set prices at specific levels or within ranges as the essence of price-fixing).  The complaint's passing references to price-fixing are insufficient under Twombly and Iqbal.[8]

Plaintiffs are indirect purchasers as to these Defendants. The Fourth Circuit has neither affirmatively adopted new exceptions to Illinois Brick nor enlarged existing exceptions to cover Plaintiffs' claims.  And the complaint does not plausibly allege price fixing.  Illinois Brick therefore bars Plaintiffs from seeking damages for antitrust violations under federal law.

### c.  Antitrust Standing & Proximate Causation

Defendants next argue that Plaintiffs' federal antitrust claims for both damages and injunctive relief should be dismissed for failure to adequately "satisfy the bedrock requirement of proximate causation."  (Doc. 95 at 32.)  Because the court concludes Illinois Brick bars Plaintiffs' federal damages claims, the court considers Defendants' proximate causation argument as it

---

[7] Plaintiffs' reliance on Lowell is misplaced.  There, plaintiffs alleged the rebate was contingent on the dealer selling American Cyanamid's product "at or above" the suggested resale price such that "the programs allegedly established a minimum resale price." 177 F.3d at 1228. Here, at best, Defendants' programs allegedly incentivize charging higher prices.

[8] Because the court concludes Plaintiffs failed to allege a price-fixing conspiracy, it need not decide whether a price-fixing conspiracy is a cognizable exception to the Illinois Brick indirect purchaser rule.  But see In re Zetia, 2019 WL 6977405, at *6 ("As a legal matter, the Fourth Circuit has never approved a price-fixing exception to the direct purchaser rule.").

relates to Plaintiffs' request for injunctive relief and relief under state law. Defendants contend that Plaintiffs' alleged injuries are "too remote from the alleged restraint of trade at the wholesale level" for three reasons: (1) Plaintiffs are indirect purchasers; (2) Plaintiffs are not "participants" in the wholesale market for CPPs, where the allegedly anticompetitive conduct reduced sales of generics; and (3) the complaint does not allege that Defendants limit the ability of generic manufacturers to reach Plaintiffs directly, such as through e-commerce. (Id. at 33-35) (emphases and boldface removed.) Plaintiffs argue in response that this proximate cause argument is essentially a "rehash" of Defendants' Illinois Brick argument. (Doc. 110 at 27.) They also assert that participation in the wholesale market is not required, and that while generics could reach farmers directly, the traditional and most efficient channel through which eighty percent of CPP sales run, as alleged in the complaint, is through seven distributors. (Id. at 16-17, 22, 28-31.)

Federal courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." Lexmark, 572 U.S. at 132. Where proximate cause is not plausibly alleged, the action may be barred on "statutory standing" grounds. Id. at 128 n.4. The Supreme Court has itself acknowledged a distinction between the Illinois Brick direct-purchaser rule and the proximate cause

34

requirement: "[T]he question of which persons have been injured by an illegal overcharge . . . is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under [the Clayton Act]." Illinois Brick, 431 U.S. at 728 n.7.  The requirement to allege antitrust standing applies to claims for both damages and injunctive relief.  Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 219-20 (4th Cir. 1987).

In the antitrust context, courts have assessed statutory standing under the factors set out in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) ("AGC").  See, e.g., Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 310-11 (4th Cir. 2007).  These factors are:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

Kloth, 444 F.3d at 324 (internal quotations and citations omitted).[9]  Here, because the court has concluded that Plaintiffs'

---

[9] The claim at issue in Lexmark was brought under the Lanham Act, 15 U.S.C. § 1051 et seq.  The Court did not adopt a proposed balancing test derived from AGC to assess proximate causation in the Lanham Act context. Lexmark Int'l, Inc., 572 U.S. at 134.  Circuit courts have nevertheless

35

federal damages claims are barred by <u>Illinois Brick</u>, there is a substantial question of the relevance of the last three factors to a request for injunctive relief. <u>See In re Interior Molded Doors Antitrust Litig.</u>, No. 3:18-cv-00718-JAG, c/w No. 3:18-cv-00850-JAG, 2019 WL 4478734, at *9 (E.D. Va. Sept. 18, 2019). However, as noted below, whether or not these factors apply, the result would not change.

The first two factors are related, because they "ensure that the plaintiff claims the proper <u>type</u> of injury to be accorded antitrust standing." <u>Novell</u>, 505 F.3d at 315 (emphasis in original). Following guidance from the Fourth Circuit, the court first considers the second factor: whether Plaintiffs have alleged an injury the antitrust laws were intended to prevent. <u>See</u> <u>id.</u> The key question is whether the alleged conduct destroys the freedom to compete through anticompetitive practices. <u>Id.</u> at 315-16. Like the Fourth Circuit in <u>Novell</u>, the court concludes

---

continued to rely on <u>AGC</u> since <u>Lexmark</u>, and Defendants cite to <u>AGC</u> frequently, including by stating that proximate causation is a "requirement of <u>Lexmark</u> and <u>AGC</u>." (Doc. 95 at 35); <u>see</u> <u>Johnson v. Comm'n on Presidential Debates</u>, 869 F.3d 976, 981-82 (D.C. Cir. 2017) (relying on <u>AGC</u>); <u>Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC</u>, 22 F.4th 103, 115-20 (2d Cir. 2021) (applying <u>AGC</u> factors); <u>Host Int'l, Inc. v. MarketPlace, PHL, LLC</u>, 32 F.4th 242, 249-50 (3d Cir. 2022) (same). The Fourth Circuit has stated that plaintiffs in the antitrust context must show "that they were <u>directly</u> — not proximately — injured by the violation" and cited <u>AGC</u>. <u>Mayor of Baltimore v. Actelion Pharms. Ltd.</u>, 995 F.3d 123, 130 (4th Cir. 2021) (emphasis in original). Defendants do not note any potential distinction between "directly" and "proximately" injured. (<u>See generally</u> Docs. 95, 124.) Because the Fourth Circuit in <u>Mayor of Baltimore</u> cited the <u>AGC</u> factors, and the parties argue under the language of proximate causation, the court will do the same.

Plaintiffs have alleged an injury to competition that the antitrust laws were designed to prevent. See id. at 316. According to the complaint, Defendants have successfully restrained competition by excluding competitor generic manufacturers from entering the market through loyalty agreements and rebate programs with the leading distributors in the market. (Doc. 78 ¶ 208); Cf. Novell, 505 F.3d at 316 ("Microsoft's activities, Novell claims, were intended to and did restrain competition in the PC operating-system market by keeping the barriers to entry into that market high.").

The court next considers the first factor: the causal connection between Plaintiffs' injuries and the alleged anticompetitive conduct. Here, that causal connection is straightforward: by excluding generic manufacturers from the CPP market, Defendants were able charge higher prices for their CPPs than they could in a competitive market with stronger participation by generic manufacturers. Those higher prices were ultimately reflected in the costs to farmers – including Plaintiffs - who serve as end users of those products. What is missing for Plaintiffs here is the related consideration of "whether [the] harm was intended." Id. (alteration in original) (quoting Kloth, 444 F.3d at 324). There is no suggestion in the complaint that Defendants acted with the specific intent to harm these Plaintiffs or end-user farmers more generally. But Plaintiffs do allege that

37

the rebate program is structured so that rebates are paid in years subsequent to purchases so as to discourage allowing the distributors to pass the rebates on to the purchasers. (Doc. 78 ¶ 80.) Because Plaintiffs have alleged conduct designed to destroy competition and harm flowing from the destruction of competition, the court concludes factors 1 and 2 favor Plaintiffs' standing.

The court next considers factors 3, 4, and 5: "the directness of the alleged injury; . . . the existence of more direct victims of the alleged antitrust injury; and . . . problems of identifying damages and apportioning them among those directly and indirectly harmed." Id. at 317 (quoting Kloth, 444 F.3d at 324). Factors 3 and 4 are closely related, because they focus on "granting standing to the most direct victims of defendants' anticompetitive conduct and denying standing to more remote victims on the theory that the direct victims have the greatest motivation to act as 'private attorney[s] general' and 'to vindicate the public interest in antitrust enforcement.' " Id. at 317-18 (quoting AGC, 459 U.S. at 542) (alteration in original).

Defendants' three reasons for why proximate cause is lacking here are not framed in relation to specific AGC factors. Nevertheless, each bears relation to the directness of Plaintiffs' injuries to Defendants' alleged conduct. As to the first — that Plaintiffs are indirect purchasers — this is a relevant but non-dispositive consideration. Illinois Brick's indirect purchaser

38

rule is a "bright-line rule". Pepper, 587 U.S. at 281. The AGC factors, however, are more flexible. Compare id. with Novell, 505 F.3d at 318-19. Rather than impose a bright-line rule, the Fourth Circuit has considered practical business realities when evaluating factors 3 and 4. In Novell, for example, the Fourth Circuit noted that other potential plaintiffs — such as OEMs who were prevented from installing the products of Microsoft's competitors — had not actually sued Microsoft. Novell, 505 F.3d at 318-19. The court reasoned that some parties might be too dependent on their existing business relationships with the antitrust violators to bring suit. Id. at 319 (citing Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 879 (1977), for the proposition that some parties "affected by an antitrust violation may well not sue because of their stake in an ongoing commercial relationship with the violator."). Here, Plaintiffs have alleged plausible reasons that the distributors are disincentivized from suing Defendants. Defendants allegedly employ both carrot and stick, offering distributors rebates for their part in excluding generic manufacturers and threatening to cancel contracts or deny access to products should the distributors fail to meet loyalty thresholds. (Doc. 78 ¶ 80-82.) Although these allegations about the relationship between Defendants and the distributors are insufficient to overcome Illinois Brick's bright-line rule, they

are relevant for the third and fourth AGC factors.  *Illinois Brick* and proximate cause are, however, ultimately analytically distinct.  *See Illinois Brick* at 431 U.S. at 728 n.7; *see also Interior Molded Doors*, 2019 WL 4478734 at *13.

As to Defendants' second reason — that Plaintiffs are not participants in the wholesale market for CPPs — Defendants cite in support *White v. Rockingham Radiologists, Limited*, 820 F.2d 98, 104 (4th Cir. 1987), for the proposition that not being an "actual consumer or competitor in the relevant market plays a meaningful role" under *AGC*.  (Doc. 95 at 35-36 & n.14.)[10]  But Defendants characterize the alleged (and unchallenged) relevant product market to fit their argument; nowhere do Plaintiffs constrain the relevant product market(s) to the wholesale level. (Doc. 78 ¶ 194 (defining product markets as comprised of each AI but not at wholesale level only).)  Moreover, Defendants do not address Plaintiffs' allegations of how the loyalty programs result in supracompetitive prices and limited market options for CPPs for Plaintiffs, even though they purchase from Defendants' alleged co-conspirators. (*See* Doc. 95 at 32-36; Doc. 78 ¶¶ 69-88).

And as to the third reason, Defendants argue that generic

---

[10] As Defendants concede, the Fourth Circuit has expressly rejected a bright-line approach that forecloses claims by non-consumers and non-competitors.  *See Novell, Inc.*, 505 F.3d at 311-12 (rejecting bright-line rule that only a consumer or competitor in a given market has antitrust standing).

40

manufacturers could reach farmers through other means, such as e-commerce. While plausibly true, Defendants fail to address the complaint's allegation that their loyalty programs substantially foreclose the most efficient channel of distribution through which eighty percent of the sales of CPPs run. (Doc. 78 ¶¶ 59, 66); see also Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." (emphasis added)). Whether other distribution channels would suffice to provide a sufficiently competitive market is a factual question. Here, the complaint plausibly alleges that pursuing these alternatives would be prohibitively inefficient for generic manufacturers, who lack access to warehouses, logistics, and retail networks with longstanding relationships with farmers. (See Doc. 78 ¶ 67.)

In sum, the court concludes Plaintiffs are the most direct victims of the alleged anticompetitive conduct under AGC, and accordingly factors 3 and 4 favor Plaintiffs.

The fifth, final factor considers "whether a finding of antitrust standing would lead to 'problems of identifying damages and apportioning them among those directly and indirectly harmed.'" Novell, 505 F.3d at 319 (quoting Kloth, 444 F.3d at 324). This factor favors Defendants. Plaintiffs' theory of harm, as previously noted, is that the exclusion of generic manufacturers

41

allows Defendants to impose supracompetitive prices. These supracompetitive prices were first paid by distributors, before Plaintiffs purchased CPPs from distributors and retailers. But the distributors receive a subsequent rebate from Defendants for participating in the loyalty programs. Apportioning damages would require the court to determine what amount of the overcharge was absorbed by the different entities within the distribution chain, an analysis that, while more complicated, is not impossible given the existence of Defendants' rebate program.

On balance, the court finds the AGC factors do not warrant dismissal of the federal antitrust claims here. Factors 1-4 favor Plaintiffs, while the potential practical problems associated with apportionment of damages favor Defendants.

As is apparent from the above analysis, AGC factor 5 is not relevant where the claim seeks injunctive relief, and factors 3 and 4 are of diminished relevance. One court has observed:

> The latter three AGC factors ensure that the most direct victims of . . . anticompetitive conduct obtain relief and prevent multiple lawsuits. Equitable relief, however, "raises no threat of multiple lawsuits or duplicative recoveries." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111 n.6 (1986). Indeed, "one injunction is as effective as 100." Hawaii v. Standard Oil Co., 405 U.S. 251, 261 (1972). In other words, injunctive relief vindicates the rights of all victims equally.

In re Interior Molded Doors Antitrust Litig., 2019 WL 4478734, at *9 (quotation marks and citation omitted) (ellipsis in original).

42

Because the court found that factors 1 and 2 favor Plaintiffs, it concludes that dismissal of all federal antitrust claims seeking injunctive relief for lack of proximate cause is unwarranted, either because four of the five AGC factors favor Plaintiffs' standing, or because only the first two factors are of primary relevance for injunctive relief and both favor Plaintiffs' standing. See Pocahontas Supreme Coal Co., 828 F.2d at 220 ("The 'antitrust standing' requirements for claimants seeking only injunctive relief concededly are less stringent than are those for claimants seeking treble money damages.").

## 2. State Antitrust and Consumer Protection Claims

The court turns next to Defendants' arguments for dismissal of Plaintiffs' state law claims. While Plaintiffs are farmers from nine states, their complaint alleges state antitrust violations occurring in twenty-nine states and territories[11] and state consumer protection act violations occurring in twenty-seven states and territories.[12] The amalgamation of these claims in this

---

[11] The state antitrust claims arise under the laws of Arizona, California, Connecticut, District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[12] The state consumer protection act claims arise under the laws of Arkansas, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Kansas, Massachusetts, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Utah, Virginia, and West Virginia.

43

one MDL action presents complex questions that require state-specific analysis, which is challenging given that the parties have devoted only a portion of their briefing to these claims. As a result, Defendants have moved to dismiss these state law claims largely on several common grounds, which the court addresses below.

### a. Causation

Defendants contend that Plaintiffs' state antitrust and consumer protection claims should be dismissed for failure to plausibly allege proximate causation. In a series of string cites, Defendants point to antitrust cases across states that they contend demonstrate (1) some states apply AGC; (2) some states apply a modified AGC test; and (3) some states have a more "state-specific remoteness inquiry." (Doc. 95 at 38-39 & nn.16-18.) They argue that similar causation requirements are imposed by states under the consumer protection statutes at issue here as well. (Id. at 41-44.) Importantly, Defendants do not contend that any state imposes a higher causation burden than exists under federal law. For this reason, and because as noted above the court concludes four of the five AGC factors favor Plaintiffs, Defendants have not demonstrated that any state law claims should be dismissed for lack of proximate causation at this stage.

### b. Out-of-State Injuries

Defendants next argue that Plaintiffs' claims under the laws of states where no named Plaintiff purchased any of Defendants'

44

CPPs should be dismissed for lack of Article III or statutory standing. (Doc. 95 at 44-45 (citing Mayor of Baltimore v. Actelion Pharms. Ltd., 995 F.3d 123, 133-34 (4th Cir. 2021)).) As Plaintiffs correctly argue (Doc. 110 at 42-43), however, claims on behalf of putative class members "need not be stricken or disregarded" under these circumstances. Mayor of Baltimore, 995 F.3d at 134. Rather, any claims under the law of states where the named Plaintiffs do not allege they purchased Defendants' CPPs, but class members did, is properly considered as a question under Rule 23 at the class certification stage, should this action proceed to that point. Id.

### c. Intrastate Conduct

Defendants argue that Plaintiffs' claims under the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq., Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws Ann. Ch. 93A § 1 et seq., and New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. Ann. § 358-A:1 et seq., should be dismissed for failure to allege sufficient intrastate conduct. (Doc. 95 at 46-49.) Because the court will dismiss Plaintiffs' MCPA claim on other grounds, infra, it need not address the parties' positions as to intrastate conduct for that claim. As to the Donnelly Act and NHCPA claims, Plaintiffs argue that Defendants ignore that they have realleged by reference preceding allegations for each of these state law claims such that intrastate injury is sufficiently

45

pleaded.  (Doc. 110 at 43-46.)

Under New York law, a Donnelly Act claim may be preempted by federal antitrust laws where the alleged conduct has "little or no impact on local intrastate commerce." WorldHomeCenter.com, Inc. v. PLC Lighting, Inc., 851 F. Supp. 2d 494, 500 (S.D.N.Y. 2011). Here, Plaintiffs realleged every preceding allegation in the complaint, thus alleging that (1) Plaintiffs or class members purchased CPPs in New York, (2) Defendants established or maintained a monopoly in New York for CPPs, and (3) Plaintiffs or class members were injured in New York.  (Doc. 78 ¶¶ 420, 422, 424, 425.)  As in WorldHomeCenter.com, Inc., these intrastate commerce allegations may be "sparse," but they are nevertheless sufficient to avoid a preemption challenge at the motion to dismiss stage. WorldHomeCenter.com, Inc., 851 F. Supp. 2d at 500-01; cf. Conergy AG v. MEMC Elec. Materials, Inc., 651 F. Supp. 2d 51, 60-62 (S.D.N.Y. 2009) (accepting preemption argument at motion to dismiss stage where there was no allegation that the defendants served New York customers).

Defendants' positions as to the NHCPA fare no better.  Under the NHCPA, the alleged conduct must constitute "trade or commerce within [New Hampshire]."  N.H. Rev. Stat. Ann. § 358-A:2. Defendants' reliance on Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 343-44 (D.N.H. 2012), is unavailing at this stage.  (See Doc. 95 at 34.)  In Precourt, the plaintiff did not

46

allege that <u>any</u> conduct by the defendant occurred in New Hampshire. <u>Precourt</u>, 856 F. Supp. 2d at 343-44.  By contrast, Plaintiffs here realleged all preceding allegations in the complaint and alleged that (1) class members purchased CPPs in New Hampshire, (2) Defendants established or maintained a monopoly in New Hampshire, and (3) class members were injured.  (Doc. 78 ¶¶ 260, 641, 644, 645, 650.)  At this stage, these allegations suffice to preclude dismissal of Plaintiffs' Donnelly Act and NHCPA claims on this ground.

### d.   Lack of <u>Illinois Brick</u> Repealer

Defendants argue that Plaintiffs' claims under the Montana Unfair Trade Practices and Consumer Protection Acts, Mont. Code Ann. §§ 30-14-101, <u>et seq.</u>, and 30-14-201, <u>et seq.</u>, and the Puerto Rico Antitrust Act ("PRAA"), 10 L.P.R.A. § 257, <u>et seq.</u>, should be dismissed because neither contains an <u>Illinois Brick</u> repealer. (Doc. 95 at 49.)  Generally, <u>Illinois Brick</u> repealer laws permit recovery for indirect purchasers under state law.  <u>See</u> <u>California v. ARC Am. Corp.</u>, 490 U.S. 93, 105-06 (1989) (holding such statutes are not preempted by federal law).  Defendants therefore argue that because Plaintiffs' claims are by indirect purchasers and these states do not permit such claims, they should be dismissed. As to Montana, Plaintiffs respond that claims under Montana's consumer protection statute are not barred by <u>Illinois Brick</u>. (Doc. 110 at 46.)  Defendants reply that these Montana Consumer

47

Protection Act claims should be barred for reasons other than _Illinois Brick_. (Doc. 124 at 28.) The viability of such claims is therefore discussed further below. As to Puerto Rico law, a majority of federal district courts have concluded indirect purchasers are barred from seeking damages under the PRAA. _See, e.g._, _In re Broiler Chicken Antitrust Litig._, No. 16 C 8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020); _In re Aggrenox Antitrust Litig._, 94 F. Supp. 3d 224, 252 (D. Conn. 2015); _United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc._, 74 F. Supp. 3d 1052, 1087 (N.D. Cal. 2014). This court, however, agrees with those courts that have concluded indirect purchasers may proceed with claims for damages under the Supreme Court of Puerto Rico's controlling interpretation of the PRAA. Interpreting that statute, the Supreme Court of Puerto Rico has explained there is only a minimal causation requirement:

> We rule that it is not necessary, in order to satisfy the "by reason of" requirement [within the PRAA], for the complaining party to prove anything more than a factual causal link between the harm suffered and the violation of the statute; that is, it is sufficient that, as a result of the violation of the law, the plaintiff has suffered damage.

_Pressure Vessels P.R. v. Empire Gas P.R._, 137 P.R. Dec. 497, 520 (1994) (Westlaw translation).

Although the _Illinois Brick_ rule was not at issue in _Pressure Vessels_, the Supreme Court of Puerto Rico did note United States Supreme Court cases considering the rule when it pronounced this

48

minimal causation requirement for the PRAA.  See id. at 519 (citing
UtiliCorp, 497 U.S. 199, and Blue Shield of Va. v. McCready, 457
U.S. 465 (1982)).    The United States District Court for the
District of Puerto Rico has relied on Pressure Vessels in
concluding that Illinois Brick does not bar indirect purchasers
under the PRAA.  Rivera-Muniz v. Horizon Lines Inc., 737 F. Supp.
2d 57, 61 (D.P.R. 2010).  A district court in the Fourth Circuit
has reached the same conclusion.  See In re Zetia Antitrust Litig.,
400 F. Supp. 3d at 433.  In like fashion, this court concludes the
Illinois Brick rule does not bar Plaintiffs from proceeding under
the PRAA.

### e.    Class Action Bars

Defendants contend that Plaintiffs' consumer protection
claims under the laws of Arkansas, Illinois, Montana, South
Carolina, and Utah[13] should be dismissed because these states'
consumer protection acts ("CPAs") expressly prohibit class
actions. (Doc. 95 at 50-51.)  Defendants argue that, under Justice
Stevens's concurring opinion in Shady Grove, which they contend
controls, Federal Rule of Civil Procedure 23 does not preempt these
statutory bars on class actions because they are "so intertwined

---

[13] The relevant statutes are the Arkansas Deceptive Trade Practices Act,
Ark. Code Ann. § 4-88-101, et seq., Illinois Consumer Fraud and Deceptive
Business Practice Act, 815 Ill. Comp. Stat. Ann. 505/1, et seq., Montana
Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§
30-14-101, et seq., and 30-14-201, et seq., South Carolina, S.C. Code
Ann. § 39-5-10, et seq., and Utah Consumer Sales Practices Act, Utah
Code Ann. § 13-11-1, et seq.

49

with a state right or remedy that [they] function[] to define the scope of the state-created right[s]." (Id. (quoting Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 423 (2010) (Stevens, J., concurring)).) In response, Plaintiffs argue that "numerous federal courts" have held that Rule 23 preempts these state class action bars. (Doc. 110 at 47-48.) While Defendants contend that Plaintiffs "do not dispute" that Justice Stevens's opinion controls (Doc. 124 at 29), Plaintiffs do not expressly state a position on which Shady Grove opinion controls. (See Doc. 110 at 47-48.)

In Shady Grove, the plaintiffs brought a class action in federal court under New York law to recover statutory interest penalties on overdue payments of insurance benefits. Shady Grove, 559 U.S. at 397. The issue before the Court was whether a separate New York state law, N.Y. Civ. Prac. Law Ann. § 901(b), which generally precludes an action to recover a "penalty" from proceeding as a class action, applies in diversity suits in federal court. Id. at 396. The plaintiffs contended that Rule 23 controlled class actions in federal court, and thus their action was not barred by the New York rule; Allstate contended that the New York rule addressed a separate, antecedent question – "whether the particular type of claim is eligible for class action treatment in the first place" – such that there was no conflict between the federal and state rules, and the court was free to apply the New

York rule.  Id. at 399-400.

To decide the case, a plurality of the Court explained that it must first decide if the federal rule "answers the question in dispute," and if so, then decide secondly if the federal rule "exceeds statutory authorization or Congress's rulemaking power" under the Rules Enabling Act, 28 U.S.C. § 2072(a).  Id. at 398.  A majority of the Court agreed at step one that Rule 23 provides a "one-size-fits-all formula for deciding the class-action question" — i.e., the question of whether a "class action may be maintained."  Id. at 399, 402.  A majority also agreed at step two that Rule 23 trumps section 901(b), but not without splintered understanding of how to determine the applicability of a federal rule which conflicted with a state rule.

Under Justice Scalia's four-justice plurality opinion, the applicability of a conflicting federal rule in a diversity action depends solely on whether the federal rule "regulates procedure." Id. at 406-10 (Scalia, J.).  As to Rule 23, the plurality reasoned that it regulates procedure, and thus applies in diversity suits, principally because the only impact it has on substantive rights is "incidental" to its procedural purposes.  Id. at 410, 415-16 (Scalia, J.).

Justice Stevens, writing for himself, concurred in the judgment and stated that the Court should instead focus on whether the state rule is "so bound up with," or "sufficiently intertwined

51

with," a substantive state law right or remedy "that it defines the scope of that substantive right or remedy." Id. at 420, 428 (Stevens, J., concurring). He concluded New York's law was not substantive and the federal rule controlled. Id. at 436. Justice Stevens reasoned that "the bar for finding an Enabling Act problem is a high one" and there must be "little doubt" that a federal rule would alter a state-created right in order to apply the state rule. Id. at 432 (Stevens, J., concurring). He further reasoned that any doubt that section 901(b) is not procedural should be resolved in favor of applying Rule 23 instead. Id. at 436 (Stevens, J., concurring). He observed that section 901(b)'s broad applicability to claims under all of New York law, other states' laws, and federal law is evidence that it does not define New York citizens' substantive rights or remedies, and that section 901(b)'s limit on class actions merely makes filing suit more difficult, akin to raising filing fees or setting deadlines for briefs, such that the rule has "classically procedural calibration." Id. at 433-35 (Stevens, J., concurring).

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" Marks v. United States, 430 U.S. 188, 193 (1977). That is not always easy to discern, and consequently courts have

not settled on which Shady Grove opinion controls. James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1217 (10th Cir. 2011) (noting that the Tenth Circuit has understood Justice Stevens's opinion to be controlling under Marks); Albright v. Christensen, 24 F.4th 1039, 1044 n.1 (6th Cir. 2022) ("[W]e restate our conclusion . . . that Justice Stevens's concurrence in Shady Grove controls the test governing the [Rules Enabling Act] and constitutional standards"); Abbas v. Foreign Pol'y Grp., LLC, 783 F.3d 1328, 1336-37 (D.C. Cir. 2015) (Kavanaugh, J.) (holding that there is no Marks controlling opinion in Shady Grove and applying Sibbach v. Wilson & Co., 312 U.S. 1 (1941)). The Fourth Circuit has not definitively adopted the reasoning of one opinion, see Pledger v. Lynch, 5 F.4th 511, 518-524 (4th Cir. 2021) (discussing Shady Grove at length, never citing or discussing Justice Stevens's concurrence, and discussing the procedural purpose of both the federal and the state rule); id. at 527-32 (Quattlebaum, J., concurring) (same), but at least one district court in this circuit has adopted Justice Stevens's concurrence, see Fejzulai v. Sam's West, Inc., 205 F. Supp. 3d 723, 726 (D.S.C. 2016) (stating, albeit without any data, that "a majority of courts have concluded that Justice Stevens' concurring opinion is controlling in view of the 'narrowest grounds' principle"). See also Ryan C. Williams, Questioning *Marks*: Plurality Decisions and Precedential Constraint, 69 Stanford L. Rev. 795, 859-64 (2017) (discussing

53

difficulty of applying Marks to Shady Grove because the dissent did not weigh in on the issue that divided the plurality and concurrence).

Here, there is little doubt that a class action could proceed under Arkansas, Illinois, Montana, South Carolina, and Utah law if Justice Scalia's plurality opinion were applied. First, the same rule at issue in Shady Grove, Rule 23, "answers the question" in dispute: whether a class action may be maintained. Shady Grove, 559 U.S. at 398. Second, because Rule 23 "really regulates procedure" and is not challenged by Defendants as ultra vires, the Shady Grove plurality would apply it here. Id. at 410 (Scalia, J.) (citation omitted).

Though Defendants advocate for the "statute-specific inquiry advanced by Justice Stevens," they do not themselves analyze the text of any of the state statutes at issue or point to any legislative history to support their position that Justice Stevens's approach requires the court to bar the challenged class action claims. (Doc. 124 at 30; see Shady Grove, 559 U.S. at 431-35 (Stevens, J., concurring) (discussing statutory text and legislative history of New York law). The parties have cited a mixed (and sizeable) assortment of district court cases applying Shady Grove to these laws, with some barring class actions,[14] and

---

[14] In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-

others permitting them.[15]  See PNY Techs., Inc. v. SanDisk Corp., No. 11-CV-04689, 2014 WL 1677521, at *5 n.7 (N.D. Cal. Apr. 25, 2014) (observing that it is "not the Court's job to dig through [string-cited cases] to discern and craft an argument" for a party).

Given the parties' limited treatment of this issue and the relative uncertainty as to the appropriate test to apply under Shady Grove in this circuit, the court concludes that it is premature to preclude the challenged class action claims at this stage. On this limited briefing, the court cannot conclude

MD-02503, 2017 WL 4621777, at *20 (D. Mass. Oct. 16, 2017) (holding at class certification stage that Montana class action bar trumps Rule 23); In re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 642, 661 n.4 (E.D. Mich. 2011) (stating that, even though Montana claim was dismissed on other grounds, the class action would "likely continue to be barred in federal court" under Shady Grove); Stalvey v. Am. Bank Holdings, Inc., No. 4:13-CV-714, 2013 WL 6019320, at *4 (D.S.C. Nov. 13, 2013) (barring class action claim under South Carolina law); Fejzulai v. Sam's W., Inc., 205 F. Supp. 3d 723, 729 (D.S.C. 2016) (same); Est. of Pilgrim v. Gen. Motors LLC, 344 F.R.D. 381, 405-06 (E.D. Mich. 2023) (barring Utah and Montana class action claims under Shady Grove after acknowledging that the plaintiffs offered no response on the issue); In re Target Corp. Data Sec. Breach Litig., 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (barring Utah class action claim where the plaintiff conceded the issue).

[15] In re Broiler Chicken Antitrust Litig., 290 F. Supp. 3d 772, 818 (N.D. Ill. 2017) (not barring Illinois class action claim); In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs, No. 21-12061, 2023 WL 2182046, at *5 (D.N.J. Feb. 23, 2023) (same); Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp., No. 23-828, 2023 WL 8018980, at *13 (E.D. Pa. Nov. 20, 2023) (same); In re Toyota RAV4 Hybrid Fuel Tank Litig., 534 F. Supp. 3d 1067, 1115 (N.D. Cal. 2021) (not barring Montana class action claim); In re Packaged Seafood Prod. Antitrust Litig., 242 F. Supp. 3d 1033, 1085-86 (S.D. Cal. 2017) (not barring South Carolina class action claim); In re Dealer Mgmt. Sys. Antitrust Litig., 362 F. Supp. 3d 510, 553 & n.23 (N.D. Ill. 2019) (concluding the plaintiffs' class-action claims would survive under either the plurality or Justice Stevens's approach and permitting Alaska, Arkansas, Georgia, and South Carolina class actions).

Defendants have met their burden at the motion to dismiss stage to clear the "high [bar]" for "finding an Enabling Act problem," even assuming Justice Stevens's <u>Shady Grove</u> opinion controls. 559 U.S. at 432. <u>Cf.</u> <u>id.</u> ("The mere possibility that a federal rule would alter a state-created right is not sufficient. There must be little doubt."). Instead, the parties may more fully address the applicability of <u>Shady Grove</u> on a more developed record. Defendants' motion to dismiss the class action claims under Arkansas, Illinois, Montana, South Carolina, and Utah law will therefore be denied without prejudice.

### f. Non-Commercial Consumers

Defendants assert that Plaintiffs' CPA claims under the laws of the District of Columbia, Massachusetts, Missouri, Montana, Oregon, Pennsylvania, Rhode Island, Utah, and Virginia should be dismissed because these acts protect only personal, rather than commercial, use of goods. (Doc. 95 at 52-53.) Specifically, Defendants contend that because Plaintiffs used the CPPs in their businesses, the CPAs cannot apply. (<u>Id.</u>) Plaintiffs counter that "personal" use merely means that the goods were not purchased for resale, which they maintain the complaint alleged. (Doc. 110 at 48-49.) Plaintiffs conceded at oral argument, however, that this litigation is "about commercial farmers," who "use [CPPs] for their businesses." (Doc. 156 at 77-78.)

The CPAs of the above jurisdictions cabin relief to purchases

for personal, family, or household purposes.[16]  As Defendants point

out, Plaintiffs allege that they use the CPPs in "their business."

(Doc. 78 ¶ 1; id. ¶¶ 18-28 (describing occupation of Plaintiffs as

"farmer").)  Moreover, as discussed below, case law analyzing each

of these CPAs supports Defendants' position that Plaintiffs

purchased CPPs outside of the "personal, family, or household"

context.

Under the District of Columbia Consumer Protection Procedures

Act ("DCCPPA"), D.C. Code § 28-3901, et seq., a purchase other

than for resale has been described as "usually" personal. Adam A.

Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005 (D.C. 1989).

However, courts have found that the purchase of goods for a

business would be exempt from the DCCPPA.  Ford v. Chartone, Inc.,

908 A.2d 72, 84 n.12 (D.C. 2006) ("A purchase of supplies or

equipment for a business operation, for example, might be exempt

even though such goods would not be resold."); Mazanderan v. Indep.

[16] The relevant statutes are the District of Columbia Consumer Protection
Procedures Act, D.C. Code § 28-3901(a)(2)(B)(i) ("normally use for
personal, household, or family purposes"); Missouri Merchandising
Practices Act, Mo. Ann. Stat. § 407.025(1) ("primarily for personal,
family or household purposes"); Montana Unfair Trade Practices and
Consumer Protection Act, Mont. Code Ann. § 30-14-102(1) ("primarily for
personal, family, or household purposes"); Oregon Trade Practices Act,
Or. Rev. Stat. Ann. § 646.605(6)(a) ("primarily for personal, family or
household purposes"); Pennsylvania Unfair Trade Practices and Consumer
Protection Law, 73 Pa. Stat. Ann. § 201-9.2 ("primarily for personal,
family or household purposes"); Rhode Island Deceptive Trade Practices
Act, R.I. Gen. Laws § 6-13.1-5.2(a) ("primarily for personal, family,
or household purposes"); Utah Consumer Sales Practices Act, Utah Code
Ann. § 13-11-3(2)(a)(i) ("primarily personal, family, or household
purposes"); Virginia Consumer Protection Act, Va. Code Ann. § 59.1-198
("used primarily for personal, family or household purposes").

<u>Taxi Owners' Ass'n, Inc.</u>, 700 F. Supp. 588, 591 (D.D.C. 1988) (exempting purchase of gasoline by taxicab driver); <u>Shaw v. Marriott Int'l, Inc.</u>, 605 F.3d 1039, 1043-44 (D.C. Cir. 2010) (exempting employer's payment of employee's hotel stay as "not meaningfully different than its purchase of a stapler for the office," which are both "done for a business purpose").

Here, Plaintiffs do not allege that CPPs are used for anything other than for business reasons – i.e., that Plaintiffs are commercial farmers rather than growing crops for personal use. However, they contend that <u>Klank</u> holds that a "transaction is covered by the statute so long as 'the purchaser is not engaged in the regular business of purchasing . . . and reselling it." (Doc. 110 at 49 (ellipsis in original).) Yet they elide the nuance in <u>Klank</u>'s analysis, which is that lack of resale "usually" would put it within the scope of the DCCPPA. <u>Klank</u>, 561 A.2d at 1005; <u>Shaw</u>, 605 F.3d at 1043 (discussing <u>Klank</u> and stating that "usually does not mean always"). While Plaintiffs contend that their purchase of CPPs has in it a "personal ingredient" (Doc. 110 at 49 n.50), they cite no authority to show that this is by itself sufficient. This proposition also fails to address how the good is "normally use[d]," as the court must consider under the DCCPPA. D.C. Code § 28-3901(a)(2)(B)(i).[17]   Accordingly, Plaintiffs' DCCPPA claim

_____

[17] Under other states' CPAs, the court must typically look to the primary

will be dismissed.

Plaintiffs' claims under Missouri's, Montana's, Oregon's, Pennsylvania's, Rhode Island's, Utah's and Virginia's CPAs fare no better. Courts have held similar allegations as alleged here to be insufficient to state a claim. Crane v. Archer Daniels Midland Co., No. 2:24-CV-3, 2024 WL 2803025, at *7-*8 (E.D. Mo. May 31, 2024) (under Missouri MPA, holding that the purchase of rabbit feed "for the purpose of breeding and selling [the rabbits'] progeny as show rabbits" constituted a business purpose, rather than personal purpose, and therefore dismissing the claim); cf. Kerr v. Vatterott Educ. Centers, Inc., 439 S.W.3d 802, 810-11 (Mo. Ct. App. 2014) (affirming that the Missouri MPA requires proof that the good was purchased "for primarily a personal, family, or household purpose," and deferring to jury finding that vocational training was a consumer service because, for the plaintiff, it was "valueless because it did not count toward her nursing degree" and instead the education was obtained "for the sake of receiving it"); see In re DRAM Antitrust Litig., 516 F. Supp. 2d 1072, 1113 (N.D. Cal. 2007) (under Montana UTPCPA, acknowledging that a business entity could be a consumer, but holding that the plaintiffs failed to allege that they had used the good for personal use); In re

_____

purpose of the purchase to determine if it is covered. E.g., Mo. Ann. Stat. § 407.025(1) ("primarily for personal, family or household purposes"). A mere "personal ingredient" would not suffice here, either.

Auto. Parts Antitrust Litig., No. 12-MD-02311, 2013 WL 2456612, at
*30 (E.D. Mich. June 6, 2013) (under Montana UTPCPA, barring claim
by automobile dealers who purchased car parts from suppliers
because they were intermediaries rather than consumers using goods
for personal, family, or household use); Miller v. Hubbard-Wray
Co., 630 P.2d 880, 905-06, modified, 53 Or. App. 531, 633 P.2d 1
(Or. Ct. App. 1981) (under Oregon TPA, dismissing claim where a
plaintiff purchased a baler to feed his cattle for his family
cattle business); Searle v. Exley Exp., Inc., 564 P.2d 1054, 1056
(Or. 1977) (under Oregon TPA, holding that freight truck purchase
was not personal because "it would be purchased to carry on a
business"); Balderston v. Medtronic Sofamor Danek, Inc., 152 F.
Supp. 2d 772, 776, 780 (E.D. Pa. 2001) (citing Valley Forge Towers
S. Condo. Ass'n v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641,
645 (Pa. Super. 1990)) (under Pennsylvania UTPCPL, dismissing the
plaintiff's claim where he, a doctor running a medical practice,
had purchased surgical screws for his business); In re Glumetza
Antitrust Litig., 611 F. Supp. 3d 848, 869-70 (N.D. Cal. 2020)
(under Rhode Island DTPA, dismissing claim where plaintiffs used
good to provide it to "subsequent consumers"); Miami Prods. & Chem.
Co. v. Olin Corp., 546 F. Supp. 3d 223, 235 (W.D.N.Y. 2021) (under
Utah CSPA, dismissing claim where plaintiffs' purchased caustic
soda, which is a "commodity chemical" sold and used "for industrial
purposes"); Baker v. Elam, 883 F. Supp. 2d 576, 579 (E.D. Va. 2012)

60

(under Virginia CPA, holding that purchase of canine semen for breeding was not personal because purchaser was a supplier of canines).

Plaintiffs' reliance on Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp., No. 23-828, 2023 WL 8018980 (E.D. Pa. Nov. 20, 2023), is inapposite, as the court there permitted the claim by the city plaintiff to proceed because it had "transitively" purchased vaccines on behalf of its individual citizens, id. at *17 (stating that theory was "novel" but akin to an insurer who reimburses members for purchases, whose claims had been permitted to proceed).  Plaintiffs make no such transitive argument here.  Plaintiffs cite no authority to support treating their purchases as transactions for personal, household, or family purposes, and consistent with the courts that have held similar allegations insufficient, this court will dismiss Plaintiffs' CPA claims under the laws of the District of Columbia, Missouri, Montana, Oregon, Pennsylvania, Rhode Island, Utah and Virginia (Claims 16, 36, 43, 51, 52, 53, 56, 57.)

The Massachusetts Consumer Protection Act ("MCPA") distinguishes between "consumer" claims under section 9 and "business" claims under section 11. Mass. Gen. Laws ch. 93A, §§ 9, 11; Lantner v. Carson, 373 N.E.2d 973, 976 (Mass. 1978) ("[W]here § 9 affords a private remedy to the individual consumer . . . , an entirely different section, § 11, extends the same remedy to '[a]ny

61

person who engages in the conduct of any trade or commerce.'"). "[A] plaintiff who acts in a business context has a cause of action exclusively under § 11." Frullo v. Landenberger, 814 N.E.2d 1105, 1112 (Mass. Ct. App. 2004). While the MCPA permits indirect purchaser claims under section 9, it does not under section 11. Rafferty v. Merck & Co., 92 N.E.3d 1205, 1223 n. 7 (Mass. 2018) ("Unlike claims under § 9, claims under § 11 require not only that the defendant's conduct occur in "trade or commerce" but also that there be a commercial transaction between the parties."). Plaintiffs have improperly pleaded a claim under section 9, having purchased CPPs "in a business context." Frullo, 814 N.E.2d at 1112. Because the court has concluded Plaintiffs are indirect purchasers under Illinois Brick, the claim would nevertheless fail even if it were pleaded under section 11. The court will dismiss this MCPA claim. (Claim 41).

### g. Deceptive, Misleading, or False Acts

Defendants contend that thirteen of Plaintiffs' CPA claims should be dismissed because each of the CPAs underlying those claims requires allegations of deceptive or misleading conduct. (Doc. 95 at 54.) Because the court has already dismissed the claims under Oregon, Pennsylvania, Utah, and Virginia law (among others), the remaining state CPA claims challenged on this ground are brought under Arkansas, Colorado, Illinois, Kansas, Minnesota, New York, North Dakota, South Dakota, and West Virginia law.

As a preliminary matter, state CPAs are varied in ways relevant here. Some are modeled after section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, by declaring unlawful "unfair or deceptive acts or practices" and "unfair methods of competition." E.g., Mont. Code Ann. § 30-14-103. Others include section 5's language and enumerate a non-exhaustive list of unlawful acts or practices. E.g., 815 Ill. Comp. Stat. Ann. 505/2. Certain others prohibit unfair or deceptive acts without reference to "unfair methods of competition." E.g., Wyo. Stat. Ann. § 40-12-105(xv). And others prohibit "unconscionable" acts without reference to "unfairness" altogether. E.g., Ala. Code § 8-19-5(27).

In parsing these differences, "a federal court sitting in diversity is obliged to apply state law principles to resolve [a question of state law statutory construction], utilizing such principles as enunciated and applied by the state's highest court." Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 482 (4th Cir. 2007). Where there is no existing on-point interpretation, the court must predict how the state's highest court would interpret it. See King v. Ord. of United Com. Travelers of Am., 333 U.S. 153, 160-61 (1948). In doing so, "a federal court should not create or extend a State's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314-15 (4th Cir. 2007) (quotation

63

marks and citation omitted) (alteration adopted). Still, it is the defendant's burden on a Rule 12(b)(6) motion to marshal the relevant legal authorities to persuade the court that the plaintiff has failed to state a claim. Marcure v. Lynn, 992 F.3d 625, 631 (7th Cir. 2021); Charles Alan Wright & Arthur R. Miller, 5A Federal Practice and Procedure § 1357 (3d ed. 2019) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Defendants first assert that the Arkansas Deceptive and Unconscionable Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-107, requires a "deceptive" act. (Doc. 95 at 55 (quoting and relying on Skalla v. Canepari, 430 S.W.3d 72, 82 (Ark. 2013)).) As Plaintiffs point out, however, the ADTPA prohibits both "deceptive" and "unconscionable" practices. (Doc. 110 at 51-52.) Defendants make no argument, and point to no authority, to support reading "unconscionable" not to encompass Plaintiffs' allegations. See State ex rel. Bryant v. R & A Inv. Co., 985 S.W.2d 299, 302 (Ark. 1999) (stating that a "liberal construction of the [A]DTPA is appropriate"); Baptist Health v. Murphy, 226 S.W.3d 800, 811 (Ark. 2006) (noting that definition of unconscionable "includes conduct violative of public policy or statute"). Moreover, Defendants' reliance on Skalla is unavailing, as the court there affirmed summary judgment on the grounds that the defendant had not "engaged in any type of consumer-oriented act or practice."

64

Skalla, 430 S.W.3d at 82.   Defendants have therefore not demonstrated they are entitled to have the ADTPA claim dismissed.

Second, Defendants argue that Plaintiffs' claim under the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-105(1)(rrr)[18] ("CCPA"), should be dismissed.   This provision prohibits "[e]ither knowingly or recklessly engag[ing] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice."   Id.   This subparagraph is one among over seventy enumerated "deceptive trade practice[s]" within § 6-1-105.   Defendants cite to a federal court that has construed subparagraph (rrr) not to cover nondeceptive unfair trade practices.   (Doc. 95 at 56); In re HIV Antitrust Litig., No. 19-cv-02573, 2023 WL 3006572, at *2 (N.D. Cal. Apr. 18, 2023) (stating that "nondeceptive unfair trade practices are actionable only if brought under other statutory or common law causes of action such as the Colorado Antitrust Act") (emphasis removed); see Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 407-08 (E.D. Pa. 2010).   Plaintiffs cite to two cases where federal courts permitted antitrust claims to

---

[18] The parties agree that Plaintiffs miscited subsection (rr), rather than (rrr), in the complaint.   (See Doc. 78 ¶ 542.)   Plaintiffs' claim under this statute is entitled "Violation of Colorado Consumer Protection Act[,] Colo. Rev. Stat. § 6-1-101, et seq."   (Id. at 139.)   Plaintiffs quoted the proper text from subsection (rrr) in the complaint despite the citation to (rr), and Defendants clearly were on notice of the intent to plead a claim under subsection (rrr), as they argue for dismissal under that provision on the merits.

65

proceed under subparagraph (rrr). (Doc. 110 at 53 n.59); In re Liquid Aluminum Sulfate Antitrust Litig., No. 16-md-2687, 2017 WL 3131977, at *26 (D.N.J. July 20, 2017); In re Generic Pharms. Pricing Antitrust Litig., 368 F. Supp. 3d 814, 846 (E.D.P.A. 2019). Neither party cites a Colorado state court decision on point, and this court has not identified one. See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 146-47 (Colo. 2003) (en banc)(describing an "unfair or deceptive trade practice" as a necessary element of a CCPA claim without statutory analysis, and analyzing alleged false statements, not anticompetitive conduct).

The court agrees with the analysis set out in Sheet Metal and In re HIV that the structure of the CCPA forecloses Plaintiffs' claim. The CCPA enumerates an extensive set of "deceptive acts," none of which expressly proscribes anticompetitive conduct without reference to deception. Moreover, section 6-1-105(3) supports the conclusion that the CCPA does not cover non-deceptive acts, as it states, "[t]he deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state" (emphases added). While not dispositive, this provision is some evidence that Colorado's legislature meant to exclude non-deceptive unfair acts from the CCPA's ambit. See In re HIV, 2023 WL 3006572, at *2. Plaintiffs' reliance on In re Liquid Aluminum Sulfate and In re Generic Pharmaceuticals Pricing as counterpoints

66

to Sheet Metal and In re HIV is unpersuasive, as neither squarely addressed the text and structure of subparagraph (rrr). In re Liquid Aluminum Sulfate Antitrust Litig., 2017 WL 3131977, at *2 (permitting CCPA claim over defendants' argument that plaintiffs had not alleged "injury in fact to a legally protected interest"); In re Generic Pharms. Pricing Antitrust Litig., 368 F. Supp. 3d at 846 (permitting CCPA in *en masse* denial of a motion to dismiss state CPA claims). Accordingly, because Plaintiffs do not allege deception,[19] the CCPA claim will be dismissed.

Third, Defendants lump together the remaining state CPA claims under Illinois, Kansas, Minnesota, New York, North Dakota, South Dakota, and West Virginia law with a lengthy string cite and request dismissal. (Doc. 95 at 57-58 n.52.) Plaintiffs counter with string cites of their own. (Doc. 95 at 50-53.) As to the Illinois Consumer Fraud and Deceptive Business Practices Act and West Virginia General Consumer Protection Act, each expressly prohibits "[u]nfair methods of competition" in addition to "deceptive" acts. 815 Ill. Comp. Stat. Ann. 505/2; W. Va. Code § 46A-6-104. Defendants do not, however, argue on this motion

---

[19] In a footnote, Plaintiffs contend that Defendants engaged in some deception because Plaintiffs did not have knowledge of the details of the loyalty programs and because they "relied on the assumption that they were charged legal prices for Defendants' products." (Doc. 110 at 50 n.51.) They neither reference the complaint nor any legal authority to support finding this allegation sufficient to support a claim for deceptive conduct. Cf. In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 760 (E.D. Pa. 2014) (distinguishing between conduct involving deception and conduct that is "merely anticompetitive").

that Plaintiffs have failed to allege "unfair methods of competition." The North Dakota Unlawful Sales or Advertising Practices Act and Kansas Consumer Protection Act, like the Arkansas DTPA, prohibit "unconscionable" conduct, and the Minnesota Consumer Fraud Prevention Act prohibits "unfair or unconscionable practice[s]." N.D. Cent. Code § 51-15-02; Kan. Stat. Ann. § 50-623(b); Minn. Stat. § 325F.69. Defendants similarly do not argue that Plaintiffs have failed to allege "unfair" or "unconscionable" conduct. Defendants have therefore failed to meet their burden of demonstrating that the Illinois, West Virginia, North Dakota, Minnesota, and Kansas CPA claims should be dismissed.

As to the New York Consumer Protection Statute ("NYCPS") and South Dakota Deceptive Trade Practices Act ("SDDTPA"), Defendants argue (Doc. 124 at 35 n.24) that Plaintiffs concede that these two states only prohibit "deceptive" acts, (see Doc. 110 at 51 n.55 (implying that NYCPS and SDDTPA do not contain the terms, "unfair" or "unconscionable")). This conclusion is supported by the text of each statute. N.Y. Gen. Bus. Law § 349(a) ("Deceptive acts or practices in the conduct of any business . . . are hereby declared unlawful."); S.D. Codified Laws § 37-24-6 (proscribing "a deceptive act or practice"). Further, the court is persuaded by the reasoning of courts that have dismissed similar NYCPS and SDDTPA claims on the ground that these statutes do not proscribe nondeceptive anticompetitive conduct. In re Lidoderm Antitrust

68

Litig., 103 F. Supp. 3d 1155, 1171-72 (N.D. Cal. 2015) (dismissing SDDTPA claim for failure to allege affirmative misrepresentation); Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 196-98 (S.D. 2007) (holding that allegations of mere unfairness do not state a claim under SDDTPA); In re Pork Antitrust Litig., 495 F. Supp. 3d 753, 782 (D. Minn. 2020) (stating that "the [NYCPS] conspicuously omits anticompetitive behavior as a cause of action"); Yong Ki Hong v. KBS Am., Inc., 951 F. Supp. 2d 402, 420 (E.D.N.Y. 2013) ("New York has chosen not to include 'unfair competition' or 'unfair' practices in its consumer protection statute, language that bespeaks a significantly broader reach." (quoting In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 410 (S.D.N.Y. 2011) (internal quotations omitted))); In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 197 (D. Me. 2004) ("An antitrust violation may violate [the NYCPS], but only if it is deceptive."). Accordingly, Plaintiffs' claims under the NYCPS and SDDTPA (Counts 48 and 55) will be dismissed.

In sum, Defendants have not met their burden as to the Arkansas, Illinois, Kansas, Minnesota, North Dakota, and West Virginia CPA claims on these grounds. However, Plaintiffs' claims under the CPAs of Colorado, New York, and South Dakota (Claims 35, 48, and 55) will be dismissed.

### h.   Hawaii and Minnesota CPA Claims

Defendants raise three "additional state-specific reasons" to dismiss the claims under the Hawaii Consumer Protection Act ("HCPA"), Haw. Rev. Stat. Ann. § 480-1, _et seq._, the Minnesota Consumer Fraud Protection Act ("MCFA"), Minn. Stat. § 325F.68, _et seq._, and the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-196, _et seq._ (Doc. 95 at 58-60.) Because the court dismisses the VCPA claim on other grounds, the court will only address Defendants' remaining arguments as to the HCPA and MCFA.

First, Defendants contend that Plaintiffs' claim under the HCPA should be dismissed for failure to allege compliance with its notification requirements. (Doc. 95 at 58.) The HCPA makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices." Haw. Rev. Stat. Ann. § 480-2(a). It imposes a notification requirement for class action claims "other than claims for unfair or deceptive acts or practices" — e.g., claims for unfair methods of competition. _Id._ § 480-13.3(a).[20] Under the notification requirement, "[a] filed copy of the complaint and all relevant supporting and exculpatory materials in possession of the proposed class representative or its counsel shall be served on the attorney general not later than seven days after filing of the

---

[20] The text of this provision is: "A class action for claims for a violation of this chapter other than claims for unfair or deceptive acts or practices may be filed, and may be prosecuted on behalf of indirect purchasers by a person other than the attorney general as follows: . . . ." Haw. Rev. Stat. Ann. § 480-13.3(a).

complaint." Id. This provision does "not limit the rights of consumers to bring class actions against any person based on unfair or deceptive acts or practices." Id. § 480-13.3(b).

Plaintiffs do not argue that they have alleged compliance with the notification requirement. Instead, they contend that under Shady Grove, the requirement is preempted because it conflicts with Federal Rule of Civil Procedure 23, which has no such pleading requirement. (Doc. 110 at 54-55.) Plaintiffs cite to two courts that have so held. See In re Aggrenox, 94 F. Supp. 3d at 253-54 (not deciding which Shady Grove opinion controls but faulting defendant for failing to analyze the text and legislative history to demonstrate that the notice requirement is part of Hawaii's "framework of substantive rights or remedies"); In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig., 355 F. Supp. 3d 145, 154-56 (E.D.N.Y. 2018) (concluding Hawaii's notification requirement is procedural and applying Rule 23). In reply, Defendants assert that the requirement "is a built-in limitation on the substantive right of indirect purchasers to bring claims under the statute." (Doc. 124 at 36.) Though they do not undertake any analysis of the provision themselves, they cite to one district court that has agreed with their view. In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig., MDL No. 2895, 2022 WL 736250, at *20 (D. Del. Mar. 11, 2022) (applying Justice Stevens's concurrence to conclude Hawaii's notification

71

requirement is not preempted).

The Fourth Circuit has recently considered the application of a different preliminary requirement under Shady Grove, which, as discussed supra, provides guidance on how a court should mediate conflict between federal and state rules of procedure. In Pledger v. Lynch, the plaintiff filed suit against the United States under the Federal Tort Claims Act ("FTCA"), alleging medical malpractice under West Virginia law. 5 F.4th 511, 517 (4th Cir. 2021). The Fourth Circuit held that several federal civil rules preempted West Virginia's requirement that a would-be medical malpractice plaintiff serve on the defendant a "screening certificate of merit" from a health care provider in his pre-suit notice of claim. Pledger v. Lynch, 5 F.4th 511, 518 (4th Cir. 2021). The court reasoned that Federal Rules of Civil Procedure 8, 9, 11, and 12 set out the exclusive bases for stating a claim for relief and thus, at step one of the Shady Grove inquiry, "answer[ed] the question in dispute." Id. at 519-20 (citing Shady Grove, 559 U.S. at 398). At step two of the Shady Grove analysis — i.e., whether the federal rule exceeds Congress's constitutional rulemaking power — the defendant in Pledger did not dispute the validity of the federal rules in question. Id. at 520-21. The court accordingly held that West Virginia's pre-suit certification requirement did not apply in federal court. Id. at 521.

Importantly, the Pledger court did not address whether it

72

would apply Justice Scalia's or Justice Stevens's approach at step two. Nevertheless, as a response to the defendant's alternative position that the FTCA "incorporates" the West Virginia certification requirement, the court did address whether it was a substantive element of a medical malpractice claim in a way that at least reads like Justice Stevens's approach in <u>Shady Grove</u>. <u>Id.</u> at 522-23. The court reasoned that the certification requirement "qualifies as 'procedural'" because (1) it appears in a section governing "prerequisites" and "procedures"; (2) it plays "no role in the actual adjudication of medical malpractice claims"; and (3) failure to comply does not speak to the defendant's liability. <u>Id.</u> at 523 (citations omitted).

Though the provision at issue in <u>Pledger</u> is distinguishable in some ways from the HCPA notification requirement, <u>Pledger</u> nevertheless supports Plaintiffs' position. <u>Pledger</u>'s streamlined step-two analysis, akin to Justice Scalia's approach, would no doubt preclude dismissal. And even if Justice Stevens's concurrence applied, Defendants here have offered no textual analysis or legislative history whatsoever to support dismissal. <u>In re Aggrenox</u>, 94 F. Supp. 3d at 254. Even so, the HCPA's notification requirement is codified in a provision, Haw. Rev. Stat. Ann. § 480-13.3(a), separate from the one establishing the basis of substantive liability, Haw. Rev. Stat. Ann. § 480-2(a), which speaks not at all to notice. <u>Pledger</u>, 5 F.4th at 523

73

(considering the location of the notice requirement in the statute, and whether it speaks to liability, in determining that the rule is procedural).

Furthermore, the court is unpersuaded by Defendants' conclusory position that notification is substantive in nature. (Doc. 124 at 36.) Defendants' only cited authority for this notion is In re Sensipar. The court there relied heavily upon the HCPA notification requirement's reference to the "right" to file a class action, without any discussion of whether that "right" is substantive or procedural. In re Sensipar, 2022 WL 736250, at *20; see Shady Grove, 559 U.S. at 408, 410 (Scalia, J.) (reasoning that making available class actions is "incidental" to substantive liability); Shady Grove, 559 U.S. at 434 (Stevens, J., concurring) (observing that a rule that makes recovery easier, such as a class action, is not necessarily substantive). Moreover, the In re Sensipar court relies on Greene v. Gerber Prods. Co., 262 F. Supp. 3d 38, 61 (E.D.N.Y. 2017), and In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013), as suggestive that notice requirements are "bound up" with substantive rights. In re Sensipar, 2022 WL 736250, at *20. Both cases involve distinguishable provisions from the one at issue here. In Greene, the "notice" requirement was that the defendant be "on notice" that his act or practice was "previously declared to be deceptive," not that the plaintiff himself file any kind of

74

notice to pursue a class action.  <u>Greene</u>, 252 F. Supp. 3d at 58-59 (analyzing Oh. Rev. Code § 1345.09(B)).  And in <u>In re Nexium</u>, the statute at issue altogether barred indirect purchaser private plaintiffs from bringing a class action and endowed <u>only</u> the state attorney general with the authority to file an action <u>parens patriae</u>.  <u>In re Nexium</u>, 968 F. Supp. 2d at 408-09 (analyzing 740 Ill. Comp. Stat. § 10/7).  Absent any other authority to support dismissal,[21] Defendants have not met their burden of showing that Plaintiffs' HCPA claim should be dismissed.[22]  See <u>Shady Grove</u>, 559 U.S. at 415 (Scalia, J.) (describing the "hard questions" that federal courts must face when "assess[ing] the substantive or procedural character of countless state rules that may conflict with a single Federal Rule" under Justice Stevens's approach).

As to the MCFA claim, Defendants argue that Plaintiffs have failed to allege (1) a benefit to the public from their cause of

---

[21] Whether the notification requirement was meant to serve some important state interest by allowing the Attorney General to decide whether to pursue or intervene in the action was not raised by any party, so the court does not consider it.  (Doc. 95 at 58-59; Doc. 110 at 54-55; Doc. 124 at 35-36.)  When the court raised the issue at the hearing, Plaintiffs argued that, while not knowing its purpose or effect, the requirement was not substantive; Defendants professed they did not know, but suggested it may allow the Attorney General to decide whether to file a <u>parens patriae</u> suit.  (Doc. 156 at 82-83, 84.)

[22] Plaintiffs also dispute whether dismissal would be the appropriate remedy for failure to file a notification with the Hawaii attorney general.  (Doc. 110 at 54.)  While some courts have held that dismissal would not be appropriate, <u>e.g.</u> <u>Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC</u>, No. 15 Civ. 6549, 2018 WL 7197233, at *25 (S.D.N.Y. Dec. 26, 2018), this court expresses no view on whether dismissal would be appropriate.

75

action, as required by <u>Ly v. Nystrom</u>, 615 N.W.2d 302, 314 (Minnesota 2000), and (2) an intent by Defendants for others to rely on the Defendants' conduct, as required by Minn. Stat. Ann. § 325F.69(1). (Doc. 95 at 59.) The court agrees with Plaintiffs that they have plausibly alleged public benefit, which is "not [an] onerous" requirement. <u>Kinetic Co. v. Medtronic, Inc.</u>, 672 F. Supp. 2d 933, 946 (D. Minn. 2009); (Doc. 110 at 56-57); (Doc. 78 ¶¶ 212, 608 (alleging harm to competition and the public).)

As to the intent to induce reliance, the MCFA provides:

> The act, use, or employment by any person of any fraud, <u>unfair or unconscionable practice</u>, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, <u>with the intent that others rely thereon</u> in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable[.]

Minn. Stat. Ann. § 325F.69, subd. 1 (emphases added). Notably, the phrase, "unfair or unconscionable practice," was recently added to this provision, effective July 1, 2023.[23] 2023 Minn. Laws ch. 57, art. 4, § 16. The Minnesota legislature simultaneously enacted subdivision 8 of the same section, which provides:

> **Unfair or unconscionable acts or practices; standard of proof.** For purposes of this section, an unfair method of competition[24] or an unfair or unconscionable act or

---

[23] Neither party addresses what impact, if any, the timing of the dates of the originally-filed actions, the date of the operative consolidated complaint, and this amendment might have. (<u>See</u> Doc. 95 at 59; Doc. 110 at 55-57; Doc. 124 at 36-37.)

[24] The MCFA does not itself proscribe "unfair methods of competition." Rather, this conduct is prohibited under the Minnesota Uniform Deceptive

76

practice is any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers.

Minn. Stat. Ann. § 325F.69, subd. 8; 2023 Minn. Laws ch. 57, art. 4, § 17.

"[The court's] goal in statutory interpretation is to ascertain and effectuate the intent of the Legislature." Roberts v. State, 945 N.W.2d 850, 853 (Minn. 2020) (quotation marks and citation omitted); Hagen v. Steven Scott Mgmt., Inc., 963 N.W.2d 164, 170 (Minn. 2021) (permitting a court to look to the statute's "text, structure, and punctuation" to determine if it is ambiguous).

Although Plaintiffs argue that the MCFA is to be "generally . . . broadly construed," Doc. 110 a 55, quoting Sheet

---

Trade Practice Act ("MUDTPA"), under which Plaintiffs do not plead a claim for relief. (See generally Doc. 78); Minn. Stat. Ann. § 325D.44, subd. 1(13) (prohibiting "(i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices"). A possible explanation for the mention of unfair methods of competition in section 325F.69 is that the MUDTPA cross-references the definition in section 325F.69, subdivision 8, as the relevant "standard of proof." Minn. Stat. Ann. § 325D.44, subdivision 2(b).

The MUDTPA does not provide for damages, unlike the MCFA. Compare Minn. Stat. Ann. § 325F.70, subd. 3 (providing for a private civil action if injured under sections 325F.68 through 325F.70 to "recover damages"), with Minn. Stat. Ann. § 325D.45, subd. 1 (providing only for injunctive relief); see also Chairez v. AW Distrib., Inc., No. 20-cv-1473, 2021 WL 1600494, at *9 (D. Minn. Apr. 23, 2021) ("An injunction is the only available remedy for the [Minnesota] Deceptive Trade Practices Act claim."). The damages action for violation of section 325F.69 became available to a private plaintiff through section 325F.70 on August 1, 2023. See 2023 Minn. Laws ch. 52, art. 19, § 15.

77

_Metal Workers Loc. 441 Health & Welfare Plan_, 737 F. Supp. 2d at 414 (alteration added), Plaintiffs nonetheless appear to acknowledge they must have alleged Defendants' intent to induce reliance to proceed with this claim, id. The court agrees that Plaintiffs must allege intent to induce reliance to proceed with their MCFA claim. Even under a broad construction of the statute, the court is not free to disregard the plain text's requirement of an "intent that others rely." Minn. Stat. Ann. § 325F.69, subd. 1; see _Bhatia v. 3M Co._, 323 F. Supp. 3d 1082, 1095-96 (D. Minn. 2018) (recognizing that failure to allege intent to induce reliance is grounds for dismissal).

Plaintiffs assert they have sufficiently alleged Defendant's intent for others to rely on their representations, with the ultimate goal of "limit[ing] the purchase levels of products manufactured by generic manufacturers to extremely low levels." (Doc. 110 at 55.) In support, Plaintiffs direct the court to paragraphs 215 and 216 of the complaint and the statement therein that Syngenta intended to "reward Retailers for their support of Syngenta products where a generic alternative exists." Id. (alteration adopted). Plaintiffs also cite paragraphs 70, 72, 100, and 175, without elaboration. Id. The court notes these paragraphs describe the incentive structure of the loyalty programs offered to distributors and retailers, as well as the effects of the loyalty programs on generics.

78

Plaintiffs appear to be arguing that they have sufficiently alleged intent to induce reliance because they have alleged Defendants intended for the distributors and retailers to rely on Defendants' loyalty programs in shaping their own decisionmaking. The court cannot conclude this is the intent to induce reliance contemplated by the statute. Whatever the outer bounds of intent to induce reliance may be under the amended statute, construing that term to reach an allegedly unlawful incentive to co-conspirators would go beyond the existing caselaw and ordinary notions of induced reliance. Cf. Boyd v. Target Corp., No. 23-CV-02668, --- F. Supp. 3d ---, 2024 WL 4287669, at *10 (D. Minn. Sept. 25, 2024) (intent to induce reliance sufficiently alleged where plaintiffs, buyers of retailer's products, claimed retailer made "false representations that certain products on its shelves were 'clean,'" to stimulate sales of those products). Even in Group Health Plan, relied on by Plaintiffs' preferred case,[25] the plaintiff health maintenance organizations "contend[ed] that they were directly and indirectly injured by the tobacco companies' conspiracy to mislead the public and the health-care industry regarding the effects of tobacco use," including by the tobacco

---

[25] Sheet Metal Workers Loc. 441 Health & Welfare Plan, 737 F. Supp. 2d at 414 (relied on by Doc. 110 at 55-56). The court considers that case factually distinguishable; that case involved "sham patent litigation" filed by the defendant to deter competitors. Id. at 389. To the extent that case stands for the proposition that it is unnecessary under the MCFA for a plaintiff to plead the defendant's intent to induce reliance, this court must respectfully disagree.

79

companies' "deceptive statements." Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 4 (Minn. 2001) (emphases added). There, the defendants still intended for the victims of the wrongdoing to rely on defendants' representations. Here, Plaintiffs only point to Defendants' efforts to incentivize distributors to participate in the exclusion of generics. The slippage between attempted inducement of reliance in an intended victim and incentivization of a co-conspirator is fatal to this claim. Plaintiffs' claim under the MCFA will thus be dismissed.

### 3. Statute of Limitations as to Paraquat

Finally, Defendants contend that Plaintiffs' claims "as they pertain to Syngenta's AI paraquat" should be dismissed as time-barred because paraquat "has not been included in Syngenta's loyalty program since before October 2017." (Doc. 95 at 60.) In support, Defendants cite to an FTC order in connection with the merger of Syngenta AG and ChemChina which requires Syngenta to exclude paraquat from its loyalty rebate program by no later than October 1, 2017. (Id.) While the complaint contains no express allegation of when paraquat was part of Syngenta's loyalty rebate program, the court cannot consider contestable factual allegations by Defendants — such as the extent of their compliance with the FTC order — on a motion to dismiss, even if the court took judicial notice of the order. Justice 360 v. Stirling, 42 F.4th 450, 455 (4th Cir. 2022) (allowing for judicial notice of "matters of public

80

record" (internal quotation marks omitted)); see Couch v. Clarke, 782 F. App'x 290, 291 (4th Cir. 2019) (noting that judges may take judicial notice of "facts not proven in the record that are 'not subject to reasonable dispute'"). Accordingly, while Plaintiffs do not appear to suggest that these claims will ultimately be successful, given the procedural posture of the case the court is constrained to deny Defendants' request to dismiss Plaintiffs' claims as to paraquat.

## III. CONCLUSION

For the reasons stated, therefore,

Defendants' motion to dismiss (Doc. 94) is GRANTED IN PART and DENIED IN PART as follows:

1. Defendants' motion to dismiss Plaintiffs' federal damages claims under the First, Second, and Third Claims for Relief is GRANTED and those claims are DISMISSED as barred by Illinois Brick.

2. Defendants' motion to dismiss Plaintiffs' claims for federal injunctive relief under the First, Second, and Third Claims for Relief for failure to plead proximate causation is DENIED.

3. Defendants' motion to dismiss for failure to plead proximate causation in support of state antitrust and consumer protection claims is DENIED.

4. Defendants' motion to dismiss claims under the laws of

81

Arizona, Colorado, Connecticut, District of Columbia, Hawaii, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, and West Virginia, for failure to allege in-jurisdiction purchases by named Plaintiffs, is DENIED.

5.   Defendants' motion to dismiss claims under the New York Donnelly Act (Claim 21) and New Hampshire Consumer Protection Act (Claim 46) for failure to allege sufficient intrastate conduct is DENIED.

6.   Defendants' motion to dismiss the claim under the Puerto Rico Antitrust Act (Claim 25) for lack of an Illinois Brick repealer is DENIED.

7.   Defendants' motion to dismiss the claims under the consumer protection laws of Arkansas (Claim 33), Illinois (Claim 39), Montana (Claim 43), South Carolina (Claim 54), and Utah (Claim 56) on the grounds of state class-action bars is DENIED WITHOUT PREJUDICE to address the applicability of Shady Grove on a more developed record.

8.   Defendants' motion to dismiss claims under the consumer protection laws of the District of Columbia (Claim 36),

Missouri (Claim 16), Montana (Claim 43), Oregon (Claim 51), Pennsylvania (Claim 52), Rhode Island (Claim 53), Utah (Claim 56), and Virginia (Claim 57) because Plaintiffs are commercial consumers of CPPs, is GRANTED.

9. Defendants' motion to dismiss the claim under the Massachusetts Consumer Protection Act (Claim 41) because Plaintiffs are not "consumers" under section 9 of that Act and indirect purchaser claims are barred under section 11 of that Act, is GRANTED.

10. Defendants' motion to dismiss claims under the consumer protection laws of Arkansas (Claim 33), Illinois (Claim 39), Kansas (Claim 40), Minnesota (Claim 42), North Dakota (Claim 50), and West Virginia (Claim 58) for failure to allege a deceptive act, is DENIED.

11. Defendants' motion to dismiss claims under the consumer protection laws of Colorado (Claim 35), New York (Claim 48), and South Dakota (Claim 55) for failure to allege a deceptive act, is GRANTED.

12. Defendants' motion to dismiss the claim under the consumer protection law of Hawaii (Claim 38) for failure to comply with the notification requirement, is DENIED.

13. Defendants' motion to dismiss the claim under the consumer protection law of Minnesota (Claim 42) for failure to allege attempt to induce reliance, is

GRANTED.

14. Defendants' motion to dismiss Plaintiffs' claims "as they pertain to Syngenta's AI paraquat" for being time-barred, is DENIED.

/s/  Thomas D. Schroeder
United States District Judge

January 28, 2025