## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

_____

IN RE: CROP PROTECTION PRODUCTS
LOYALTY PROGRAM ANTITRUST
LITIGATION

This document relates to:  All actions.

_____

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  1:23-MD-3062-TDS-JEP

**AMENDED CONSOLIDATED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................... 2

II.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE .......................... 6

III.  PARTIES ................................................................................... 8

    A.    Plaintiffs ........................................................................ 8

    B.    Defendants ..................................................................... 11

    C.    Defendants' Conspirators ................................................... 14

IV.  INDUSTRY BACKGROUND ........................................................... 14

    A.    Crop Protection Product Industry ........................................... 14

    B.    Regulatory Framework for Crop Protection Products ................... 16

    C.    Crop Protection Product Supply Chain ..................................... 19

V.   DEFENDANTS' ANTICOMPETITIVE CONDUCT .................................... 22

    A.    Defendants Illegally Blocked Entry of Generics by Conditioning Cash Payments to Refusals to Sell Generic Substitutes ................................... 22

    B.    Syngenta AIs and Loyalty Programs ....................................... 29

        1.    Overview of Syngenta's Loyalty Programs ..................... 29

        2.    Syngenta's Azoxystrobin and Its Related Loyalty Program Scheme ................................................................................ 36

        3.    Syngenta's Mesotrione and Its Related Loyalty Program Scheme .. 39

        4.    Syngenta's Metolachlor and Its Loyalty Program Scheme ............. 42

        5.    Syngenta's Fomesafen and Its Loyalty Program Scheme ............... 45

        6.    Syngenta's Lambda-cyhalothrin and Its Loyalty Program Scheme. 47

    C.    Corteva's AIs and Loyalty Programs ....................................... 48

        1.    Overview of Corteva's Loyalty Programs ....................... 48

        2.    Corteva's Rimsulfuron and Its Loyalty Program Scheme ............... 50

        3.    Corteva's Oxamyl and Its Loyalty Program Scheme ...................... 53

        4.    Corteva's Acetochlor and Its Loyalty Program Scheme ................. 56

        5.    Corteva's Methoxyfenozide and Its Loyalty Program Scheme ....... 59

    D.    Syngenta's and Corteva's Agreement to Restrain the Supply of the Relevant Active Ingredients to Maintain Monopoly Profits ................... 61

VI.  RELEVANT MARKETS AND DEFENDANTS' MARKET POWER ............... 63

    A.    Market Definition .......................................................... 63

    B.    Defendants' Monopoly Power .............................................. 66

i

VII.    DEFENDANTS' EXCLUSIONARY CONDUCT HARMED COMPETITION . 69

    A.    Market Foreclosure ........................................................................ 70

    B.    Lack of Innovation ........................................................................ 77

    C.    Supracompetitive Prices ............................................................... 78

VIII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ......... 83

IX.     EFFECT ON INTRASTATE AND INTERSTATE COMMERCE ..................... 84

X.      CLASS ACTION ALLEGATIONS ....................................................... 85

XI.     CLAIMS FOR RELIEF ..................................................................... 89

    A.    Violations of Federal Antitrust Laws ............................................ 89

        First Claim for Relief Violation of Section 1 of the Sherman Act 15 U.S.C. §1 (On Behalf of the Class) ........................................................... 89

        Second Claim for Relief Violation of Section 2 of the Sherman Act 15 U.S.C. §1 (On Behalf of the Class) .............................................. 91

        Third Claim for Relief Violation of Section 3 of the Clayton Act (On Behalf of the Class) ..................................................................... 92

    B.    Violations of State Antitrust Laws ............................................... 93

        Fourth Claim for Relief Violation of Arizona's Uniform State Antitrust Act Ariz. Rev. Stat. Ann. §44-1401, *et seq.* ...................................... 94

        Fifth Claim for Relief Violation of California's Cartwright Act Cal. Bus. & Prof. Code §16700, *et seq.* ........................................................ 95

        Sixth Claim for Relief Violation of the Connecticut Antitrust Act Conn. Gen. Stat. §35-24, *et seq.* ............................................................. 97

        Seventh Claim for Relief Violation of District of Columbia Antitrust Act D.C. Code §28-4501, *et seq.* ........................................................ 98

        Eighth Claim for Relief Violation of Illinois Antitrust Act 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.* ........................................................... 99

        Ninth Claim for Relief Violation of Iowa Competition Law Iowa Code §553.1, *et seq.* ........................................................................ 101

        Tenth Claim for Relief Violation of Kansas Restraint of Trade Act Kan. Stat. Ann. §50-101, *et seq.* ........................................................ 102

        Eleventh Claim for Relief Violation of Maine's Antitrust Statute Me. Rev. Stat. Ann. tit. 10, §1101, *et seq.* ............................................... 103

Twelfth Claim for Relief Violation of Maryland's Antitrust Statute Md. Code Ann., Com. Law, §11-204(A), *et seq*..................................................104

Thirteenth Claim for Relief Violation of the Michigan Antitrust Reform Act Mich. Comp. Laws §445.771, *et seq*.......................................................106

Fourteenth Claim for Relief Violation of the Minnesota Antitrust Law Minn. Stat. §§325d.49, *et seq*. & 325d.57, *et seq*. ....................................107

Fifteenth Claim for Relief Violation of the Mississippi Antitrust Statute Miss. Code Ann. §75-21-1, *et seq*.............................................................108

Sixteenth Claim for Relief Violation of the Missouri Merchandising Practices Act Mo. Ann. Stat. §407.010, *et seq*.............................................110

Seventeenth Claim for Relief Violation of the Nebraska Junkin Act Neb. Rev. Stat. §59-801, *et seq*............................................................................112

Eighteenth Claim for Relief Violation of the Nevada Unfair Trade Practices Act Nev. Rev. Stat. Ann. §598a.010, *et seq*. ..............................................113

Nineteenth Claim for Relief Violation of New Hampshire's Antitrust Statute N.H. Rev. Stat. Ann. tit. XXXI, §356, *et seq*..................................115

Twentieth Claim for Relief Violation of the New Mexico Antitrust Act N.M. Stat. Ann. §57-1-1, *et seq*. .................................................................116

Twenty-First Claim for Relief Violation of Section 340 of the New York General Business Law N.Y. Gen. Bus. Law §340, *et seq*..........................117

Twenty-Second Claim for Relief Violation of the North Carolina General Statutes N.C. Gen. Stat. §75-1, *et seq*. ........................................................118

Twenty-Third Claim for Relief Violation of the North Dakota Uniform State Antitrust Act N.D. Cent. Code §51-08.1-01, *et seq*. .........................119

Twenty-Fourth Claim for Relief Violation of the Oregon Antitrust Law Or. Rev. Stat. §646.705, *et seq*. .........................................................................121

Twenty-Fifth Claim for Relief Violation of the Puerto Rico Monopolies and Restraint of Trade Act 10 L.P.R.A. §257, *et seq*.......................................122

Twenty-Sixth Claim for Relief Violation of the Rhode Island Antitrust Act 6 R.I. Gen. Laws §6-36-1, *et seq*...............................................................123

Twenty-Seventh Claim for Relief Violation of the South Dakota Antitrust Statute S.D. Codified Laws §37-1-3.1, *et seq*. ...........................................124

Twenty-Eighth Claim for Relief Violation of the Tennessee Trade Practices Act Tenn. Code Ann. §47-25-101, *et seq*..................................................125

Twenty-Ninth Claim for Relief Violation of the Utah Antitrust Act Utah Code Ann. §76-10-3101, *et seq.*................................................................ 127

Thirtieth Claim for Relief Violation of the Vermont Antitrust and Consumer Fraud Act Vt. Stat. Ann. tit. 9, §2451, *et seq.*.......................... 129

Thirty-First Claim for Relief Violation of the West Virginia Antitrust Act W. Va. Code §47-18-1, *et seq.* ................................................................ 131

Thirty-Second Claim for Relief Violation of the Wisconsin Antitrust Act Wis. Stat. §133.01, *et seq.* ........................................................................ 133

C.    Violations of State Consumer Protection Laws ........................................ 134

Thirty-Third Claim for Relief Violation of Arkansas' Deceptive Trade Practices Act Ark. Code Ann. §4-88-101, *et seq.* ...................................... 135

Thirty-Fourth Claim for Relief Violation of California's Unfair Competition Law (The "UCL") Cal. Bus. & Prof. Code §17200, *et seq.*.. 137

Thirty-Fifth Claim for Relief Violation of Colorado Consumer Protection Act Colo. Rev. Stat. §6-1-101, *et seq.*........................................................ 139

Thirty-Sixth Claim for Relief Violation of the District of Columbia Consumer Protection Procedures Act D.C. Code §28-3901, *et seq*.......... 141

Thirty-Seventh Claim for Relief Violation of Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §501.201(2), *et seq.*.................................... 142

Thirty-Eighth Claim for Relief Violation of Hawaii Consumer Protection Laws Haw. Rev. Stat. Ann. §480-1, *et seq*................................................. 144

Thirty-Ninth Claim for Relief Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 Ill. Comp. Stat. Ann. 505/1, *et seq.* ...................................................................................................................... 145

Fortieth Claim for Relief Violation of the Kansas Consumer Protection Act Kan. Stat. Ann. §50-623, *et seq.*.............................................................. 147

Forty-First Claim for Relief Violation of the Massachusetts Consumer Protection Act Mass. Gen. Laws. ch. 93a, §1, *et seq.* ................................ 149

Forty-Second Claim for Relief Violation of the Minnesota Prevention of Consumer Fraud Act Minn. Stat. §325F.68, *et seq.* .................................. 150

Forty-Third Claim for Relief Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970 Mont. Code Ann. §§30-14-103, *et seq.*, and §§30-14-201, *et seq.* ...................................................... 152

Forty-Fourth Claim for Relief Violation of the Nebraska Consumer Protection Act Neb. Rev. Stat. §59-1602, *et seq.*........................................ 153

iv

Forty-Fifth Claim for Relief Violation of the Nevada Deceptive Trade Practices Act Nev. Rev. Stat. §598.0903, *et seq.* ....................................... 155

Forty-Sixth Claim for Relief Violation of the New Hampshire Consumer Protection Act N.H. Rev. Stat. Ann. tit. XXXI, §358-A:1, *et seq.* ........... 156

Forty-Seventh Claim for Relief Violation of the New Mexico Unfair Practices Act N.M. Stat. Ann. §57-12-1, *et seq.* ....................................... 158

Forty-Eighth Claim for Relief Violation of New York's General Business Law N.Y. Gen. Bus. Law §349 ................................................................ 159

Forty-Ninth Claim for Relief Violation of the North Carolina Unfair and Deceptive Trade Practices Act N.C. Gen. Stat. §75-1.1, *et seq.* ............... 161

Fiftieth Claim for Relief Violation of the North Dakota Unlawful Sales or Advertising Practices Act N.D. Cent. Code §51-10-01, *et seq.* ................ 162

Fifty-First Claim for Relief Violation of the Oregon Trade Practices Act Or. Rev. Stat. §646.605, *et seq.* ........................................................ 163

Fifty-Second Claim for Relief Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 Pa. Stat. and Cons. Stat. §201-1, *et seq.* ......................................................................................... 165

Fifty-Third Claim for Relief Violation of the Rhode Island Deceptive Trade Practices Act R.I. Gen. Laws §6-13.1-1, *et seq.* ....................................... 167

Fifty-Fourth Claim for Relief Violation of the South Carolina Unfair Trade Practices Act S.C. Code Ann. §39-5-10, *et seq.* ........................................ 169

Fifty-Fifth Claim for Relief Violation of South Dakota Deceptive Trade Practices Act S.D. Codified Laws §37-24-1, *et seq.* ................................. 170

Fifty-Sixth Claim for Relief Violation of the Utah Consumer Sales Practices Act Utah Code Ann. §13-11-1, *et seq.* ........................................ 172

Fifty-Seventh Claim for Relief Violation of Virginia Consumer Protection Act Va. Code Ann. §59.1-196, *et seq.* ....................................................... 173

Fifty-Eighth Claim for Relief Violation of West Virginia General Consumer Protection Act W. Va. Code §46A-6-101, *et seq.* .................... 175

XII.     PRAYER FOR RELIEF ..................................................................... 177

XIII.    DEMAND FOR JURY TRIAL ........................................................... 178

Plaintiffs Gavin Brothers, LLC, Matthew S. Taylor, Inc. d/b/a Hooper's Landscape & Nursery, Clifton Kirven, Janie Yeargin, Donald F. Deline, Peter F. Bonin, Iron Horse Ranches, Jones Planting Co. III, Gary Bentzinger, Brett Robberts, and Chris Bole bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc. Defendants' exclusionary and anticompetitive behavior has caused Plaintiffs and other similarly situated farmers to pay artificially inflated prices for crop protection products needed to protect their crops from pests. Plaintiffs bring this action on behalf of themselves and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in the United States and its territories, who purchased a crop protection product containing one or more of the Relevant AIs (as defined below) that was manufactured by one or more of the Defendants at any time during the period from October 27, 2018, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

Plaintiffs bring this action against Defendants for damages and injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1-2, and Section 3 of the Clayton Act, 15 U.S.C. §14, and, for damages under state antitrust laws and consumer protection laws.

Plaintiffs demand a trial by jury.

1

# I.    INTRODUCTION

1.    This case involves an anticompetitive scheme by Defendants, two manufacturing giants in the crop protection product industry, to block rivals from the market and insulate themselves from competition.  Defendants have entered into exclusionary "loyalty agreements" with substantially all major crop protection product dealers (distributors and retailers)[1] that deter those dealers from purchasing products produced by manufacturers other than Defendants.  The effect of those exclusionary agreements has been to lock lower-cost rival manufacturers out of the market and force farmers like Plaintiffs to pay artificially inflated prices for the crop protection products that are essential to their business.

2.    Federal law rewards manufacturers who develop a new active ingredient for a crop protection product with a lengthy period of exclusivity rights.  During that period, the manufacturer effectively acts as a monopolist, safe in the knowledge that federal law prohibits any rival from selling any competing product containing the same ingredient. Those exclusivity rights act as a powerful incentive for companies to develop new active ingredients to ward off pests more effectively.

3.    At the same time, these federal exclusivity rights do not last forever.  Once the rights expire, the market for the active ingredient, and therefore the market for products containing the active ingredient is, by design, supposed to be open to competition.  Once

---

[1]    In the crop protection products industry, the term dealer is used interchangeably by manufacturers to refer to both distributors and retailers.

exclusivity rights expire, generic manufacturers can legally enter the market and sell their own products containing the same active ingredients. In theory, generic products could use the same formula as the brand name product but retail at a significant discount. Other times, generic manufacturers could develop new and innovative crop protection products using the same active ingredient. In either case, it is economically rational for the original manufacturer to respond to the new competitive threat by reducing its price or otherwise offering a better value for its own product — or else see its sales volume drop. This vigorous competition is intended to have salutary effects throughout the market. But the ultimate intended beneficiaries are farmers, who gain access to cheaper products and a wider range of choices.

4.     Federal law thus strikes a balance between two competing objectives: incentivizing the development of innovative new active ingredients on the one hand and unlocking the benefits of a free and competitive market on the other.

5.     For each of the Defendants in this case, however, the extensive exclusivity rights provided under federal law were not enough. Each of the Defendants has unlawfully sought to extend its monopoly over its active ingredients beyond that provided for by federal law.

6.     Specifically, each of the Defendants uses unlawful exclusionary contracts to foreclose competition. Defendants entice dealers to drastically limit sales of competing, less expensive generic products by paying distributors a kickback in the form of a share of the monopoly profits that the exclusionary contracts create. Defendants effectuate these

3

payments through so-called "loyalty programs," but the terminology is pretextual. Under the "loyalty programs," each of the Defendants pays substantial kickbacks to distributors and retailers — the dealers who serve as middlemen between Defendants and farmers — to discourage those dealers from purchasing specified active ingredients from generic manufacturers.

7. To be clear, the issue in this case is not with the concept of a "rebate" in the abstract. Defendants did not merely offer rebates or lower prices based on the volume of a customer's sales. Rather, the kickback of the monopoly profit shares are conditioned on the dealer making a high ***percentage*** of their purchases of products containing the specified active ingredient produced by Defendants. In other words, the primary (and really, only) condition for whether a dealer gets a kickback is not how ***much*** of Defendants' product has been sold, but rather how ***few*** generics have been sold. The net result is that Defendants' loyalty programs are effectively *de facto* exclusive dealing agreements that foreclose competition.

8. This is no accident. Excluding generics from the market is the very reason these programs exist. As a Corteva product manager bragged, "[O]ur team truly has done an A+ job blocking generics." Corteva's strategy documents reflect its intent to use its loyalty program to "keep the channel locked up" and "battle [the generic] in our core market and push them out."

9. The value of the kickbacks is so substantial — and the loyalty thresholds are so high — that distributors and retailers subject to agreements with Defendants are

compelled to buy no more than a small fraction of their purchases of products covered by the loyalty programs from generic manufacturers.

10. Each of the Defendants also ensure that dealers meet the loyalty thresholds by threatening to punish, and actually punishing the dealers that purchase too many products from rival generic producers. The punishments include canceling contracts, temporarily denying access to certain products, and declining to supply the dealer with needed products.

11. Each Defendant entered into exclusionary loyalty agreements with each of the leading distributors and their authorized retailers. Due to the agreements, these distributors and retailers purchase only minimal volumes of crop protection products containing active ingredients covered by the loyalty agreements from generic manufacturers. By unlawfully blocking access to the major distributors and retailers, Defendants have restrained generic competition for crop protection products containing active ingredients covered by the loyalty provisions. Each of the Defendants has therefore locked its competitors out of the Relevant Markets (as defined below).

12. To further exclude generic competition, Defendants entered into an unlawful agreement. Under the agreement, Defendants agreed not to produce each other's AIs. Instead, they would supply each other the necessary AIs, as needed. For example, Corteva agreed to have Syngenta serve as its exclusive supplier of Syngenta's mesotrione and s-metolachlor, even though Corteva's predecessor company had previously produced these AIs and presumably could supply Corteva at a lower cost. By entering into this unlawful

5

agreement, Syngenta and Corteva (1) removed Corteva as a source of supply for competing formulators; (2) prevented generic manufactures of these AIs from being a source of supply to Corteva (and thus denying them scale for their production); and (3) ensured that the prices for products containing these AIs would remain artificially high, as Syngenta controlled Corteva's input costs for the AIs.

13.   The consequences of Defendants' anticompetitive conduct are severe.  Each of the Defendants has leveraged the lack of competition in the market to maintain prices at artificially inflated levels.  Due to Defendants' exclusionary conduct, farmers have paid approximately 40% higher prices — if not more — for certain crop protection products than they would have paid in a competitive market.  Also, due to the lack of competition, there is little innovation in these markets and farmers often have no choice but to purchase Defendants' products.  Defendants' anticompetitive conduct has forced Plaintiffs and the Class to pay millions of dollars more in supracompetitive prices while at the same time restricting their ability to benefit from new and innovative products.  Plaintiffs and the Class will continue to suffer from these harmful effects until Defendants' exclusionary and anticompetitive conduct is brought to an end and competition is restored to the market.

## II.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE

14.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there

are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one of Defendants.

15.    In the alternative, the Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1-2.  Plaintiffs request declaratory and equitable relief and seek to recover overcharges and treble damages for injuries sustained by Plaintiffs and the Class resulting from Defendants' anticompetitive agreements and unlawful foreclosure of competition in the Relevant Market and Submarkets that maintained and enhanced Defendants' dominant position and monopoly power.  Given that Plaintiffs seek declaratory and equitable relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337(a).  The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

16.    Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. §1391 because each Defendant regularly transacts business within this district, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, one or more of Defendants resides in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

17.    Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

7

## III. PARTIES

### A. Plaintiffs

18.     Plaintiff Gavin Brothers, LLC is an Illinois farm jointly operated by Michael Shows. Gavin Brothers, LLC grows corn, beans, wheat and hay. During the Class Period, Gavin Brothers, LLC purchased Syngenta and Corteva products that contain active ingredients at issue in this case. Gavin Brothers, LLC has purchased the following Syngenta-manufactured products: Quattro, a fungicide containing the active ingredient azoxystrobin, Tenacity, an herbicide containing the active ingredient mesotrione, Boundary, an herbicide containing the active ingredient S-metolachlor, and Acuron, an herbicide containing both mesotrione and S-metolachlor. Gavin Brothers, LLC also purchased the Corteva-manufactured product LPI, an herbicide containing the active ingredient rimsulfuron. Gavin Brothers, LLC purchased each of these products at a supracompetitive price.

19.     Plaintiff Matthew S. Taylor, Inc., which operates as Hooper's Landscape & Nursery is a Florida farm. Matthew S. Taylor, Inc., d/b/a Hooper's Landscape & Nursery grows citrus products and row crops, and during the Class Period, purchased at least five Syngenta and Corteva products that contain active ingredients at issue in this case. Matthew S. Taylor, Inc. d/b/a/ Hooper's Landscape & Nursery purchased each of these products at a supracompetitive price.

20.     Plaintiff Clifton Kirven is an Illinois farmer who grows corn, soybeans, oats and alfalfa. During the Class Period, Mr. Kirven purchased Syngenta products that contain

8

active ingredients at issue in this case. In particular, he purchased the fungicides Trio and Trivapro, both of which contain the active ingredient azoxystrobin. He also purchased the herbicide Halex, containing the active ingredients mesotrione and S-metolachlor. Mr. Kirven purchased each of these products at a supracompetitive price.

21. Plaintiff Janie Yeargin is a Tennessee farmer who grows corn, soybeans, wheat and hay. During the Class Period, she purchased Syngenta products that contain active ingredients at issue in this case including the fungicide Trivapro, which contains azoxystrobin, and the herbicide Prefix, containing the active ingredients S-metolachlor and sodium salt of fomesafen. Each of these products were purchased at a supracompetitive price.

22. Plaintiff Donald F. Deline, a Missouri farmer, owns and operates Deline Farms North, Deline Farms South, and Deline Farms partnerships ("Deline Farms"). Deline Farms grows corn, beans, cotton, wheat and rice at its farms in Missouri, Arkansas, Illinois, Mississippi, and Tennessee. During the Class Period, Mr. Deline purchased Syngenta and Corteva products that contain active ingredients at issue in this case. Specifically, Mr. Deline purchased the following Syngenta-manufactured products: Quadris and Quilt, both fungicides containing azoxystrobin, Mesotrione and Callisto, both herbicides containing mesotrione, Sequence, an herbicide containing S-metolachlor, and Prefix, an herbicide containing metolachlor as well as sodium salt of fomesafen. Mr. Deline also purchased the following Corteva-manufactured products: LeadOff, an herbicide containing the active ingredient rimsulferon, Vydate, an insecticide/nematicide

9

containing the active ingredient Oxamyl, FulTime, an herbicide containing the active ingredient acetochlor, and Intrepid Edge, an insecticide containing the active ingredient methoxyfenozide. Mr. Deline purchased each of these products at a supracompetitive price.

23.   Plaintiff Peter F. Bonin is a Wisconsin farmer who grows corn and soybeans. During the Class Period, Mr. Bonin purchased Syngenta products that contain active ingredients at issue in this case. In particular, Mr. Bonin purchased the following Syngenta products: the herbicide Halex, which contains mesotrione, the herbicide Acuron, containing both mesotrione and S-metolachlor, the herbicide Flexstar GT, which contains sodium salt of fomesafen, and the insecticide Endigo ZC, which contains the active ingredient lambda-cyhalothrin. Mr. Bonin purchased each of these products at a supracompetitive price.

24.   Plaintiff Iron Horse Ranches farm is a California general partnership of which Robert Ott is an owner and managing partner. Iron Horse Ranches grows cherries and has grown almonds in the past. During the Class Period, Iron Horse Ranches purchased Syngenta products that contain active ingredients at issue in this case. These products include Abound, which contains azoxystrobin, and Warrior, which contains lambda-cyhalothrin. Iron Horse Ranches purchased each of these products at a supracompetitive price.

25.   Plaintiff Jones Planting Co. III is a Mississippi farm owned and operated by Bernard Jones IV. Jones Planting Co. III grew corn, cotton, peanuts, soybeans and wheat.

During the Class Period, Jones Planting Co. III purchased Syngenta's fungicide product Elatus, which contains azoxystrobin, an active ingredient at issue in this case. Jones Planting Co. III purchased Elatus at a supracompetitive price.

26. Plaintiff Gary Bentzinger is a Nebraska farmer who grows corn and soybeans. During the Class Period, Mr. Bentzinger purchased Syngenta and/or Corteva products that contain active ingredients at issue in this case. Mr. Bentzinger purchased each of these products at a supracompetitive price.

27. Plaintiff Brett Robberts is an Iowa farmer who grows corn and soybeans. During the Class Period, Mr. Robberts purchased Syngenta products that contain active ingredients at issue in this case. In particular, Mr. Robberts purchased the following Syngenta products: the herbicide Mesotrione, the herbicide Callisto, which contains mesotrione, the herbicide Magnum, which contains S-metolachlor, and the insecticide Endigo, which contains the active ingredient lambda-cyhalothrin. Mr. Robberts purchased each of these products at a supracompetitive price.

28. Plaintiff Chris Bole is a Kansas farmer who grows soybean, wheat, and corn. During the Class Period, Mr. Bole purchased Syngenta and Corteva products at a supracompetitive price.

B. Defendants

29. *Syngenta Group Defendants*. Defendant Syngenta Crop Protection AG is a corporation organized under the laws of Switzerland, with its headquarters in Basel, Switzerland. Syngenta Crop Protection AG is an indirect subsidiary of Sinochem Holdings

11

Corporation Ltd., a corporation based in Beijing, China. Syngenta Crop Protection AG operates and oversees the Syngenta Group's global crop protection business. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is located in Greensboro, North Carolina.

30.     Syngenta Corporation is a corporation organized under the laws of Delaware, with its headquarters in Wilmington, Delaware. Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG. It is the Syngenta Group's top-level business incorporated in the United States. It is registered to do business in North Carolina.

31.     Syngenta Crop Protection, LLC is a limited liability company organized under the laws of Delaware, with its headquarters in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG. Syngenta Crop Protection, LLC operates the Syngenta Group's crop protection business in the United States. It is registered to do business in North Carolina.

32.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Protection, LLC are referred to collectively as "Syngenta."

33.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC, each transacts or has transacted business in this District, and each is engaged in the development, manufacture, and sale of crop protection products.

34.     The Syngenta group describes itself as "one of the world's leading agriculture innovation companies," and a "world leading agribusiness," with four business units, including Syngenta Crop Protection, headquartered in Switzerland. The Syngenta group reports consolidated financial statements for all of its subsidiaries, including Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Protection.

35.     Syngenta operates as a single enterprise, both structurally and operationally. The Syngenta group's global management approves the appointment of senior executives for all Syngenta group companies, including Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Protection. Syngenta's global leadership oversees its U.S. leadership and determines the extent to which management authority is delegated to local or regional levels. For example, Syngenta Crop Protection, LLC cannot settle significant litigation without approval from Syngenta's global management. According to Vern Hawkins — the President of Syngenta Crop Protection, LLC, President of Syngenta Corporation, and North America Regional Director for Crop Protection for the overall Syngenta enterprise — Syngenta has "a global strategy philosophy" and "a local implementation and execution implementation plan."

36.     *Corteva Defendant*. Corteva, Inc. ("Corteva") is a publicly held corporation organized under the laws of Delaware, with its headquarters in Indianapolis, Indiana. Corteva, Inc. is referred to as "Corteva."

13

37.     Corteva is a product of the mergers of Dow and DuPont, which occurred in 2011.  In 2015, the merged entity, DowDuPont, formed Corteva.  In 2019, DowDuPont spun off Corteva into a separate company.

### C.     Defendants' Conspirators

38.     Distributors (including, but not limited to, Helena Agri-Enterprises; Nutrien Ag Solutions; Growmark; WinField Solutions; J.R. Simplot Company; Wilbur-Ellis; and CHS Inc.) and retailers that joined Defendants' loyalty programs at issue herein are Defendants' conspirators and have performed acts and made statements in furtherance of Defendants' anticompetitive conduct.  Defendants are jointly and severally liable for the acts of their conspirators, whether or not named as defendants in this Complaint.

## IV.     INDUSTRY BACKGROUND

### A.     Crop Protection Product Industry

39.     Crop production is a cornerstone of the United States economy.  The U.S. agricultural sector produces hundreds of billions of dollars' worth of crops every year.  In 2021, the U.S. produced more than $86 billion worth of corn alone.

40.     To protect their crops, farmers rely on crop protection products.  Crop protection products are products that kill, repel, prevent, or mitigate the impact of pests that threaten crop production.  The use of crop protection products increases crop yields and contributes to more efficient production of crops.

41.     Crop protection products are a type of pesticide.  Most pesticides sold in the United States are crop protection products.

14

42.     To kill or otherwise control pests, crop protection products contain one or more "active ingredients."  An active ingredient, also known as an "AI," is the actual chemical substance that acts on the pest to kill or otherwise control it.  A crop protection product may contain only one active ingredient, or it may contain mixtures of different active ingredients.

43.     Crop protection products also include "inert ingredients."  These ingredients may contribute to the effectiveness and usability of the crop protection product but do not themselves kill or otherwise control the pest.  For instance, an inert ingredient might make it easier to apply the product on a crop or it might improve the product's shelf life.  Finished crop protection products that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

44.     There are three main types of crop protection products, each of which corresponds to a type of pest that threatens crops.  Herbicides, the most common type of pesticide, are used to protect crops from other plants.  Insecticides are used to protect crops from insects.  Fungicides are used to protect crops from fungi.

45.     An active ingredient operates through what is known as a "mode of action." A "mode of action" refers to the chemical and biological mechanism by which an active ingredient affects a pest, causing it to be killed or otherwise controlled.

46.     Active ingredients are not interchangeable.  Active ingredients differ on a number of dimensions, including: (1) what crop or crops they are suited for and registered to be used on, which may correlate with geography; (2) when in the growing cycle they

15

may be used; (3) whether they are used in herbicides, insecticides, or fungicide; (4) what specific pest(s) they are designed to target; (5) their efficacy in protecting crops from pests, which is often measured in terms of crop yield improvements; and (6) their suitability for use in different locations, weather, or climates.

47.     Because active ingredients are not interchangeable, farmers who use an active ingredient for one purpose may not be able to readily substitute that active ingredient with a different active ingredient.  Farmers may prefer the specific characteristics of an active ingredient and alternatives to that active ingredient may not achieve the same results.

48.     In consequence, a generic crop protection product that shares the same active ingredient(s) as a branded crop protection product is a substitute for that branded crop protection product because the active ingredients are chemically identical.  However, other crop protection products that contain different active ingredients are not reasonable substitutes.

49.     Active ingredients are sometimes sold to formulators who process and mix them into a final crop protection product.  Active ingredients sold in this manner are referred to as "technical grade" or "manufacturing use" active ingredients.

### B.     Regulatory Framework for Crop Protection Products

50.     When a company develops a new active ingredient for use in crop protection products, federal law provides protection from competition for that active ingredient for a limited period of time under two legal frameworks.

16

51.     First, a company that has developed a new active ingredient may apply for U.S. patent protection.  Under U.S. patent law, a company that successfully obtains a patent gains twenty years of exclusive use of that invention starting on the day that patent was issued.

52.     Second, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") provides exclusivity protections for companies that develop a new active ingredient and obtain regulatory approval.  Specifically, a company seeking to sell a new active ingredient must obtain approval from the federal Environmental Protection Agency ("EPA") to ensure that the pesticide will not cause unreasonable harm to human health or the environment. In order to obtain approval, the applicant must submit substantial scientific data to the EPA about the health and environmental effects of the pesticide.

53.     Once the EPA has approved the new active ingredient, the applicant gains exclusive rights to use the scientific data it provided to the agency for a period of ten years, which serves as a separate exclusivity period in which other companies cannot use the active ingredient.  This ten-year period frequently ends after the date of patent expiration and, in practice, extends the length of time in which the company that developed the active ingredient possesses exclusive rights to sell it.

54.     Both the patent system and the FIFRA approval system incentivize innovation.  Companies that develop a new active ingredient and collect the data necessary to obtain EPA approval are rewarded with a substantial period of time in which they may

17

market crop protection products containing the active ingredient free of competition from rival companies.

55.     At the same time, both of these legal frameworks are, by design, limited in time.  Once the protections provided by patent law and FIFRA expire, federal law deliberately opens the market up to competition.  At that point, a company that did not develop a given active ingredient may nevertheless manufacture and sell crop protection products containing that active ingredient.

56.     The period of time after which the exclusivity rights provided under patent law and FIFRA have expired is commonly known as the "post-patent" period.  Active ingredients that are no longer subject to those regimes are known as "post-patent" active ingredients.

57.     Post-patent crop protection products are still subject to the FIFRA regulatory approval process.  EPA can fast track registration of a post-patent pesticide when both the pesticide and its proposed uses are "identical or substantially similar" to a currently registered pesticide.  Those registrations were formerly called "Me Too" registrations.  For "Me Too" registrations, generic registrants typically rely on safety and other data submitted by the primary registrant and, in exchange, make the so-called data "compensation" payments to the primary registrant for using its data.  This reflects FIFRA's objective of facilitating generic entry and encouraging competition once the exclusivity period has expired.

18

58. For each of the Relevant AIs defined below, EPA has registered at least one generic "Me Too" registration of the technical grade active ingredient. Therefore, the EPA has acknowledged that these generic crop protection AIs ("generic products") are identical or substantially similar to the brand name AIs for the same uses.

59. As in the pharmaceutical market, generic crop protection products are generally sold at significantly lower prices than equivalent branded products. The generic manufacturers have the capacity to ramp up the production of generic products by sourcing from China, India, or other countries. If generic manufacturers were able to access the crop protection market, they would spark price competition, and would cause the price and sales volume of branded products — and thus Defendants' profits — to decline. Rather than compete with generic crop input products, however, Defendants employ "generic defense" strategies for the post-patent period. These strategies, led by the loyalty programs at issue herein, are designed to, and are successful in, foreclosing generic competition in the post-patent period for a variety of active ingredients, and as a result, minimize or eliminate the impact of generic competition on Defendants' prices and profits.

## C. Crop Protection Product Supply Chain

60. Crop protection products are manufactured by crop protection manufacturers. There are both "basic" and "generic" or ("post-patent") manufacturers. Basic manufacturers (1) research and develop new active ingredients and (2) manufacture and sell crop protection products containing those ingredients. Generic manufacturers only manufacture and sell crop protection products containing active ingredients that other

19

companies have developed.  As a result, basic manufacturers benefit from the exclusivity rights provided by U.S. law while generic manufacturers typically only try to enter the market once the exclusivity rights belonging to basic manufacturers have expired.

61.     Defendants are among the top twenty global agrochemical companies.  In Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales) and Corteva was reported to be number four (with $7.2 billion in sales).[2]

62.     There are more than a dozen generic manufacturers of crop protection products in the United States.  Generic manufacturers are capable of producing crop protection products that are equivalent to the crop protection products sold by basic manufacturers like Syngenta and Corteva.  As one owner of an independent dealer of crop protection products put it, generics "are the same products as the name brand."

63.     In the crop protection industry, manufacturers usually sell directly to distributors.  The seven largest distributors include: Helena Agri-Enterprises; Nutrien Ag Solutions; Growmark; WinField Solutions; J.R. Simplot Company; Wilbur-Ellis; and CHS Inc.

64.     Distributors own and operate retail businesses at locations near the farmers who purchase directly from those distributor-owned retailers.  In the United States, at least 80% of retail locations are owned by distributors.  There are also a small number of

---

[2]     Shane Thomas, *Upstream AG Insights - October 16, 2022*, UPSTREAM AG INSIGHTS (Oct. 16, 2022), *available at*: http://upstreamaginsights.substack.com/p/upstream-ag-insights-october16th?utm_source=profile&utm_medium=reader2.

independent retailers who are authorized by Defendants to sell their crop protection products.

65. Basic manufacturers exercise control over retailers by having their local sales representatives work closely with retailers. Sales representatives help retailers develop and implement business plans to influence farmer demand. The manufacturers' local sales representatives also monitor a retailer's sales to farmers in a certain area.

66. This chain of sales — from manufacturers to distributors and retailers — is known in the crop protection product industry as the "traditional distribution channel" or, simply, "the channel." More than 90% of sales of crop protection products run through the traditional distribution channel, and more than 90% of sales through the traditional distribution channel run through the seven largest distributors. In consequence, more than 80% of sales of crop protection products run through the seven largest distributors and their owned retailers.

67. It would be inefficient for manufacturers to bypass the traditional distribution channel and sell directly to farmers. Distributors typically have access to a large, preexisting base of customers, while manufacturers do not. Distributors own warehouses, logistics, and retail networks that are the means to provide crop protection products to farmers. The most efficient way for the manufacturers to distribute their products to farmers is through the distributors and retailers who have a longstanding relationship with farmers.

21

68.     In short, there are no viable, cost-effective alternatives to selling through the traditional distribution channel.

## V.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.     Defendants Illegally Blocked Entry of Generics by Conditioning Cash Payments to Refusals to Sell Generic Substitutes

69.     At least nine active ingredients are relevant to this case.  Five of those active ingredients are sold by Syngenta: azoxystrobin, mesotrione, metolachlor (including its variant s-metolachlor), fomesafen, and lambda-cyhalothrin (collectively, the "Syngenta AIs").  Four of those active ingredients are sold by Corteva: rimsulfuron, oxamyl, acetochlor, and methoxyfenozide (collectively, the "Corteva AIs").  This Complaint refers to the Syngenta AIs and the Corteva AIs as, collectively, the "Relevant AIs."  Upon information and belief, the Relevant AIs include additional, active ingredients that are implicated by Defendants' unlawful schemes to exclude competition, the identities of which are not yet known to Plaintiffs.

70.     Both Syngenta and Corteva use their exclusionary contracts (a/k/a "loyalty programs") to exclude competitors during the post-patent period when they no longer have any exclusivity rights to the Relevant AIs.  Those loyalty programs have the intended and actual effect of blocking generic manufacturers from producing crop protection products containing the Relevant AIs that could compete with Defendants' products.  As one former executive for a generic manufacturer put it, "when products come into a post-patent environment," the basic manufacturers who developed the product "limit the amount of market share that they're willing to give to generics."

22

71. The loyalty programs all work in essentially the same way. Each Defendant enters into "loyalty agreements" with each of the major distributors, distributor-owned retailers, and other authorized retailers who sell Defendants' crop protection products directly to farmers. Through those loyalty agreements, Defendants pay distributors and retailers a share of their monopoly profits in exchange for their help to exclude generic competition. More specifically, the loyalty agreements offer substantial exclusionary payments to each distributor and retailer (collectively dealers) in the form of kickbacks if and only if the dealer limits its purchase of crop protection products containing specified active ingredients. Specifically, for each Relevant AI, in order to receive an exclusionary payment, a dealer needs to purchase a very high percentage of its crop protection products from the Defendant that manufactures that Relevant AI. This necessarily means that the dealer cannot purchase more than an incredibly *low* percentage of products from generic manufacturers. If a dealer fails to meet that loyalty threshold in a given year it does not receive an exclusionary payment.

72. Both Syngenta and Corteva have loyalty agreements with virtually all of the major distributors and the authorized retailers, and their conduct is ongoing. Each Defendant's loyalty programs are intended to promote adherence to loyalty thresholds and thus ensure that the practical effect of the programs is to prevent any substantial distribution of generic crop protection products. Each Defendant has described exclusion payments as profit-enhancing "rewards" for loyalty performance and support of branded products over generic products. Internal Syngenta planning documents depict its Key AI program as a

23

way to generate "channel profit." Syngenta has even admitted that its loyalty programs are, in essence, **not** discount programs: one executive stated that the loyalty payment for a particular program is "not 11 percent off. It's 11 percent incentive paid at the end of the year for performance[]" – *i.e.*, it is a split of the monopoly profits created by the exclusionary contracts.

73. A former employee of the distributor Growmark explained that the loyalty programs meant that if Growmark hit certain benchmarks, "we'd have a kicker of 2% to 3% more per product." The exclusion payments could be "sizable." In some cases, according to the former Growmark employee, "you could earn 20% or more back on particular products."

74. A former employee of the distributor Wilbur-Ellis said that manufacturers talked to distributors in terms of "loyalty." For instance, according to the employee, a manufacturer might tell a distributor, "We want you to be 80% loyal on this active ingredient." As the former employee explained, that meant that the manufacturer wanted the distributor to purchase 80% of the total volume of crop protection products containing that specific active ingredient from the manufacturer in the upcoming year. The manufacturer's payment to the distributor would be conditioned on the distributor hitting that target.

75. A former executive for a generic company provided an example of how a loyalty agreement might operate. A distributor like "Crop Production Services [now named "Nutrien Ag Solutions"] or Helena" has "to maintain a certain percentage, usually

24

a very high percentage, 90 percent of their buying purchases from a company, such as Syngenta, to maintain the rebates." The loyalty agreements, according to the executive, "leave[] very limited market share access for . . . generics to participate in."

76. Defendants are leading basic manufacturers in the crop protection product industry who provide a large portfolio of crop protection products. In addition to the AI-specific loyalty programs, Defendants bundle their relevant AIs and crop protection products into a portfolio and give dealers extra exclusionary kickbacks across their purchases of the whole portfolio if they can meet the percentage-based loyalty threshold Defendants set for each AI in the portfolio. This means for every product covered by Defendants' bundled loyalty programs dealers have to keep their purchase from generic manufacturers at very low percentage. If a dealer fails to meet a loyalty threshold in one product in the portfolio, it will lose the bundled extra exclusionary kickbacks across all the products included in the portfolio.

77. Defendants and their affiliates are also leading manufacturers who produce a full spectrum of crop related products, for example seeds and fertilizers. In addition to the crop protection loyalty programs entered with dealers, Defendants bundle their seed, fertilizer, and crop protection products, and provide incentives to farmers if they purchase a certain threshold of products across Defendants' seed, fertilizer, and crop protection suite. By bundling other products, especially patent protected seeds, with their crop protection products, Defendants dissuade farmers from adopting generic crop protection products.

78.     One chart prepared by Syngenta summarized how falling beneath a loyalty threshold could severely impact a distributor's bottom line.  The chart shows that if a distributor purchased more than 4% of its azoxystrobin products from generic manufacturers instead of from Syngenta, it would lose out on kickbacks from Syngenta and lose money overall.  The chart also shows that the only way the customer could avoid losing money would be to switch to purchasing more than 60% of its azoxystrobin from generic manufacturers instead of from Syngenta.  But due to Syngenta's dominant market share, incumbency advantage, and other factors inhibiting generic uptake among growers, purchasing that volume of azoxystrobin products from generic manufacturers is not a viable alternative for a distributor.  In other words, because the demand of some subset of growers is "incontestable," distributors cannot avoid being penalized by switching their purchases to generics en masse.  In consequence, a distributor subject to this agreement would be strongly incentivized to purchase more than 96% of its azoxystrobin products from Syngenta instead of from generic manufacturers.

79.     Defendants closely monitor dealers' sales to make sure they comply with their loyalty programs.  Syngenta and Corteva adopted an industry standard reporting system called electronic data interchange, or EDI.  Every sale made through the authorized dealers is reported through the EDI system, which gives Syngenta or Corteva real-time reporting of a qualifying sale under the loyalty program.  This real-time reporting system enables Syngenta and Corteva to easily monitor the enforcement of their loyalty programs with dealers.

26

80.     Generally, because eligibility for the exclusionary payments is based on Defendants' market share at the dealer calculated across an entire year's worth of sales, the payments are sent out only after the year in question is over.  For instance, a loyalty agreement might be calculated based on purchases over the course of a fiscal year, which ends on August 31.  But the exclusionary payment from the manufacturer might not be paid out until the following December or January.

81.     In addition to the "carrots" they offer in the form of exclusionary payments, both Syngenta and Corteva further ensure compliance with their loyalty thresholds by using "sticks" to keep distributors and retailers in line.  Both Syngenta and Corteva have threatened to punish distributors and retailers who fail to meet their loyalty thresholds by canceling contracts, temporarily denying access to certain products, and/or declining to supply the distributor or retailers with needed products.

82.     Both Syngenta and Corteva have followed through on those retaliatory threats, punishing distributors and retailers who failed to meet the loyalty threshold set by Defendants.  Because Syngenta and Corteva are the leading pesticides manufacturers in the United States, their products are considered a must have for distributors and retailers. Therefore, completely forgoing Defendants' products and only distributing generic products is not a viable option for distributors and retailers.

83.     In addition, with the kickbacks from Defendants' loyalty programs, distributors and retailers are able to sell Defendants' branded products at premium prices and maintain a higher profit margin compared to the margin of selling generic products.

27

Therefore, Defendants' exclusionary loyalty programs successfully remove any incentive to offer generic products from distributors and retailers.

84.     For each of the Relevant AIs, the relevant Defendant has made substantial exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic products.

85.     To meet the threshold for each of the Relevant AIs, distributors and retailers strictly manage and allocate their generic open space under the loyalty program and steer their customers toward loyalty-compliant products, despite customer demand for lower-priced generic products that exceeds the available open space.  They also have curtailed marketing efforts associated with generic substitutes and sometimes even removed generic products from their price lists altogether.  As a result of the incentives created by the relevant loyalty program, major distributors have repeatedly met the required loyalty threshold.

86.     Even in circumstances where the purchase of additional generic products would not cause distributors and retailers to drop beneath the percentage threshold, distributors and retailers often decide not to purchase generic products because of the risk that unexpected developments — like a sudden change in farmer demand near the end of the year — might cause them to drop beneath the threshold.

87.     For each of the Relevant AIs, the loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of crop protection products containing that AI.  Loyalty-program constraints have prevented distributors and

retailers from purchasing more than minimal amounts of generic substitutes of Defendants' products (or in some cases, any at all) despite generic products being of identical or substantially similar quality and supply availability, while the program also dis-incentivizes (in effect, blocks) the entry of generics into the market.

88. Due to the success of their loyalty programs with dealers, Defendants maintain prices significantly above those of equivalent generic products and significantly above what would be charged in a competitive market. Each loyalty program has resulted in higher prices for crop protection products containing each Relevant AI than would prevail in a competitive market.

## B. Syngenta AIs and Loyalty Programs

### 1. Overview of Syngenta's Loyalty Programs

89. Syngenta's loyalty agreements cover each of the Syngenta Relevant AIs. Syngenta's loyalty program is named the "Key AI" program. Syngenta Crop Protection, LLC is the Syngenta entity that signs agreements with distributors under the Key AI program. Syngenta also operates loyalty programs with retailers that sell crop protection products. The loyalty programs are structured similarly to its loyalty programs with distributors. Leading retailers participate in these programs.

90. Syngenta's use of loyalty programs goes back almost twenty years. As early as 2004, Syngenta acted with distributors to incentivize their stocking and sale of certain brand products to U.S. farmers. The 2004 agreement covered AI products that are at issue here, as seen below:

91. To maintain its monopoly, Syngenta unlawfully targets generics by incentivizing Retailers to block generic infiltration into Relevant Markets, as depicted in this 2004 Loyalty Program Agreement.

92. This 2004 Loyalty Program protects multiple AIs, including s-metolachlor and lambda-cyhalothrin by requiring retailers to meet a 98% threshold share in order to collect a 5% incentive payment. The threshold requirement meant that the participating retailer could not carry or sell greater than 2% of competing generic products containing



**2004 SOUTHERN FIELD CROPS**
RETAILER PROGRAM

**Portfolio Sales Support**
*Rewards Retailers for their stewardship of Syngenta brands.*

| BRANDS | ACTIVITY | INCENTIVE |
|---|---|---|
| All participating Syngenta Crop Protection brands and pack sizes. Corn and cotton seed commercially | • Purchase and sell Syngenta brands to growers | 4% |

**Key Active Ingredient Support**
*Rewards Retailers for their loyalty to Syngenta brands where a generic alternative exists.*

| ACTIVE INGREDIENTS | BRANDS | SYNGENTA THRESHOLD SHARE | INCENTIVE |
|---|---|---|---|
| Abamectin | Agri-mek®, Zephyr®, and Clinch® | | |
| S-metolachlor | Boundary®, Bicep II MAGNUM® brands, Dual MAGNUM® brands, Expert™, LUMAX™ and Sequence™ | 98% | |
| Paraquat | Gramoxone Max™ | | |
| Lambda Cyhalothrin | Warrior® and Karate® | | 5% |
| Flumetralin | Prime+® | 95% | |
| Chlorothalonil | Bravo® brands and Tilt®/Bravo® | | |
| Propiconazole | Orbit™ and Tilt® | 90% | |
| Mefenoxam | Ridomil Gold® brands | | |
| Prometryn | Caparol® | 85% | |

these AIs, essentially blocking any meaningful competing generic products from entering this point in the distribution chain.

93.    Through additional bundled incentive programs, dealers can achieve even greater profits by meeting each "support" programs' mandatory stocking, selling, or blocking incentive requirements.

**Summary of Maximum Potential Incentives under 2004 Syngenta Southern Field Crops Retailer Offer.**

| BULK BRANDS | MAXIMUM INCENTIVE POSSIBLE |
|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands and LUMAX™ | 19% |
| AAtrex®, Bravo® brands, Boundary®, Caparol®, Expert™, Gramoxone Max™, Sequence™ and Touchdown® brands | 16% |
| Princep® | 11% |
| Touchdown CF™ | 9% |
| **PACKAGE BRANDS** | **MAXIMUM INCENTIVE POSSIBLE** |
| Karate®, Tilt® and Warrior® | 14% |
| AAtrex®, Abound®, Agri-mek®, Amistar™, Bicep II MAGNUM® brands, Boundary®, Bravo® brands, Carnix™, Caparol®, Callisto™, Centric®, Clinch®, Curacron®, Cruiser® on commercially treated cotton seed, Denim™, Dual MAGNUM® brands, Envoke™, Expert™, Flexstar®, Force® 3G, Fusilade®, Fusion®, Gramoxone Max™, LUMAX, Omega®, Orbit®, Platinum®, Platinum®/Ridomil Gold®, Prime+®, Proclaim®, Quadris®, Quadris®/Bravo®, Quilt™, Reflex®, Ridomil Gold® brands, Ridomil®/Bravo®, Sequence™, Suprend™, Tilt/Bravo®, Touchdown® brands except CF, Uniform™ (Quadris®/Ridomil Gold®), Zephyr® | 9% |
| All other participating package brands | 4% |

94.    Importantly, although billed as a "retailer" program, the program is reflective of the industry's blurred distinction between retailers and distributors.  Syngenta defined "Retailers" as "a retail business which purchases Syngenta products from Syngenta or an authorized Syngenta Distributor who has been appointed by Syngenta to sell and service eligible Syngenta products within the retailer's geographic area and resells such products to growers."  And Syngenta used the term "distributors" (below) in its qualifications for participation in its programs:

31

- Qualification and performance for this program are determined based on net EDI sales transactions as reported by an authorized Syngenta distributor and then sold to growers. Net EDI sales are defined as purchases in weight or volume minus any returns from a contracted Syngenta Distributor. Purchases from ineligible entities or unauthorized distributors will be disqualified and not included in qualification or payment. Any volumes determined by Syngenta to be 'brokered' will be disqualified.
- Sales from Retailer-to-Retailer do not qualify for qualification levels or program incentives.
- Distributors and Distributor-owned Retailers cannot claim sales to or from independent Retailers for qualification and or incentive payment under this program. Any sales made by a Distributor must be reported to Syngenta with accurate Retailer or 'end user' designation. Reporting sales to Retailers as 'end users' is fraud and will result in data being declared ineligible for consideration in this program. Reporting of excessive quantities that equate to more products than an 'end user' can use on his acreage will result in data being declared ineligible for consideration in this program. Sales to 'brokers' (including Internet brokers), and others that are not considered Retailers by definition in this program will be disqualified. Syngenta reserves the right to be the final authority in determining the validity of data and the inclusion of said data in this program.

95. A similar 2016 Syngenta loyalty program agreement shows the continued scheme to protect its monopoly of "key AIs" by rewarding retailers for supporting certain Syngenta AIs when a generic alternative exists. The image below, excerpted from the 2016 Syngenta LP, shows continuation of incentives on older AIs and inclusion of new AIs.

## Section 2. Key Active Ingredient Support
Reward Retailers for their support of Syngenta products where a generic alternative exists.

| ACTIVE INGREDIENTS | PRODUCTS | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| Mesotrione | Acuron, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ, Zemax | 99% | 5% |
| Clodinafop | Discover NG | 98% | |
| Azoxystrobin | Abound, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt, Quilt Xcel, Uniform | 94% | 10% |
| Diquat | Reglone | 90% | 5% |
| Flumetralin | Prime+ | | |
| Fomesafen | Flexstar, Flexstar GT, Flexstar GT 3.5, Prefix, Reflex | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo | | |
| S-metolachlor (S-MOC) | Bicep II Magnum brands, Bicep Lite II Magnum, BroadAxe XC, Boundary, Dual Magnum, Dual II Magnum brands, Expert, Sequence | | |
| Abamectin | Agri-Flex, Agri-Mek SC | 85% | |
| Lambda Cyhalothrin | Karate with Zeon Technology, Warrior II with Zeon Technology | | |
| Paraquat | Gramoxone SL, Gramoxone SL 2.0 | | |

96. Retailers are required to stock and sell each Syngenta AI at a certain threshold in order to receive an incentive payment.

97. By way of example, to obtain the 5% incentive applicable to mesotrione, the retailer must achieve a threshold of 99% Syngenta mesotrione sales. For azoxystrobin, the

32

threshold is 94% and the incentive is even higher — 10%. And for s-metolachlor, it is 90%. Older AIs, such as lambda-cyhalothrin that required a 98% threshold in 2004 still required an 85% threshold in 2016. Thus, the threshold and incentive amounts changed, but the objective did not.

98. The purpose and effect of the 2016 loyalty program remains the same: in order to obtain the incentive, a dealer must virtually exclude from its inventory generic products containing the AI. This sharing of monopoly profits has a substantial impact on dealers' income and make it economically irrational for an individual dealer to purchase significant amounts of generic AIs.

99. As reflected in these documents, Syngenta polices these requirements rigorously. It starts by collecting data from dealers, which must provide information about their total net sales to farmers of Syngenta and generic products before Syngenta makes incentive payments. Syngenta provides dealers with a handy digital calculator app to assist them in making sure they have correctly calculated the necessary support threshold. Syngenta reserves the right to verify the accuracy of dealers' math and to independently audit the threshold figures to confirm, to Syngenta's satisfaction, that dealers have earned Syngenta's incentive award by selling the required percentages of Syngenta AI. Syngenta has had these programs for many years.

100. As also reflected in these documents, Syngenta can modify the incentive system at will based on its determination of changes in the market, and has full discretion to change the AI calculator at any time to reflect what Syngenta believes are the current

33

marketplace conditions. Syngenta's loyalty program deprives generic competitors of the ability to gain meaningful market share, as is intended. Such suppression of generic market penetration causes Plaintiffs and the Class to pay artificially maintained, higher prices for these products.

101. Prior to the merger of Dow and DuPont, the latter had in place the "DuPont Agricultural Retailer Sales & Service Incentive Offers" program that offered incentive payments to retailers profiting on DuPont crop protection products.

102. The program was implemented by payments calculated with reference to "base incentives" and "additional incentives" that allowed distributors to engage in "stewardship" for DuPont branded products, which meant selling less generic competitive products. Likewise, prior to the merger, Dow had a similar program that incentivized "Stocking" and "Stewardship" for its branded products.

103. Dow's Stocking incentive required retailers to stock and sell a certain threshold percentage of its branded products. More specifically, it required participants to stock and sell an amount of certain AI products based on the previous year's EDI, ensuring that only a minimum percentage of generic, competing products can enter that participant's chain of distribution. As seen in the image below, the stocking threshold for certain AIs reached up to 75% of the previous year's EDI volume.

**Stocking**

Once the minimum requirement is met by the stocking date and sold by the end of the Market Year, payment is made on all net purchases during the program year.

| Product | Stocking Pay Rate | Min. Volume Customer Must Stock & Sell in 2005-2006 | Date |
|---|---|---|---|
| Sonalan¹ 10G herbicide | 4.5% | 8,000 lbs. | 11/15/05 |
| Sonalan HFP Bulk | 4.0% | 1,000 gallons | 11/15/05 |
| Dow AgroSciences Branded Acetochlor Bulk | 4.0% | 1,000 gallons | 12/5/05 |
| Dow AgroSciences Branded Acetochlor Custom Repack | 4.0% | Minimum repack order | 12/5/05 |
| Lorsban¹ 15G insecticide | 10.0% | 75% of 2004-2005 EDI | 12/5/05 |
| Treflan¹ TR-10¹ herbicide | 4.5% | 70% of 2004-2005 EDI | 12/5/05 |
| Glyphomax¹ XRT herbicide & Durango¹ herbicide Bulk | 4.0% | 1,000 gallons | 2/1/5/06 |
| FirstRate¹ herbicide | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Glyphomax XRT & Durango Custom Repack | 4.0% | Minimum repack order | 3/15/06 |
| Glyphomax XRT & Durango package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Hornet¹ WDG herbicide | 3.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Pendimax¹ 3.3EC herbicide Bulk | 6.0% | 1,000 gallons | 3/15/06 |
| Pendimax 3.3EC Custom Repack | 6.0% | Minimum repack order | 3/15/06 |
| Pendimax Package | 6.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Python¹ WDG herbicide 4x2.5 lbs. | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Sonalan HFP Package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |

104.    As seen below, the same 2005-06 program also offered a Stewardship incentive program for certain products that met an 80% EDI threshold:

4. Dow AgroSciences may make program progress payments during the 2005-2006 Market Year:
   (a) Progress payments are based on 80% of the stewardship earnings of participating products calculated from EDI-reported data available to Dow AgroSciences.
   (b) Final payment issued by December 31, 2006.
   (c) Following the program end date and final payment for the 2005-2006 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Dow AgroSciences Retail Program earnings.

105.    In a 2015 DuPont loyalty program agreement, participants had to exceed their prior year's sales of specific AIs and products in exchange for an additional profitable bonus offer. The 105% threshold seen below meant that even fewer generic competitor products than the small percentage allowed under the program's terms the previous year would be allowed to compete.

Sales and Service Pays
The Sales and Service Pays incentive is a reward for achieving total portfolio growth vs the prior year.

Criteria
- Qualify for the Retail Advantage - Sales and Service Incentive
- Earn 1% on total portfolio sales with growth of 105% over prior year.
- Earn another 1% on the total portfolio if sales growth of the following products collectively total 105% over prior year.
  - Afforia™, Aproach® Prima, Coragen®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q and Vydate® C-LV.

### 2. Syngenta's Azoxystrobin and Its Related Loyalty Program Scheme

106.    Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases.  Global annual sales of azoxystrobin total over $1 billion, which Syngenta touts as making it the "largest fungicide in the world."  Sales of crop protection products containing azoxystrobin totaled over $285 million in 2020.

107.    A Syngenta predecessor company initially developed, patented, and registered azoxystrobin with the EPA.  Syngenta's statutory exclusivity rights relating to azoxystrobin, namely its exclusive-use period under FIFRA and relevant patent protection, have both expired.

108.    Syngenta sells azoxystrobin as the product Quadris.  Syngenta publicly touts Quadris as a superior product, claiming that it provides "complete plant protection," offers effective control of "all four classes of fungi," and "optimizes" yield and quality by helping the plant to efficiently use resources.  Azoxystrobin is also the sole active ingredient in Syngenta's product Heritage, which Syngenta describes as a "unique" fungicide with "a novel mode of action."

36

109.    Syngenta also sells mixed-ingredient fungicide products that include azoxystrobin, such as Miravis Neo and Trivapro.  Syngenta advertises Miravis Neo as setting "the standard in its class for broad-spectrum disease control and plant-health benefits."  Syngenta sells Trivapro as "the hardest-working, longest-lasting fungicide."

110.    In or about 2014, Syngenta adopted a post-patent strategy to "aggressively defend [its] azoxystrobin share position while upholding market value."  Syngenta projected that if it did not do so by deploying loyalty programs, both it and the traditional distribution channel would lose substantial revenues and profits due to downward pricing pressure from generic entry.  On the other hand, were Syngenta to succeed in securing loyalty from a critical mass of the distribution channel, Syngenta projected that azoxystrobin pricing would remain flat for several years before beginning a slower descent. Syngenta anticipated that generic entry would erode Syngenta's azoxystrobin prices and the corresponding "market value" to Syngenta no matter what, but that the erosion would be substantially more severe if Syngenta did not successfully implement its Key AI loyalty program and other generic countermeasures.

111.    To prevent the effects of unimpeded generic competition, Syngenta added azoxystrobin to its Key AI loyalty program, beginning in or about the 2013-2014 market year, with a 98% share threshold, i.e., 2% open space.  The threshold was gradually reduced over time to 92%, i.e., 8% open space, where it stands today.  Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products.

37

112. Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of azoxystrobin products and as a result maintained supracompetitive prices for azoxystrobin products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced azoxystrobin products in the United States. Generic azoxystrobin products were priced significantly below Syngenta's existing azoxystrobin crop protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors.

113. As a result of the incentives created by Syngenta's loyalty program, major distributors and retailers have repeatedly met Syngenta's azoxystrobin loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic azoxystrobin open space under the loyalty program, steer their customers toward Syngenta's azoxystrobin products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced azoxystrobin products. Some distributors and retailers have removed generic mesotrione products from their price lists altogether because of loyalty program considerations. Generic manufacturers seeking to sell crop protection products containing azoxystrobin have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

114. At least two generic manufacturers have exited the market entirely. These two generic manufacturers abandoned azoxystrobin products after failing to achieve

38

market success in the face of constraints imposed by Syngenta's loyalty program. At least one other generic manufacturer decided against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program.

115. In at least one instance, a generic manufacturer has been hindered in its attempt to market an innovative product containing azoxystrobin. This generic manufacturer sought to combine azoxystrobin with a different fungicide to target a market opportunity presented by particular crop diseases. Distributors and retailers are unwilling to purchase significant amounts of the product because the inclusion of azoxystrobin in the product could impact their ability to meet Syngenta's loyalty threshold.

116. Syngenta's prices remain significantly above prices of equivalent generic products and competitive levels. Syngenta's loyalty program has resulted in higher prices for crop protection products containing azoxystrobin than would prevail in a competitive market.

### 3. Syngenta's Mesotrione and Its Related Loyalty Program Scheme

117. Mesotrione is a frequently used corn herbicide.

118. Syngenta and its affiliates initially developed, patented, and registered mesotrione with the EPA. Syngenta's statutory exclusivity rights relating to mesotrione, namely its exclusive-use period under FIFRA and relevant patent protection, have both expired.

119. Syngenta sells mesotrione as the product Callisto. Syngenta's advertising claims that Callisto provides residual broadleaf weed control, flexible timing, and "exceptional" crop safety.

120. Mixed-ingredient herbicide products sold by Syngenta, such as Lumax EZ and Acuron, also include mesotrione. Syngenta sells Lumax EZ as enabling "one-pass weed control in corn with a single product for broader-spectrum control" while touting Acuron as the product that "outperforms and outyields all other corn herbicides."

121. Among other steps, Syngenta added mesotrione to its Key AI loyalty program. Mesotrione was first added to the program in or about the 2014-2015 market year, with a 99% share threshold, *i.e.*, 1% open space. Syngenta gradually lowered the loyalty threshold over time, arriving at 92% (*i.e.*, 8% open space) for the 2020-21 market year. Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic mesotrione products.

122. Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of mesotrione products and as a result maintained supracompetitive prices for mesotrione products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced mesotrione products in the United States. Generic mesotrione products were priced significantly below Syngenta's existing mesotrione crop protection

40

products.  In spite of this, generic manufacturers have struggled to make inroads with distributors.

123.    As a result of the incentives created by Syngenta's loyalty program, major distributors and retailers have repeatedly met Syngenta's mesotrione loyalty threshold.  To meet the threshold, distributors and retailers strictly manage their generic mesotrione open space under the loyalty program, steer their customers toward Syngenta's mesotrione products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced mesotrione products.  Some distributors and retailers have removed generic mesotrione products from their price lists altogether because of loyalty program considerations.  Generic manufacturers seeking to sell crop protection products containing mesotrione have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

124.    Two generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns.  A third developed a mixture product containing mesotrione, but dropped the product after the manufacturer was unable to make sufficient sales in the face of Syngenta's loyalty program.

125.    Syngenta's prices remain significantly above prices of equivalent generic products and competitive levels.  Syngenta's loyalty program has resulted in higher prices for crop protection products containing mesotrione than would prevail in a competitive market.

### 4.    Syngenta's Metolachlor and Its Loyalty Program Scheme

126.    Metolachlor is an herbicide. It is applied to a range of crops including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. This Complaint uses the term "metolachlor" to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, as described below.

127.    A Syngenta predecessor company developed, patented, and registered the original metolachlor compound with the EPA in or about 1976 and Syngenta's relevant patent protection for the original metolachlor expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered s-metolachlor, a variant of the original compound. Syngenta's statutory exclusivities relating to s-metolachlor, namely its exclusive-use period under FIFRA and relevant patent protection, as well as a patent pertaining to the s-metolachlor manufacturing processes, have all expired.

128.    Syngenta sells metolachlor under brand names that use the term "Dual." There have been multiple iterations of Syngenta's "Dual" product, the most recent of which is the Dual II Magnum herbicide. According to Syngenta, Dual II Magnum provides season-long weed control, eliminates any early-season weed competition that threatens yield production while plants are most vulnerable, and has flexible application timing. Syngenta also sells premixes of Dual and other herbicides.

129.    Most farmers consider the term "Dual" to be synonymous with "metolachlor."

130. In or about the early 2000s, in response to anticipated generic competition on the original form of metolachlor, Syngenta added metolachlor to its Key AI loyalty program, with loyalty thresholds at or above 90% (*i.e.*, 10% open space), and Syngenta's loyalty threshold stands at 90% today. Syngenta counts the original metolachlor and the s-metolachlor variant, which are commonly viewed as largely interchangeable at varying use rates, as a single active ingredient for purposes of its Key AI loyalty program. This means that there is a single loyalty calculation for the two variants, and a dealer that purchases too much original metolachlor from a generic manufacturer (as a proportion of its combined metolachlor and s-metolachlor purchases) risks forfeiting payments associated with Syngenta s-metolachlor products.

131. Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of metolachlor products and as a result maintained supracompetitive prices for metolachlor products. Generic manufacturers introduced products containing original metolachlor in or about 2003. The Generic metolachlor products were priced significantly below Syngenta's existing metolachlor crop protection products. In spite of this, they were unable to achieve significant market success. Other generic manufacturers delayed or canceled the introduction of metolachlor products as a result of Syngenta's loyalty program. There has also been more recent entry by generic manufacturers into the sale of crop protection products containing s-metolachlor, but these manufacturers, too, have been marginalized by Syngenta's loyalty program.

132.    As a result of the incentives created by Syngenta's loyalty program, major distributors and retailers have repeatedly met Syngenta's metolachlor loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic metolachlor open space under the loyalty program, steer their customers toward Syngenta's metolachlor products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced metolachlor products. Some distributors and retailers have removed generic metolachlor products from their price lists altogether because of loyalty program considerations. Generic manufacturers seeking to sell crop protection products containing metolachlor have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

133.    In at least one instance, a generic manufacturer was thwarted in its attempt to innovate with a product containing metolachlor. The generic manufacturer considered combining metolachlor with a different herbicide to market a new mixture product. The manufacturer did not bring the product to market, however, because of concerns that Syngenta's loyalty program would prevent the manufacturer from gaining share in the United States.

134.    Syngenta's prices remain significantly above prices of equivalent generic products and competitive levels. Syngenta's loyalty program has resulted in higher prices for crop protection products containing metolachlor than would prevail in a competitive market.

### 5. Syngenta's Fomesafen and Its Loyalty Program Scheme

135. Fomesafen is a widely used selective-applied and foliar herbicide for control of broadleaf weeds in soybeans. In 2018, approximately six million pounds of fomesafen were applied. Syngenta's predecessor filed a U.S patent for fomesafen on August 25, 1981 and the patent protection has expired

136. Syngenta sells fomesafen using the trade names Reflex and FlexStar. According to Syngenta, Reflex is fast, "with effective and long-lasting residual activity, offers pre- and post-emergence management of difficult weeds such as glyphosate-resistant Palmer amaranth and ALS-resistant pigweed, grass and sedges. Reflex can be used on a wide range of crops, including cotton, dry beans, snap beans, potatoes and soybeans." FlexStar is a "tank-mix partner for post-emergence weed management" which "manages glyphosate- and ALS-resistant weeds with fast contact activity. Flexstar absorbs on contact and is rainfast in 1 hour, providing maximum performance and effectiveness."

137. As noted in the discussion of the 2016 Syngenta document, fomesafen was subject to a 90% retailer support threshold for which dealers received a 5% exclusionary payment.

138. Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of fomesafen products and as a result maintained supracompetitive prices for fomesafen products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced fomesafen products in the United States. Generic fomesafen

45

products were priced significantly below Syngenta's existing fomesafen crop protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors.

139. As a result of the incentives created by Syngenta's loyalty program, major distributors and retailers have repeatedly met Syngenta's fomesafen loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic fomesafen open space under the loyalty program, steer their customers toward Syngenta's fomesafen products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced fomesafen products. Some distributors and retailers have removed generic fomesafen products from their price lists altogether because of loyalty program considerations. Generic manufacturers seeking to sell crop protection products containing fomesafen have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

140. Syngenta's prices remain significantly above prices of equivalent generic products and competitive levels. Syngenta's loyalty program has resulted in higher prices for crop protection products containing fomesafen than would prevail in a competitive market.

46

### 6. Syngenta's Lambda-cyhalothrin and Its Loyalty Program Scheme

141. Lambda-cyhalothrin is a pyrethroid insecticide that allows for the control of a wide variety of economically damaging insects. According to Syngenta, it has long-lasting residual effects compared to other insecticides.

142. Sales of lambda-cyhalothrin in 2020 have been estimated at $1.25 billion worldwide. Lambda-cyhalothrin was initially developed by a Syngenta predecessor company and was registered by the EPA in 1988. Syngenta has sold and sells products containing lambda-cyhalothrin under the names Karate® and Warrior®, among others. Lambda-cyhalothrin received patent protection until 2003.

143. As noted in the 2004 Syngenta document discussed above, lambda-cyhalothrin was subject to a 98% loyalty threshold requirement for which a dealer could obtain a 5% exclusionary payment.

144. Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of lambda-cyhalothrin products and as a result maintained supracompetitive prices for lambda-cyhalothrin products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced lambda-cyhalothrin products in the United States. Generic lambda-cyhalothrin products were priced significantly below Syngenta's existing lambda-cyhalothrin crop protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors.

145.    As a result of the incentives created by Syngenta's loyalty program, major distributors and retailers have repeatedly met Syngenta's lambda-cyhalothrin loyalty threshold.  To meet the threshold, distributors and retailers strictly manage their generic lambda-cyhalothrin open space under the loyalty program, steer their customers toward Syngenta's lambda-cyhalothrin products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced lambda-cyhalothrin products.  Some distributors and retailers have removed generic lambda-cyhalothrin products from their price lists altogether because of loyalty program considerations.  Generic manufacturers seeking to sell crop protection products containing lambda-cyhalothrin have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

146.    Syngenta's prices remain significantly above prices of equivalent generic products and competitive levels.  Syngenta's loyalty program has resulted in higher prices for crop protection products containing lambda-cyhalothrin than would prevail in a competitive market.

C.    **Corteva's AIs and Loyalty Programs**

1.    **Overview of Corteva's Loyalty Programs**

147.    Programs similar to the 2005-06 DuPont program are carried out by Corteva, which was spun out as a stand-alone company in 2019.  Corteva's loyalty program agreement is reflected in the below image, excerpted from its 2020-21 Retailer Offers brochure.

48

## Retail Advantage Program

The Retail Advantage Program has been designed to provide retail channel partners with competitive rewards for supporting Corteva products.

**Program Qualification**

The Corteva Agriscience™ Retail Advantage Program payment is based on product volume reported by approved distributors via EDI to Corteva. Only products intended for resale to growers are eligible for payment under the terms of this program. Retail customers must have purchased a minimum of $50,000 of participating and qualifying products between Oct. 1, 2020 and Sep. 30, 2021 to be eligible for program earnings.

**Program Payment**

Retailers will have an opportunity to earn a reward payment on participating products provided the following criteria are met:

- Participating in training workshops as needed
- Work with the Corteva Territory Manager to develop new market or product opportunities
- Promptly reporting product or performance concerns
- Work with the Corteva Territory Manager to resolve any product or performance issues that may arise
- Follow the product label and providing sound agronomic recommendations
- Comply with all local, state and federal regulations in the storage and distribution of Corteva products
- Submit valid Grower data for the Corteva crop protection portfolio

**Qualifying Products for EDI Product Values**

Additional Corteva Agriscience™ Crop Protection and Range & Pasture EDI product values count toward meeting the $50,000 purchase requirement, but do not participate in any retail payments. For more information, see terms and conditions section in the back of this book.

**Where to submit data**

www.yourdatadimensions.com
Customer Support: 1-800-901-0012

**Data Dimensions User Guide**
www.yourdatadimensions.com/
UserGuide/UserGuide.pdf

**How to submit Grower Purchase data**
- Upload an existing Excel file containing required information and utilize the Data Dimensions mapping tool
- Key in purchase information fields that are prompted on website
- Utilize vendor support SSI/AgVance and Agrimine. Contact information found in user guide
- EDI/XML data currently fed into Data Dimensions for reporting purposes

**Key dates**
- Program dates:
  Oct. 1, 2020 – Sep. 30, 2021
- Grower point of sale data report deadline: Oct. 15, 2021

Not applicable to products sold outside the United States

148.    To obtain the kickbacks promised under this program, the dealer must be a significant force in the market, with a minimum of $50,000 in Corteva sales during the previous year. The dealer must also work closely with a Corteva Territory Manager, which would necessarily impede it from making any purchases of generic crop protection products manufactured by generics that compete with Corteva branded products. Finally, the dealer must submit valid grower data to Corteva consisting of an Excel spreadsheet reflecting purchases from it by growers.

49

149. Corteva's loyalty agreements cover each of the Corteva AIs: rimsulfuron, oxamyl, acetochlor, and methoxyfenozide implemented at both the distributor level and retailer level. Corteva operates at least two loyalty programs. One is named the Crops, Range & Pasture, and Industrial Vegetation Management Loyalty Program ("CRPIVM Loyalty Program") and is implemented via written agreements with participating distributors and retailers. Under the CRPIVM program, distributors and retailers must source a minimum percentage of a given AI — generally at least 85% — from Corteva to be eligible for the exclusionary payments. A distributor or a retailer may in some cases be eligible for a larger payment by meeting a second, higher threshold.

150. Corteva's second discount program for distributors is its Corporate Distributor Offer ("CDO" or "Corporate Officer"). The Corporate Offer is implemented through written offers that participating distributors may accept by compliance.

151. Corteva's loyalty programs are designed to maintain "value," *i.e.*, higher prices and profits for Corteva and its distributor and retailer partners, by blocking generic competition. According to one Corteva employee, the "primary objective" of the loyalty program is to prevent the "value" deterioration associated with generic entry in other words, to maintain high prices and market share.

### 2. Corteva's Rimsulfuron and Its Loyalty Program Scheme

152. Rimsulfuron is an herbicide applied to so-called "specialty" crops including fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes.

50

153.     Corteva's predecessor company, DuPont, initially developed, patented, and registered rimsulfuron with the EPA.  Corteva's relevant patent protection for rimsulfuron has expired.  By 2007, Corteva's FIFRA exclusive-use period also expired.

154.     Corteva sells rimsulfuron as the herbicide product Matrix SG, which, according to Corteva, delivers contact and extended soil residual control of grasses and broadleaf weeds.

155.     Rimsulfuron is commonly known as Realm-Q, which is the brand name for a mixed-ingredients product sold by Corteva.  Corteva advertises Realm-Q as an "excellent" postemergence broadleaf weed control in corn with a built-in crop safener and several modes of action for control.  Additional mixed-ingredient products under which Corteva sells rimsulfuron include Basis and Resolve-Q.  Corteva publicly claims that Basis provides "dependable, broad-spectrum weed control, even under cool, wet conditions."  Corteva claims that Resolve-Q provides "immediate" contact control followed by a "strong" residual activity to prevent later emerging weeds and grasses from competing with corn.

156.     Prior to the 2017 DowDuPont merger that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its own loyalty program.  By the time of the merger, Corteva believed that its rimsulfuron business had become vulnerable to lower-priced generic competition.  It recognized that competing on price would risk a downward price spiral, so rather than lowering price it placed rimsulfuron in its loyalty program beginning in the 2017-2018 market year.

51

157.    Corteva's strategy involved maintaining both a high loyalty program threshold and a price significantly higher than generic prices.  Under its loyalty program, Corteva made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products.

158.    Corteva's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of rimsulfuron products and as a result maintained supracompetitive prices for rimsulfuron products.  Following the expiration of Corteva's patent exclusivity, a number of generic manufacturers have registered rimsulfuron products in the United States.  Those generic rimsulfuron products were priced significantly below Corteva's existing rimsulfuron crop protection products. In spite of this, the marketing efforts of these generic manufacturers has been stifled due to Corteva's loyalty program.

159.    As a result of the incentives created by Corteva's loyalty program, major distributors and retailers have repeatedly met Corteva's rimsulfuron loyalty threshold.  To meet the threshold, distributors and retailers strictly manage their generic rimsulfuron open space under the loyalty program, steer their customers toward Corteva's rimsulfuron products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced rimsulfuron products.  Some distributors and retailers have removed generic rimsulfuron products from their price lists altogether because of loyalty program considerations.    Generic manufacturers seeking to sell crop protection products containing rimsulfuron have found

52

distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

160.    At least one generic manufacturer withdrew its rimsulfuron product and others canceled or deferred entry plans. A Corteva employee observed internally that its loyalty program has succeeded despite farmer demand for lower-priced generic products: "We have many growers who put generic on the bid but buy Matrix [Corteva's rimsulfuron brand] because nobody sells generic." In this way, Corteva has achieved its generic defense objectives of maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.

161.    One Corteva employee observed that through operation of its loyalty program, "we have been able to hold a significant brand premium over the generics."

162.    Corteva's prices remain significantly above prices of equivalent generic products and competitive levels. Corteva's loyalty program has resulted in higher prices for crop protection products containing rimsulfuron than would prevail in a competitive market.

### 3.    Corteva's Oxamyl and Its Loyalty Program Scheme

163.    Oxamyl is an insecticide and nematicide. It is predominantly applied to cotton and potatoes, but it is also used on onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco.

164. Corteva's predecessor company, DuPont, initially developed, patented, and registered oxamyl with the EPA. Corteva's relevant patent protection for oxamyl has expired. By 1987, Corteva's FIFRA exclusive-use period had also expired.

165. Corteva sells oxamyl as the product Vydate L, which it advertises as an "effective, fast-acting control" against a spectrum of yield-robbing pests across multiple life stages.

166. A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. At the time, oxamyl was not included in Corteva's loyalty program. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Given Corteva's plant outage and the absence of loyalty constraints, generic entrants were at first relatively successful.

167. Following the 2017 DowDuPont merger, a Corteva integration planning team determined that the company's oxamyl business was threatened by generic competition and planned a generic defense strategy to maintain profit margins and share. Corteva added oxamyl to the new company's loyalty program, with the stated objective of maintaining "the vast majority of share," while still operating at "a price premium to generics (at all levels)." Maximum open-space figures were defined and put into the loyalty program. Under the program, Corteva has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic oxamyl products.

168.     As a result of the incentives created by Corteva's loyalty program, major distributors and retailers have repeatedly met Corteva's oxamyl loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic oxamyl open space under the loyalty program, steer their customers toward Corteva's oxamyl products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced oxamyl products. Some distributors and retailers have removed generic oxamyl products from their price lists altogether because of loyalty program considerations. Generic manufacturers seeking to sell crop protection products containing oxamyl have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

169.     Corteva's loyalty program had the intended effect of reversing the initial success of generic manufacturers selling crop protection products containing oxamyl. Corteva's oxamyl business quickly re-stabilized. Generic sales volumes plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices. Corteva recognized that the potential loss of exclusion payments created a "significant penalty" to ensure that distributors stayed loyal. A Corteva product manager responsible for oxamyl observed that generic competitors curtailed or limited oxamyl imports and declared the program a success, stating: "[O]ur team truly has done an A+ job blocking generics."

55

170. Corteva's prices remain significantly above prices of equivalent generic products and competitive levels. Corteva's loyalty program has resulted in higher prices for crop protection products containing oxamyl than would prevail in a competitive market.

### 4. Corteva's Acetochlor and Its Loyalty Program Scheme

171. Acetochlor is an herbicide used primarily on corn but can also be applied to cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane.

172. In 1994, the EPA granted registration for acetochlor to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers that continues to hold the U.S. registration for acetochlor. ARP's current partners are Corteva and Bayer. Bayer manufactures acetochlor for itself and Corteva. The relevant patent protection for acetochlor has expired.

173. Corteva's statutory exclusivities relating to acetochlor, namely its exclusive-use period under FIFRA and relevant patent protection, both expired in or about 2007.

174. Corteva sells acetochlor products that do not contain other active ingredients, such as under the brand name Surpass NXT. Corteva also sells acetochlor in combination with other herbicides, such as under the brand name Keystone LA.

175. In or about 2017, Corteva (then Dow) received reports that a generic manufacturer was planning to launch an acetochlor product in the United States. Corteva assessed the risk of generic acetochlor competition as potentially affecting two million acres and causing a 10-15% price devaluation across the market.

56

176. Rather than lower prices in response to the perceived new competitive threat Corteva implemented an acetochlor generic defense strategy. Corteva's strategy documents reflect its intent to use its loyalty program to "keep the channel locked up," to defend market share while holding the "value" of acetochlor products in the marketplace, and to "battle [the generic] in our core market and push them out" with the help of distributors and retailers.

177. Corteva added acetochlor to its loyalty program for the 2016-2017 market year, with one threshold of exclusion for a given set of exclusionary payments and a higher level for a greater kickback. Under its loyalty program, Corteva made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic acetochlor products.

178. As a result of the incentives created by Corteva's loyalty program, major distributors and retailers have repeatedly met Corteva's acetochlor loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic acetochlor open space under the loyalty program, steer their customers toward Corteva's acetochlor products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced acetochlor products. Some distributors and retailers have removed generic acetochlor products from their price lists altogether because of loyalty program considerations. Generic manufacturers seeking to sell crop protection products containing acetochlor have found

distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

179. Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. Even though one generic manufacturer offered acetochlor prices substantially below Corteva's prices, major distributors and retailers have declined to purchase from the manufacturer as a result of Corteva's loyalty program.

180. Corteva's loyalty program has deterred generic manufacturers from introducing acetochlor products in the United States at all, or from offering innovative new products. This includes one generic firm that has achieved significant success in the sale of acetochlor products overseas, beyond the constraints of Corteva's loyalty program.

181. Bayer, a basic manufacturer, also produces some products containing acetochlor. However, Bayer does not price its acetochlor at levels that put substantial pressure on Corteva's pricing, and Bayer's presence in the market has not deterred Corteva from pricing its products at supracompetitive levels.

182. Corteva's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop protection products containing acetochlor than would prevail in a competitive market.

### 5. Corteva's Methoxyfenozide and Its Loyalty Program Scheme

183. Methoxyfenozide is an insecticide used to treat a variety of crops, including fruits and vegetables, nuts, corn, soybeans and cotton.

184. Corteva's predecessor company, Dow Chemical, initially developed, patented, and registered methoxyfenozide with the EPA. Corteva's relevant patent protection for methoxyfenozide has expired. By 2010, Corteva's FIFRA exclusive-use period also expired.

185. Corteva sells methoxyfenozide as the insecticide product Intrepid Edge, which, according to Corteva, uses a novel mode of action to target harmful pests while not adversely affecting beneficial insects.

186. Methoxyfenozide's patent protections expired in 2013, and the very next year (in 2014), Corteva's predecessor company Dow Chemical placed methoxyfenozide in its loyalty programs.

187. Corteva's strategy involved maintaining both a high loyalty program threshold and a price significantly higher than generic prices. Under its loyalty program, Corteva made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products.

188. Corteva's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of rimsulfuron products and as a result maintained supracompetitive prices for methoxyfenozide products. Following the expiration of Corteva's patent exclusivity, a number of generic manufacturers have

59

registered methoxyfenozide products in the United States. Those generic methoxyfenozide products were priced significantly below Corteva's existing rimsulfuron crop protection products. In spite of this, the marketing efforts of these generic manufacturers has been stifled due to Corteva's loyalty program.

189. As a result of the incentives created by Corteva's loyalty program, major distributors and retailers have repeatedly met Corteva's methoxyfenozide loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic methoxyfenozide open space under the loyalty program, steer their customers toward Corteva's methoxyfenozide products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced methoxyfenozide products. Generic manufacturers seeking to sell crop protection products containing methoxyfenozide have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of loyalty requirements. Indeed, Corteva sought to "punish" distributors who even considered offering generic alternatives to Corteva's methoxyfenozide products.

190. Corteva's prices remain significantly above prices of equivalent generic products and competitive levels. Corteva's loyalty program has resulted in higher prices for crop protection products containing methoxyfenozide than would prevail in a competitive market.

60

### D. Syngenta's and Corteva's Agreement to Restrain the Supply of the Relevant Active Ingredients to Maintain Monopoly Profits

191. Following expiration of patent and regulatory exclusivity terms protecting the relevant AIs, Defendants faced a threat from generic manufacturers and basic manufacturers. Once relevant patent protection expired, basic manufacturers have the capacity to replicate and produce the AIs developed by other basic manufacturers with lower cost. Alternatively, basic manufacturers can purchase the AIs from generic manufacturers with lower prices and put the AIs in their mixture products. The ability to produce generic versions of competitors' AIs or source post-patent AIs from generic manufacturers should create more competition in the crop protection products markets leading to lower prices of the post-patent AIs.

192. To avoid downward pricing pressure from competing products containing their AIs, Syngenta and Corteva have entered into an unlawful agreement relating to their AIs. Under this agreement, Defendants have agreed not to produce each other's AIs. Instead, they would supply each other the necessary AIs, as needed. This agreement has restrained the supply of AIs by eliminating Corteva or Syngenta as source of AIs for other formulators. It also has prevented generic competitors from supplying Corteva or Syngenta the AIs, thus depriving generic competitors of the necessary scale to effectively compete. Finally, it ensures that products containing the AIs whether sold by Corteva or Syngenta will be sold at artificially high prices, because they control the costs input of the AI. Notably, Defendants are more than capable of producing these AIs at lower costs internally, and thus pricing their products lower. Rather than compete, Defendants, however,

recognize the agreements in combination with their loyalty programs would allow them to maintain monopoly profits for their products containing the AIs.

193.    For example, a Corteva predecessor company developed a mixture product containing mesotrione and two other active ingredients.  Instead of producing a generic version of mesotrione or purchase mesotrione from generic manufacturers at lower cost, Corteva (and its predecessor DuPont) entered into and maintained an exclusive supply agreement with Syngenta under which Corteva agreed to buy mesotrione from Syngenta. Similarly, Syngenta and Corteva entered and maintained an exclusive supply agreement for the supply of technical-grade and manufacturing-use s-metolachlor used in Corteva-branded products.

194.    By agreeing to source branded AIs from each other, Defendants effectively control the cost input to each other's products that contain the relevant AIs, and will not price their finished products at levels that put substantial downward pressure on each other's pricing.

195.    The agreement between Defendants allow them to allocate the relevant markets and maintain their monopoly power.  This unlawful agreement has reinforced each other's loyalty program by restricting the availability of lower-priced crop protection products that contain generic AIs to farmers.  Together with Defendants' other anticompetitive conduct, the agreement harms competition in the sale of crop protection products containing the relevant AIs.

## VI. RELEVANT MARKETS AND DEFENDANTS' MARKET POWER

### A. Market Definition

196.    For each of the Relevant AIs — azoxystrobin, mesotrione, metolachlor, fomesafen, lambda-cyhalothrin, rimsulfuron, oxamyl, acetochlor, and methoxyfenozide — there exists a relevant market: a relevant product market that is no broader than EPA-registered crop protection products for sale in the United States that contain that active ingredient. The aforementioned nine markets are referred to as the "Relevant Markets" in this Complaint.

197.    Each Relevant AI is distinctive, both from each other and from other active ingredients. Several features that distinguish Relevant AIs from one another include what pest(s) the active ingredient targets; how effectively the active ingredient controls the targeted pest(s), generally assessed in terms of yield crop improvements; the crops for which an active ingredient is suited and registered to be used, often linked to geography; the applicability of the active ingredient during various stages of the growing cycle; and the impact of climate and weather conditions on the performance of the active ingredient. For example:

a)    Azoxystrobin facilitates simple pesticide management as it can be applied to all major row crops. According to Syngenta, azoxystrobin has growth-enhancing effects that are unique among active ingredients.

b)    Mesotrione has superior efficacy and crop safety, as well as a lower use rate, as compared to other, similar herbicide active ingredients. According to a former

employee of a distributor, Growmark, mesotrione is "in its own class" and there is no comparable active ingredient.

c)　　Metolachlor has superior water solubility as compared to other, similar herbicide active ingredients, and thus generally performs better in dry conditions. Metolachlor also maintains superior performance as compared to active ingredients in warmer conditions. Further, it is more "crop friendly" and can be applied to a wider range of crops. According to a former employee of the distributor Growmark, metolachlor is preferred over a similar active ingredient because it has a slower release and lasts longer.

d)　　Fomesafen is a selective herbicide for control of broadleaf weeds, grasses and sedges in cotton, dry beans, snap beans, potatoes, and soybeans. It is often applied postemergence but can also be applied preemergence and even preplant. One study showed that, in cotton, fomesafen retains its selective character when applied preplant or preemergence while remaining effective against troublesome weeds due to its residual soil activity. Fomesafen can be combined with a number of herbicides and is a component in several preemergence herbicide premixes.

e)　　Lambda-cyhalothrin is a pyrethroid insecticide that allows for the control of a wide variety of economically damaging insects, such as aphids, Colorado beetle, and thrips. Customers prefer it due to its long-lasting residual effects compared to other insecticides. According to a university source, it is non-mobile, has low water solubility, and, based upon chemical properties, has a low risk of leaching into groundwater.

64

f)      Rimsulfuron boasts a number of advantages compared to other, similar herbicide active ingredients, including that it can be applied to a broader spectrum of crops, controls a wider range of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate.  Compared to other, similar herbicide active ingredients, rimsulfuron is also inexpensive to produce.

g)      Products containing oxamyl can be sprayed directly onto crops.  By contrast, other, similar insecticide active ingredients must be applied at the root level or mixed into the soil.  Compared to other, similar insecticide active ingredients, oxamyl is also safer for crops and better for soil health.

h)      Acetochlor generally outperforms other similar, herbicide active ingredients in wetter and cooler conditions.  Acetochlor also tends to maintain superior effectiveness against certain weed species as well as superior weed control in the early growing season.  According to a former Corteva employee, "there [is] not a direct substitute for acetochlor that is applied for the exact same factors."

i)      Methoxyfenozide functions as an acutely effective resistance management insecticide.  The unique mode of action in Methoxyfenozide products enable them to regulate the growth of a broad spectrum of lepidopterous pests such as the corn earworm, hickory shuckworm, and green cloverworm—while simultaneously not disrupting insects, mites and pollinators across a range of crops.  Methoxyfenozide also provides extended residual control.

198.    Even where there are similarities between the applications of a Relevant AI and another active ingredient, the similarities are not so significant as to prevent a hypothetical monopolist of any given Relevant AI from profitably raising prices above competitive levels.

199.    The relevant geographic market is the United States.  Crop protection products are regulated on the federal level through statutes like FIFRA.  It is illegal for farmers in the United States to use active ingredients that have been labeled for use outside the United States.

### B.    Defendants' Monopoly Power

200.    Syngenta possesses monopoly and market power in the Relevant Markets for the crop protection products that contain the Syngenta AIs – azoxystrobin, mesotrione, metolachlor, fomesafen, and/or lambda-cyhalothrin.   Syngenta has possessed both monopoly and market power in each of those markets throughout the Class Period.

201.    Corteva possesses monopoly and market power in Relevant Markets for the crop protection products that contain the Corteva AIs – rimsulfuron, oxamyl, acetochlor, and/or methoxyfenozide.  Corteva has possessed both monopoly and market power in each of those markets throughout the Class Period.

202.    Corteva possesses market power in both the Relevant Market for acetochlor and the Relevant Market for crop protection products that contain acetochlor.  Corteva has possessed market power in those markets throughout the Class Period.

66

203.    Defendants' monopoly power in the Relevant Markets is established by direct evidence.  As detailed below in Section VII. C, Syngenta and Corteva have imposed supracompetitive prices in the Relevant Markets.  As detailed above, Syngenta and Corteva use their exclusionary loyalty programs to exclude competition from the Relevant Markets, which has allowed Defendants to maintain their prices at artificially high levels without losing market shares to generic manufactures.  As acknowledged by Defendants, they are able to maintain their products at prices significantly higher than generic prices because "nobody sells generics."   Farmers have paid at least 40% higher prices for the crop protection products in the Relevant Markets than they would have paid in a competitive market.  Defendants could not maintain their prices at a supracompetitive level had they not had a monopoly and/or market power in the Relevant Markets.

204.    Syngenta's and Corteva's monopoly and/or market power is also shown through their market shares in each of the Relevant Markets.

205.    Syngenta maintains a dominant market share in each of the Relevant Markets for the crop protection products that contain the Syngenta AIs.  Each year from at least 2017 through 2020, Syngenta's share of sales in each of these Relevant Markets was approximately 70%.

206.    Corteva maintains a dominant market share in each of the Relevant Markets for the crop protection products that contain the Corteva AI.  Each year from at least 2017 through 2020, Corteva's share of sales in the Relevant Markets for the crop protection products that contain rimsulfuron and oxamyl exceeded 70%.

67

207.    Corteva also maintains more than 40% market share in the Relevant Market for the crop protection products that contain acetochlor.  Although Bayer also competes in the Relevant Market for acetochlor, Bayer's participation in that market has not constrained Corteva's ability to impose artificially high prices on its products in that market, as demonstrated by Corteva's imposition of artificially high prices through its exclusionary loyalty programs.

208.    Defendants' monopoly power in the Relevant Markets is protected by high barriers to entry.  There are substantial barriers to entry for generic manufacturers to sell crop protection products.  Obtaining federal regulatory approval can be expensive and time consuming, and it can be expensive to pay the manufacturer that developed an active ingredient for the use of their data, which may be needed to obtain approval.  Sourcing ingredients and developing a process for manufacturing the active ingredients may also be costly.  According to a former employee of the distributor Wilbur-Ellis, the cost of active ingredients, labor, and capital can be a significant barrier to entry.  According to that employee, a large basic manufacturer like Corteva can achieve "economies of scale" that are difficult for generic manufacturers to match, particularly when the ability to sell the resulting product is artificially suppressed by a loyalty program.

209.    As described above, entry into the Relevant Markets is also constrained by Defendants' exclusionary loyalty programs, which deny generic manufacturers access to large distributors and retailers, the most efficient entry point into the market.  By "keep[ing] the channel locked up," Defendants have been successfully defending their market shares

68

in each of the Relevant Markets while holding a significant "price premium to generics (at all levels)."

## VII. DEFENDANTS' EXCLUSIONARY CONDUCT HARMED COMPETITION

210. Through the use of their exclusionary loyalty programs and the anticompetitive agreement between themselves, Syngenta and Corteva substantially foreclosed generic manufacturers from the Relevant Markets, stifled innovation, and imposed supracompetitive prices on farmers.

211. Defendants' exclusionary conduct harmed competition in the Relevant Markets and created and/or maintained Defendants' monopoly and/or market power in the Relevant Markets.

212. Plaintiffs and the Class — the farmers who purchase crop protection products containing the Relevant AIs — have been harmed by Defendants' anticompetitive conduct in the form of higher prices.

213. Defendants' exclusionary loyalty programs were not reasonably necessary to achieve any procompetitive objective. To the extent such conduct achieved any procompetitive objectives, those objectives could have been achieved through means less damaging to competition. For example, rather than limiting dealers' sales of generic products to a set low percentage, Defendants could offer rebates or lower prices based on the volume of a dealer's sales. Even assuming Defendants' exclusionary conduct was reasonably necessary to achieve any procompetitive objectives, such procompetitive

benefits were substantially outweighed by the harms to competition caused by Defendants' conduct.

214.    Syngenta and Corteva continue to enforce their market allocation agreement and operate loyalty programs that include exclusionary agreements with distributors. This anticompetitive conduct is ongoing, and unless this Court issues injunctive relief, the harms to competition created by these programs will likely continue unabated.

A.    **Market Foreclosure**

215.    Syngenta's and Corteva's loyalty programs are part of an anticompetitive scheme that achieved their exclusionary objectives. Because of Defendants' anticompetitive conduct, generic competitors have been driven out of the Relevant Markets or have been unable to gain a foothold in those markets at all. Each Defendant has substantially foreclosed generic competitors from the Relevant Markets.

216.    The traditional distribution channel for crop protection products — from manufacturers to distributors to retailers — is the best and most efficient way for manufacturers to get their products to market. Because more than 80% of the sales of crop protection products run through just seven distributors any manufacturer who wishes to find a market for their product must be able to sell their product to those distributors. In addition, retailers are the necessary channel to reach farmers. Generic manufacturers who cannot sell their product through the traditional channel compete at a severe disadvantage.

217.    Defendants' loyalty programs have blocked generic manufacturers from selling their products through the traditional distribution channel. Because of the channel's

importance, each Defendant has foreclosed a substantial share of the applicable Relevant Markets to competition from other manufacturers. For example, Syngenta's intent with its Key AI program regarding retailers is to "[r]eward Retailers for their support of Syngenta products where a generic alternative exists," and to defend[] Syngenta's market share position."

218.    To ensure they meet the loyalty thresholds, distributors and retailers subject to the loyalty agreements have limited their purchase of products manufactured by generic manufacturers to extremely low levels. Distributors and retailers subject to the loyalty agreements remove generic products from price lists, steer customers away from such products, neglect to inform them about generic alternatives at all, and refuse customers' requests to purchase such products outright.

219.    The anticompetitive effects of Defendants' loyalty programs are accentuated by the fact that distributors and retailers have significant ability to influence farmers' decisions about what crop protection products to purchase. As one former executive of a generic manufacturer explained, "the loyalty programs are the big thing because distributors make recommendations to inform farmers." Another person in the industry, an owner of an independent dealer of crop protection products, explained that farmers are confused by the various products and do not know which to purchase without guidance from distributors and retailers.

220.    Generic manufacturers are capable of producing the same or better quality alternatives to the branded products sold by Syngenta and Corteva in significant volumes.

For example, according to one former executive for a generic manufacturer, the azoxystrobin product previously sold by his company was "identical," including "on a percentage basis," to the equivalent product sold by Syngenta. A former chemist for another generic manufacturer explained his company created products identical to Syngenta's formulated products because doing so facilitated "Me Too" registration. The company could cite the safety data submitted by Syngenta if the product was identical. But, he contended, the generic products were better quality than Syngenta's because the active and other ingredients were formulated using newer technologies freer from impurities.

221. Generic manufacturers also generate demand for their products among farmers. In markets where loyalty programs do not foreclose generic manufacturers from selling into the traditional distribution channel, distributors and retailers purchase crop protection products from generic manufacturers and generic manufacturers can make all or nearly all of their sales in the traditional distribution channel.

222. In a competitive market, distributors and retailers purchase significant volumes of crop protection products sold by generic manufacturers containing each of the Relevant AIs. The additional sales enable generic manufacturers to achieve production efficiencies that they have been unable to achieve due to Defendants' exclusionary conduct.

223. Absent Defendants' exclusionary conduct, generic manufacturers are able to compete with Syngenta or Corteva in each of the Relevant Markets. Absent Defendants' exclusionary conduct, generic manufacturers collectively sell volumes of crop protection

products in each of the Relevant Markets that significantly exceed the amounts currently allowed under Defendants' loyalty agreements with distributors and retailers.

224. Each of the Relevant Markets have been substantially foreclosed to competition from generic manufacturers for at least five years, dating back to before the beginning of the Class Period.

225. The loyalty programs operated by Defendants have such a severe exclusionary impact that they foreclose the Relevant Markets to generic manufacturers that are equally as efficient as the Defendants. Equally efficient competitors may be foreclosed from the Relevant Markets even when Defendants are not engaging in predatory pricing (*i.e.*, even when the Defendants are selling their products at a higher price than the price of producing the product).

226. The market foreclosure caused by Defendants' loyalty programs does not depend on whether the loyalty agreements actually commit distributors and retailers to sell a certain percentage threshold of their products from Syngenta or Corteva. Even if no contractual commitment exists, the exclusionary payments offered under the loyal agreements are enough of an incentive for distributors to minimize their purchases from generic manufacturers and meet the percentage thresholds specified in the loyalty agreements. In consequence, distributors and retailers adhere to these agreements even when the agreements do not include a promise by the distributor or retailer to meet the specified percentage threshold.

73

227. Because substantially all leading distributions and retailers have loyalty agreements with Defendants, distributors and retailers know that their competitors are also strongly incentivized to make all or nearly all of their purchases of products containing the Relevant AIs from Defendants. As one former employee of a distributor Wilbur-Ellis put it, loyalty programs are "an industry norm." As a result, distributors and retailers know that their competitors are unlikely to undercut them on price by purchasing cheaper generics, which in turn makes it less likely that any given distributor or retailer will feel pressure to purchase more generics for resale. This fact enhances the exclusionary effects of Defendants' loyalty programs. Syngenta and Corteva both promote broad participation in their loyalty programs to distributors and retailers, providing assurance from time to time that other distributors and retailers are meeting their loyalty thresholds. One example of Corteva's loyalty program messaging to distributors and retailers states that "all channel partners" are adhering as to a covered AI, that Corteva has "always stood with the Channel," and that, in reference to Corteva's generic defense strategy, "[i]f we stay together it won't fail."

228. Exclusionary payments are usually made as a single payment at the end of the year and eligibility calculations are complex. As a result, the timing of payments and uncertainty surrounding them reduce the transparency of Defendants' loyalty programs, making it unlikely that a distributor or retailer will lower its prices in anticipation of receipt of a future (uncertain) exclusionary payment. As one Corteva executive observed, program

74

complexity "isn't necessarily a bad thing" and "[s]ome level of complexity helps customers maintain margins."

229.    In each Relevant Market, Syngenta's or Corteva's exclusionary conduct pushed generic manufacturers out of the market, delayed generic manufacturers' entry into the market, constrained generic manufacturers' ability to expand, and/or denied generic manufacturers entry into the market altogether.

230.    According to one former executive for a generic manufacturer, loyalty programs make it difficult for his company to enter the market. He said, "we ran up against these [loyalty] programs and couldn't get some distributors" to sell his company's generic product.

231.    In sum, as a result of the loyalty programs, distributors and retailers have declined to buy more than minimal amounts of generic alternatives, even though: (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer level; and (3) absent Defendants' loyalty programs, demand for generic products containing the Relevant AIs would exceed the open space allowed by the loyalty programs. This unwillingness is caused by the limited open space window under the loyalty programs. One generic manufacturer says that it is futile to even approach a large distributor that is subject to loyalty requirements. In contrast, when selling products containing active ingredients that are not subject to loyalty programs, generic manufacturers make all or nearly all of their sales through traditional channel distributors and retailers.

232.     In the absence of loyalty programs, sales of generics would be significantly higher, because the demand and ability to meet that demand is larger than the open space window currently allowed by the loyalty programs.

233.     In the absence of Defendants' respective loyalty programs, generic manufacturers compete more effectively and for more sales in each Relevant Market.  For instance, in the absence of loyalty programs, the increased ability to sell generic substitutes would only increase over time.  Increased sales would lead to increased economies of scale for the generic manufacturers.  This would increase price competition, innovation, and choice.

234.     Loyalty programs prevented, delayed, and diminished entry and expansion by generic manufacturers of crop protection products containing the Relevant AIs, and each Defendant's so-called "loyalty program" prevented, delayed, and diminished entry and expansion by generic manufacturers of crop protection products containing applicable Relevant AIs and caused generic exit as to products containing applicable Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

235.     Multiple generic manufacturers that have assessed the competitive landscape to evaluate whether to enter a particular Relevant Market have concluded that entry is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

236.    Syngenta's or Corteva's loyalty program has caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product or to stop offering a product containing the Relevant AI.

## B.    Lack of Innovation

237.    Syngenta's and Corteva's loyalty programs hamper innovation in the Relevant Markets, reducing farmers' access to new and creative products.

238.    Once the exclusivity rights belonging to a basic manufacturer expire, generic manufacturers have the opportunity not just to sell products that mimic the crop protection products sold by the basic manufacturer but also to sell new, innovative products.  Those new products may use a different combination of active ingredients, vary the percentages of the different active ingredients in a mixture, or use different inert ingredients.  Such innovation occurs frequently in competitive markets for crop protection products.

239.    Because Syngenta and Corteva have blocked generic manufacturers from entering the Relevant Markets, generic manufacturers have not had the opportunity to develop new and innovative products that make use of the Relevant AIs.  Indeed, generic manufacturers have halted plans to develop new innovative products using those active ingredients — or declined to incorporate one of those active ingredients into a new innovative product — because of the Defendants' exclusionary loyalty programs.

240.    As a consequence of Syngenta's and Corteva's exclusionary conduct, farmers have access to an artificially limited number of options to choose from when purchasing crop protection products.

## C.    Supracompetitive Prices

241.    Because Syngenta's and Corteva's exclusionary loyalty programs and anticompetitive agreement foreclose generic manufacturers from entering the Relevant Markets, these programs lead farmers to pay artificially inflated prices for crop protection products that contain the Relevant AIs.

242.    Generic crop protection products of equal or greater quality are priced at lower levels than branded products in the same market.  By blocking generic products from the market, Syngenta and Corteva deny farmers the option of buying a cheaper generic product that serve the farmers' purposes just as well as a branded product containing the same active ingredient.

243.    Many farmers who purchase crop protection products containing the Relevant AIs from Defendants would not prefer Defendants' products to a similar product produced by a generic manufacturer.  Instead, these farmers purchase Defendants' products because the loyalty programs mean that no alternative product is available or no other product is marketed by distributors or retailers.

244.    Absent Defendants' exclusionary conduct, many farmers would choose to purchase cheaper crop protection products produced by generic manufacturers that are not currently available to them.

245.    Moreover, the entry of generic crop protection products into the market puts downward price pressure on every manufacturer in the market.  As a result, in a competitive market, Syngenta and Corteva would charge less for their products containing the Relevant

78

AIs than they do today or otherwise risk losing market share. Thus, even farmers who prefer to purchase Defendants' products than purchase a cheaper generic alternative, and who would do so in a competitive market, nevertheless pay inflated prices due to Defendants' loyalty programs relative to what they would pay in a competitive market

246.    To the extent generic manufacturers have made limited inroads in the Relevant Markets, Defendants' loyalty programs still constrain the sales growth of products containing equivalent generic AIs and their ability to put downward pressure on prices in the Relevant Markets. Thus, even insofar as generic manufacturers are able to sell some products in the Relevant Markets, prices in those markets are still inflated relative to what they would be in a competitive market.

247.    Defendants regularly forecast in their internal planning documents and in communications with dealers that successful loyalty-program implementation will lead to higher prices for crop protection products containing affected active ingredients, to the benefit of both the Defendant and the dealers, by reducing the downward price effect of generic entry.

248.    Defendants also regularly make backwards-looking assessments of the impact of their loyalty programs. Those assessments have concluded that loyalty-program implementation successfully curtail generic entry and sustain higher prices that would otherwise prevail.

249.    An internal Corteva analysis concluded that its loyalty program was "best in class for generic defense," effective because it "[d]elays erosion in price and volume" for products subjects to generic competition.

250.    Due to Defendants' exclusionary conduct, farmers have paid at least 40% higher prices — if not more — for products in the Relevant Markets than they would have in a competitive market.

251.    In countries where loyalty programs do not block generic manufacturers from competing in the markets associated with the Relevant AIs, Syngenta and Corteva are forced to price their products more competitively than they do in the United States. In those countries, prices for products containing the Relevant AIs are lower than they are in the U.S.

252.    As Figure 1 shows, in Germany the price of Syngenta's azoxystrobin product is only 23% higher than the price of azoxystrobin products produced by generic manufacturers. In the United States, however, the price of Syngenta's azoxystrobin product, Quadris, is 116% higher than the price of generic azoxystrobin products — more than double the generic price. Thus, while generics put significant downward pricing pressure on the prices of crop protection products containing the Relevant AIs in Germany, Defendants' loyalty programs enable Defendants to keep prices at artificially high levels in the United States.

**Figure 1**



253.    Preliminary regression analysis conducted by economist experts based on a comparison between Germany and the United States suggests that the lack of competition in the U.S. enable Syngenta and Corteva to maintain prices at staggeringly high levels.  As Figure 2 shows, if generic manufacturers put the same pressure on the prices of Syngenta's azoxystrobin products in the United States as they do in Germany, prices for Syngenta's azoxystrobin products in the U.S. would be 43% lower — nearly half the price they are today.  Put otherwise, prices in the United States are 57% higher than they would be if the market was as competitive as Germany's.

**Figure 2**



254.    Table 1 summarizes the results of the regression analysis underlying this conclusion.    The number next to "Overcharge (log points)" represents the estimated overcharge associated on azoxystrobin products in the United States, or approximately 57%.    The asterisks next to that number represent the statistical significance of those estimates.    Here, the statistical significance suggests a confidence level of more than 99%. The percentage next to "Percentage," 43%, represents the estimated drop in the price of Syngenta's azoxystrobin product in the United States if the United States market operated like Germany's.

82

**Table 1**

|  | (1) Azoxystrobin Overcharge |
|---|---|
| Overcharge (log-points) | 0.567*** |
|  | (0.202) |
| Percentage | 43% |
| Observations | 43 |
| R-squared | 0.315 |
| U.S. Fixed Effect | YES |
| Name-Brand Control | YES |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

## VIII. STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

255. During the Class Period, Syngenta's and Corteva's conduct constitutes a continuing violation in which Defendants repeatedly invaded the interests of Plaintiffs and the members of the Class by adhering to, enforcing, reaffirming, and repeatedly re-entering into the exclusionary loyalty agreements that form the basis of this Complaint.

256. Syngenta and Corteva's conduct also constitutes a continuing violation because Defendants repeatedly sold products containing the Relevant AIs at supracompetitive prices during the Class Period and each member of the Class paid supracompetitive prices for Defendants' products during the Class Period. Each purchase of a relevant product at supracompetitive prices constitutes a new and distinct injury. A new cause of action accrues every time a member of the Class suffers a new and distinct injury in the form of paying supracompetitive prices.

83

257.     Thus, even if Defendants engaged in exclusionary conduct prior to the Class Period, and even if certain members of the Class paid supracompetitive prices prior to the Class Period as a result of that exclusionary conduct, each member of the Class suffered at least one new and distinct injury during the Class Period, and each member of the Class possesses a claim premised on such an injury.

## IX.     EFFECT ON INTRASTATE AND INTERSTATE COMMERCE

258.     The crop protection products at issue in this case are sold in interstate commerce and Defendants' conduct set forth herein substantially affected interstate commerce throughout the United States. Since Defendants began marketing and selling the relevant products, Defendants have promoted, distributed, sold, and/or shipped in a continuous and uninterrupted flow of commerce across state lines and sold to customers located outside its state of manufacture.

259.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the Relevant States defined below. During the class period, Defendants shipped the relevant products into each Relevant State and sold the relevant products to customers in each of those jurisdictions. Defendants' conduct resulted in growers and members of the Class in each Relevant State paying artificially inflated prices for the relevant products.

260.     In addition, Defendants' conduct has and continues to have substantial interstate and intrastate effects throughout the United States, including within each Relevant State because distributors and retailers within each state have been coerced by Defendants' loyalty programs to refrain from purchasing generic crop protection products

84

that compete with Defendants' active ingredients. As a result, growers and class members have been forced to pay supracompetitive prices for the relevant products, which, in the absence of Defendants' anticompetitive scheme, would have been reduced as a result of competition from generic manufacturers.

## X.    CLASS ACTION ALLEGATIONS

261.    Plaintiffs bring this action on behalf of themselves, and on behalf of members of the following class (the "Class"), under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3):

> All persons and entities in the United States and its territories who purchased a crop protection product at any time during the period from October 27, 2018, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period") that was manufactured by one or more of the Defendants and contained one or more of the Relevant AIs, directly from one or more Defendants, or directly from a distributor or retailer that entered into a loyalty program agreement with one or more of the Defendants.

262.    The Class includes a Subclass of persons and entities located in Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin (collectively "Relevant States"), who during the Class Period, purchased a crop protection product containing one of more of the Relevant AIs that was manufactured by

85

one or more of the Defendants. This subclass will be referred to herein as the "State Law Subclass."

263. The following are specifically excluded from the Class and the State Law Subclass: the Defendants; the officers, directors, and employees of the Defendants; any entity in which the Defendants have a controlling interest; any divisions, subsidiaries, and predecessors of the Defendants; any affiliate, legal representative, heir, or assign of the Defendants; and any persons or entities that purchased the crop protection products solely for resale to others. Also excluded from the Class and the State Law Subclass are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of their immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

264. At least tens or hundreds of thousands of persons or entities have purchased a crop protection product containing a Relevant AI that was manufactured by Syngenta or Corteva during the Class Period.

265. Plaintiffs' claims are typical of the claims of the Class and where applicable, the State Law Subclass.

266. Plaintiffs and all members of the Class and the State Law Subclass were injured in the form of overcharges caused by Defendants' exclusionary conduct.

267. Plaintiffs will fairly and adequately protect and represent the interests of the Class and the State Law Subclass. Plaintiffs' interests are not antagonistic to those of the Class or the State Law Subclass.

268.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

269.    Questions of law and fact are common to the members of the Class or the State Law Subclass and predominate over questions, if any, that may affect only individual members because Syngenta and Corteva have acted and refused to act on grounds generally applicable to the entire Class and State Law Subclass.  Such generally applicable conduct is inherent in Syngenta's and Corteva's exclusionary conduct in monopolizing the Relevant Markets, as more fully alleged above.

270.    Questions of law and fact common to the Class and the State Law Subclass include:

a)      Whether each of the Defendants intentionally or unlawfully impaired or impeded competition in the Relevant Markets;

b)      Whether each of the Defendants has monopoly and/or market power in each of the Relevant Markets;

c)      Whether each of the Defendants willfully maintained or enhanced their monopoly and/or market power in the Relevant Markets associated with Syngenta AIs;

d)      What effect each of the Defendants' conduct had on prices for crop protection products containing Relevant AIs;

87

e)	Whether each of the Defendants' conduct caused antitrust injury to the business or property of Plaintiffs and members of the Class and the State Law Subclass in the nature of overcharges; and

f)	What the proper measure of damages is.

271.	The Class and the State Law Subclass are readily identifiable and is one for which records should exist.

272.	Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

273.	Plaintiffs know of no difficulty to be encountered in maintenance of this action as a class action.

88

## XI.    CLAIMS FOR RELIEF[3]

### A.    Violations of Federal Antitrust Laws

**First Claim for Relief**
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. §1**
**(On Behalf of the Class)**

274.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

275.    Beginning at a time currently unknown to Plaintiffs, but at least as early as October 27, 2018 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, and conspiracy with distributors and authorized retailers, either express or tacit, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for crop protection products containing the Relevant AIs in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

276.    In formulating and carrying out the alleged agreement, understanding, and conspiracy Defendants, distributors, and authorized retailers did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for crop protection products containing the Relevant AIs principally but not exclusively, by

---

[3]    Plaintiffs recognize that the Court has dismissed certain of the claims asserted herein. Plaintiffs include those claims here to the extent necessary to preserve their appellate rights.

89

designing and enforcing loyalty programs that prevented and continue to prevent competing generic manufacturers from entering the market and/or efficiently distributing their products.

277. In addition, Defendants entered into a continuing agreement, understanding, and conspiracy, either express or tacit, in restraint of trade, with each other, to artificially raise, fix, maintain, and/or stabilize prices of crop protection products containing the Relevant AIs.

278. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for crop protection products containing the Relevant AIs principally but not exclusively, by entering into a market allocation agreement.

279. This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

280. Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants'

90

conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

281. Plaintiffs and members of the Class directly purchased crop protection products containing the Relevant AIs from Defendants' co-conspirators, including distributors and retailers that participate in Defendants' loyalty programs, at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

282. Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

283. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

284. Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

**Second Claim for Relief**
**Violation of Section 2 of the Sherman Act**
**15 U.S.C. §1**
**(On Behalf of the Class)**

285. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

91

286. At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, mesotrione, metolachlor, paraquat, fomesafen, and lambda-cyhalothrin. At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl.

287. Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct — primarily, but not exclusively, by entering and maintaining agreements with distributors and retailers that contain loyalty requirements and enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties, and entering into an unlawful agreement with one another for the relevant AIs — in violation of Section 2 of the Sherman Act, 15 U.S.C.

288. Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

**Third Claim for Relief**
**Violation of Section 3 of the Clayton Act**
**(On Behalf of the Class)**

289. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

290. Syngenta and Corteva have provided exclusionary payments to distributors and retailers, in the form of kickbacks for the sale of crop protection products, that are conditioned on the recipients not using or dealing in the goods of generic manufacturers of crop protection products.

291.     Syngenta's and Corteva's anticompetitive and exclusionary conduct have substantially lessened competition and tends to create monopolies in each of the Relevant Markets.

292.     Syngenta's and Corteva's exclusionary conduct have foreclosed a substantial share of the Relevant Markets to competition from generic manufacturers.

293.     Plaintiffs and all others similarly situated are threatened with future injury to their business and property by reason of Syngenta's and Corteva's continuing violation of Section 3 of the Clayton Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

294.     Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B.     Violations of State Antitrust Laws**

295.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

296.     The following Fourth through Thirty-Second Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Law Subclass.

297.     Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same.  The above-alleged conduct, which violates the

federal Sherman Antitrust Act will, if proven, establish a claim under each of the state laws cited below.

**Fourth Claim for Relief**
**Violation of Arizona's Uniform State Antitrust Act**
**Ariz. Rev. Stat. Ann. §44-1401, *et seq*.**

298.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

299.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. Ann. §44-1401, *et seq.*

300.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint.  *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

301.    Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."  Ariz. Rev. Stat. Ann. §44-1403.

302.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona.

303.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part

of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

304.    Defendants' violations of Arizona law were flagrant.

305.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

306.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

307.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under Ariz. Rev. Stat. Ann. §44-1401, *et seq*.

308.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with Ariz. Rev. Stat. Ann. §44-1415.  Plaintiffs will file proof of such service with the Court.

**Fifth Claim for Relief**
**Violation of California's Cartwright Act**
**Cal. Bus. & Prof. Code §16700, *et seq*.**

309.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

310.    The California Business & Professions Code generally governs conduct of corporate entities.  The Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770, governs antitrust violations in California.

Case 1:23-md-03062-TDS-JEP    Document 261    Filed 07/28/25    Page 101 of 193

311. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code §301.

312. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code §16750(a).

313. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code §16720. Every trust in California is unlawful except as provided by the Code. *Id.* §16726.

314. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the Relevant Markets, a substantial part of which occurred within California.

315. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

316.     Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code §16700, *et seq.*

317.     Plaintiffs and/or other members of the Class purchased crop protection products within the State of California during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

318.     Plaintiffs and members of the Class were injured in their business or property with respect to purchases of crop protection products containing the Relevant AIs in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### Sixth Claim for Relief
### Violation of the Connecticut Antitrust Act
### Conn. Gen. Stat. §35-24, *et seq.*

319.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

320.     Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within Connecticut during the Class Period.   But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

321.     Under Connecticut law, indirect purchasers have standing to maintain an action under the antitrust provisions based on the facts alleged in this Complaint, because

a defendant "[m]ay not assert as a defense that the defendant did not deal directly with the person on whose behalf the action is brought." Conn. Gen. Stat. §35-46a(1).

322.    Each Defendant contracted, combined, or conspired to act in restraint of trade within the Connecticut, and monopolized or attempted to monopolize the Relevant Markets within Connecticut, in violation of Conn. Gen. Stat. §35-24, *et seq.*

323.    Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

324.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Connecticut Attorney General in accordance with Conn. Gen. Stat. §35-37.  Plaintiffs will file proof of such service with the Court.

### Seventh Claim for Relief
### Violation of District of Columbia Antitrust Act
### D.C. Code §28-4501, *et seq.*

325.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

326.    The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. Code §28-4501.

98

327.    Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the District of Columbia during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

328.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production, or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter."  D.C. Code §28-4509(a).

329.    Each Defendant contracted, combined, or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the Relevant Markets within the District of Columbia, in violation of D.C. Code §28-4501, *et seq.*

330.    Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Eighth Claim for Relief**
**Violation of Illinois Antitrust Act**
**740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.***

331.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

332.     The Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. Ann. 10/2.

333.     Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the State of Illinois during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

334.     Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

335.     Each Defendant entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling, or maintaining prices for crop protection products containing the Relevant AIs sold within the State of Illinois.

336.     Each Defendant further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the Relevant Markets in Illinois for the purpose of excluding competition in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq*.

337.     Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Illinois and are entitled to all

forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**Ninth Claim for Relief**
**Violation of Iowa Competition Law**
**Iowa Code §553.1, *et seq*.**

338. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

339. The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." Iowa Code §553.2.

340. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

341. Members of the Class purchased crop protection products containing the Relevant AIs within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

342. Each Defendant contracted, combined, or conspired to restrain or monopolize trade in the Relevant Markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing, or maintaining prices for crop protection products containing the Relevant AIs in violation of Iowa Code §553.1, *et seq*.

101

343.    Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**Tenth Claim for Relief**
**Violation of Kansas Restraint of Trade Act**
**Kan. Stat. Ann. §50-101, *et seq*.**

344.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ."  Kan. Stat. Ann. §50-112.

346.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of Kansas during the Class Period.

347.    But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

348.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Kan. Stat. Ann. §50-161(b).

349.    Each Defendant combined capital, skills, or acts for the purposes of creating restrictions in trade or commerce of crop protection products containing the Relevant AIs,

102

increasing the price of crop protection products containing the Relevant AIs, or preventing competition in the sale of crop protection products containing the Relevant AIs in a manner that established the price of crop protection products containing the Relevant AIs and precluded free and unrestricted competition in the sale of crop protection products containing the Relevant AIs, in violation of Kan. Stat. Ann. §50-101, *et seq.*

350.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### Eleventh Claim for Relief
### Violation of Maine's Antitrust Statute
### Me. Rev. Stat. Ann. tit. 10, §1101, *et seq.*

351.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

352.    Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine.  Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade.  *See* Me. Rev. Stat. Ann. tit. 10, §§1101-02.

353.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of Maine during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

354.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Me. Rev. Stat. Ann. tit. 10, §1104(1).

355.    Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. tit. 10, §1101, *et seq.*

356.    Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

### Twelfth Claim for Relief
### Violation of Maryland's Antitrust Statute
### Md. Code Ann., Com. Law, §11-204(A), *et seq.*

357.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

358.    Maryland's antitrust statute makes it unlawful to, *inter alia*, "[m]onopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce."  Md. Code Ann., Com. Law §11-204(a)(2).

104

359. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." Md. Code Ann., Com. Law §11-202(a)(1).

360. Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Md. Code. Ann., Com. Law §11-209(b)(2)(i).

361. Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maryland, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maryland, in violation of Md. Code. Ann., Com. Law §11-204(a)(2), *et seq.*

362. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. Md. Code. Ann., Com. Law §11-209(b)(4).

363. Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

105

**Thirteenth Claim for Relief**
**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws §445.771, *et seq*.**

364.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

365.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (Mich. Comp. Laws §445.771, *et seq.*).

366.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

367.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws §445.778(2).

368.    Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the Relevant Markets and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly of trade or commerce in violation of Mich. Comp. Laws §445.773.

106

369. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## Fourteenth Claim for Relief
## Violation of the Minnesota Antitrust Law
## Minn. Stat. §§325d.49, *et seq.* & 325d.57, *et seq.*

370. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

371. The Minnesota Antitrust Law of 1971 prohibits:

any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination, or conspiracy, wherever created, formed or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the forgoing affects the trade or commerce of [Minnesota].

Minn. Stat. §325D.54.

372. Members of the Class purchased crop protection products containing the Relevant AIs within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

373. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. §325D.57.

107

374. Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Markets within the intrastate commerce of and outside of Minnesota, and established, maintained, used, or attempted to establish, maintain, or use monopoly power over the trade or commerce in the Relevant Markets, for the purpose of affecting competition or controlling, fixing, or maintaining prices within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. §325D.49, *et seq.*

375. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

376. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with Minn. Stat. §325D.63.

**Fifteenth Claim for Relief**
**Violation of the Mississippi Antitrust Statute**
**Miss. Code Ann. §75-21-1, *et seq.***

377. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

378. Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising

from competition in business [are] preserved" to Mississippians.  Miss. Code Ann. §75-21-39.

379.    "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity.  Miss. Code Ann. §75-21-1.

380.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Mississippi.

381.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

382.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Mississippi during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

383.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint.  Miss. Code Ann. §75-21-9.

384. Each Defendant combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of crop protection products containing the Relevant AIs, and hindering competition in the sale of crop protection products containing the Relevant AIs, in violation of Miss. Code Ann. §75-21-1, *et seq*.

385. Each Defendant monopolized or attempted to monopolize the production, control, or sale of crop protection products containing the Relevant AIs, in violation of Miss. Code Ann. §75-21-3, *et seq*.

386. Crop protection products containing the Relevant AIs are sold indirectly via distributors and retailers throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

387. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**Sixteenth Claim for Relief**
**Violation of the Missouri Merchandising Practices Act**
**Mo. Ann. Stat. §407.010, *et seq*.**

388. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

389.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

390.    Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

391.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

392.    Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Missouri and monopolized or attempted to monopolize the market for crop protection products containing the Relevant AIs within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets, and otherwise control trade, in violation of Mo. Ann. Stat. §407.010, *et seq.*

393.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount

which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**Seventeenth Claim for Relief**
**Violation of the Nebraska Junkin Act**
**Neb. Rev. Stat. §59-801, *et seq*.**

394.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

395.    Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

396.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of Nebraska during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

397.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint.  Neb. Rev. Stat. §59-821.

398.    Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the Relevant Markets within the intrastate commerce of Nebraska by possessing monopoly power in the

112

market and willfully maintaining that power through agreements to fix prices, allocate markets, and otherwise control trade, in violation of Neb. Rev. Stat. §59-801, *et seq.*

399.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**Eighteenth Claim for Relief**
**Violation of the Nevada Unfair Trade Practices Act**
**Nev. Rev. Stat. Ann. §598a.010, *et seq.***

400.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

401.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada."  Nev. Rev. Stat. Ann. §598A.030(1)(a).

402.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices . . . ."  Nev. Rev. Stat. Ann. §598A.030(2).  Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade.  *See* Nev. Rev. Stat. Ann. §598A.060.

403.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of Nevada during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

404.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint.  Nev. Rev. Stat. Ann. §598A.210(2).

405.    Defendants monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Nevada, constituting a contract, combination, or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*.

406.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Nevada in that at least thousands of sales of crop protection products containing the Relevant AIs took place in Nevada, purchased by Nevada farmers at supracompetitive prices caused by Defendants' conduct.

407.    Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

408.    In accordance with the requirements of Nev. Rev. Stat. Ann. §598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

## Nineteenth Claim for Relief
## Violation of New Hampshire's Antitrust Statute
## N.H. Rev. Stat. Ann. tit. XXXI, §356, *et seq.*

409.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

410.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

411.    Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade.  *See* N.H. Rev. Stat. Ann. tit. XXXI, §§356:2, 3.

412.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of New Hampshire during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

413.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.H. Rev. Stat. Ann. §356:11(II).

414.    Defendants established, maintained, or used monopoly power, or attempted to, constituting a contract, combination, or conspiracy in restraint of trade in violation of N.H. Rev. Stat. §356:1, *et seq*.

415.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

115

## Twentieth Claim for Relief
## Violation of the New Mexico Antitrust Act
## N.M. Stat. Ann. §57-1-1, *et seq.*

416.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

417.     The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. Stat. Ann. §57-1-15.

418.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower in an amount to be determined at trial.

419.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. Stat. Ann. §57-1-3(A).

420.     Each Defendant contracted, agreed, combined, or conspired in restraint of, and monopolized or attempted to monopolize, trade for crop protection products containing the Relevant AIs within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §57-1-1 and 57-1-2, *et seq.*

421.     Plaintiffs and other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## Twenty-First Claim for Relief
## Violation of Section 340 of the New York General Business Law
## N.Y. Gen. Bus. Law §340, *et seq.*

422.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

423.    Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade, or commerce in New York.  *See* N.Y. Gen. Bus. Law §340(1).

424.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of New York during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

425.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  *See* N.Y. Gen. Bus. Law §340(6).

426.    Each Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of crop protection products containing the Relevant AIs and restrained competition in the free exercise of the conduct of the business of crop protection products containing the Relevant AIs within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §340, *et seq.*

427.    Plaintiffs and/or other members of the class were injured with respect to purchases of crop protection products containing the Relevant AIs in New York and are

117

entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. Gen. Bus. Law §349, *et seq*.

428.     Pursuant to New York General Business Law §340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by Plaintiffs.

**Twenty-Second Claim for Relief**
**Violation of the North Carolina General Statutes**
**N.C. Gen. Stat. §75-1, *et seq.***

429.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

430.     Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

431.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584, 473 S.E. 2d 680, 687-688, *rev. denied,* 344 N.C. 734, 748 S.E. 2d 5 (1996).

432.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Carolina.

433.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

434.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

435.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

436.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available, including treble damages, attorneys' fees and costs, under N.C. Gen. Stat. §75-1, *et seq*.

## Twenty-Third Claim for Relief
## Violation of the North Dakota Uniform State Antitrust Act
## N.D. Cent. Code §51-08.1-01, *et seq.*

437.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

438.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade.  *See* N.D. Cent. Code §51-08.1-01, *et seq*.

119

439. Members of the Class purchased crop protection products containing the Relevant AIs within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

440. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code §51-08.1-08.

441. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Dakota.

442. Each Defendant established, maintained, or used a monopoly, or attempted to do so, a substantial part of which occurred within North Dakota, for the purposes of excluding competition or controlling, fixing, or maintaining prices for crop protection products containing the Relevant AIs, in violation of N.D. Cent. Code §51-08.1-02, 03.

443. Defendants' violations of North Dakota law were flagrant.

444. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

445. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual

damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. Cent. Code §51-08.1-01, *et seq.*

**Twenty-Fourth Claim for Relief**
**Violation of the Oregon Antitrust Law**
**Or. Rev. Stat. §646.705, *et seq.***

446.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

447.     Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon.  Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state . . . ."  Or. Rev. Stat. §646.715(1).

448.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Oregon during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

449.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint.  Or. Rev. Stat. §646.780(1)(a).

450.     Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs, in violation of Or. Rev. Stat. §646.705, *et seq.*

451. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

452. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Oregon Attorney General in accordance with Or. Rev. Stat. §646.780(5)(b). Plaintiffs will file proof of such service with the Court.

### Twenty-Fifth Claim for Relief
### Violation of the Puerto Rico Monopolies and Restraint of Trade Act
### 10 L.P.R.A. §257, *et seq.*

453. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

454. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within Puerto Rico during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

455. Each Defendant contracted, combined, and conspired in restraint of trade crop protection products containing the Relevant AIs within Puerto Rico, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly in the trade of crop protection products containing the Relevant AIs for the purpose of excluding

122

competition or controlling, fixing, or maintaining prices within Puerto Rico, in violation of 10 L.P.R.A. §257, *et seq.*

456. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**Twenty-Sixth Claim for Relief**
**Violation of the Rhode Island Antitrust Act**
**6 R.I. Gen. Laws §6-36-1, *et seq.***

457. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

458. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. Gen. Laws §6-36-2(a)(2).

459. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

460. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws §6-36-11(a).

461. Each Defendant contracted, combined, and conspired in restraint of trade crop protection products containing the Relevant AIs within the intrastate commerce of Rhode Island, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly in the trade of crop protection products containing the Relevant AIs for the purpose of excluding competition or controlling, fixing, or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws §6-36-1, *et seq.*

462. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

463. In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. Gen. Laws §6-36-21. Plaintiffs will file proof of such service with the Court.

**Twenty-Seventh Claim for Relief**
**Violation of the South Dakota Antitrust Statute**
**S.D. Codified Laws §37-1-3.1, *et seq.***

464. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

465. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. Codified Laws §§37-1-3.1, 3.2.

466. Members of the Class purchased crop protection products containing the Relevant AIs within the State of South Dakota during the Class Period. But for each

124

Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

467.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint.  *See* S.D. Codified Laws §37-1-33.

468.    Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws §37-1, *et seq.*

469.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Twenty-Eighth Claim for Relief**
**Violation of the Tennessee Trade Practices Act**
**Tenn. Code Ann. §47-25-101, *et seq.***

470.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

471.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend

125

to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* Tenn. Code Ann., §47-25-101.

472. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

473. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §47-25-101, *et seq.*

474. Each Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, each Defendant's combination or conspiracy had the following effects: (1) price competition for crop protection products containing the Relevant AIs was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for crop protection products containing the Relevant AIs were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for crop protection products containing the Relevant AIs.

126

475. During the Class Period, each Defendant's illegal conduct had a substantial effect on Tennessee commerce as crop protection products containing the Relevant AIs were sold in Tennessee.

476. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

477. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury.

478. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Twenty-Ninth Claim for Relief**
**Violation of the Utah Antitrust Act**
**Utah Code Ann. §76-10-3101, *et seq*.**

479. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

480. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and

unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. §76-10-3102.

481. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

482. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. §76-10-3109(1)(a).

483. Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs and monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs, in violation of Utah Code Ann. §76-10-3101, *et seq.*

484. Plaintiffs and/or other members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of crop protection products containing the Relevant AIs in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

485. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with Utah Code Ann. §76-10-3109(9).

128

**Thirtieth Claim for Relief**
**Violation of the Vermont Antitrust and Consumer Fraud Act**
**Vt. Stat. Ann. tit. 9, §2451, *et seq.***

486.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

487.    By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, §2451, *et seq.*

488.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont.  Chapter 63 thereof governs consumer protection and prohibits, *inter alia*, unfair methods of competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization.  *See* Vt. Stat Ann. tit. 9, §2453(a).

489.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of Vermont during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

490.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint.  Vt. Stat. Ann. tit. 9, §2465(b); *see also Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

491.    Defendants competed unfairly by restraining trade as set forth herein, in violation of Vt. Stat. Ann. tit. 9, §2453, *et seq.*

492. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Vermont.

493. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

494. Defendants' violations of Vermont law were flagrant.

495. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

496. Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

497. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

498. Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**Thirty-First Claim for Relief**
**Violation of the West Virginia Antitrust Act**
**W. Va. Code §47-18-1,** *et seq.*

499.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

500.     The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

501.     During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia and the establishment or maintenance of a monopoly for the purpose of excluding competition, in violation of W. Va. Code §§47-18-3; 47-18-4.

502.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred in West Virginia.

503.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

504.     Plaintiffs and/or other members of the Class purchased crop protection products within the State of West Virginia during the Class Period.   But for each

131

Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

505. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1, *et seq*., may bring an action for damages under W. Va. Code §47-18-9.").

506. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

507. As a direct and proximate result of each Defendant's unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for crop protection products containing the Relevant AIs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

508. Members of the Class have standing to pursue their claims under, *inter alia*, W. Va. Code §47-18-9.

509. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

## Thirty-Second Claim for Relief
## Violation of the Wisconsin Antitrust Act
## Wis. Stat. §133.01, *et seq.*

510.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

511.    Chapter 133 of the Wisconsin Statutes governs trusts and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition."  Wis. Stat. §133.01.

512.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Wisconsin during the Class Period.  But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

513.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint.  *See* Wis. Stat. §133.18(1)(a).

514.    Defendants contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs with the intention of injuring or destroying competition therein, in violation of Wis. Stat. §133.01, *et seq.*

515.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for crop protection products containing the Relevant AIs in Wisconsin.

516.    Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

517.    Each Defendant's anticompetitive activities have directly, foreseeably, and proximately caused injury to Plaintiffs and members of the Class in the United States. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced crop protection products containing the Relevant AIs, and (2) paying higher prices for crop protection products containing the Relevant AIs than they would have in the absence of Defendants' conduct.  These injuries are of the type that the laws of the above States were designed to prevent, and they flow from that which makes Defendants' conduct unlawful.

518.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and members of the Class.

**C.    Violations of State Consumer Protection Laws**

519.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

520.    Each Defendant's above-described conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state statutes set forth below, which are sometimes referred to as "consumer protection" statutes.  As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and members of the Class paid higher prices for crop protection products containing the Relevant AIs than they should have.

521.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct.  Plaintiffs and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

522.    There was and is a gross disparity between the price that Plaintiffs and members of the Class paid for crop protection products containing the Relevant AIs and the value they received.

523.    The following Thirty-Third through Fifty-Eighth claims for relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Law Subclass.

**Thirty-Third Claim for Relief**
**Violation of Arkansas' Deceptive Trade Practices Act**
**Ark. Code Ann. §4-88-101**, *et seq.*

524.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

525.     The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101, *et seq.*, generally prohibits "[d]eceptive and unconscionable trade practices."  Ark. Code Ann. §4-88-107.

526.     Under Arkansas law, indirect purchasers have standing to maintain an action under the Deceptive Trade Practices Act based on the facts alleged in this Complaint.  *See* Ark. Code Ann. §4-88-113(f)(1)(A) ("A person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation . . . .").

527.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Arkansas during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

528.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets which is an unconscionable and deceptive practice.

529.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Arkansas at a higher level than the competitive market level, beginning at least as early as the beginning of the

136

Class Period and continuing through the date of this filing, which is an unconscionable and deceptive practice.

530.    Accordingly, Defendants' conduct was an unconscionable and deceptive practice that substantially affected commerce within the State of Arkansas.

531.    As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

532.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Ark. Code Ann. §4-88-113.

### Thirty-Fourth Claim for Relief
### Violation of California's Unfair Competition Law (The "UCL")
### Cal. Bus. & Prof. Code §17200, *et seq.*

533.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

534.    The violations of federal antitrust law set forth above also constitute violations of Section 17200, *et seq.*, of the California Business and Professions Code.

535.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

536. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

537. Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq.*, of California Business and Professions Code, set forth above.

538. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

539. Plaintiffs and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

540. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

541. The unlawful and unfair business practices of each Defendant have caused and continue to cause members of the Class to pay supracompetitive and artificially inflated prices for crop protection products containing the Relevant AIs sold in the State of

138

California.  Plaintiffs and/or other members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

542.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

**Thirty-Fifth Claim for Relief**
**Violation of Colorado Consumer Protection Act**
**Colo. Rev. Stat. §6-1-101**, *et seq.*

543.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

544.    The Colorado Consumer Protection Act, Colo. Rev. Stat. §6-1-101, *et seq.*, prohibits knowingly engaging in any "unfair," "unconscionable," or "deceptive" practice. Colo. Rev. Stat. §6-1-105(rr).

545.    Under Colorado law, indirect purchasers have standing to maintain an action under the Consumer Protection Act based on the facts alleged in this Complaint.  *See* Colo. Rev. Stat. §6-1-113 ("An action under this section shall be available to any person who . . . (a) [i]s an actual or potential consumer of the defendant's goods . . . [or] (c) [i]n the course of the person's business or occupation, is injured as a result of such deceptive trade practice").

139

546. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Colorado during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

547. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets.

548. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Colorado at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

549. Accordingly, Defendants' conduct was an unconscionable, unfair, and deceptive practice that affected commerce within the State of Colorado.

550. As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

551. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Colo. Rev. Stat. §6-1-113.

**Thirty-Sixth Claim for Relief**
**Violation of the District of Columbia Consumer Protection Procedures Act**
**D.C. Code §28-3901, *et seq*.**

552. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

553. By reason of the conduct alleged herein, Defendants have violated D.C. Code §28-3901, *et seq*.

554. Defendants are "merchants" within the meaning of D.C. Code §28-3901(a)(3).

555. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

556. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

557. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

558. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

559. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is

greater) plus punitive damages, reasonable attorneys' fees and costs under D.C. Code §28-3901, *et seq*.

**Thirty-Seventh Claim for Relief**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §501.201(2), *et seq*.**

560.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

561.     The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. §501.204(1).

562.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

563.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

564.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. *See* Fla. Stat. §501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . . .").

565.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Florida during the Class Period.

142

But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

566.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Florida.

567.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Florida at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

568.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

569.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

570.    As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

571.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. §501.208

and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Fla. Stat. §501.211.

**Thirty-Eighth Claim for Relief**<br>**Violation of Hawaii Consumer Protection Laws**<br>**Haw. Rev. Stat. Ann. §480-1,** *et seq.*

572.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

573.     The contract, combination, or conspiracy alleged above constitutes "unfair or deceptive acts or practices in the conduct of any trade or commerce," within the meaning of Haw. Rev. Stat. Ann. §480-2(a).  Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for crop protection products containing the Relevant AIs in Hawaii, restrained trade or commerce for crop protection products containing the Relevant AIs in Hawaii, and caused the prices of crop protection products containing the Relevant AIs to be raised, fixed, maintained and stabilized at supracompetitive levels, all in violation of Haw. Rev. Stat. Ann. §480-2(a).

574.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Hawaii during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

575.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, which is an unfair method of competition.

144

576.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Hawaii at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing, which is an unfair method of competition.

577.     Accordingly, Defendants' conduct was an unfair method of competition within the conduct of commerce within the State of Hawaii.

578.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief, treble damages, attorneys' fees, and costs of suit pursuant to Haw. Rev. Stat. Ann. §480-13.

### Thirty-Ninth Claim for Relief
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*

579.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

580.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*, generally prohibits "unfair methods of competition." 815 Ill. Comp. Stat. Ann. 505/2.

581.     Under Illinois law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* 815 Ill. Comp. Stat. Ann. 505/10a(a)

145

("Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person.").

582.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Illinois during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

583.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, which is an unfair method of competition.

584.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Illinois at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing, which is an unfair method of competition.

585.     Accordingly, Defendants' conduct was an unfair method of competition within the conduct of commerce within the State of Illinois.

586.     As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

587. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to 815 Ill. Comp. Stat. Ann. 505/10a.

**Fortieth Claim for Relief**
**Violation of the Kansas Consumer Protection Act**
**Kan. Stat. Ann. §50-623**, *et seq.*

588. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

589. The Kansas Consumer Protection Act, Kan. Stat. Ann. §50-623, *et seq.*, is intended to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. §50-623(b).

590. Under Kansas law, indirect purchasers have standing to maintain an action under the Deceptive Trade Practices Act based on the facts alleged in this Complaint. *See* Kan. Stat. Ann. §50-624(l) ("'Supplier' means a manufacturer . . . whether or not dealing directly with the consumer.").

591. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Kansas during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

592.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, which is an unconscionable and deceptive practice.

593.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Kansas at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing, which is an unconscionable and deceptive practice.

594.     Accordingly, Defendants' conduct was an unconscionable and deceptive practice that substantially affected commerce within the State of Kansas.

595.     As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

596.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Kan. Stat. Ann. §50-634.

## Forty-First Claim for Relief
## Violation of the Massachusetts Consumer Protection Act
## Mass. Gen. Laws. ch. 93a, §1, *et seq.*

597.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

598.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §2, *et seq*.

599.    Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the Commonwealth of Massachusetts during the Class Period.  But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

600.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

601.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

602.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

603.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

604.    By reason of the foregoing, Plaintiffs and the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorneys' fees and costs under Massachusetts General Laws ch. 93A, §9.

605.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Syngenta or Corteva because, upon information and belief, neither company has identified a place of business or assets within Massachusetts.

606.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Massachusetts Attorney General in accordance with Massachusetts General Laws ch. 93A, §10.  Plaintiffs will file proof of such service with the Court.

### Forty-Second Claim for Relief
Violation of the Minnesota Prevention of Consumer Fraud Act
Minn. Stat. §325F.68, *et seq.*

607.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

608.    The Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §325F.68, *et seq.*, prohibits the use of deception or "unfair or unconscionable practice[s]" in connection with the sale of merchandise. Minn. Stat. §325F.68.

150

609.    Under Minnesota law, indirect purchasers have standing to maintain an action under the Prevention of Consumer Fraud Act based on the facts alleged in this Complaint.  *See* Minn. Stat. §8.31(3a) ("any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court.").

610.    This action provides a public benefit to the people of Minnesota.

611.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Minnesota during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

612.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets.

613.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Minnesota at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

614. Accordingly, Defendants' conduct was an unfair, unconscionable, and deceptive practice that substantially affected commerce within the State of Minnesota.

615. As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Minn. Stat. §8-31.

**Forty-Third Claim for Relief**
**Violation of the Montana Unfair Trade Practices and**
**Consumer Protection Act of 1970**
**Mont. Code Ann. §§30-14-103, *et seq*., and §§30-14-201, *et seq*.**

616. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

617. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code Ann. §§30-14-103, *et seq.*, and 30-14-201, *et seq*.

618. Defendants' unlawful conduct had the following effects: (1) price competition for crop protection products containing the Relevant AIs was restrained, suppressed, and eliminated throughout Montana; (2) prices for crop protection products containing the Relevant AIs were raised, fixed maintained, and stabilized at artificially high

levels; (3) Plaintiffs and other members of the Class were deprived of free and open competition; and (4) Plaintiffs and other members of the Class paid supracompetitive, artificially inflated prices for crop protection products containing the Relevant AIs.

619.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

620.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§30-14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

621.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Montana Attorney General in accordance with Mont. Code §30-14-133(2).  Plaintiffs will file proof of such service with the Court.

**Forty-Fourth Claim for Relief**
**Violation of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. §59-1602, *et seq.***

622.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

623.     By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. §59-1602, *et seq*.

624.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* Neb. Rev. Stat. §59-1609.

625.     Each Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Nebraska.

626.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

627.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

628.     Defendants' conduct had a direct or indirect impact upon Plaintiffs and members of the Class's ability to protect themselves.

629.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

630.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

631.     By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. §59-1614.

## Forty-Fifth Claim for Relief
## Violation of the Nevada Deceptive Trade Practices Act
## Nev. Rev. Stat. §598.0903, *et seq.*

632. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

633. By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. §598.0903*, et seq.*

634. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

635. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Nevada.

636. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade of commerce in the Relevant Markets, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

637. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

638. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

639. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

155

640. Defendants' conduct was willful.

641. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

642. By reason of the foregoing, the Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. §598.0993.

### Forty-Sixth Claim for Relief
### Violation of the New Hampshire Consumer Protection Act
### N.H. Rev. Stat. Ann. tit. XXXI, §358-A:1, *et seq.*

643. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

644. By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, §358-A:1, *et seq*.

645. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

646. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within New Hampshire.

156

647. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Hampshire, for the purpose of excluding or limiting competition or controlling or maintaining prices.

648. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

649. Defendants' conduct was willful and knowing.

650. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and other members of the Class's ability to protect themselves.

651. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

652. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

653. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief available under New Hampshire Revised Statutes Annotated §§358-A:10 and 358-A:10-a.

654. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the New Hampshire Attorney General in accordance with New Hampshire Revised Statutes Annotated §358-A:10(II). Plaintiffs will file proof of such service with the Court.

**Forty-Seventh Claim for Relief**
**Violation of the New Mexico Unfair Practices Act**
**N.M. Stat. Ann. §57-12-1, *et seq*.**

655.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

656.   By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §57-12-3, *et seq*.

657.   Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico.

658.   Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

659.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

660.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

661.   Each Defendant's conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class members and the price paid by them for crop protection products containing the Relevant AIs as set forth in N.M. Stat. Ann. §57-12-2E.

158

662.    Defendants' conduct was willful.

663.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

664.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §57-12-10.

**Forty-Eighth Claim for Relief**
**Violation of New York's General Business Law**
**N.Y. Gen. Bus. Law §349**

665.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

666.    N.Y. Gen. Bus. Law §349(a), *et seq.*, prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."

667.    Under New York law, indirect purchasers have standing to maintain an action under the Prevention of Consumer Fraud Act based on the facts alleged in this Complaint. *See* N.Y. Gen. Bus. Law §349(h) ("any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice" and "an action to recover his actual damages").

668.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of New York during the Class Period.

159

But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

669.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets.

670.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Minnesota at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

671.    Accordingly, Defendants' conduct was a deceptive practice that substantially affected commerce within the State of New York.

672.    As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

673.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to N.Y. Gen. Bus. Law §349(h).

160

**Forty-Ninth Claim for Relief**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §75-1.1, *et seq.***

674.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

675.    By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. §75-1.1, *et seq*.   Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584, 473 S.E. 2d 680, 687-688, *rev. denied,* 344 N.C. 734, 748 S.E. 2d 5 (1996).

676.    Each Defendant entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Carolina.

677.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

678.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

679.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

680.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North

161

Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

681.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

682.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages, attorneys' fees and costs, under N.C. Gen. Stat. §75-16.

**Fiftieth Claim for Relief**
**Violation of the North Dakota Unlawful Sales or Advertising Practices Act**
**N.D. Cent. Code §51-10-01, *et seq.***

683.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

684.     By reason of the conduct alleged herein, Defendants have violated N.D. Cent. Code §51-10-01, *et seq*.  Under North Dakota law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  *See* N.D. Cent. Code §51-15-09 ("[T]his chapter does not bar any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter.").

685.     Each Defendant engaged in conduct in connection with the sale or advertisement of merchandise that was unconscionable and/or conduct that caused or was

162

likely to cause substantial injury to persons which was not reasonable avoidable by the injured person.

686. Each Defendant's unconscionable and/or injurious conduct was not outweighed by countervailing benefits to consumers or to competition.

687. Defendants' conduct was committed knowingly.

688. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

689. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages and costs, disbursements, and attorneys' fees under N.D. Cent. Code §51-15-09.

**Fifty-First Claim for Relief**
**Violation of the Oregon Trade Practices Act**
**Or. Rev. Stat. §646.605**, *et seq.*

690. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

691. Oregon's Trade Practices Act prohibits "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services," Or. Rev. Stat. §646.607(1), and "unfair or deceptive conduct in trade or commerce," §646.608(u).

692. Under Oregon law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* Or. Rev. Stat. §646.638(1) and (8) (permitting private actions when "a person that suffers an ascertainable loss of money or

property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful").

693. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Oregon during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

694. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets.

695. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Oregon at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

696. Accordingly, Defendants' conduct was an unfair, unconscionable, and deceptive practice that substantially affected commerce within the State of Oregon.

697. As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

698.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Or. Rev. Stat. §646.638.

699.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Oregon Attorney General in accordance with Or. Rev. Stat. §646.638(2).  Plaintiffs will file proof of such service with the Court.

### Fifty-Second Claim for Relief
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 Pa. Stat. and Cons. Stat. §201-1, *et seq.*

700.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

701.    The Pennsylvania Unfair Trade Practices Act and Consumer Protection Law, 73 Pa. Stat. and Cons. Stat. §201-1, *et seq.*, prohibits "unfair methods of competition," including by "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 Pa. Stat. and Cons. Stat. §201–2(4)(xxi).

702.    Under Pennsylvania law, indirect purchasers have standing to maintain an action under the Unfair Trade Practices and Consumer Protection Law based on the facts alleged in this Complaint.  *See* 73 Pa. Stat. and Cons. Stat. §201-9.2(a) ("Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages . . . .").

703. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Pennsylvania during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

704. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, which is an unfair method of competition that, among other things, consists of fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding.

705. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Pennsylvania at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing, which is an unfair method of competition that, among other things, consists of fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding.

706. Accordingly, Defendants' conduct was which an unfair method of competition that, among other things, consisted of fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding within the conduct of commerce within the State of Pennsylvania.

166

707. As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

708. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to 73 Pa. Stat. and Cons. Stat. §201-9.2.

## Fifty-Third Claim for Relief
## Violation of the Rhode Island Deceptive Trade Practices Act
## R.I. Gen. Laws §6-13.1-1, *et seq*.

709. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

710. By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws §6-13.1-1, *et seq*.

711. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supracompetitive profits.

712. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Rhode Island.

713. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part

167

of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the Relevant Markets.

714. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

715. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

716. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

717. Defendants' conduct was willful.

718. Defendants' deception constitutes information necessary to Plaintiffs and members of the Class relating to the cost of crop protection products containing the Relevant AIs purchased.

719. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

720. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen. Laws §6-13.1-5.2.

721. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Rhode Island Attorney General in accordance with R.I. Gen. Laws §6-13.1-5.2(c). Plaintiffs will file proof of such service with the Court.

## Fifty-Fourth Claim for Relief
## Violation of the South Carolina Unfair Trade Practices Act
## S.C. Code Ann. §39-5-10, *et seq.*

722.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

723.     By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §39-5-10, *et seq*.

724.     Each Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within South Carolina.

725.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within South Carolina, for the purpose of excluding or limiting competition or controlling or maintaining prices.

726.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

727.     Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class's ability to protect themselves.

728.     Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

169

729.    Each Defendant's unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of members of the public purchase crop protection products containing the Relevant AIs.

730.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the South Carolina Attorney General in accordance with S.C. Code Ann. §39-5-140(b).  Plaintiffs will file proof of such service with the Court.

**Fifty-Fifth Claim for Relief**
**Violation of South Dakota Deceptive Trade Practices Act**
**S.D. Codified Laws §37-24-1**, *et seq.*

731.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

732.    South Dakota's Deceptive Trade Practices Act prohibits "any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."  S.D. Codified Laws §37-24-6(1).

733.    Under South Dakota law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  *See* S.D. Codified Laws §37-24-31 ("Any person who claims to have been adversely affected by any act or a practice declared to be unlawful by §37-24-6 shall be permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or practice.").

734.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of South Dakota during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

735.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets.

736.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in South Dakota at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

737.    Accordingly, Defendants knowingly engaged in deceptive acts and practices in connection with the sale of merchandise within the State of South Dakota.

738.    As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

739.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment,

actual damages, reasonable attorneys' fees and costs pursuant to S.D. Codified Laws §37-24-31 and 37-24-32.

**Fifty-Sixth Claim for Relief**
**Violation of the Utah Consumer Sales Practices Act**
**Utah Code Ann. §13-11-1, *et seq*.**

740.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

741.    By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §13-11-1, *et seq*.

742.    Defendants are a supplier within the meaning of Utah Code Ann. §13-11-3.

743.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred in Utah.

744.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

745.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

746.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §13-11-3.

172

747.    Defendants knew or had reason to know that their conduct was unconscionable.

748.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

749.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of Class have been injured in their business or property and are threatened with further injury.

750.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§13-11-19(5) and 13-11-20.

751.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with Utah Code Ann. §13-11-21(2).  Plaintiffs will file proof of such service with the Court.

**Fifty-Seventh Claim for Relief**
**Violation of Virginia Consumer Protection Act**
**Va. Code Ann. §59.1-196**, *et seq.*

752.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

753.    The intent of the Virginia Consumer Protection Act, Va. Code Ann. §59.1-196, *et seq.*, is to "promote fair and ethical standards of dealings between suppliers and the consuming public" Va. Code. Ann. §59.1-197, and it prohibits using "deception, fraud,

173

false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. §59.1-200(A)(14).

754.    Under Virginia law, indirect purchasers have standing to maintain an action under the Consumer Protection Act based on the facts alleged in this Complaint. *See* Va. Code Ann. §59.1-204(A) ("Any person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages").

755.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Virginia during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

756.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, which is an unfair method of competition that, among other things, consists of fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding.

757.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Virginia at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

758.    Accordingly, Defendants' conduct was which an unfair method of competition that involved fraudulent or deceptive conduct affecting commerce within the State of Virginia.

759.    As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Va. Code. Ann. §59.1-204.

**Fifty-Eighth Claim for Relief**
**Violation of West Virginia General Consumer Protection Act**
**W. Va. Code §46A-6-101**, *et seq.*

760.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

761.    The West Virginia General Consumer Protection Act, W. Va. Code §46A-6-101, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  W. Va. Code §46A-6-104.

762.    Under West Virginia law, indirect purchasers have standing to maintain an action under the General Consumer Protection Act based on the facts alleged in this Complaint.  *See* W. Va. Code §46A-6-106(a) ("any person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property, real or personal,

as a result of the use or employment by another person of a method, act, or practice prohibited or declared to be unlawful by the provisions of this article may bring an action").

763.   Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of West Virginia during the Class Period.  But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

764.   Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, which is an unfair method of competition that, among other things, consists of fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding.

765.   Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in West Virginia at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

766.   Accordingly, Defendants' conduct was which an unfair method of competition that involved fraudulent or deceptive conduct affecting commerce within the State of West Virginia.

767.   As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by

virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to W. Va. Code. §46A-6-106.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

1. Certifies the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

2. Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

3. Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

4. Awards a declaratory judgment that Syngenta's and Corteva's conduct was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Markets in violation of Section 1 of the Sherman Act, Section 2 of the Sherman Act, and Section 3 of the Clayton Act;

5. Grants permanent injunctive relief:

a. Enjoining Syngenta and Corteva from engaging in future anticompetitive conduct with the purpose or effect of foreclosing the Relevant Markets to competition from actual or potential rivals; and

b. Requiring Syngenta and Corteva to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct.

6. Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with the law;

7. Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Syngenta's and Corteva's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

8. Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees provided by law; and

9. Directs such further relief as it may deem just and proper.

## XIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

July 28, 2025

Respectfully submitted,

/s/ Lyn K. Broom
Richard L. Pinto (N.C. State No. 9412)
Lyn K. Broom (N.C. State Bar No. 17674)

178

Kenneth K. Kyre, Jr.  (N.C. State Bar No. 7848)
**PINTO COATES KYRE & BOWERS, PLLC**
3203 Brassfield Rd.
Greensboro, NC 27410
Telephone: (336) 282-8848
rpinto@pckb-law.com
lbroom@pckb-law.com
kkyre@pck-law.com
*Liaison Counsel for the Putative Class*

/s/ Jay Chaudhuri
Jay J. Chaudhuri
N.C.  State Bar No. 27747
COHEN MILSTEIN SELLERS & TOLL PLLC
50 Fayetteville St., Suite 980
Raleigh, NC 27601
Telephone (919) 890-0560
Facsimile (919) 890-0567
jchaudhuri@cohenmilstein.com

Michael B. Eisenkraft (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Telephone (212) 838-7797
Facsimile (212) 838-7745
meisenkraft@cohenmilstein.com

Zachary R. Glubiak (pro hac vice)
Nina Jaffe-Geffner (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, Suite 800, NW Washington D.C. 20005

179

Telephone (202) 408-4600
zglubiak@cohenmilstein.com
njaffegeffner@cohenmilstein.com


Manuel J. Dominguez
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-2604
jdominguez@cohenmilstein.com


*/s/ Carol O'Keefe*
Carol O'Keefe (pro hac vice)
Rosemarie Fiorillo (pro hac vice)
Ian Moody (pro hac vice)
**KOREIN TILLERY PC**
505 N 7th St #3600
St. Louis, MO 63101
Telephone: (314) 241-4844
cokeefe@koreintillery.com
rfiorillo@koreintilerry.com
imoody@koreintillery.com


George A. Zelcs (pro hac vice)
Randall P. Ewing, Jr. (pro hac vice)
Chad E. Bell (pro hac vice)
Labeat Rrahmani (pro hac vice)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
gzelcs@koreintillery.com
erwing@koreintilerry.com
cbell@koreintilerry.com
lrrahmani@koreintilerry.com

180

*/s/ Vincent Briganti*

Vincent Briganti (pro hac vice)
Margaret MacLean (pro hac vice)
Nicole A. Veno (pro hac vice)
**LOWEY DANNENBERG P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
mmaclean@lowey.com
nveno@lowey.com


*/s/ Daniel L. Brockett*

Daniel L. Brockett (pro hac vice)
Steig D. Olson (pro hac vice)
Sami H. Rashid (pro hac vice)

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com
Jeremy D. Andersen (pro hac vice)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com


*Interim Co-Lead Class Counsel for the
Putative Class*

M. Stephen Dampier
**THE DAMPIER LAW FIRM, P.C.**
11 N. Water Street, Suite 10290
Mobile, AL 36602
Telephone: (251) 929-0900
stevedampier@dampierlaw.com

*Counsel for Plaintiffs* Gavins Brothers, LLC, and Matthew S. Taylor, Inc. d/b/a Hooper's Landscape & Nursery


Karin E. Garvey
**SCOTT+SCOTT**
**ATTORNEYS AT ALW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
kgarvey@scott-scott.com

Charles F. Barrett
**CUNEO, GILBERT & LADUCA, LLP**
4235 Hillsboro Pike, Suite 300
Nashville, TN 37215
Telephone: 615-293-7375
cbarrett@cuneolaw.com


Jonathan P. Barrett
**BARRETT LAW, PLLC**
121 Colony Crossing, Suite D
Madison, MS 39110
Telephone: (601) 790-1505
jpb@barrettlawms.com

*Counsel for Plaintiff Jones Planting Co. III*


William M. Audet (pro hac vice)
Ling Y. Kuang (pro hac vice)
Thom E. Smith

182

**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 568.2555
waudet@audetlaw.com
lkuang@audetlaw.com
tsmith@audetlaw.com
*Counsel for Plaintiffs Peter F. Bonin and*
*Brett Robberts*

David E. Kovel
Thomas W. Elrod (pro hac vice)
Sarah E. Flohr (pro hac vice)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, York 10177
Telephone: (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
sflohr@kmllp.com

*Counsel for Plaintiffs Clifton Kirven Janie*
*Yeargin, Gary Bentinzger, and Chris Bole*

F. Hill Allen
Wade M. Smith
**THARRINGTON SMITH LLP**
Wells Fargo Building
150 Fayetteville Street, Suite 1800
Raleigh, NC 27601
Telephone: (919) 821-4711
hallen@tharringtonsmith.com
wsmith@tharringtonsmith.com

*Liaison Counsel for Plaintiff Donald F.*
*DeLine (d/b/a DeLine Farms North, DeLine*
*Farms South, and DeLine Farms Partnership)*

Bryan L. Clobes (pro hac vice)
Ellen Meriwether (pro hac vice)
**CAFFERTY CLOBES MERIWETHER**

**& SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Telephone: (215) 864-2800
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Alexander J. Sweatman (pro hac vice)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
asweatman@caffertyclobes.com

*Counsel for Plaintiff Donald F. DeLine (d/b/a DeLine Farms North, DeLine Farms South, and DeLine Farms Partnership)*

Christopher T. Micheletti (pro hac vice)
Qianwei Fu (pro hac vice)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com
*Counsel for Plaintiff Iron Horse Ranches*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2025, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all counsel of record and have served the Notice hereof and a true and correct copy of the forgoing upon the following Attorney Generals via Certified Mail addressed as follows:

Kris Mayes
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-2926

Philip J. Weiser
Colorado Attorney General
1300 Broadway
Denver, CO 80203

William Tong
Office of Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120

The Honorable Andrea Joy Campbell
Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108-1698

Keith Ellison
Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131

Andrew Bailey
Missouri Attorney General
207 W. High St. P.O. Box 899
Jefferson City, MO 65102

Austin Knudsen
Office of the Attorney General
215 North Sanders, Third Floor
PO Box 201401
Helena, MT 59620-1401

Aaron Ford
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717

John Formella
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Letitia James
Office of the Attorney General
1 Empire State Plaza
Albany, NY 12224

Dan Rayfield
Office of the Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301

Peter Neronha
Office of the Attorney General
150 South Main Street
Providence, RI 02903

The Honorable Alan Wilson
Attorney General
PO Box 11549
Columbia, SC 29211

Derek Brown
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT 84114-2320

186

This is the 28th day of July 2025.

*/s/ Lyn K. Broom*
Lyn K. Broom
N.C. State Bar No. 17674
PINTO COATES KYRE & BOWERS, PLLC
3202 Brassfield Road Greensboro, NC 27410
Tel: (336) 282-8848
Facsimile: (336) 282-8409
lbroom@pckb-law.com
*Liaison Counsel for the Putative Class*
