# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| IN RE CROP PROTECTION PRODUCTS LOYALTY PROGRAM ANTITRUST LITIGATION<br><br><br>This document relates to ALL ACTIONS | Case No. 1:23-md-3062-TDS-JEP<br><br>**MEMORANDUM OF LAW IN SUPPORT OF THE SYNGENTA DEFENDANTS' JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. ROSA ABRANTES-METZ**<br><br>**Oral Argument Requested** |

# TABLE OF CONTENTS

I.    Abrantes-Metz's Flawed Benchmarks Render Her Overcharge Estimates Unreliable and Inadmissible ................................................................................................................ 11

    A.    Abrantes-Metz Cannot Reliably Prove That Her Estimated Overcharges Were Caused by Syngenta's Allegedly Anticompetitive Rebate Programs................................................. 11

    B.    Abrantes-Metz Fails to Control for Relevant Differences Between Syngenta and Her Benchmarks............................................................................................................ 20

II.   Abrantes-Metz's *Average* Estimate of Overcharge Cannot Establish That All or Nearly All Class Members Were Injured ................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ................................................................. 24

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................... 9, 10

*Anderson v. Lab. Corp. of Am. Holdings*,
  2023 WL 1970953 (M.D.N.C. Feb. 13, 2023) ............................................. 25

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ..................................................................... 11, 12

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ....................................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................................................... 9

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ............................................. *passim*

*In re Flash Memory Antitrust Litig.*,
  2010 WL 2332081 (N.D. Cal. June 9, 2010) ............................................. 27

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
  2016 WL 7373857 (D. Kan. Dec. 20, 2016) ................................... 15, 16, 17

*United States v. Hudak*,
  156 F.4th 405 (4th Cir. 2025) ................................................................. 9, 17

*Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte &*
  *Touche LLP*, 348 F.R.D. 35 (D.S.C. 2024) .................................................. 10

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...................................................................................... 9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  801 F. Supp. 3d 330 (S.D.N.Y. 2025) .................................................... 22, 23

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012)..................................................... 20, 22

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
710 F. Supp. 3d 1090 (D. Utah 2023) ............................................ 23, 24, 25

*In re Niaspan Antitrust Litig.*,
464 F. Supp. 3d 678 (E.D. Pa. 2020) .......................................................... 26

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014)................................................................. 26

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)............................................................. 26, 27

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ...................................................................... 19

*West v. Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002)...................................................................... 10

*In re Wholesale Grocery Prods. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019)................................................................. 20, 22

*In re Zetia (Ezetimibe) Antitrust Litig.*,
566 F. Supp. 3d 509 (E.D. Va. 2021)............................................... 12, 17, 19

**Other Authorities**

Fed. R. Evid. 104(a) ....................................................................................9

Fed. R. Evid. 702..................................................................................... 9, 10

Fed. R. Civ. P. 23(b)(3)................................................................................ 23

Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC ("Syngenta")[1] submit this brief in support of their Motion to Exclude the Expert Testimony of Dr. Rosa Abrantes-Metz.

**PRELIMINARY STATEMENT[2]**

Plaintiffs rely on the opinions of Abrantes-Metz to show that "all or nearly all putative class members paid an overcharge as a result of Syngenta's anticompetitive conduct." (Pls.' Mem. of Law in Support of Their Mot. for Certification of the Syngenta Classes ("Pls. Class Cert. Br.") at 2). Abrantes-Metz cannot reliably make that showing. Her injury and damages opinions thus are inadmissible to prove class-wide impact, for at least two reasons.[3]

*First*, Abrantes-Metz's benchmark models cannot reliably attribute any overcharge to Syngenta's allegedly anticompetitive conduct, and so cannot serve as evidence of overcharge to a single class member—much less all or nearly all of them. To measure the effect of Syngenta's loyalty rebates on prices, Abrantes-Metz purports to compare prices for Syngenta's products (*i.e.*,

---

[1] "Syngenta" when used singularly in this brief refers only to Syngenta Crop Protection, LLC.

[2] Unless noted, emphasis has been added to quotations, and internal quotations, brackets, citations, footnotes, and deposition objections have been omitted.

[3] By focusing its motion on these two issues, Syngenta does not concede that other aspects of Abrantes-Metz's expert opinion are valid or correct. The flaws identified in this motion confirm, however, that no class can be certified based on Abrantes-Metz's unreliable methodology.

the treatment group) to the prices for a "control group" of products. As benchmarks in her control group, Abrantes-Metz selects BASF and Bayer products. She assumes that any pricing differences relative to generics between Syngenta, on the one hand, and BASF and Bayer, on the other, are due to the effects of Syngenta's loyalty rebates. But that assumption is fundamentally flawed because, as Abrantes-Metz acknowledges, BASF and Bayer both employed their own AI share-based loyalty rebates during the relevant period. Models using control groups that employed similar AI share-based loyalty rebate programs to Syngenta's cannot isolate the effect of Syngenta's rebates or show what Syngenta's pricing would have been in a but-for world without the challenged loyalty rebates. Without a model that can estimate the overcharge allegedly caused by Syngenta's loyalty rebates, Abrantes-Metz cannot reliably estimate harm to any class member or prove that all or nearly all class members were injured.

In an attempt to obscure the basic flaw in her models' design, Abrantes-Metz asserts for the first time in her reply report that her models are not meant to illustrate a but-for world with *no* loyalty rebates, but rather only a but-for world without Syngenta's allegedly *anticompetitive* loyalty rebates. That distinction cannot save Abrantes-Metz's models, because she does not opine on whether BASF's and Bayer's loyalty programs were anticompetitive and she applies no reliable methodology in her discussion of BASF and Bayer to

-2-

support such an opinion. She thus has not shown that her benchmarks reflect the absence of the allegedly anticompetitive loyalty rebates, and so her models cannot isolate the effect of Syngenta's allegedly anticompetitive conduct or reliably estimate Syngenta's but-for world pricing. Simply put, because Abrantes-Metz's treatment group and control group both reflect the effect of loyalty rebates, her model is measuring a price difference that cannot be attributed to loyalty rebates.

Further, Abrantes-Metz does not control for differences between Syngenta, on the one hand, and BASF and Bayer, on the other, that could explain the differences in pricing that her models reflect. BASF's and Bayer's broader business strategies are not identical to Syngenta's. BASF's margins on its seed business, for example, were much higher than Syngenta's, and Bayer's seed business was approximately six times larger than Syngenta's during the relevant time period. Abrantes-Metz does not control for the effect these differences in the companies' overall business strategies have on crop protection product pricing, and so has not shown that her models are measuring anything more than the difference between how Syngenta and other companies managed their businesses, rather than any effect attributable to Syngenta's loyalty rebates. This, too, renders her models unreliable and therefore inadmissible to prove any amount of overcharge.

-3-

*Second*, even if Abrantes-Metz could reliably measure overcharges attributable to Syngenta's loyalty rebates (she cannot), her models still could not reliably prove class-wide impact because they produce only an ***average*** estimate of overcharges for Syngenta's products. Average overcharge estimates cannot determine whether any individual class member was actually injured where, as here, class members purchased a variety of different products, at different prices, in different geographic markets, to treat different pests on different crops. Abrantes-Metz's models wipe those factors away, obscuring individual injury and rendering her opinions inadmissible. Indeed, when Abrantes-Metz's estimate of average overcharge is disaggregated to the product level, roughly one-third of Syngenta's straight crop protection products are ***not*** priced higher than BASF's and Bayer's products, on average, relative to generics. Abrantes-Metz never disputes this result. These disaggregated findings confirm that individualized inquiry is necessary to determine whether class members purchased Syngenta products for which Abrantes-Metz's models estimate overcharge. Therefore, her opinions should be excluded.

## NATURE OF THE MATTER

Plaintiffs challenge Syngenta's loyalty rebates under federal and state laws on behalf of themselves and certain putative classes. Plaintiffs claim they can prove class-wide injury through the opinions of Abrantes-Metz. Syngenta now moves to exclude Abrantes-Metz's opinions regarding class-wide injury.

-4-

## STATEMENT OF FACTS

Syngenta researches, develops, manufactures, and sells innovative crop protection products ("CPPs")—herbicides, insecticides, and fungicides—that American growers use to control pests and protect crop yields. (D.E. 261 (Am. Consol. Class Action Compl.) ¶¶ 40-44, 60, 62; *see generally* D.E. 378-5 (Abrantes-Metz Rep.) Section II.) CPPs combine one or more active ingredients ("AIs"), which control the targeted pest, with inert ingredients, which support the performance and usability of a product. (D.E. 261 ¶¶ 42-43.) Syngenta offers CPP distributors and retailers certain loyalty rebate incentives based on AI shares of sold CPPs. Plaintiffs allege that Syngenta's loyalty rebate incentives have foreclosed generic competition for CPPs containing five AIs: the fungicide azoxystrobin; the herbicides mesotrione, metolachlor/s-metolachlor, and fomesafen; and the insecticide lambda-cyhalothrin (collectively, the "at-issue AIs"). (*Id.* ¶ 69.)

Plaintiffs seek to represent proposed classes of growers throughout the United States who purchased a variety of Syngenta CPPs containing any of the at-issue AIs. (D.E. 380-1 (Orszag Rebuttal Rep.) ¶¶ 17, 20, 31, fig. 1.) The putative class members, and the details of their purchases, are heterogenous. Some of the at-issue AIs are used predominantly or almost exclusively to treat a particular crop or a small number of crops. (D.E. 378-5 figs. 3, 5, 7.) Others have more diffuse applications. (*Id.* figs. 9, 11.) Not all growers purchased all

of the at-issue AIs. (*See, e.g.*, D.E. 261 ¶¶ 20, 24.) Only ▮ of growers used all of the at-issue AIs from 2018 until 2024, and ▮▮▮▮ used only one of the five at-issue AIs. (D.E. 380-1 fig. 3.) Among products with the same at-issue AI, growers chose different products depending on their individualized needs and budgets. (*Id.* ¶ 30.) Different growers paid different prices for even the same product due to different competitive conditions in different geographic markets. (*Id.* ¶ 31, fig. 4.) And growers are indirect purchasers—removed from Syngenta on the supply chain by at least two levels—which creates additional variability in the prices they paid. (*Id.* ¶¶ 8, 13(g), 73.)

Despite these variations, Plaintiffs assert that they can prove using common evidence that "all or nearly all" of a class of more than 250,000 growers of a multitude of crops (from papaya to corn) across dozens of states (from Hawaii to New Hampshire) paid alleged "overcharges" on hundreds of Syngenta CPPs that contained one or more of the five different at-issue AIs. (Pls.' Class Cert. Br. at 1 n.1, 2 n.2, 20, 38.) To do so, Plaintiffs rely on the expert testimony of Abrantes-Metz. Abrantes-Metz acknowledges "that farmers' prices can vary for slightly different reasons for one person versus another." (Ex. 1 (Abrantes-Metz Dep. Vol. II) 465:20-466:21.) And she agrees that "variation in the prices paid by farmers is directly relevant to the question of whether all or nearly all members of the proposed class paid an overcharge." (*Id.* 466:22-467:14.) Abrantes-Metz affirmatively disclaims, however, that she

is "attempting to explain all of the reasons by which farmers' price is moving." (*Id.* 465:20-466:21.)

Instead, Abrantes-Metz attempts to prove that all or nearly all growers overpaid for CPPs containing one or more of the various at-issue AIs by using econometric models that purport to estimate an average "overcharge" for all class members, for all sales. Abrantes-Metz's models work as follows:

Abrantes-Metz uses her "Single-AI model" to estimate the alleged overcharge on "straight" CPPs containing a single AI. (D.E. 378-5 ¶¶ 530-45, fig. 59.) She begins by calculating the "price premium" between the average price per pound that growers paid for Syngenta products and the generic alternatives containing an at-issue AI. (*Id.* ¶¶ 531-32.) She hypothesizes that if Syngenta's loyalty rebate programs "are successful" in "inhibiting competition from generic companies," then there should be "a greater price premium for products associated with" Syngenta's loyalty rebates relative to other branded products. (*Id.* ¶ 533.) To test that hypothesis, Abrantes-Metz compares her price premium for Syngenta single-AI products (*i.e.*, the treatment group) to a price premium she calculates for single-AI BASF/Bayer products (together) relative to generics (*i.e.*, the control group). (*Id.* ¶¶ 537-40.) Abrantes-Metz concludes, based on this comparison, that straight crop protection "products protected by [Syngenta's] loyalty programs . . . would have

-7-

been priced approximately . . . ███ lower" in the but-for world without the challenged Syngenta loyalty rebates. (*Id.* ¶ 543.)

Abrantes-Metz conducts a different analysis, using her "Multi-AI model," for "premix" CPPs that contain multiple AIs. (*See id.* ¶ 567, fig. 60.) She first assumes that the overcharge estimated by her Single-AI model applies to each single-AI component of the premix. (*Id.* ¶¶ 546-52.) For each premix CPP, she then calculates a premix "convenience premium," defined as the difference between the price of the Syngenta premixed product and the total price a grower would have to pay for the Syngenta straight CPPs necessary to allow the grower to "tank mix" a chemical equivalent to the premix CPP. (*Id.* ¶¶ 546-51.) Abrantes-Metz then compares that convenience premium to the convenience premium for BASF/Bayer products over time and finds a purported average overcharge for Syngenta premix CPPs of ███. (*Id.* ¶ 551.)

Abrantes-Metz opines that these average overcharges "would have been broadly felt by all Class Members" because, she claims, "there is a strong statistical relationship between the prices paid by distinct buyers and categories of buyers" and "individual customer prices follow product-specific, aggregate price movements of magnitudes comparable to the estimated overcharge." (*Id.* ¶¶ 557, 571.) Leveraging this conclusion, she then purports to calculate class-wide damages by "applying the estimated overcharge percentage" from each of her models to grower expenditures on CPPs

containing the at-issue AIs. (*Id.* ¶ 578, fig. 80.) In total, Abrantes-Metz estimates overcharge damages of ████████ for Syngenta CPPs containing the at-issue AIs during the class period. (*Id.*)

<h2 align="center">QUESTION PRESENTED</h2>

Should Abrantes-Metz's class-wide injury opinions be excluded?

<h2 align="center">LEGAL STANDARD</h2>

Expert testimony is admissible only if it: (1) helps the trier of fact understand the evidence or determine a fact in issue, (2) is based on sufficient facts or data, and (3) is derived from reliable principles and methods that (4) have been reliably applied to the facts of the case. Fed. R. Evid. 702. The proponent of expert testimony has the burden to demonstrate that it is "relevant" and "reliable," *United States v. Hudak*, 156 F.4th 405, 409 (4th Cir. 2025), "by a preponderance of proof," *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *see also* Fed. R. Evid. 104(a). Courts have "a special obligation" to ensure that expert testimony is both reliable and relevant before it can be admitted. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592-93 (1993).

Courts are "obliged to rigorously examine the soundness" of an expert's model when it is "the basis for a plaintiff's claim of classwide impact and causation," regardless of whether "the soundness and persuasiveness of the expert's model" would also be relevant to a decision on the merits. *In re*

-9-

*Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46-47 (S.D.N.Y. 2020); *see also West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (Easterbrook, J.) ("A district judge may not duck hard questions by observing . . . that considerations relevant to class certification also may affect the decision on the merits."). Accordingly, even where flaws in an expert's model are "'common' to the entire Class," a court "is obliged to rigorously examine the soundness of that model at the class certification stage" and can only certify a class if it finds the model "methodologically sound." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 46; *see also Int'l Bhd. of Elec. Workers Loc. 98 Pension Fund v. Deloitte & Touche LLP*, 348 F.R.D. 35, 43 n.5 (D.S.C. 2024) ("[C]ourts in the Fourth Circuit typically conduct full *Daubert* analyses, especially where expert opinion is critical to the issue of class certification.").

## ARGUMENT

Abrantes-Metz's expert opinions regarding class-wide injury are unreliable and inadmissible under Federal Rule of Evidence 702 for at least two reasons: (1) Abrantes-Metz's selection of BASF and Bayer as benchmarks renders her models incapable of reliably estimating overcharges attributable to Syngenta's allegedly anticompetitive rebates and (2) Abrantes-Metz's average estimate of overcharge cannot reliably show whether any individual growers—much less all or nearly all growers—were injured.

-10-

## I. Abrantes-Metz's Flawed Benchmarks Render Her Overcharge Estimates Unreliable and Inadmissible

To show class-wide injury and damages, Abrantes-Metz was required to reliably show that the "price that was actually charged" to all or nearly all class members in the actual world was higher than "the price that would have been charged 'but for' the [alleged] violation." Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 392a (4th & 5th eds. 2015-2021) ("Areeda & Hovenkamp"). Her models cannot do so, and must be excluded, for two independent reasons. *First*, Abrantes-Metz cannot prove that her estimated overcharges were caused by Syngenta's allegedly anticompetitive loyalty rebates because her control group benchmarks, BASF and Bayer, also employed AI share-based loyalty rebate programs during the relevant period that were nearly identical to Syngenta's in material respects. *Second*, Abrantes-Metz fails to control for differences between the broader business strategies of Syngenta and BASF/Bayer in the actual world that could explain the differences in pricing that her models observe.

### A. Abrantes-Metz Cannot Reliably Prove That Her Estimated Overcharges Were Caused by Syngenta's Allegedly Anticompetitive Rebate Programs

To reliably show impact, Abrantes-Metz was "required to construct a hypothetical market, a but-for market, free of the restraints and conduct

-11-

alleged to be anticompetitive." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). An expert model that does "not employ a hypothetical 'but-for world' free of the allegedly anticompetitive conduct" is inadmissible because it "would not aid the trier of fact in assessing the [e]ffect of the alleged antitrust violation." *In re Zetia (Ezetimibe) Antitrust Litig.*, 566 F. Supp. 3d 509, 514 (E.D. Va. 2021). "[I]t is axiomatic that, when designing an experiment to test whether an observed result was caused by [a] given variable, the control or benchmark group must lack that variable. ***That is the whole point of a control group.***" *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at \*5 (S.D.N.Y. Feb. 10, 2015).

Abrantes-Metz's models fail this basic requirement because, as she acknowledges, the benchmark firms in her control group—BASF and Bayer— also employed AI share-based loyalty rebate programs during the relevant period. (D.E. 378-5 ¶ 540 n.1144; D.E. 381-2 (Abrantes-Metz Reply Rep.) ¶¶ 238-40; Ex. 2 (Abrantes-Metz Dep. Vol. I) 49:20-24.)

BASF offered AI share-based incentive rebates to retailers and distributors based on their ability to meet contractually identified thresholds, measured on a "share of wallet" percentage, for specific AIs:

-12-

| AI | AI LOYALTY BRANDS | SOW REQUIREMENT |
|---|---|---|
| BOSCALID | Endura EG fungicide, Pristine EG fungicide | 90% |
| F500 | Cabrio fungicide, Headline AMP fungicide, Headline EC fungicide, Headline SC fungicide, Merivon fungicide, Nexicor fungicide, Priaxor fungicide, Pristine EG fungicide, Revytek fungicide, and Veltyma fungicide | 90% |
| GLUFOSINATE-AMMONIUM[1,2] | Liberty herbicide, Noventa™ herbicide, and BASF sourced private label Glufosinate-ammonium | 90% |
| | Branded Liberty herbicide | 75% |
| IMAZAMOX | Beyond herbicide, Raptor herbicide, and Varisto herbicide | 95% |
| PENDIMETHALIN | Prowl 3.3 EC herbicide, Prowl H2O herbicide and BASF sourced private label Pendimethalin | 90% |

(Ex. 3 (BASF_LOYALTY00001448) at -1449; *see also* D.E. 380-1 ¶ 39 n.66.)

███████████████████████████████████████████████████████████

████████████████████████████████████████████ :



(Ex. 4 (WIN_MDNC_0196414) at -6422; D.E. 380-1 ¶ 41.)

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ .

| KEY ACTIVE INGREDIENT | PRODUCTS ELIGIBLE FOR INCENTIVES | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| Azoxystrobin | Abound, Amistar Top, Miravis Neo, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt Xcel, Trivapro | 92% | 5% |
| Mesotrione | Acuron, Acuron Flexi, Acuron GT, Broadworks, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ | | |
| Thiamethoxam | Avicta Complete Beans 500, Clariva Elite Beans, Cruiser 5FS, CruiserMaxx Potato, CruiserMaxx Potato Extreme, CruiserMaxx Vibrance, CruiserMaxx Vibrance Cereals, CruiserMaxx Vibrance Cereals/Cruiser 5FS Pallet, CruiserMaxx Vibrance Potato, CruiserMaxx Vibrance Pulses | 99% | |
| | Actara, Agri-Flex, Centric 40WG, Durivo, Endigo ZC, Platinum brands, Voliam Flexi | | |
| Pinoxaden | Axial Bold, Axial Star, Axial XL | 98% | |
| Cyprodinil | Switch, Vangard | | |
| Difenoconazole | Inspire brands, Miravis Top | | |
| Trinexapac-ethyl | Moddus, Palisade EC | | |
| S-Metolachlor | Bicep II Magnum brands, Bicep Lite II Magnum, Boundary 6.5 EC, BroadAxe XC, Dual II Magnum brands, Dual Magnum, Sequence, Tavium Plus VaporGrip Technology | 90% | |
| Diquat | Reglone | | |
| Flumetralin | Prime+ | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo SC, Uniform | | |
| Fomesafen | Flexstar, Flexstar GT 3.5, Prefix, Reflex | 85% | |
| Lambda Cyhalothrin | Warrior II with Zeon Technology | | |

(Ex. 5 (SYT_REBATELIT_02745248) at -5251.)

The inclusion of benchmark firms in the control group that employ loyalty rebate programs similar to Syngenta's invalidates Abrantes-Metz's models. The very purpose of Abrantes-Metz's control group was to "estimate[] the effect of loyalty programs on the price premium" by "comparing the distribution of price premia for loyalty products sold by Syngenta . . . with the premia for **non-loyalty products**." (D.E. 378-5 ¶¶ 533-34.) Because Abrantes-Metz's control group benchmark firms also employed loyalty programs, however, she is **not** comparing Syngenta's pricing to "non-loyalty products." Abrantes-Metz thus has no reliable basis to conclude that the differences between Syngenta's pricing and that of BASF/Bayer observed by her models are attributable to Syngenta's AI share-based loyalty rebate

-14-

program.  To the contrary, her models cannot differentiate between the alleged effects of the loyalty rebates at issue and the effects of other, lawful factors.

Because BASF and Bayer also sold loyalty products, any "comparison of performance would not be illuminating." *Nomura*, 2015 WL 539489, at *6.  In *Nomura*, an expert purported to "conduct[] regression analyses that compared the performance of" loans that were allegedly improperly underwritten "to the performance of three benchmark groups of loans" that supposedly "lack[ed] the problems—such as noncompliance with underwriting guidelines and inflated appraisals—that allegedly plagued the [at-issue] loans." *Id.* at *2.  The expert, however, "failed to demonstrate that the benchmarks [were] sufficiently clean to serve as reliable control groups." *Id.* at *11.  The court excluded his opinions because the failure to demonstrate a clean control group was a "flaw large enough that [the expert] lack[ed] good grounds . . . for his conclusions." *Id.*; *see also Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, 2016 WL 7373857, at *6-8 (D. Kan. Dec. 20, 2016) (excluding regression models where control group included "the variable being tested").

The same is true here, and the same result is warranted.  Abrantes-Metz set out to compare "loyalty products sold by Syngenta" to a control group of "non-loyalty products" (D.E. 378-5 ¶ 534), but her own chosen control group contains loyalty products.  As a result, she "lacks good grounds" to conclude that her models isolate the effect of Syngenta's loyalty rebates and her models

-15-

should be excluded as unreliable. *Nomura*, 2015 WL 539489, at *5, 11; *UBS*, 2016 WL 7373857, at *6-8.

In her reply report, Abrantes-Metz tries to salvage her models by stating (for the first time) that she does "not assert that [her] but-for world is one in which there is no loyalty program," but rather "one in which Syngenta" does not "undertake *anticompetitive* loyalty programs." (D.E. 381-2 ¶ 253.) That belated explanation cannot save her models because she has not established that the BASF and Bayer loyalty programs are *not* anticompetitive and offers no such opinion.

Abrantes-Metz does not purport to conduct any of the analyses, or offer any of the conclusions, with respect to BASF and Bayer, that undergird her opinion that the Syngenta loyalty programs are anticompetitive. In her opening report, for example, Abrantes-Metz purports to analyze whether the challenged Syngenta programs excluded "rivals or potential rivals from competing for a portion of sales in the market," "diminished rival generic scale, reduced entry of some generic competitors, and induced the exit of others." (D.E. 378-5 ¶ 489; *see also id.* § VII.) Regardless of whether that analysis is valid and reliable, Abrantes-Metz does not apply it to the BASF and Bayer rebate programs and offers no analogous conclusions.

Abrantes-Metz faults Syngenta's expert for *not* offering an opinion on the anticompetitive effects of the BASF and Bayer rebates (*id.* ¶ 260), but it was

-16-

Plaintiffs' burden to show that their control group was sufficiently clean—not Syngenta's. *Nomura*, 2015 WL 539489, at *11; *UBS*, 2016 WL 7373857, at *7; *see also Hudak*, 156 F.4th at 409. Abrantes-Metz says that her benchmarks "remain reasonable"[4] because she purports to identify certain differences between the Syngenta rebates and the BASF and Bayer rebates, such as the ▬▬▬▬▬▬▬▬▬▬▬. (D.E. 381-2 ¶¶ 254-59.) But these superficial distinctions are no substitute for an analysis of, and opinion on, the anticompetitive effects of the BASF and Bayer programs. Abrantes-Metz discussed in her opening report economic literature that purports to identify attributes of loyalty discounts that cause anticompetitive effects. (D.E. 378-5 ¶ 202.) But in her reply report, faced with the need to differentiate between Syngenta's allegedly anticompetitive loyalty rebates and BASF's and Bayer's programs, Abrantes-Metz does not analyze whether BASF's or Bayer's loyalty programs have the attributes set forth in the literature discussed in her opening report.

---

[4] The question is not whether Abrantes-Metz's benchmarks are "reasonable," as she belatedly asserts, but whether they can isolate the effect of Syngenta's allegedly anticompetitive loyalty rebates by, in her own words, comparing Syngenta's prices to prices on "non-loyalty products." *See In re Zetia*, 566 F. Supp. 3d at 514; (D.E. 378-5 ¶ 534.) Her benchmarks fail at that task, because BASF and Bayer employed their own AI-share-based loyalty rebate programs during the relevant period.

In any event, the data confirm that the inclusion of BASF and Bayer loyalty products in Abrantes-Metz's control group renders her models unreliable. ███████████████████████████████████████████

███ ████████████ ███████████████████████████████████████

████████ (D.E. 380-1 fig. 5.) ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

(D.E. 381-2 figs. 31-32.) Nowhere in her reply report does Abrantes-Metz offer the opinion that the variations in generic performance relative to Syngenta that she observes show that the BASF and Bayer programs were *not* anticompetitive. Instead, she simply assumes that her benchmarks "remain reasonable" and that any difference in pricing she observes is attributable to Syngenta's allegedly anticompetitive rebates. (*Id.* ¶ 254.) "Under *Daubert*,"

-18-

however, "something as fundamental . . . as the quality of [her] control group cannot be assumed." *Nomura*, 2015 WL 539489, at \*7.[5]

At bottom, Abrantes-Metz invites the Court to assume that her models show a but-for world free from anticompetitive loyalty rebates. But assumptions supported only by the *ipse dixit* of the expert are the "hallmark of an unreliable opinion." *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 296 (4th Cir. 2021).[6] Abrantes-Metz has not offered an opinion, based on sufficient facts and reliable methods, that the BASF and Bayer loyalty programs—which resemble the Syngenta rebate programs in material ways—are *not* anticompetitive. As a result, she "did not employ a hypothetical 'but-for world' free of the allegedly anticompetitive conduct." *In re Zetia*, 566 F. Supp. 3d at 514. Her models thus "would not aid the trier of fact in assessing the [e]ffect of the alleged antitrust violation," and are inadmissible. *Id.*

---

[5] Elsewhere in her reply report, Abrantes-Metz performs a revised regression analysis comparing the Syngenta price premia to the price premia for Bayer products only, excluding BASF from her benchmark, and again purports to find a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (D.E. 381-2 fig. 27.) This does not save her models, however, because, as discussed, Bayer operated its own "Key AI" rebate program during the 2021 and 2022 crop years.

[6] Indeed, certain of Abrantes-Metz's attempts to distinguish BASF's and Bayer's loyalty programs make no sense. For example, Bayer had a rebate program substantially identical to Syngenta's, but Abrantes-Metz disregarded it because it lasted "only" two years (more than a quarter of an approximately seven-and-a-half year relevant period). Abrantes-Metz does not explain why this supposed distinction matters.

### B. Abrantes-Metz Fails to Control for Relevant Differences Between Syngenta and Her Benchmarks

Even assuming, contrary to fact, that Abrantes-Metz had shown that the BASF/Bayer loyalty programs were *not* anticompetitive, her overcharge estimates would still be unreliable because her models fail to adequately control for other variables. A benchmark is valid only if it controls for factors "extraneous to the antitrust dispute." Areeda & Hovenkamp ¶ 392g. "Stating that a benchmark controls for *all* factors does not make it so." *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019). The proponent of the benchmark must instead identify factors that could account for differences in pricing observations and "eliminate those factors, specifically using the relevant data." *Id.* A comparison that "simply assumes—without further examination—that the difference in average" prices between the treatment group and control group "is due entirely to [the] allegedly anticompetitive conduct" is inadmissible. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975-76 (C.D. Cal. 2012).

Here, Abrantes-Metz's benchmark methodology did not control for salient differences between Syngenta and BASF and Bayer. (D.E. 380-1 ¶¶ 49-53.) For example, BASF and Bayer have seeds businesses that are either more profitable or larger than Syngenta's. In 2022, the gross margin for BASF's seed business was 77.5%, considerably higher than Syngenta's, and Bayer's

seed business was approximately six times the size of Syngenta's with margins approaching 50%, also higher than Syngenta's. (Ex. 6 (CRTVA-CPL-01924192) at -4199 (cited at D.E. 380-1 n.92).) And Syngenta understood that Bayer was ████████████████████████████████████████████████████ (Ex. 7 (SYT_REBATELIT_00600666) at pp. 4-5.) To the extent that Abrantes-Metz's benchmark firms were prioritizing margins on their seed businesses over their CPP businesses, or using margins on seeds to subsidize lower prices on CPPs, those differences could explain the difference in pricing that Abrantes-Metz observes between Syngenta and BASF and Bayer. Abrantes-Metz's models do not, however, control for differences in product margins or pricing strategies between Syngenta and BASF and Bayer.

Abrantes-Metz claims there was no need to control for these issues because there is no evidence that BASF and Bayer had the requisite market power necessary to prioritize margins on seeds at the expense of CPPs. (D.E. 381-2 ¶ 249.) She asserts that if BASF and Bayer did not have market power, they would have set their prices equal to marginal cost, and could not have discounted CPPs relative to seeds. (*Id.* ¶ 249 n.419.) But the margin data discussed above refute this claim, and Abrantes-Metz admitted during her deposition that Bayer did not price "close to cost." (Ex. 1 330:24-331:2.). In other words, BASF and Bayer were not "price takers" incapable of employing differential pricing strategies. Rather, they possess the economic market

power necessary to price above marginal costs, and Abrantes-Metz does not address these data or claim otherwise. At the very least, these numbers show that BASF and Bayer were capable of pursuing a strategy of maximizing seed margins at the expense of CPPs or using their seed businesses to subsidize lower CPP prices.

Abrantes-Metz's models fail to control for this possibility and thus cannot exclude the possibility that differences in the price premia between Syngenta's branded CPPs and BASF's/Bayer's are attributable in whole or in part to BASF's and Bayer's business strategies, rather than the allegedly anticompetitive loyalty rebates. This failure is yet another reason why Abrantes-Metz's overcharge models are not reliable to show injury caused by Syngenta's allegedly anticompetitive conduct. *See In re Wholesale Grocery*, 946 F.3d at 1002-03 (affirming the exclusion of expert testimony that was "ultimately speculative" since it failed to account for certain "economic realities," even where the model did include some regression analysis); *In re Live Concert*, 863 F. Supp. 2d at 975-76 (excluding benchmark testimony because the expert failed to analyze whether differences in product popularity accounted for observed pricing differentials).[7]

---

[7] *See also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 462-63 (S.D.N.Y. 2025) (without deciding "one way or the other" whether an "obvious" alternative explanation of the difference between the allegedly suppressed LIBOR and the benchmark Eurodollar deposit rate in fact

## II. Abrantes-Metz's *Average* Estimate of Overcharge Cannot Establish That All or Nearly All Class Members Were Injured

Abrantes-Metz's overcharge models should also be excluded because they measure *averages* that cannot show whether all or nearly all individual class members were injured.

Abrantes-Metz does not dispute "that farmers' prices"—the individual prices paid by members of the proposed class—can "vary for slightly different reasons for one person versus another." (Ex. 1 465:20-466:21.) Nor does she dispute evidence showing that putative class members purchased many different combinations of different CPPs, all with different prices, and even paid different prices when purchasing the *same* CPP. (D.E. 380-1 ¶¶ 30-31, fig. 4.) And Abrantes-Metz concedes that "variation in the prices paid by farmers is directly relevant to the question of whether all or nearly all members of the proposed class paid an overcharge." (Ex. 1 466:22-467:14.) She does not, however, "attempt[] to explain all of the reasons by which farmers'

---

caused the difference, excluding an expert report for failing to control for that alternative explanation), *appeal dismissed sub nom. In re Libor-Based Fin. Instruments Antitrust Litig. v. The Royal Bank of Scotland PLC*, 2025 WL 4092207 (2d Cir. Dec. 10, 2025); *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1113-14 (D. Utah 2023) (finding the plaintiff failed to demonstrate that class certification under Rule 23(b)(3) was appropriate for several independent reasons, including that its expert's benchmark methodology was "unable to 'bridge the differences between supra-competitive prices in general and supra-competitive prices attributable'" to the plaintiff's expert's theory of anticompetitive harm) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013)).

-23-

price is moving." (*Id.* 465:20-466:21.) Instead, as discussed above, she models only an *average* overcharge. In other words, Abrantes-Metz's models **do not** estimate the price that any *individual* class member would have paid in a but-for world without Syngenta's allegedly anticompetitive rebates.

Where, as here, different class members purchase different products at different prices in different locations for treating different pests on different crops based on different market conditions, an average overcharge cannot prove injury on a class-wide basis. As the court in *North Brevard County Hospital District v. C.R. Bard, Inc.* ("*Bard*") explained, use of an overcharge benchmark is "inappropriate" to assess injury caused by alleged monopolization of "differentiated product markets with heterogeneous customers and individualized pricing." 710 F. Supp. 3d 1090, 1109 (D. Utah 2023). Unlike the market in a price-fixing case, the market in *Bard* had "no standard price, no standard product, and no standard purchaser." *Id.* at 1111; *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 175-76 (C.D. Cal. 2007) ("proof of fact of injury" outside of the price-fixing context "requires much more than a simple showing that the plaintiffs purchased an item in a world where average prices were inflated"). The *Bard* court reasoned that, in such a market, "there [was] no reason to assume—as [the expert had]—that Bard's conduct affect[ed] purchasers equally and in the same way." 710 F. Supp. 3d at 1111. Rather, a "30% [average] overcharge

-24-

could mean half of the class was not overcharged at all and the other half paid a 60% overcharge." *Id.* The *Bard* court accordingly, and appropriately, denied class certification. *Id.* at 1114.

The same reasoning explains why Abrantes-Metz's average overcharge cannot assist the trier of fact in this case. As discussed above, the geographic markets in this case are variable, and customers purchase varying mixes of products at differing prices from different third-party retailers. *Supra* 5-6. An average overcharge methodology that smooths out, rather than accounting for, such heterogeneity cannot reliably demonstrate that all or nearly all class members were injured. *Bard*, 710 F. Supp. 3d at 1109; *Anderson v. Lab. Corp. of Am. Holdings*, 2023 WL 1970953, at \*10 (M.D.N.C. Feb. 13, 2023) ("It is well established . . . that averages can mask significant variation across individual cases." (collecting cases)).

Abrantes-Metz's methodology is particularly unreliable because she does not estimate an average overcharge for each Syngenta product containing an at-issue AI. Her work is much more aggregated and averaged than that. Abrantes-Metz concludes that the prices of Syngenta's CPPs were inflated because the difference between the price of Syngenta's branded CPPs and generics was higher, ***on average***, than the price premium for BASF/Bayer CPPs. (D.E. 380-1 ¶ 56.) When the price premia calculated by Abrantes-Metz are broken down to the CPP-by-CPP level, however, the data show that certain

Syngenta straight CPPs were sold at a lower brand premium than the average brand premium charged for straight BASF and Bayer CPPs. (*Id.*) Specifically, ███ of Syngenta's straight CPPs had a lower brand premium than that of the average BASF and Bayer straight CPP. (*Id.* figs. 6-7.) Abrantes-Metz does not dispute this analysis or explain why growers would have been overcharged if they purchased straight CPPs sold at a lower brand premium as compared to the average BASF/Bayer brand premium. Her average overcharge estimate instead obscures the question, which only confirms that individualized inquiry in this case is necessary.

In a case like this one, where only ███ of purchasers purchased all of the at-issue AIs, and where certain Syngenta straight CPPs were sold at a lower brand premium than Abrantes-Metz's competitive benchmark (*id.* ¶¶ 27, 56, figs. 3, 6-7), the "use of averages to determine classwide injury . . . masks uninjured class members" and cannot support class certification. *See In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 713, 720-21 (E.D. Pa. 2020); *see also In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (explaining that a statistical model in which the alleged conspiratorial overcharge is assumed to be the same for all purchasers and throughout the entire class period "cannot serve to establish that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct"); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009)

("Measuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy."); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) ("By looking only at an average price trend, [plaintiff's expert's] model obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data.").

To avoid the obvious problems caused by her use of averaging, Abrantes-Metz theorizes there must be a common pricing structure for Syngenta CPPs, meaning that the prices paid by different customers for the same product were correlated. Abrantes-Metz employs her common price structure theory to argue that if the price paid by some customers was elevated above competitive levels by Syngenta's rebates, then it necessarily follows that the prices paid by all or nearly all other customers must also have been inflated.

This theory is itself infected by the same fatal averaging issues that it was intended to remedy. Abrantes-Metz does not test whether prices paid by individual growers are correlated for a given product. (D.E. 380-1 ¶ 64.) Her price structure analysis for growers is instead based on an analysis of average prices across aggregated groups of growers at the state or a size-quintile level. (*Id.*) This averaging smooths out and masks any price variation between individual growers within the same state or group.

Further, as discussed above, Abrantes-Metz does not dispute that her benchmark model does not purport to show an overcharge for all Syngenta CPPs containing at-issue AIs. *Supra* 25-26; (*see also* D.E. 380-1 figs. 6-7.) Even if the prices paid by different customers for the same CPP were correlated, that would not imply an overcharge where Abrantes-Metz's own data show that a particular CPP was sold at a lower brand premium relative to the average BASF/Bayer benchmark premium. As a result, even assuming some degree of price correlation, whether an individual class member was overcharged would still depend on an analysis of the specific CPPs purchased by each individual class member. Abrantes-Metz's average overcharge model thus cannot show injury for all or nearly all class members through common proof.

**CONCLUSION**

Abrantes-Metz's opinions on class-wide injury should be excluded because they are the product of unreliable benchmark models that fail to isolate the effect of the alleged anticompetitive conduct and report only an average estimated overcharge that cannot reliably prove that all or nearly all class members were injured.

-28-

Date: April 27, 2026

/s/ Patrick M. Kane
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
P.O. Box 21927 (27420)
Greensboro, NC 27401
Telephone: 336.378.5200
Facsimile: 336.378.5400

Jesse Solomon*
jsolomon@paulweiss.com
Benjamin M. Miller*
bmiller@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
Telephone: 202.223.7300

William B. Michael*
wmichael@paulweiss.com
Paul D. Brachman
pbrachman@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212.373.3000
Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com
Michael Scheinkman*
michael.scheinkman@davispolk.com
David B. Toscano*

-29-

david.toscano@davispolk.com
Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

* Specially appearing under L.R. 83.1(d)

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

-30-

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing brief complies with Local Rule 7.3(d) in that it contains fewer than 6,250 words as reported by word processing software.

This the 27th day of April, 2026.

/s/ Patrick M. Kane
Patrick M. Kane (N.C. Bar No. 36861)

-31-

<h1 style="text-align:center">CERTIFICATE OF SERVICE</h1>

I hereby certify that on April 27, 2026, I caused to be served upon counsel of record for the parties in this action via email this Memorandum of Law in Support of the Syngenta Defendants' Joint Motion to Exclude the Expert Testimony of Dr. Rosa Abrantes-Metz.

*/s/ Patrick M. Kane*

Patrick M. Kane (NC Bar No. 36861)

-32-